IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| ) | |
| ) | |
| PETER ACKERMAN, ) | |
| ) | |
| Plaintiff, ) | No. 1:08-cv-00279 (HHK) |
| ) | |
| v. ) | No. 1:08-cv-00722 (HHK) |
| ) | |
| UNITED STATES, ) | No. 1:08-cv-01136 (HHK) |
| ) | |
| Defendant. ) | |
| ) | |
| ) | |

**UNITED STATES'S COMBINED STATEMENT OF THE CASES
AND STATUTORY BASIS OF ALL CAUSES OF ACTION AND DEFENSES**

The United States respectfully submits this combined statement of the

cases and statutory basis of causes of action and defenses covering each of

*Ackerman I* (No. 1:08-cv-00279); *Ackerman III* (No. 1:08-cv-00722); and *Ackerman IV*

(No. 1:08-cv-01136), because all three complaints relate to, or arise from, *Santa*

*Monica Pictures LLC v. Commissioner of Internal Revenue,* T.C. Memo. 2005-104

("*Santa Monica Pictures*").  The *Santa Monica Pictures* opinion is attached as

Exhibit 1.[1]

---

[1] Along with this combined statement, the United States is submitting a separate statement for
*Ackerman II* (No. 1:08-cv-0657), because it does not relate to *Santa Monica Pictures.*

I.      **Statutory basis of causes of action and defenses**

    A.      *Ackerman I* (No. 1:08-cv-00279)  -- *"computational adjustment"*

Plaintiff, via a trust, was a member (effectively a partner) in a limited liability company Santa Monica Pictures LLC ("Santa Monica Pictures" or "SMP").  The United States challenged over $300 million of losses claimed by SMP and related entities on their partnership returns for 1997 and 1998.  The Tax Court, *inter alia,* agreed with the United States that such losses should be disallowed.  See *Santa Monica Pictures,* T.C. Memo. 2005-104, *passim.*

In this first of his four complaints, plaintiff pleads a claim for a tax refund of approximately $24 million because of an alleged erroneous computational adjustment by the United States in applying the Tax Court's decision in *Santa Monica Pictures* to plaintiff's individual income tax liability for tax years 1997 – 2003.  Plaintiff pleads his cause of action for erroneously and illegally collected tax under the Tax Equity and Fiscal Responsibility Act of 1982 ("TEFRA") provision codified at 26 U.S.C. §6230(c)(3) in combination with 28 U.S.C. §1346(a).[2]

---

[2] Plaintiff also pleads jurisdiction under 28 U.S.C. §1340 but that provision is "not a waiver of sovereign immunity and consent to be sued must be found in some other statute." Wright, Miller & Cooper, *Federal Practice & Procedure:  Jurisdiction 2d* §3580, pp. 267-70.  By contrast, 28 U.S.C. §1346(a) and 26 U.S.C. §6230(c)(3), when conjoined with the provisions of the Internal Revenue Code including those setting forth the requirements of exhaustion of administrative remedies (i.e., a properly and duly filed administrative refund claim) and satisfaction of the applicable statutes of limitation do constitute a waiver of sovereign immunity.  *See e.g.,* 26 U.S.C. §§6230(c)(2)(A), 6511, 6512(a), 6532, 7422.

The United States has pleaded numerous defenses including:

- lack of subject matter jurisdiction because plaintiff's informal claims were not "refund" claims because they were filed before plaintiff paid the tax liabilities due and owing; see 26 U.S.C. §§6230(c)(1) & (3), 6511(a), 7422(a) & (h).

- to the extent plaintiff pursues a non-TEFRA theory of liability, lack of subject matter jurisdiction because plaintiff has separately filed petitions with the Tax Court for tax years 1997, 1998, 2000, and 2002; see 26 U.S.C. §6512(a);

- failure to state a claim because many of the items claimed do not qualify as "computational adjustments"; see 26 U.S.C. §§6230(c), 6231(a)(6);

- settlement and bar because of the settlement of *Santa Monica Pictures* under which the United States issued checks to plaintiff and his wife totaling over $29.1 million (see *Ackerman IV* complaint, Ex. F);

- plaintiff must establish that he (and not he and his wife) paid the tax liability at issue in order to claim the refund. See 26 U.S.C. §6402(a). The original *Ackerman I* complaint named both Peter Ackerman and his wife Joanne Leedom-Ackerman as plaintiffs. (No. 1:08-cv-00279, PACER #1.)

B.     *Ackerman III* (No. 1:08-cv-0722) – *"failure to pay"*

On January 18, 2006, the United States issued its notice and demand for payment for the tax, penalties, and interest that plaintiff and his wife owed as a result of the *Santa Monica Pictures* decision.  Plaintiff did not immediately pay the tax liabilities due and owing; specifically, plaintiff and his wife did not completely pay these liabilities until October 23, 2006.  Consequently, a statutory "failure to pay" ("FTP") penalty began accruing in January 2006 at a rate of 0.5% per month.  See 26 U.S.C. §6651(a)(3).  By this third Ackerman complaint brought under 28 U.S.C. §1346(a)(1)[3], plaintiff claims a refund of the approximately $3 million FTP penalties that accrued prior to October 23, 2006.  Plaintiff asserts that he is not liable for these penalties because his failure to pay in a timely fashion is "due to reasonable cause and not due to willful neglect." See 26 U.S.C. §6651(a)(3).

The United States has pleaded numerous defenses including:

- lack of subject matter jurisdiction because plaintiff has separately filed petitions with the Tax Court for tax years 1997, 1998, 2000, and 2002; see 26 U.S.C. §6512(a);

- plaintiff did not exercise ordinary business care and prudence in preparing in advance for payment of his tax liability and, in any event, was able to pay the tax on the due date in January 2006 without undue

---

[3] With regard to plaintiff's pleading of jurisdiction under 28 U.S.C. §1340, see footnote 2, above.

hardship; see 26 U.S.C. §6651(a)(3); 26 C.F.R. §§53.6161-1(b) & 301.6651-1(c)(1).

- plaintiff must establish that he (and not he and his wife) paid the tax liability at issue in order to claim the refund; see 26 U.S.C. §6402(a).

C.    *Ackerman IV* (No. 1:08-cv-01136) – *"§6662 accuracy-related penalty"*

The *Santa Monica Pictures* decision held that the 40% "gross valuation misstatement" accuracy-related penalty of 26 U.S.C. §6662 applied to the disallowed partnership losses that exceeded $300 million. *Santa Monica Pictures,* 2005-104 at **95 – 112. That 40% penalty flowed through to plaintiff's personal tax liability for all tax years from 1997 – 2003. By this fourth complaint, again brought under 28 U.S.C. §§1346(a)(1), plaintiff seeks a total refund of $27.8 million.[4] Plaintiff claims he is not liable for these §6662 penalties because of the "reasonable cause" and "good faith" defense of 26 U.S.C. §6664(c)(1).

Plaintiff did not file this complaint until June 30, 2008; the United States' answer is not due until early September; and it has not yet had the opportunity thoroughly to analyze *Ackerman IV*. The United States tentatively expects to assert at least the following defenses:

- lack of subject matter jurisdiction because plaintiff's cause of action, if properly pleaded, would be subject to TEFRA's six month statute of limitations; see 26 U.S.C. §§6230(c)(1)(C) & (c)(2)(A), 6230(c)(3), 7422(a);

---

[4] With regard to plaintiff again also pleading jurisdiction under 28 U.S.C. §1340, see footnote 2 above.

- settlement and bar because of the settlement of *Santa Monica Pictures* under which the United States issued checks totaling $29.1 million to plaintiff and his wife (see *Ackerman IV* complaint, Ex. F);

- collateral estoppel/issue preclusion resulting from *Santa Monica Pictures*; see *Santa Monica Pictures*, T.C. Memo. 2005-104 at **101 – 112 (rejecting the partnership's claim of "reasonable cause" and "good faith").

- plaintiff must establish that he (and not he and his wife) paid the tax liability at issue in order to claim the refund. 26 U.S.C. §6402(a).

## II.    Combined statement of the cases

"Peter Ackerman is a successful businessman. . . . From 1978 to 1989, Mr. Ackerman worked at Drexel Burnham . . . with Michael Milken in the high-yield and convertible bond department.  While there, he was exposed to buying and selling high-yield bonds, recapitalizing (leveraging) companies, restructuring troubled businesses, and financing and investing in businesses."  *Santa Monica Pictures, LLC v. Commissioner of Internal Revenue*, T.C. Memo. 2005-104 at *3.  The United States contends that Ackerman's decade at Drexel transformed him into an unusually sophisticated investment banker and transactional businessman; an individual with a profound understanding of complicated business transactions, especially including their tax implications.

Ackerman departed Drexel in 1990 relatively unscathed.  *See, e.g., Business Week*, June 8, 1992, p. 92 ("The Drexel Debacle's 'Teflon Guy':  Peter Ackerman,

Milken's mysterious right-hand man, will emerge with about $500 million")
(available Westlaw "allnews" file).  For the next several years, Ackerman was
involved in various pursuits.  One such pursuit, an Ackerman-related limited
liability company ("Santa Monica Pictures" or "SMP") created in December 1996,
is the genesis of three of the four Ackerman tax refund complaints currently
before the Court.

    A.    *Santa Monica Pictures:*  **a deal "too good to be true"**

  Santa Monica Pictures was purportedly created to enter the film
distribution business, but its portfolio of films consisted in only some low value
"B film titles" (e.g., "Banana Monster", ""Plutonium Baby", "SS Experimental
Love Camp") with but "fragmented chain-of-title history, and limited or expiring
distribution rights" to boot.  *Santa Monica Pictures*, T.C. Memo. 2005-104 at **21,
22 and 64.

    Soon after its creation, SMP entered into various further transactions with
the result that on "its partnership tax returns for 1997 and 1998, SMP claimed
capital losses totaling, altogether, about $300 million from these various
transactions.  These claimed losses passed through for the primary benefit of Mr.
Ackerman."  *Santa Monica Pictures,* T.C. Memo. 2005-104 at *1.  For example,
"Peter and Joanne Ackerman filed joint Federal income tax returns for 1997 and
1998.  On their 1997 return, the Ackermans reported a net long-term capital loss
from SMP of $213,715,813 and a net short term capital loss from SMP of
$11,545,023. . . . On their 1998 return, the Ackermans reported a net long-term

capital loss from SMP of $80,190,418." *Santa Monica Pictures,* T.C. Memo. 2005-104 at *37. These losses offset Ackerman's real capital gains on which he otherwise would have had to pay real tax in 1997 and 1998. These SMP generated losses also carried-over and substantially reduced plaintiff's real tax bill in later years through 2003.

The United States subsequently challenged and disallowed the hundreds of millions of SMP and related partnership claimed capital losses. *See Santa Monica Pictures,* T.C. Memo. 2005-104 at *2, 37-38. These claimed losses were litigated via a TEFRA partnership proceeding. On May 11, 2005, in a careful, detailed, and exhaustive 133 page opinion, the Tax Court agreed with the United States. *Santa Monica Pictures*, T.C. Memo. 2005-104, *passim.* See Exhibit 1 attached. In holdings that the United States contends will be fatal to Ackerman's complaints here, the Tax Court found, *inter alia,* that:

> In substance, the Ackerman group paid the banks $10 million . . . in exchange for the banks' high-basis, low-value receivables and SMHC stock so that . . . the Ackerman group could attempt to exploit, the tax attributes associated with these assets. . . . [T]he economic realities lead us to conclude that this $10 million amount was paid, not as an inducement for entering into the partnership, but for the *$1.7 billion* in tax attributes that the Ackerman group acquired in the transaction. . . .
>
> [T]he transaction between the Ackerman group and CDR, Generale Bank, and CLIS, had no economic purpose. The transaction's sole purpose was to transfer approximately *$1.7 billion* in tax losses from the banks to [Ackerman's] Somerville S Trust in exchange for a $10 million cash payment. Although these transfers were accomplished using the partnership basis rules, it seems evident that Congress did not envision these rules' being used merely as a vehicle to transfer built-in losses from a tax-indifferent party to an interested purchaser pursuant to a prearranged plan.

*Santa Monica Pictures,* T.C. Memo. 2005-104 at *54, 64, 76, 80, 100 (emphases supplied).  Any "reasonable and prudent person", including the highly experienced and sophisticated Ackerman, well knew that acquiring $1.7 billion in tax-attributes for but a mere pittance, i.e., for but $10 million, "was 'too good to be true.'"  *Santa Monica Pictures,* T.C. Memo. 2005-104 at *99.

Not only did the Tax Court agree with the United States that the approximately $300 million of tax losses should be rejected, the Court in its May 2005 opinion also agreed that the 40% "gross valuation misstatement" accuracy-related penalty of 26 U.S.C. §6662 applied.  *Santa Monica Pictures,* T.C. Memo. 2005-104 at *95 – 101.   The Tax Court thoroughly addressed, and rejected, the partnership's assertion of the 26 U.S.C. §6664(c)(1) "reasonable cause" and "good faith" defense.  *Santa Monica Pictures,* T.C. Memo. 2005-104 at *101 – 112.  The United States contends plaintiff is bound by all of these Tax Court findings, particularly with respect to *Ackerman IV* where plaintiff, too, asserts the "reasonable cause" and "good faith" defense.

**B.    Plaintiff's claims in *Ackerman III* fail**

**1.    Plaintiff has no excuse for his failure timely
to pay the tax upon demand in January 2006**

Having lost before the Tax Court, an appeal was taken to the Second Circuit Court of Appeals in mid-2005.  However, the pendency of that appeal – despite plaintiff's assertion in *Ackerman III* – furnishes no excuse for not preparing to pay the coming tax bill.  Upon learning of the May 11, 2005, adverse

Tax Court opinion, plaintiff was legally required to marshal his assets and finances so as to be able timely to pay the tax bill that was surely to arrive.

Plaintiff had over eight months to do what was needed in order to be able to pay the taxes, penalties, and interest consequent upon the *Santa Monica Pictures* decision.  It was not until January 18, 2006, that the United States completed its calculations of the multi-year impact of the *Santa Monica Pictures* decision on Peter and Joanne Ackerman's income tax liability.  On that date, the United States assessed plaintiff and his wife for well over $100 million of tax, penalties, and interest for tax years 1997 -- 2003; demanded payment; and also mailed them the notice of computational adjustment that explained, in great detail, the calculation of the total amount due.  (See Exhibit A to each of *Ackerman I, Ackerman III,* and *Ackerman IV* complaints.)

Plaintiff provides many excuses for his failure to pay in a timely fashion, such as the pendency of the appeal, that the Department of Justice "conceded a key point" from the Tax Court ruling, and eventually entered an "unprecedented settlement."  Plaintiff also relies on his *Ackerman I* challenges to the January 18, 2006 notice of computational adjustment.  See *Ackerman III,* amended complaint, Ex. I, pp., 7-8, 12-13, 17-18, 22-23, 27-28, 32-33, 37-38.  The United States contends that none of these excuses constitute legally cognizable defenses for a failure to pay tax when due.  See 26 U.S.C.  §6651(a)(3).

Plaintiff also complains that, despite his considerable wealth, he "did not have sufficient liquid assets to write a check for the total amount reflected in the

IRS bills." *Id.*, Ex. 1, pp. 8, 13, 18, 23, 28, 33, 38. This excuse also falls because a taxpayer who invests funds in illiquid assets has not exercised ordinary business care unless the remainder of his assets and income are sufficient to pay the tax. See 26 C.F.R. §53.6161-1(b).

Finally, discovery may show that plaintiff expected to profit from delaying payment to the United States in 2006. Such strategic borrowing from the government is precisely what the failure to pay penalty is intended to deter.

## 2.    In 2006, plaintiff filed petitions in the Tax Court for 1997, 1998, 2000, and 2002 that for those years bar *Ackerman III* subject matter jurisdiction

On July 19, 2006, plaintiff filed a Tax Court petition for tax years 1997, 1998, and 2000. This petition was amended in September 2006 and in January 2008 to raise additional issues. On December 22, 2006, plaintiff filed a second Tax Court petition for 2002. That petition, too, was amended in January 2008 in order to challenge further matters.

For whatever reason, plaintiff did not raise the failure to pay penalties in either petition, or in any amendment. These two Tax Court petitions bar *Ackerman III* subject matter jurisdiction for the tax years before the Tax Court: "if the taxpayer files a petition with the Tax Court . . . no credit or refund of income tax for the same taxable year . . . to which such petition relates . . . shall be allowed . . . except . . . as to overpayments determined by a decision of the Tax Court which has become final. . . ." See 26 U.S.C. §6512(a). "The Tax Court's

jurisdiction, once it attaches, extends to the entire subject of the correct tax for the

particular year." *Erickson v. United States,* 309 F.2d 760, 767 (Ct.Cl. 1962).[5]

> **C.     Subject matter jurisdiction does not exist for *Ackerman I* or *Ackerman IV* because plaintiff did not timely file an administrative claim for refund for either**

As *Ackerman III* lacks jurisdiction, so too do *Ackerman I* and *Ackerman IV*

fall for that reason.

The United States mailed the notice of computational adjustment to

plaintiff on January 18, 2006.  *See e.g., Ackerman IV,* complaint, Ex. A, p. 2.  For the

claims asserted in each of *Ackerman I* and *Ackerman IV,* plaintiff then had six

months from January 18, 2006, properly to pay the tax, penalties, and interest,

and then file an administrative refund claim.  See 26 U.S.C. §6230(c)(1)(A) & (C)

and §6230(c)(2)(A) (individual partner in TEFRA partnership has six months to

file administrative refund claim for either of (1) claim that government made

erroneous computational adjustment (i.e., *Ackerman I)* or (2) claim that

government "erroneously imposed any penalty . . . which relates to an

adjustment to a partnership item" (i.e., *Ackerman IV*).)  Because plaintiff did not

comply with this six month statute of limitation, subject matter jurisdiction is

therefore lacking for each *Ackerman I* and for *Ackerman IV* as follows*:*

---

[5] Furthermore, plaintiff's Tax Court petitions are relevant beyond *Ackerman III.*  No fewer than seven items raised in *Ackerman I* were also raised before the Tax Court and have either been settled or are still in litigation there.  See *Ackerman I,* amended complaint, Ex. D, p. 2 (four separate cited claims relating to Central European Foods, Metrocash, Vesura, and Arc Spectrum were raised before the Tax Court but have been resolved ); Ex. D, pp. 2-3 (two cited claims relating to Economy Color Card and US Technologies Corporation currently before Tax Court); Ex. C, pp. 2-3 (item B.3 relating to "passive" versus "active" classification of International Service Investors ("ISI") losses currently before Tax Court).

- *Ackerman I:* On February 21, 2006, and March 28, 2006, and therefore within the six month statute of limitations, plaintiff did file what he now asserts were informal claims for refund citing numerous supposed erroneous computational adjustments. (See Exhibits B and C to *Ackerman I* complaint.)[6] However, Ackerman had made no payment before those letters and did not make complete payment of his tax liability until October 23, 2006. (See *Ackerman IV* complaint, ¶7 & Ex. E.) Exhibits B and C cannot be a claim for a *refund,* but only a claim for an *abatement* of unpaid tax liabilities. But sovereign immunity is only waived if a "claim for *refund*" is "duly filed" after the payment of tax. See 26 U.S.C. §7422(a) (emphasis supplied). Here it was not.

- *Ackerman IV:* The January 18, 2006 notice of computational adjustment clearly identified and explained, including providing the specific amounts, that Ackerman was being assessed with the 40% "gross valuation misstatement" accuracy-related penalty under 26 U.S.C. §6662 for each tax year from 2003 back to 1997. E.g., *Ackerman IV* complaint, Ex. A, pp. 12-13, 22-23, 33-34, 43-44, 53-54, 65-66, 76-77. However, plaintiff did not file any administrative refund claim with regard to the 40% penalty until October 10, 2007 – nearly 20 months after January 18, 2006. See *Ackerman IV* complaint, ¶10 & Ex. G.

---

[6] The August 16, 2006 letter (Exhibit D to the *Ackerman I* complaint) falls outside of the six month statute of limitations.

Unlike the complaint in *Ackerman I,* the *Ackerman IV* complaint carefully avoids pleading a cause of action under 26 U.S.C. §6230(c)(3). But a taxpayer cannot plead around the administrative refund claim statute of limitations under which the United States has only waived sovereign immunity.[7]

### D.    Ackerman settles *Santa Monica Pictures*

"On May 3, 2007, the Government and Plaintiff resolved the *Santa Monica Pictures* case."  See  *Ackerman III,* amended complaint, ¶10 & Ex. G.  With regard to *Ackerman IV,* perhaps plaintiff made no effort timely to file an administrative refund claim because he expected the 40% accuracy-related penalty to be resolved as part of *Santa Monica Pictures.*  For example, the plaintiff made an early 2006 offer to settle *Santa Monica Pictures* by making certain concessions "in exchange for abatement of all penalties."[8]  In any event, the United States contends that plaintiff's subsequent settlement of *Santa Monica Pictures*, a settlement that resulted in the United States' payment to him of over $29 million, bars both *Ackerman I* and *Ackerman IV*. See *Ackerman IV,* complaint, Ex. F (United States checks written jointly to plaintiff and to his wife totaling over $29.1 million).

---

[7] The Tax Court itself even noted that any separate refund claim by Ackerman in this regard was to be brought under 26 U.S.C. §6230(c)(1)(C).  See *Santa Monica Pictures,* T.C. Memo. 2005-104, nn. 187 & 195.  Section 6230(c)(1)(C) is subject to the six month statute of limitations, i.e., 26 U.S.C. §6230(c)(2)(A), that plaintiff did not satisfy with regard to *Ackerman IV*.

[8] See Latham & Watkins letter to DOJ, May 2, 2006, p. 7.

Plaintiff pleads that the settlement included a carve-out for the *Ackerman III* claim for refund of failure to pay penalties. See *Ackerman III,* amended complaint, ¶10 ("the Government and Plaintiff . . . specifically agreed that the resolution [of *Santa Monica Pictures*] did not address Plaintiff's claims with respect to failure to pay penalties assessed for the years 1997 to 2003"). By contrast, no carve-out for the claims in *Ackerman I* and *Ackerman IV* is to be found.

E.    **If reached, the merits of *Ackerman I* and *Ackerman IV* will be complex and justify a significant discovery window**

*Ackerman I* alleges that the United States made erroneous "computational adjustments" in applying the *Santa Monica Pictures* decision to plaintiff's tax liability. "Computational adjustment" means "the change in the tax liability of a partner which properly reflects the treatment under this subchapter of a partnership item." See 26 U.S.C. §6231(a)(6). Although the text of the amended complaint in *Ackerman I* is deceptively short, the referenced exhibits include numerous claimed items. See *Ackerman I,* amended complaint, Ex. B (four items); Ex. C (at least eleven items comprised of items A.1 to A.5 plus items B.1 to B.6); Ex. D (modifying some prior items and adding ten more claimed items). The United States contends that only Exhibit B *may* properly state claims of erroneous computational adjustment. Exhibits C and D, generally speaking, allege items that are not timely, or are either partnership items that the treatment of which at this point plaintiff may not substantively challenge; see 26 U.S.C. §6230(c)(4); or

constitute non-partnership items that do not qualify as computational adjustments and some of which are independently barred because of plaintiff's filing of two petitions in the Tax Court for tax years 1997, 1998, 2000, and 2002. See above, 26 U.S.C. §6512(a). However, to the extent that some of these many items survive initial challenge, thereby requiring discovery of their underlying merit, thorough discovery may be required perhaps even including extensive discovery relating to the *Santa Monica Pictures* transactions.

Finally, *Ackerman IV* most directly places the propriety of the *Santa Monica Pictures* transactions at issue. In this last complaint, plaintiff alleges that he should be relieved of, and refunded, the 40% accuracy-related penalties totaling $27.8 million because of "reasonable cause" and his "good faith." 26 U.S.C. §6664(c)(1). Plaintiff asserts that he "understood and believed that . . . the French Banks became partners in Santa Monica Pictures, and that they transferred their [$1.7 billion] tax basis to the Santa Monica partnership. The Ackermans had no reason to contemplate that the treatment of the basis was incorrect, or to question the legal advice indicating that it was properly handled." *Ackerman IV*, complaint, Ex. G, pp. 8, 16, 24, 32, 40, 48, 57. Plaintiff claims that the "Tax Court . . . closed its eyes . . . that this was not a shelter but a real business deal, premised upon the French Banks becoming members of a partnership and contributing film properties which the partnership could exploit." *Id.,* Ex. G., pp. 4, 12, 20, 28, 36, 44, 52. Plaintiff also claims to have relied in "good faith" on certain documents from outside advisors (e.g., Sherman & Sterling, Ernst & Young,

Grant Thornton, and Chamberlain, Hrdlicka).  *Id.,* Ex. G, pp. 5, 13, 21, 29, 37, 45, 53.

The United States contends that plaintiff is bound by the specifics of the Tax Court's holdings regarding §6664(c)(1)'s "reasonable cause" and "good faith" defense.  See *Santa Monica Pictures,* 2005-104 at **103 – 112.  In part, plaintiff appears to rely on the exact same documents that the Tax Court has already rejected with regard to the "reasonable cause" and "good faith" defense. *Santa Monica Pictures,* 2005-104 at **103 – 112.[9]

More important,   plaintiff -- an unusually sophisticated and experienced transactional businessman -- is bound by the overarching *Santa Monica Pictures* holding that the exchange of a mere $10 million for $1.7 billion of tax losses to be exploited at Ackerman's leisure was a deal simply "too good to be true." *Santa Monica Pictures,* T.C. Memo. 2005-104 at *99.

The United States therefore expects to bring a motion to limit the ambit of the claimed bases for plaintiff's alleged "good faith."  See 26 U.S.C. §6664(c)(1). However, if the merits of *Ackerman IV* are ever reached, extensive discovery may be required of Santa Monica Pictures' structure and transactions, as well as the parties' intent.

---

[9] The Tax Court in *Santa Monica Pictures* did point out that partner level defenses are reserved for for a "separate refund action following assessment and payment."  *Santa Monica Pictures,* T.C. Memo. 2005-104, nn. 187 & 195.  However, as noted above, the Tax Court specifically indicated that such a refund claim (i.e., leading to *Ackerman IV* here), is to be brought under 26 U.S.C. §6230(c)(1)(C).  See *Santa Monica Pictures,* T.C. Memo. 2005-104, nn. 187 & 195.  Section 6230(c)(1)(C) is subject to the six-month administrative refund claim statute of limitations of 26 U.S.C. §6230(c)(2)(A).

DATED:  July 22, 2008                    Respectfully submitted,


                                          /s/ Joseph E. Hunsader
                                         JOSEPH E. HUNSADER
                                         Trial Attorney, Tax Division
                                         U.S. Department of Justice
                                         Post Office Box 227
                                         Washington, DC 20044
                                         Telephone: (202) 514-0472
                                         Facsimile: (202) 514-6866
                                         Email: Joseph.E.Hunsader@usdoj.gov


OF COUNSEL:
JEFFREY A. TAYLOR
United States Attorney

## CERTIFICATE OF SERVICE

I certify that on July 22, 2008, I caused to be served via the court's ECF system

and U.S. Mail this SCHEDULING CONFERENCE JOINT STATEMENT upon:

> James P. Joseph, Esq.
> Arnold & Porter
> 555 Twelfth Street, N.W.
> Washington, D.C.  20004

/s/ Joseph E. Hunsader

Westlaw.

T.C. Memo. 2005-104                                                                      Page 1
T.C. Memo. 2005-104, 2005 WL 1111792 (U.S.Tax Ct.), 89 T.C.M. (CCH) 1157, T.C.M. (RIA) 2005-104, 2005
RIA TC Memo 2005-104
**T.C. Memo. 2005-104, (U.S.Tax Ct.)2005 WL 1111792**

**C**

Santa Monica Pictures, LLC v. C.I.R.
U.S.Tax Ct.,2005.

United States Tax Court.
SANTA MONICA PICTURES, LLC, Perry Lerner, Tax
Matters Partner, Petitioner
v.
COMMISSIONER OF INTERNAL REVENUE, Re-
spondent
CORONA FILM FINANCE FUND, LLC, Perry Lerner,
Tax Matters Partner, Petitioner
v.
COMMISSIONER OF INTERNAL REVENUE, Re-
spondent
**Nos. 6163-03, 6164-03.***

FN* Petitioner in docket No. 6163-03 is Santa
Monica Pictures, LLC (SMP), Perry Lerner,
Tax Matters Partner. Petitioner in docket No.
6164-03 is Corona Film Finance Fund, LLC

(Corona), Perry Lerner, Tax Matters Partner.
By Order dated Jan. 16, 2004, we consolidated
these cases for purposes of trial, briefing, and
opinion. References to petitioner in this opin-
ion are to Perry Lerner in his capacity as tax
matters partner of SMP and Corona.

May 11, 2005.

George W. Connelly, Jr., Linda S. Paine, and Phyllis
Ann Guillory, for petitioner.
James P. Thurston, H. Clifton Bonney, Jr., and Kenneth
C. Peterson, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPIN-
ION

THORNTON, J.

TABLE OF CONTENTS.

| | |
|---|---|
| FINDINGS OF FACT. | 13 |
| I. The Ackerman Group. | 13 |
| A. Perry Lerner. | 13 |
| B. Peter Ackerman. | 14 |
| C. Somerville S Trust. | 15 |
| D. Rockport Capital, Inc.. | 16 |
| E. Rockport Advisors, Inc.. | 16 |
| F. Crown Capital Group. | 16 |
| II. The Credit Lyonnais Group. | 17 |
| A. Credit Lyonnais. | 17 |
| B. Consortium de Realisation. | 18 |
| C. Generale Bank Nederlands. | 19 |
| III. Metro-Goldwyn-Mayer, Inc.. | 19 |
| A. History of MGM Before 1990. | 19 |
| B. Pathe Acquisition of MGM. | 20 |
| C. Sealion Corp.. | 20 |

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

| | |
|---|---|
| D. Cashflow Problems of MGM-Pathe. | 21 |
| E. Facility Agreements with CLBN. | 22 |
| F. Credit Lyonnais Takes Control of MGM. | 23 |
| G. 1993 Financial Restructuring. | 26 |
| H. Carolco Pictures, Inc.. | 29 |
| I. Sealion Settlement. | 33 |
| J. Credit Lyonnais Decides to Sell New MGM. | 33 |
| IV. Safari Acquisition Co.. | 34 |
| A. The Safari Consortium. | 34 |
| B. Safari Indicates Its Interest In New MGM. | 35 |
| C. Investigation of MGM. | 36 |
| D. Kerkorian Moves In and Buys MGM. | 38 |
| E. Debt Release and Assumption Agreement. | 39 |
| F. Subparticipation Agreement. | 40 |
| G. Dissolution of MGM Holdings and Formation of SMHC. | 41 |
| V. The CDR Transaction. | 41 |
| A. Initial Contact with Mr. Jouannet. | 41 |
| B. Negotiation and Drafting Process. | 43 |
| 1. Rockport Capital Confirms Its Interest. | 43 |
| 2. Draft Term Sheet and Letter Agreements. | 44 |
| 3. Further Negotiation and Drafting. | 48 |
| 4. Santa Monica Pictures, LLC, is Formed. | 49 |
| C. Final Agreements and Documents. | 49 |
| 1. Side Letter Agreement. | 49 |
| 2. Exchange and Contribution Agreement. | 51 |
| 3. SMP LLC Agreement. | 53 |
| a. Amendment No. 1. | 55 |
| b. Amendment No. 2. | 55 |
| 4. Deposit Account Agreement. | 57 |
| 5. Advisory Fee Agreement. | 57 |
| 6. Consent. | 58 |
| D. Assignment to Santa Monica Finance, B.V.. | 58 |
| E. Exercise of the Put. | 59 |
| VI. Film Rights Contributed to SMHC. | 59 |
| A. Film Titles and Development Projects. | 59 |
| B. History of the EBD Film Library. | 61 |

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

T.C. Memo. 2005-104                                                                                    Page 3
T.C. Memo. 2005-104, 2005 WL 1111792 (U.S.Tax Ct.), 89 T.C.M. (CCH) 1157, T.C.M. (RIA) 2005-104, 2005
RIA TC Memo 2005-104
**T.C. Memo. 2005-104, (U.S.Tax Ct.)2005 WL 1111792**

| | |
|---|---|
| 1. Epic Productions. | 61 |
| 2. EBD (Rotterdam) Finance, B.V.. | 62 |
| 3. Selection of Film Titles for CDR. | 62 |
| 4. Assignments Before the Contributions to SMHC. | 63 |
| 5. Storage Conditions of the EBD Film Library. | 64 |
| VII. Due Diligence for the CDR Transaction. | 65 |
| A. James Rhodes. | 65 |
| B. Troy & Gould. | 67 |
| 1. Chain-of-Title and Record Search. | 67 |
| 2. Access Letters. | 69 |
| VIII. Other Film Activities. | 70 |
| IX. Relationship with TroMetro Films, LLC. | 71 |
| A. John H. van Merkensteijn. | 71 |
| B. TroMetro Films, LLC. | 71 |
| C. TroMetro's Purchases of SMP's Receivables. | 72 |
| 1. First Note Purchase Agreement. | 72 |
| 2. Second Note Purchase Agreement. | 74 |
| 3. Purchase Price Determinations. | 75 |
| 4. Payments on the TroMetro Notes. | 75 |
| X. Distribution Agreements. | 76 |
| A. The TroMetro Distribution Agreement. | 76 |
| B. The Troma Distribution Agreement. | 77 |
| C. Troma Entertainment, Inc.. | 77 |
| D. Troma's Distribution of the EBD Film Library. | 78 |
| 1. Distribution History. | 78 |
| 2. Distribution Revenue and Expenses. | 79 |
| XI. Transactions with Imperial Credit Industries, Inc.. | 80 |
| A. Imperial Credit Industries, Inc.. | 80 |
| B. Shopping for Tax Deals. | 81 |
| C. Proposed Transaction with SMP. | 82 |
| D. Proposed Transaction with Corona. | 84 |
| 1. Formation of Corona Film Finance Fund, LLC. | 84 |
| 2. The Corona Transaction. | 85 |
| 3. Initial Purchase of SMP's Interest in Corona. | 88 |
| 4. Additional Purchase of SMP's Interest in Corona. | 89 |
| 5. Sale of the $79 Million Receivable. | 91 |

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

T.C. Memo. 2005-104                                                                                                    Page 4
T.C. Memo. 2005-104, 2005 WL 1111792 (U.S.Tax Ct.), 89 T.C.M. (CCH) 1157, T.C.M. (RIA) 2005-104, 2005
RIA TC Memo 2005-104
**T.C. Memo. 2005-104, (U.S.Tax Ct.)2005 WL 1111792**

| | |
|---|---|
| 6. Imperial's Capital Contribution. | 92 |
| 7. Treasury Bills. | 93 |
| XII. Subsequent Transactions Involving TroMetro and Troma. | 93 |
| A. Capital Contribution Agreement. | 93 |
| B. Assumption Agreement. | 94 |
| C. Transfer and Assignment of the Carolco Securities. | 94 |
| D. SMHC and Troma Merger. | 94 |
| 1. SMHC Merges into Troma. | 94 |
| 2. SMHC's Dissolution. | 95 |
| 3. Tax Return Treatment of the Transaction. | 95 |
| 4. Termination of the Distribution Agreements. | 96 |
| E. Letter Agreement with TroMetro. | 97 |
| F. Troma Finance, LLC. | 97 |
| XIII. Business Characteristics of SMP, Corona, and SMHC. | 98 |
| A. SMP. | 98 |
| B. Corona. | 99 |
| C. SMHC. | 99 |
| XIV. Partnership Tax Returns. | 99 |
| A. SMP. | 99 |
| B. Corona. | 101 |
| C. Mr. and Mrs. Ackerman. | 101 |
| XV. Notices of Final Partnership Administrative Adjustments. | 103 |
| A. SMP. | 103 |
| B. Corona. | 104 |
| OPINION. | 105 |
| I. Partnership Tax Rules. | 108 |
| A. In General. | 108 |
| B. Claimed Application of Partnership Tax Rules. | 112 |
| II. Burden of Proof. | 113 |
| III. Economic Substance. | 115 |
| A. Parties' Contentions. | 115 |
| B. General Legal Principles. | 117 |
| C. Summary of Conclusions. | 120 |
| D. Subjective Business Purpose. | 121 |

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

T.C. Memo. 2005-104                                                                                    Page 5
T.C. Memo. 2005-104, 2005 WL 1111792 (U.S.Tax Ct.), 89 T.C.M. (CCH) 1157, T.C.M. (RIA) 2005-104, 2005
RIA TC Memo 2005-104
**T.C. Memo. 2005-104, (U.S.Tax Ct.)2005 WL 1111792**

1. Banks' Purposes.                                                                                    122
a. Banks' Prior History With Film Business.                                                           125
b. Banks' Regulatory Environment.                                                                     128
c. Why the Ackerman Group?.                                                                            128
d. Inattention to Film Rights in Negotiations.                                                        129
e. Selection of EBD Film Rights.                                                                       130
f. Conclusion.                                                                                          131
2. Ackerman Group's Purposes.                                                                          131
a. Mr. Lerner's and Mr. Ackerman's Backgrounds.                                                       132
b. Focus on Tax Attributes.                                                                            134
c. Nature of EBD Film Rights.                                                                           135
d. Purported Interest in CDR Library.                                                                  145
e. Purported Springboard for New Library.                                                             147
f. Acquiring NOLs for a Film Business.                                                                147
g. Contemporaneous Expression of Purpose.                                                             149
3. Conclusion.                                                                                          150
E. Objective Economic Substance.                                                                       151
1. Economic Significance of Banks' "Contributions".                                                  152
a. Advisory Fee and Put Price.                                                                         153
i. Banks' Understanding.                                                                                155
ii. Ackerman Group's Understanding.                                                                   157
iii. Negotiation and Drafting Process.                                                               159
b. Redemption and Liquidation Rights.                                                                 167
c. SMP's Conversion Option.                                                                             169
d. Distribution Rights.                                                                                 171
e. Carolco Securities.                                                                                  174
2. Economic Benefits for the Ackerman Group.                                                          177
3. EBD Film Library.                                                                                    180
a. Petitioner's Expert.                                                                                 180
i. Income Projections.                                                                                  181
ii. Cost Projections.                                                                                   183
iii. Net Cashflows.                                                                                     184
iv. Valuations.                                                                                         184
v. Market Approach.                                                                                     185
b. Respondent's Expert.                                                                                 186
i. Income Projections.                                                                                  187
ii. Cost Projections.                                                                                   189

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

| | |
|---|---|
| iii. Net Cashflows. | 190 |
| iv. Valuations. | 191 |
| v. Market Approach. | 191 |
| c. Court's Analysis. | 192 |
| i. Reconciliation of Expert Opinions. | 192 |
| ii. Exclusion of Certain Film Titles. | 193 |
| iii. Analysis of Expert Opinions. | 196 |
| iv. Conclusion. | 203 |
| 4. Carolco Securities. | 208 |
| 5. Net Operating Losses. | 215 |
| 6. Conclusion. | 216 |
| F. Other Considerations. | 217 |
| 1. SMP's Other Film-Related Activities. | 217 |
| 2. Relationship Between the Parties. | 219 |
| 3. Ackerman Group's Exploitation of Tax Attributes. | 219 |
| 4. Congressional Intent. | 222 |
| G. Conclusion. | 226 |
| IV. Step Transaction Doctrine. | 227 |
| A. Legal Principles. | 227 |
| B. Parties' Arguments. | 229 |
| C. Court's Analysis. | 231 |
| D. Conclusion. | 236 |
| V. Basis Arguments. | 237 |
| A. Worthlessness Issue. | 237 |
| 1. Contribution of Worthless Assets. | 238 |
| 2. Worthlessness of Debts. | 240 |
| B. Bona Fide Indebtedness Issue. | 244 |
| VI. Corona Transaction. | 254 |
| VII. Sales of Receivables to TroMetro. | 257 |
| VIII. Summary of Conclusions So Far. | 259 |
| IX. At-Risk and Passive Activity Loss Rules. | 261 |
| X. SMP's Basis in SMHC Stock. | 262 |
| XI. Accuracy-Related Penalties. | 264 |
| A. Burden of Production. | 265 |
| B. Gross Valuation Misstatements. | 267 |
| C. 20-Percent Accuracy-Related Penalties. | 275 |
| 1. Negligence. | 275 |

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

| | |
|---|---|
| 2. Substantial Understatement of Income Tax. | 279 |
| D. Reasonable Cause. | 284 |
| 1. August 1996 Memorandum From Shearman & Sterling. | 289 |
| 2. Ernst & Young Memorandum. | 292 |
| 3. May 12, 1997, Shearman & Sterling Memorandum. | 293 |
| 4. October 10, 1997, Shearman & Sterling Memorandum. | 298 |
| 5. February 26, 1998, Shearman & Sterling Memorandum. | 301 |
| 6. Grant Thornton Memorandum. | 303 |
| 7. Opinion From Chamberlain Hrdlicka. | 307 |
| 8. Conclusion. | 311 |
| XII. Evidentiary Matters. | 312 |
| A. Daubert Issues. | 312 |
| 1. Mr. Crawford. | 313 |
| 2. Ms. Nemschoff. | 316 |
| a. Ms. Nemschoff's Expert Opinion. | 317 |
| b. Petitioner's Arguments. | 318 |
| c. Court's Analysis. | 319 |
| 3. Mr. Shapiro. | 322 |
| a. Mr. Shapiro's Expert Opinion. | 322 |
| b. Court's Analysis. | 325 |
| B. Mr. Jouannet's Response (Exhibit 226-P). | 328 |

*1 These consolidated cases stem from transactions that occurred in the wake of the 1996 sale of the legendary motion picture company Metro-Goldwyn-Mayer (MGM) by the French banking giant Credit Lyonnais.

Peter Ackerman, his business partner Perry Lerner, and their related entities (collectively, the Ackerman group) had helped organize a consortium which made a bid to purchase MGM from Credit Lyonnais. The consortium lost out to Kirk Kerkorian's winning bid. The Ackerman group then set out to acquire MGM's parent company, Santa Monica Holdings Corp. (SMHC), which Credit Lyonnais still owned.

SMHC was largely devoid of assets; it owed about $1 billion to Credit Lyonnais and its cluster of subsidiaries, adjuncts, and associated companies (the Credit Lyonnais group).[FN1] There were, however, tantalizing tax attributes: Credit Lyonnais's purported tax basis in the SMHC indebtedness was about $1 billion; its purported tax basis in the SMHC stock was about $665 million.

To acquire SMHC in a manner that might preserve the tax attributes, the Ackerman group formed a new limited liability company, Santa Monica Pictures, LLC (SMP), which elected to be treated as a partnership for Federal tax purposes. The Credit Lyonnais group agreed to contribute to SMP the high-basis, low-value indebtedness and SMHC stock after first contributing to SMHC a library of what might charitably be called B-grade films. In exchange, the Credit Lyonnais group was to receive preferred interests in SMP and a $5 mil-

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

lion "advisory fee".[FN2] Pursuant to a side agreement, the Ackerman group committed to purchase these preferred interests from the Credit Lyonnais group, upon demand, for a $5 million "put" price.[FN3]

In late 1996, the Credit Lyonnais group made the agreed-upon contributions to SMP. Some 3 weeks later, the Credit Lyonnais group exercised its "put", sold its SMP interests to Somerville S Trust (Mr. Ackerman's grantor trust), and so departed SMP. SMP was left holding, instead of the proverbial bag, the high-basis, low-value assets that the Credit Lyonnais group had contributed and, indirectly (through SMHC), the B-grade films.

Relying upon certain partnership basis rules (i.e., sections 704(c), 743 and 754), the Ackerman group claimed to succeed to Credit Lyonnais's purported $1 billion tax basis in the contributed SMHC indebtedness and purported $665 million tax basis in the SMHC stock.[FN4]In separate transactions in 1997 and 1998, SMP sold to TroMetro Films, LLC (TroMetro) portions of the SMHC indebtedness for much less than the claimed basis. SMP also formed another partnership, Corona Film Finance Fund, LLC (Corona) and contributed to it part of the SMHC indebtedness.[FN5]SMP then sold most of its ownership interest in Corona to Imperial Credit Industries, Inc. (Imperial), for much less than its claimed basis. On its partnership tax returns for 1997 and 1998, SMP claimed capital losses totaling, altogether, about $300 million from these various transactions. These claimed losses passed through for the primary benefit of Mr. Ackerman.

**\*2** Corona, meanwhile, sold to TroMetro the SMHC indebtedness that SMP had contributed at Corona's formation. On its partnership tax return for 1997, Corona claimed a capital loss of about $79 million from this transaction.[FN6]

Respondent issued separate notices of final partnership administrative adjustment (FPAAs) to Perry Lerner as tax matters partner for SMP and Corona with respect to their partnership taxable years ended December 31, 1997, and December 31, 1998. In the FPAAs, respondent disallowed SMP's and Corona's aforementioned claimed capital losses.[FN7]On a number of theories, in-

cluding the application of substance over form principles, respondent argues that SMP and Corona are not entitled to the indebtedness bases or the associated capital losses that those entities claimed on their respective 1997 partnership tax returns and that SMP claimed on its 1998 partnership tax return.

Petitioner disagrees. Petitioner contends, among other things, that substance over form principles do not apply because, when the contribution of SMHC stock and debt occurred (and thereafter), the Ackerman group had the legitimate business purpose of getting into the film business with the Credit Lyonnais group.

Ultimately, we must decide: (1) Whether SMP is entitled to a $147,486,000 capital loss on its sale to Tro-Metro of a $150 million receivable in 1997; (2) whether SMP is entitled to capital losses of $11,647,367 and $62,237,061 on its sales to Imperial of portions of its Corona membership interest in 1997; (3) whether SMP is entitled to a $80,190,418 capital loss on its sale to TroMetro of an $81 million receivable in 1998; (4) whether Corona is entitled to a capital loss on its sale to TroMetro of a $79 million receivable in 1997; [FN8] ( 5) whether accuracy-related penalties under section 6662(a) or (h) apply with respect to the partnership adjustments to SMP's 1997 and 1998 returns and Corona's 1997 return.[FN9]

## FINDINGS OF FACT

SMP is a Delaware limited liability company with its principal place of business in New York, New York. Corona is a Delaware limited liability company with its principal place of business in New York, New York.

The parties have stipulated many facts, which are incorporated herein by this reference.

### I. *The Ackerman Group*

#### A. *Perry Lerner*

During the taxable years at issue, Perry Lerner was the managing member and the tax matters partner of SMP

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

T.C. Memo. 2005-104                                                     Page 9
T.C. Memo. 2005-104, 2005 WL 1111792 (U.S.Tax Ct.), 89 T.C.M. (CCH) 1157, T.C.M. (RIA) 2005-104, 2005
RIA TC Memo 2005-104
**T.C. Memo. 2005-104, (U.S.Tax Ct.)2005 WL 1111792**

and Corona.

Mr. Lerner is a successful tax lawyer. He graduated from Clairmont McKenna College in Clairmont, California, in 1965 and from Harvard Law School in 1968. From 1968 to 1970, Mr. Lerner worked as a clerk/attorney advisor to Judge Arnold Raum of the U.S. Tax Court. From 1970 to 1976 and again from 1979 to 1980, Mr. Lerner worked for the law firm of Kindall & Anderson in Los Angeles. From 1976 to 1979, Mr. Lerner worked as an attorney advisor for the U.S. Treasury Department, Office of International Tax Counsel, in Washington, D.C.

**\*3** From approximately 1980 to 1995, Mr. Lerner worked for the law firm of O'Melveny & Myers, LLP. He worked in the firm's Los Angeles office until 1986 or 1987, before leaving to head up the firm's London office. In 1992, he returned to the firm's Los Angeles office for about a year before moving to the firm's New York office. In 1996, Mr. Lerner retired from O'Melveny & Myers to become a sole practitioner.

### B. *Peter Ackerman*

Peter Ackerman is a successful businessman. He attended Colgate University, where he received a bachelor's degree. He attended graduate school at the Fletcher School of Law and Diplomacy, ultimately receiving a Master of Arts and Law and Diplomacy, and a Ph.D. in international affairs.

From 1978 to 1989, Mr. Ackerman worked at Drexel Burnham (formerly Burnham & Co.) with Michael Milken in the high-yield and convertible bond department. While there, he was exposed to buying and selling high-yield bonds, recapitalizing (leveraging) companies, restructuring troubled businesses, and financing and investing in businesses.

During the period of Mr. Ackerman's employment there, Drexel Burnham arranged the financing for major film companies, including Warner Brothers, Paramount, Turner, CNN, and Orion. Mr. Ackerman was actively involved in structuring the financing for the transaction wherein Kirk Kerkorian sold the MGM library (for the

first time) to Ted Turner.

In 1990, Mr. Ackerman was invited to become a visiting scholar at the International Institute for Strategic Studies in London. He stayed there until 1994 while he wrote and published a 400-page book called "Strategic Nonviolent Conflict." During this period, Mr. Ackerman met Mr. Lerner. Mr. Lerner represented Mr. Ackerman in certain legal matters, including issues stemming from Drexel Burnham's bankruptcy and issues relating to Mr. Ackerman's estate planning.

### C. *Somerville S Trust*

During the taxable years at issue and at all relevant times, Mr. Ackerman was the beneficiary of the Somerville S Trust, which was treated as a grantor trust for Federal income tax purposes. All items of income, expense, or loss from Somerville S Trust were reported on Mr. Ackerman and his wife's joint Federal income tax returns.

Somerville S Trust was the capital source for many of Mr. Ackerman's investments, including the transaction involving the Credit Lyonnais group. Mr. Lerner was the trustee of the Somerville S Trust, and he was fully empowered to transfer or invest its assets.

### D. *Rockport Capital, Inc.*

During the taxable years at issue and at all relevant times, Mr. Ackerman conducted all his investment activities through a wholly owned advisory company called Rockport Capital, Inc. (Rockport Capital). Rockport Capital was a Delaware subchapter S corporation. Mr. Lerner was an officer in Rockport Capital.

### E. *Rockport Advisors, Inc.*

After Mr. Lerner retired from O'Melveny & Myers in 1996, Mr. Ackerman asked Mr. Lerner to continue representing him. Mr. Ackerman was interested in various investment opportunities that were coming his way, and he often asked Mr. Lerner's legal advice about them. Initially, Mr. Lerner devoted about half his time to Mr.

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Ackerman's affairs. As a product of this representation, Mr. Lerner formed Rockport Advisors, Inc. (Rockport Advisors), which he owned. Rockport Capital and Rockport Advisors operated together with respect to Mr. Ackerman's investment activities, including the transaction involving the Credit Lyonnais group.

### F. *Crown Capital Group*

**\*4** In early 1997, Mr. Lerner ceased using Rockport Advisors with respect to Mr. Ackerman's investments. Instead, Mr. Lerner created a new firm, Crown Capital Group, Inc. (Crown Capital), located in New York, to investigate and manage Mr. Ackerman's investments. Mr. Lerner owned 49 percent and Mr. Ackerman's nephew owned 51 percent of Crown Capital.

Crown Capital provided the due diligence and management services for Mr. Ackerman's investments, including SMP, a theater exhibition company (Resort Theaters), a textile company, a small insurance company, a business involved in manufacturing Pokemon game cards, a company that manufactured sample wallpaper and carpet boards, a newspaper stuffing business, a grocery business, and a number of private equity investments. Oftentimes, Crown Capital would make an investment in its own name and then transfer it into some new entity established for Mr. Ackerman. In some cases, Crown Capital also acted on behalf of SMP or SMHC, although there was no written agency agreement between these companies.

### II. *The Credit Lyonnais Group*

#### A. *Credit Lyonnais*

During the early 1990s and the taxable years at issue, Credit Lyonnais, S.A. (Credit Lyonnais), was a large European banking and financial institution organized under the laws of France. Credit Lyonnais was the direct or indirect parent of other banking and financial institutions, including Credit Lyonnais Bank Nederland, N.V. (CLBN), a bank organized under the laws of the Netherlands, and Credit Lyonnais International Services (CLIS). Credit Lyonnais acquired CLBN in the mid-

1980s. CLBN developed a large business of financing media entertainment (e.g., film, television, etc.); it was partly responsible for Credit Lyonnais's indirect financing and ownership of film companies, including MGM.FN10

### B. *Consortium de Realisation*

In 1995, Credit Lyonnais experienced a financial crisis. Following the intervention of the French government, Credit Lyonnais announced a restructuring program that was intended to shore up its balance sheet going forward. Under the restructuring program, Credit Lyonnais's troubled investments and loans, including its loans to film companies such as MGM, were effectively transferred into a wholly owned subsidiary, Consortium de Realisation (CDR). CDR was set up for the purpose of liquidating and maximizing recovery on Credit Lyonnais's "bad assets".

When CDR was set up, the Credit Lyonnais employees who were working on the troubled entertainment loans were given the option of transferring to CDR to continue working on those loans or taking other positions within Credit Lyonnais. Rene-Claude Jouannet, a long-time employee of Credit Lyonnais, transferred to CDR, where he served as CDR's general counsel.FN11

### C. *Generale Bank Nederland*

In September 1995, CLBN was acquired by Generale Bank Nederlands (Generale Bank).FN12 In this acquisition, CLBN's "good" and "bad" assets were transferred to Generale Bank. Credit Lyonnais lent Generale Bank the money to purchase the "bad assets" of CLBN, including the debt that MGM owed to CLBN. The loan from Credit Lyonnais to Generale Bank was nonrecourse; Generale Bank was not obligated to pay back the borrowed amount except to the extent it realized anything on the bad assets.

### III. *Metro-Goldwyn Mayer, Inc.*

#### A. *History of MGM Before 1990*

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

T.C. Memo. 2005-104                                                                                                Page 11
T.C. Memo. 2005-104, 2005 WL 1111792 (U.S.Tax Ct.), 89 T.C.M. (CCH) 1157, T.C.M. (RIA) 2005-104, 2005
RIA TC Memo 2005-104
**T.C. Memo. 2005-104, (U.S.Tax Ct.)2005 WL 1111792**

**\*5** Metro-Goldwyn-Mayer, Inc., was established in 1924 as a major film studio based in Los Angeles, California. Since its establishment, Metro-Goldwyn-Mayer, Inc., has experienced numerous reorganizations and name changes. For convenience, we sometimes refer to Metro-Goldwyn-Mayer, Inc. (and its successors) generally as "MGM".

In 1981, MGM purchased United Artists (UA). The combined entity then changed its name to MGM/UA Entertainment Co. (MGM/UA). From 1981 through 1986, MGM/UA continued to produce and distribute film and television products. In 1986, Kirk Kerkorian, the majority shareholder of MGM/UA, entered into a series of transactions with Turner Broadcasting System (TBS), resulting in TBS's acquisition of the pre-1986 MGM film library. See, e.g., *Turner Broad. Sys., Inc. & Subs. v. Commissioner,* 111 T.C. 315, 1998 WL 892635 (1998). MGM/UA Communications Co. (MGM Communications) was formed out of the remaining assets of MGM and UA, including the UA film library. In 1988, MGM Communications began to explore selling all or part of these assets.

### B. *Pathe Acquisition of MGM*

In June 1990, the board of directors of MGM Communications agreed to sell the company for approximately \$1.33 billion (excluding certain additional costs) to Pathe Communications Corp. (Pathe), which was indirectly controlled by Giancarlo Parretti and Florio Fiorini.FN13Pursuant to this agreement, MGM-Pathe Communications Co. (a wholly owned subsidiary of Pathe) merged with and into MGM Communications (the 1990 merger). The surviving corporation was MGM-Pathe Communications Co. (MGM-Pathe). As a result of the 1990 merger, Pathe owned 98.5 percent of MGM-Pathe stock.

### C. *Sealion Corp.*

In connection with Pathe's acquisition of MGM, Credit Lyonnais lent \$150 million to Sealion Corp., N.V. (Sealion) pursuant to a credit agreement dated October 30, 1990. Sealion then lent the \$150 million to Pathe,

which in turn used the funds to finance part of the acquisition of MGM Communications. Sealion entered into a stock purchase agreement dated as of November 1990, with Melia International N.V. (Melia), which owned 51.9 percent of Pathe's outstanding common stock. Pursuant to the stock purchase agreement, Sealion purchased 900,000 shares of MGM-Pathe's common stock (constituting 1.5 percent of the common stock of MGM-Pathe) from Melia. Sealion in turn pledged its 1.5-percent interest in MGM-Pathe to Credit Lyonnais as security for the \$150 million loan. Thereafter, Sealion, Melia, and Pathe controlled the boards of directors of Pathe and MGM-Pathe.

### D. *Cashflow Problems of MGM-Pathe*

Before the Pathe acquisition, MGM relied on cashflows from its distribution agreements to conduct its day-to-day operations and to generate revenue. To finance Pathe's recent acquisition of MGM/UA Communications, however, Mr. Parretti entered into new distribution agreements which were then factored with financial institutions, thereby depriving MGM of approximately 80 to 90 percent of its ordinary cashflow. Consequently, MGM-Pathe was soon unable to finance its day-to-day operations, including motion picture production and release. To fund all its operating costs, including the payment of interest, MGM-Pathe had to rely on external capital in the form of continuous borrowing from the Credit Lyonnais group. MGM-Pathe's weak financial condition was well-known in the entertainment industry and made it harder to attract film talent to MGM.

### E. *Facility Agreements with CLBN*

**\*6** On March 22, 1991, Pathe and MGM-Pathe entered into a socalled \$250 million interim revolving credit facility with CLBN (the \$250 million facility), which incorporated all of MGM-Pathe's borrowing from November 1, 1990.FN14All borrowing under the \$250 million facility was at the absolute discretion of CLBN and was secured by MGM-Pathe's assets and Pathe's interest in MGM-Pathe stock.

On March 29, 1991, a group of MGM-Pathe's creditors

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

T.C. Memo. 2005-104                                                                Page 12
T.C. Memo. 2005-104, 2005 WL 1111792 (U.S.Tax Ct.), 89 T.C.M. (CCH) 1157, T.C.M. (RIA) 2005-104, 2005
RIA TC Memo 2005-104
**T.C. Memo. 2005-104, (U.S.Tax Ct.)2005 WL 1111792**

(excluding CLBN) filed an involuntary chapter 7 bankruptcy petition in U.S. Bankruptcy Court. To pay off its creditors (other than CLBN) and allow it to emerge from bankruptcy, MGM-Pathe entered into a so-called $145 million facility agreement (the $145 million facility agreement) with CLBN dated as of April 12, 1991.FN15Borrowing under the $145 million facility agreement was secured by MGM-Pathe's assets, as well as the stock of Pathe and MGM-Pathe. As a result of the new financing, MGM-Pathe was able to reach an accord with its creditors and emerge from bankruptcy.

In connection with the $145 million facility agreement, Pathe and certain of Melia's stockholders and subsidiaries entered into certain agreements in April 1991, whereby those parties guaranteed MGM-Pathe's obligations under the $145 million facility agreement and pledged to CLBN all shares of Pathe, MGM-Pathe, and Melia owned by those parties, to secure all indebtedness then owing by Pathe (and certain affiliates) to CLBN (the 1991 pledge agreement). The shares covered by these agreements represented approximately 89.3 percent of the outstanding common stock of Pathe and 98.5 percent of the stock of MGM-Pathe, which shares were held in irrevocable voting trust agreements in favor of CLBN. As part of this process, Mr. Parretti entered into corporate governance agreements with CLBN wherein Mr. Parretti and Pathe ceded responsibility for the day-to-day management of MGM-Pathe to Credit Lyonnais. On June 17, 1991, as a result of certain actions by Mr. Parretti in violation of the corporate governance agreements between him and CLBN, CLBN removed Mr. Parretti and certain other directors of MGM-Pathe.

### F. *Credit Lyonnais Takes Control of MGM*

As of June 1991, Credit Lyonnais exercised effective control over MGM-Pathe. It controlled all management decisions at MGM-Pathe and elected MGM-Pathe's board of directors. During this period, Credit Lyonnais maintained a constant presence at MGM-Pathe's corporate offices.

MGM-Pathe's deepening financial problems, however, strained its relationship with Credit Lyonnais. For example, during the quarter ended March 31, 1992, MGM-Pathe's operating expenses and financing costs exceeded its operating receipts, and its management expected that operating expenses and financing costs would continue to exceed operating receipts for the foreseeable future. MGM-Pathe's market share was less than two percent; many of its valuable assets had either been sold or factored to finance Pathe's acquisition of MGM-Pathe. As a result, MGM-Pathe remained entirely dependent on CLBN for additional capital to fund its ongoing operations. MGM-Pathe's deepening financial problems persisted well into 1993.

**\*7** As of March 31, 1992, CLBN had lent MGM-Pathe $124,288,000 pursuant to the so-called $250 million facility agreement and $398,223,000 pursuant to the so-called $145 million facility agreement. MGM-Pathe was in default on these obligations. On April 16, 1992, CLBN notified Pathe and MGM-Pathe that it was exercising its right under the 1991 pledge agreement to foreclose on 59.1 million shares of the common stock of MGM-Pathe (representing 98.5 percent of the outstanding common stock of that company). The letter stated that the foreclosure auction was scheduled for May 7, 1992, and that CLBN intended to bid-in, or cause to be bid-in, at least $400 million of the secured indebtedness. CLBN also advised Pathe and MGM-Pathe that $400 million would be the minimum bid-in amount and that the sale of 40.2 million shares would be subject to a prior pledge in favor of Credit Lyonnais, as assignee of Sealion.

Credit Lyonnais formed MGM Holdings Corp. (MGM Holdings) to effect the foreclosure on the common stock of MGM-Pathe. As of May 1, 1992, CLBN sold to MGM Holdings approximately $483,489,000 of Pathe's and MGM-Pathe's indebtedness.FN16Credit Lyonnais foreclosed on the MGM-Pathe stock to recover amounts that it had invested in MGM; it was not interested in any long-term investment in a film business. As a result of the foreclosure, MGM Holdings owned 98.5 percent of MGM-Pathe's common stock and had the power to elect the entire board of directors of MGM-Pathe. Nevertheless, the Credit Lyonnais group was working on a 5-year time clock from the date of foreclosure, because

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

U.S. banking laws required the Credit Lyonnais group to sell MGM within 5 years (i.e., on or before May 7, 1997).

On May 20, 1992, MGM-Pathe changed its name to Metro-Goldwyn-Mayer, Inc. (MGM).

### G. *1993 Financial Restructuring*

After the foreclosure, MGM was a tarnished brand. As a maker of motion picture products, it was minimally competitive. MGM had effectively gotten out of the television business and had no activities in ancillary media such as interactive and video games. MGM had a substantial film library, including the considerable UA library, but it was not aggressively exploiting it. MGM's financial position was precarious. It was functioning on a credit facility that CLBN had granted in an emergency fashion. Although the facility was supposed to be in the $150 million range, CLBN's exposure had risen to half a billion dollars. MGM needed additional funding for its production activities. This funding came directly or indirectly from the Credit Lyonnais group. The Credit Lyonnais group meanwhile had already invested approximately $1.6 billion in MGM-Pathe, including amounts that it had lent to Pathe, to various entities in connection with Pathe's acquisition of MGM-Pathe, and to MGM-Pathe.

Credit Lyonnais determined that it needed to maintain MGM's operations to increase MGM's value. Because it appeared impossible to sell MGM under satisfactory conditions, it was necessary to rebuild it, which required both time and financial means. Consequently, effective April 1, 1993, CLBN provided MGM a commitment for an additional $190 million, 3-year revolving credit facility ($190 million facility).[FN17]

**\*8** In light of Credit Lyonnais's escalating financial exposure and MGM's dwindling business prospects, Credit Lyonnais formulated a business strategy for MGM which included: (1) completely replacing the company's management; (2) restructuring MGM's finances to replenish its equity capital and to significantly reduce the weight of its debt; and (3) establishing a 5-year business plan intended to reposition MGM among the film industry's "major players" and to increase the value of its assets, particularly through an intensive program of new film production.[FN18]

In July 1993, MGM began a comprehensive restructuring of its capital structure and its corporate management (the 1993 restructuring). This restructuring consisted primarily of splitting MGM into two entities. The goal was to set up a separate operating company which would be capitalized with $1 billion in equity and would have sufficiently reduced liabilities to allow additional borrowing from lenders other than Credit Lyonnais. MGM was renamed MGM Group Holdings Corp. (MGM Group Holdings). MGM Group Holdings contributed substantially all its assets (including its film and television assets) and some liabilities to a new subsidiary, which was later named Metro-Goldwyn-Mayer, Inc. (New MGM).[FN19]

In the 1993 restructuring, MGM's debt to CLBN was divided between MGM Group Holdings and New MGM. MGM Group Holdings retained approximately $960 million of the debt, which was restated and consolidated in an amended, restated, and consolidated credit agreement with CLBN. MGM Group Holdings executed a $965,904,188.96 note dated December 30, 1993, which was due and payable on July 15, 1997. This $966 million debt was unsecured by New MGM's assets; $800 million of the principal amount was non-interest bearing.

As of December 31, 1993, New MGM owed CLBN approximately $618 million in principal and interest. New MGM and CLBN entered into an amended, restated, and consolidated credit agreement (the New MGM credit agreement) in which the loans that New MGM assumed in the 1993 restructuring were consolidated and converted into a term loan with a due date of July 15, 1997 (the CLBN term loan).

In accordance with the 1993 restructuring, New MGM and Credit Lyonnais entered into a working capital agreement dated December 30, 1993 (the working capital agreement). The working capital agreement provided for payment of interest on the amounts that Credit Lyo-

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

T.C. Memo. 2005-104, 2005 WL 1111792 (U.S.Tax Ct.), 89 T.C.M. (CCH) 1157, T.C.M. (RIA) 2005-104, 2005
RIA TC Memo 2005-104
**T.C. Memo. 2005-104, (U.S.Tax Ct.)2005 WL 1111792**

nnais had previously lent to MGM. These amounts became due on July 15, 1997. New MGM executed a $490 million note dated December 30, 1993. In connection with the working capital agreement and the New MGM credit agreement, MGM Group Holdings pledged its New MGM stock, as well as New MGM's film and other assets, to Credit Lyonnais.

CLBN advanced $8,994,970.32 in additional funds to MGM Group Holdings pursuant to a demand promissory note (CLBN demand note) and an irrevocable notice of drawing, both dated October 26, 1994. On April 26, 1995, MGM Group Holdings made an additional drawing of $595,750.56 under the CLBN demand note. In all, CLBN advanced a total of $9,590,720.88 in additional funds to MGM Group Holdings.

### H. *Carolco Pictures, Inc.*

**\*9** In 1993, Credit Lyonnais, using MGM as a vehicle, made an investment in Carolco Pictures, Inc. (Carolco), and sought to take an active role in that company's operations. Carolco had been a major motion picture producer, producing some of the highest revenue-grossing motion pictures ever made, including "Terminator 2: Judgment Day", "Total Recall", "Cliffhanger", "Basic Instinct", and "Rambo: First Blood Part II". Carolco initially produced four to six major motion pictures a year but, like MGM, was forced to cut production in the early 1990s due to serious financial problems.

In 1993, Carolco underwent a financial restructuring (the 1993 Carolco restructuring) to reduce or satisfy Carolco's financial obligations and to provide additional capital to permit Carolco to continue as a going concern. As part of the 1993 Carolco restructuring, MGM, with other investors, agreed to invest in Carolco in exchange for distribution rights to Carolco's films.[FN20] On May 25, 1993, in connection with the restructuring, MGM Holdings purchased 30,000 shares of Carolco preferred stock for $30 million and Carolco subordinated notes for $30 million (the Carolco securities).[FN21] Credit Lyonnais provided MGM Holdings the funds for investing in the Carolco securities.

As a result of the 1993 Carolco restructuring, Carolco's management began preparing some of Carolco's motion picture projects for eventual production. By January 1995, however, due to the unexpectedly high cost of certain motion pictures it became apparent that Carolco would have inadequate capital to execute its business plan going forward. During the second half of 1994 and early 1995, Carolco sold substantially all its rights in such motion picture projects as "Crusades", "Showgirls", and "Lolita" to raise operating capital and reduce payment obligations. Carolco obtained certain accommodations from its investors.

After discussions with its present investors and potential new investors during 1994-95, it became apparent to Carolco that the necessary additional capitalization required to continue Carolco's business plan was not going to be forthcoming. Consequently, Carolco decided to sell its main film library and certain other assets in hopes of generating cash with which it could reduce its debt and pursue motion picture projects.

In October 1995, Twentieth Century Fox Film Corp. (Twentieth Century Fox) offered approximately $50 million for the Carolco film library, the projects, and the studio. Although accepting this offer would have doomed Carolco's prospects as a going concern, Carolco decided to pursue the offer and began negotiating a sale agreement. On November 10, 1995, Carolco and Twentieth Century Fox executed an agreement providing for the sale of substantially all of Carolco's assets for approximately $47.5 million and requiring Carolco to file a voluntary chapter 11 bankruptcy petition.

On November 10, 1995, Carolco filed a voluntary petition under chapter 11 of the U.S. Bankruptcy Code. On November 22, 1995, Carolco filed a motion asking the bankruptcy court to issue an order allowing Carolco to sell its assets to Twentieth Century Fox for $47.5 million. On January 16, 1996, the bankruptcy court held a hearing on Carolco's motion, wherein Carolco announced that Canal+ had offered $58 million for the Carolco film library and related assets. In an order dated March 21, 1996, the bankruptcy court approved the sale of Carolco's film library and related assets to Canal+ for $58 million.

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

T.C. Memo. 2005-104                                                                                    Page 15
T.C. Memo. 2005-104, 2005 WL 1111792 (U.S.Tax Ct.), 89 T.C.M. (CCH) 1157, T.C.M. (RIA) 2005-104, 2005
RIA TC Memo 2005-104
**T.C. Memo. 2005-104, (U.S.Tax Ct.)2005 WL 1111792**

**\*10** Between September 13, 1996, and March 28, 1997, the debtors' and creditors' committee filed various successive plans of reorganization. Under each of these plans of reorganization, the holders of Carolco subordinated notes were in class 10 and the holders of Carolco preferred stock were in class 12. In each case, the securities holders were to receive nothing in Carolco's liquidation.

In an order dated April 3, 1997, the bankruptcy court confirmed the fourth and final amended plan of reorganization. The bankruptcy court confirmed that SMHC (MGM Group Holdings' successor), which then held the Carolco securities under this plan of reorganization, was to receive nothing for the Carolco securities because it was classified as a holder of class 10 and 12 claims.

I. *Sealion Settlement*

In November 1995, Credit Lyonnais and Sealion entered into a settlement agreement whereby: (i) Sealion assigned its 1.5-percent interest in MGM Group Holdings stock to Credit Lyonnais, and, in exchange, (ii) Credit Lyonnais accepted as repayment of all sums that Sealion owed to it, the assignment to Credit Lyonnais of the entire claim that Sealion held against Pathe pursuant to its loan agreement with Pathe.

J. *Credit Lyonnais Decides To Sell New MGM*

As of 1994, MGM was not saleable; its filmed entertainment business was still in financial disarray. Nevertheless, after the 1993 restructuring and after nearly 2 years under its new management team, MGM made a fair recovery. The management team's actions began bearing fruit with some successful film releases such as "Stargate", "Get Shorty", and the next two "James Bond" movies. MGM started to resemble a real operating motion picture company once again.

Nonetheless, Credit Lyonnais's investment in MGM was considerable and never ending. As time went on, Credit Lyonnais became very pessimistic about recovering its investment in MGM; certainly after Credit Lyonnais transferred ownership of the MGM stock to Consortium

de Realisation (CDR) in 1995, Credit Lyonnais had much less interest in putting money into MGM's movies. As a result, the number of movies in production at MGM diminished considerably. Credit Lyonnais had reason to get out of its investment in MGM as expeditiously as possible.

At some point, Credit Lyonnais decided to sell all the assets of MGM. Credit Lyonnais assigned to CDR's new management team (which included Mr. Jouannet) the task of putting together the investment banking support and other support necessary to sell New MGM. This team selected Lazard Freres & Co., LLC, (Lazard & Freres) as its investment banking firm and exclusive financial adviser for the sale of New MGM. In early 1996, Credit Lyonnais, through CDR, formally put New MGM up for sale to pay off its outstanding debts. Credit Lyonnais and MGM management hoped and expected to sell MGM for approximately $2 billion.

IV. *Safari Acquisition Co.*

A. *Safari Consortium*

In early 1996, Mark Seiler contacted Mr. Lerner about organizing a bid for New MGM. Mr. Seiler was the U.S. president of Capella Films, Inc., a motion picture company and a wholly owned U.S. subsidiary of Deyhle Media Group, one of the largest film distributors in Germany.[FN22]Mr. Lerner introduced Mr. Seiler to Mr. Ackerman. At some point, a consortium called the Safari Acquisition Co. (Safari) was formed. In an effort to secure financing for a Safari bid, Messrs. Lerner and Ackerman met with a Japanese company and a number of major film distributors, including Twentieth Century Fox.

B. *Safari Indicates Its Interest in New MGM*

**\*11** On April 17, 1996, Messrs. Ackerman and Seiler wrote a letter to Mr. Peter R. Ezersky, managing director of Lazard Freres, submitting Safari's preliminary indication of interest in acquiring New MGM. The letter stated an approximate range in which Safari might be prepared to bid ($1.95 billion to $2.5 billion) and men-

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

tioned a number of conditions to be satisfied before any bid would be final and effective. When this bid was submitted, Safari had not completed its due diligence of New MGM. In formulating its final bid, Safari hired Donaldson, Lufkin & Jenrette Corp., as its financial adviser, and Houlihan, Lokey, Howard, & Zukin Capital (Houlihan Lokey), as its valuation adviser.

On April 24, 1996, Lazard Freres faxed a memorandum to Capella Films confirming a visit to MGM on May 1 to 3, 1996, and providing a draft list of information that was to be available during that time in the New MGM data room. The New MGM data room was established in MGM's offices in Santa Monica, and each of the "qualified" bidders was permitted to bring in a team of advisers to investigate MGM's company information.

### C. *Investigation of MGM*

Mr. Lerner was involved in investigating New MGM. Mr. Lerner testified that he spent nearly a week in the data room of New MGM and talked to various members of New MGM's corporate management team regarding their view of the company and its future. In the course of this investigation, Mr. Lerner received an MGM Corporation Information Memorandum and a confidential memorandum that Lazard Freres had prepared in connection with the sale of New MGM. Safari hired Deloitte & Touche, LLP, and the law firm of Kaye, Scholer, Fierman, Hays & Handler, LLP (Kaye Scholer), to assist in investigating New MGM.

On May 14, 1996, Deloitte & Touche submitted its preliminary data room due diligence observations to Safari. This document explained the process and procedures followed in Deloitte & Touche's investigation of MGM, including its review of the information in the New MGM data room. It also identified certain open issues with respect to MGM.

On May 15, 1996, Kaye Scholer submitted its preliminary memorandum to Safari summarizing its legal due diligence investigation of New MGM. Kaye Scholer reviewed: (i) The corporate organization of MGM, MGM's principal subsidiaries, and MGM Group Hold-

ings; (ii) chain-of-title documentation for the available portion of New MGM's film library and other product-related documents; and (iii) historical information for the MGM and UA entities, including the more recent corporate restructurings. The Kaye Scholer memorandum also provided a discussion of CDR's tax basis in MGM Holdings stock ($605 million), MGM Holdings's tax basis in MGM Group Holdings stock ($483 million), MGM Group Holdings's tax basis in New MGM stock ($300 million), New MGM's tax basis in its assets ($1.14 billion), as well as tax loss carryforwards, and net operating loss carryforwards.

A memorandum dated May 31, 1996, from Kaye Scholer to Capella Films, which Mr. Lerner received, describes an "MGM Acquisition/Partnership Structure" and explains:

**\*12** The proposed structure outlined herein would increase the amount receivable by CDR over a straight purchase. Under the proposed structure CDR would contribute the $873 million of debt owed to it by MGM to the capital of Holdings, which in turn would contribute the debt to Group, which in turn would contribute the debt to MGM. Such contributions would increase the tax basis of the stock of each of the companies. As a result, CDR would have a tax basis in the stock of Holdings of approximately $1.478 billion. CDR would then form a limited liability company (the 'LLC') by contributing the stock of Holdings in exchange for a 99% interest in the LLC. An unrelated party would receive a 1% interest in exchange for a nominal amount. Then CDR would sell half of its interest, or 49.5% of the LLC, to an investor who could benefit from the use of a capital loss ("Investor"). The LLC would not make an election under section 754 * * * to adjust the basis of its assets. Group would then sell the stock of MGM to Capella and make an election under section 338(h)(10) of the Code to treat the stock sale as an asset sale. Group would use a portion of the proceeds to repay to CDR the $970 million of debt. The remainder of the proceeds would be held by Group, other than the amount necessary to pay any taxes on the sale (inasmuch as MGM's NOL's may not be suffi-

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

cient to offset the entire gain and some of Group's NOLs are subject to limitations which prevent their use to offset MGM's income on the deemed asset sale). After waiting for at least one year, Investor would buy CDR's other 49.5% interest. Again the LLC would not make an election under section 754 of the Code to adjust the basis of its assets. As a result of these transactions, Investor would own 99% of the LLC, and Group and Holdings could be liquidated into the LLC. The capital loss on the liquidation (which would be approximately $1.4 billion) would be allocated to Investor.

In June 1996, Houlihan Lokey prepared a "Pro-Forma Library Valuation" as of August 31, 1996, valuing New MGM's film library at $2.6 billion, an amount greatly in excess of MGM's capital and debt.FN23Mr. Lerner testified that it was a valuation which "we thought was fairly good, a fairly good guess at what the assets were worth", but that Safari wanted to prepare its bid below this estimate in hopes of getting a discount. Accordingly, Safari submitted a $1.2 billion bid, which it believed was the high bid.

### D. *Kerkorian Moves in and Buys MGM*

Safari was one of a number of bidders for New MGM. New MGM's management was interested in finding parties who would fund the acquisition of New MGM and retain existing management. New MGM's management met with Messrs. Lerner and Ackerman to discuss the possibility of doing a transaction with the management group. New MGM's management, however, decided against it; they lacked confidence in Messrs. Lerner's and Ackerman's capital sources and were not comfortable that their proposed financing from Japan was going to materialize.

**\*13** Unbeknownst to Safari, New MGM's management had the right, after all the final bids were in, to find another buyer within a certain number of hours. After all bids were submitted, New MGM's management approached Kirk Kerkorian who, through his company, P & F Acquisition Corp. (P & F Acquisition), successfully bid $1.3 billion for New MGM. Safari was not given an

opportunity to rebid; it lost out on its attempt to buy New MGM.

On July 16, 1996, P & F Acquisition entered into a stock purchase agreement (the stock purchase agreement) with CDR, MGM Holdings, MGM Group Holdings, and New MGM. The stock purchase agreement provided that all of New MGM's and its subsidiaries' indebtedness would be repaid in full upon the consummation of the sale and that any New MGM indebtedness remaining unpaid would be satisfied, canceled, or extinguished at or before the closing on the sale. The closing date was set as of October 10, 1996.

### E. *Debt Release and Assumption Agreement*

As of October 9, 1996, New MGM owed Credit Lyonnais $378,748,588.93 under the working capital agreement. The $1.3 billion purchase price that P & F Acquisition paid for New MGM sufficed to pay off all of New MGM's creditors except Credit Lyonnais.FN24Because the debt that New MGM owed Credit Lyonnais ($378,748,588.93) exceeded the New MGM sale proceeds that Credit Lyonnais was to receive ($298,835,633.58), New MGM still owed Credit Lyonnais $79,912,955.34. On October 9, 1996, Credit Lyonnais, MGM Group Holdings, and New MGM executed a debt release and assumption agreement releasing New MGM from its obligations on the remaining $79,912,955.34 of principal owed to Credit Lyonnais under the working capital agreement and providing that MGM Group Holdings assumed this remaining $79,912,955.34 of indebtedness (the $79 million receivable). MGM Group Holdings (and its successor SMHC) never executed a note for the $79,912,955.34 of indebtedness referred to in the debt release and assumption agreement.

### F. *Subparticipation Agreement*

On September 25, 1996, CDR and Credit Lyonnais entered into a subparticipation agreement concerning the working capital agreement. Under this agreement, CDR agreed to take a 100-percent subparticipation in the working capital agreement, assuming all risks con-

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

nected to that loan.

On October 11, 1996, Credit Lyonnais sent a letter to CDR referencing the $79,912,955.34 excess debt from the New MGM sale and stating: "Pursuant to your agreement of October 1, 1996, we have resolved and settled this insufficient payment by utilizing your sub-participation to meet the amount owed."On December 13, 1996, CDR assigned the $79 million receivable to CLIS, effective as of that date, pursuant to a document entitled "Cession de Creance".

### G. *Dissolution of MGM Holdings and Formation of SMHC*

On or about September 28, 1996, MGM Holdings contributed its Carolco preferred stock and Carolco subordinated notes to MGM Group Holdings. On October 8, 1996, MGM Holdings was dissolved; its assets were distributed to CLIS, MGM Holdings's sole shareholder. On October 15, 1996, MGM Group Holdings changed its corporate name to Santa Monica Holdings Corp. (SMHC).

### V. *The CDR Transaction*

#### A. *Initial Contact With Mr. Jouannet*

**\*14** After agreement was reached on the sale of New MGM, one of Mr. Jouannet's continuing jobs at CDR was to see what, if anything, he could realize on the stock of MGM Group Holdings. CDR and Mr. Jouannet were interested in "monetizing" MGM Group Holdings as soon as possible.

Sometime before September 11, 1996, Mr. Lerner, on behalf of Rockport Capital, and Mr. Jouannet, on behalf of CDR, discussed a possible transaction involving MGM Holdings and MGM Group Holdings. The Ackerman group hired a French firm (unnamed in the record) and the law firm of Shearman & Sterling, LLP (Shearman & Sterling), in New York City, to assist in the proposed transaction with CDR.

Mr. Lerner testified that "When our conversation began

with Rene Claude [Jouannet] about acquiring MGM Holdings, I already knew from the due diligence exercise before that there were, I would say, complex tax issues arising from the acquisition of that company", including tax basis and NOL issues. He testified that he asked Shearman & Sterling to give him "an analysis of the ways in which a transaction could be organized involving MGM Holdings so that any tax attributes that might have existed could be preserved."Shearman & Sterling prepared two memoranda summarizing the anticipated U.S. tax consequences of certain hypothetical transactions involving MGM Holdings.

On November 1, 1996, Alvin D. Knott of Shearman & Sterling sent a letter to William Wofford, an associate at White & Case, requesting documentation of obligations that MGM Group Holdings owed; balance sheets and income statements of MGM Group Holdings, MGM, and Generale Bank; documentation of the loans from CLBN to Pathe; documentation of the transactions in which MGM Group Holdings acquired Sealion's 1.5-percent interest in MGM Group Holdings; and documentation of the liquidation of MGM Holdings. On November 6 and 8, 1996, Mr. Wofford sent two letters to Mr. Knott providing the requested information and documentation. On December 3, 1996, Mr. Knott sent a letter to Mr. Lerner enclosing these letters and summarizing the information and documentation received. On December 6, 1996, Mr. Wofford faxed to Mr. Lerner's representative, James M. Rhodes: (i) The debt release and assumption agreement dated as of October 9, 1996, by and among MGM Group Holdings, MGM, and Credit Lyonnais; and (ii) the certificate of amendment of MGM Group Holdings, changing its name to SMHC.

#### B. *Negotiation and Drafting Process*

At some point, Mr. Lerner, on behalf of Rockport Capital, and Mr. Jouannet, on behalf of CDR, decided to move forward with a transaction involving MGM Group Holdings. Negotiations concerning this proposed transaction continued throughout October and November 1996. The law firm of White & Case, LLP, represented the interests of CDR during the course of the negotiation, drafting, and agreement process with the Acker-

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

man group. Sean Geary was the lead attorney in White & Case's representation of CDR.

### 1. Rockport Capital Confirms Its Interest

**\*15** On September 11, 1996, Mr. Lerner sent a letter to Mr. Geary, as counsel for CDR, confirming "the interest of Rockport Capital * * * in MGM Holdings, Inc. * * * and the U.S. tax attributes which may relate to the direct and indirect investments by Credit Lyonnais, S.A., and * * * [CDR] in Metro-Goldwyn-Mayer, Inc." The letter agreement did not mention any films or film business.

### 2. Draft Term Sheet and Letter Agreements

On October 16, 1996, at Mr. Lerner's request, Shearman & Sterling sent Mr. Geary a "Draft Term Sheet" proposing a transaction with Generale Bank concerning MGM Group Holdings. The draft term sheet contained a section entitled "Initial Transactions", providing:

> Generale Banque acquires all the stock of MGM Group Holdings ("Group") and subsequently contributes obligations owed to it by Group in the approximate amount of $1.050 billion (collectively, the "Note") to the capital of Group.

The draft term sheet proposed an alternative transaction whereby:

> if CLIS's current basis in Group stock is significant, in lieu of the transactions described in the term sheet: (a) CLIS will contribute all of the stock of Group to Newco in exchange for Preferred Interests, (b) Generale Banque will contribute the Note to Newco in exchange for Preferred Interests, and (c) Newco will contribute the Note to Group.

The draft term sheet also contained a section entitled "Transaction Structure", providing:

> Step 1: Rockport Capital, Inc., and its associates (the "Initial Members") form a Delaware limited liability company ("Newco"), and contribute assets (cash and securities) to Newco in an agreed amount to enhance and monetize the value of the Preferred Interests to be issued in Step 2.

> Step 2: Generale Banque contributes all of the stock of Group to Newco in exchange for preferred membership interests in Newco ("Preferred Interests").

The draft term sheet contained a section called "Terms of Preferred Interests", which provided:

> The Preferred Interests will have a liquidation value equal to $ ___ million, will have a 6% per annum dividend preference, and will be convertible after 5 years into 51% of Newco's common membership interests, *provided* that if the conversion right is exercised, Newco may redeem all of the Preferred Interests at their liquidation value plus accrued and unpaid dividends. The conversion right will be accelerated in the event Newco fails to make a dividend payment when due on the Preferred Interests, and in other pertinent circumstances.

In addition to these items, the draft term sheet contained a section entitled "Conditions", which, among other things, required Generale Bank to give satisfactory representations and warranties to Newco and Rockport Capital as to the original amount of the loans evidenced by its "Note", the amount outstanding under those loans at the time of the contribution of the note to Newco, and the fact that MGM Group Holdings and Generale Bank continuously recorded the note as debt from the date of its creation through the date of contribution. It also provided that Rockport Capital (and its associates) would decide whether Newco should be structured as a partnership or a corporation for Federal income tax purposes. The draft term sheet did not mention any films or film business.

**\*16** On October 21, 1996, at the request of Mr. Lerner, Shearman & Sterling sent Mr. Geary a memorandum entitled "Draft Letter Agreement" discussing the alternative transaction alluded to in the draft term sheet and refining the terms and provisions in the draft term sheet. The memorandum stated that the letter agreement "would require Generale Bank and CLIS simply to transfer their respective assets to a Newco in exchange for preferred interests which will be monetized."[FN25]Rockport Capital would form a Delaware limited liability company ("Newco") and contribute assets (cash and securities) to Newco in an

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

amount mutually agreed by Rockport, CLIS, and Generale Bank, in exchange for all the common interests in Newco; CLIS would contribute all the stock of MGM Group Holdings to Newco in exchange for preferred membership interests in Newco; and Generale Bank would contribute to Newco, in exchange for preferred membership interests, some $1.050 billion of obligations that MGM Group Holdings owed to Generale Bank. Regarding documentation, the first draft letter agreement provided:

> 3. *Documentation.*The Transactions will be documented in the form of an Exchange and Contribution Agreement * * * among Newco, CLIS and * * * [Generale Bank] which will contain customary representations, warranties and indemnification provisions, including, without limitation, (i) representations and warranties by CLIS concerning Group's assets and the absence of any undisclosed liabilities, (ii) representations and warranties by CLIS as to its basis in the stock of Group, (iii) representations and warranties by * * * [Generale Bank] as to the original amount of the loans evidenced by the Note [MGM Group Holdings' debt obligations of $1.05 billion], the amount outstanding under such loans at the time of the contribution of the Note to Newco, and the fact that * * * [Generale Bank] and Group continuously recorded the Note as debt from the date of creation through the date of contribution, and (iv) provisions providing for the indemnification by CLIS and * * * [Generale Bank] of Newco, the Initial Members and their affiliates and agents against breaches of any of the foregoing representations or warranties.

At some point, White & Case took control of drafting the letter agreement. Mr. Geary tried to produce something that reflected his discussions with Mr. Jouannet. Mr. Geary incorporated into the drafting process a side letter agreement giving Generale Bank and CLIS the right to put their preferred interests in Newco (later SMP) to Rockport Advisors (or its affiliate). The put could be exercised "no earlier than December 31, 1996 and no later than December 31, 1997 upon two days written notice from a Seller to Purchaser directing that the Put be effected."The side letter agreement proposed

a $6 million purchase price for the preferred interests and an advisory fee consisting of $4 million plus an amount (not to exceed $2 million) equal to three-quarters of 1 percent of the tax losses, if any, in excess of $1 billion that would have been allocated to all members of Newco (other than Generale Bank, CLIS, Rockport Advisors, CDR, or their affiliates) upon consummation of the various transactions. The $6 million purchase price and the advisory fee were to be deposited in a blocked account with a bank designated by CDR.FN26 On November 21, 1996, after exchanging numerous drafts of the letter agreement and the side letter agreement, the parties reached a basic agreement. No draft of the letter agreement or side letter agreement mentioned any films or film business.

### 3. *Further Negotiation and Drafting*

**\*17** Although the parties had reached basic agreement on the terms of the proposed transaction, including the put in favor of Generale Bank and CLIS, the transaction did not close at this point. The parties proposed supplementary terms to the letter agreement and to the side letter agreement, as well as several revisions to the terms of the side letter agreement. These proposals primarily concerned the Carolco securities-CDR wanted to retain the benefit of whatever value might be realized on those securities. To this end, the parties added a contingent amount to the put price that would be tied to any recovery on the Carolco securities and also provided certain preferred distribution rights tied to any proceeds realized on a liquidation of Carolco. In addition, the parties agreed that Rockport Capital (instead of Rockport Advisors) and Mr. Lerner would be the initial members of a limited liability company (that would later become SMP), which would be structured as a partnership for Federal tax purposes and would be formed with an aggregate contribution of $20 million. After further negotiations on the terms of the transaction, the attorneys for both sides began distilling those terms into an exchange and contribution agreement, a limited liability company agreement, a deposit account agreement, and an advisory fee agreement.

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

T.C. Memo. 2005-104, 2005 WL 1111792 (U.S.Tax Ct.), 89 T.C.M. (CCH) 1157, T.C.M. (RIA) 2005-104, 2005
RIA TC Memo 2005-104
**T.C. Memo. 2005-104, (U.S.Tax Ct.)2005 WL 1111792**

### 4. *Santa Monica Pictures, LLC, Is Formed*

On December 6, 1996, SMP filed its certificate of limited liability company. On or about December 10, 1996, SMP applied for registration with the State of California for the purpose of registering to transact intrastate business in California.

### C. *Final Agreements and Documents*

On December 11, 1996, the parties finalized the agreements that they had negotiated over the course of several months.

### 1. *Side Letter Agreement*

On December 11, 1996, Rockport Capital, CDR, Generale Bank, and CLIS executed a side letter agreement pursuant to which Rockport Capital irrevocably agreed to purchase, upon written or facsimile notice, all the preferred interests of Generale Bank and CLIS in SMP for a specified purchase price. Under the side letter agreement, CLIS and Generale Bank could exercise the put by giving written or facsimile notice during the period commencing on December 31, 1996, and ending December 31, 1997.[FN27]

The purchase price for the preferred interests consisted of a "Cash Purchase Price" and a "Contingent Amount". The Cash Purchase Price was defined as the amount of CLIS's and Generale Bank's initial preferred capital accounts in SMP ($5 million) plus interest as of the purchase date. The Contingent Amount was defined as: (i) The lesser of $7 million or the amount recovered on the Carolco subordinated notes; plus (ii) the lesser of $3 million or the amount recovered on the Carolco preferred stock.

By its terms, the side letter agreement was not effective until: (i) Each of the parties signed a counterpart of the side letter agreement and received a full set of signed counterparts; and (ii) Rockport deposited $5 million (i.e., the sum of the preferred capital accounts of CLIS and Generale Bank on the closing date of the exchange and contribution agreement) in an account maintained at

Chase Manhattan Bank. The side letter agreement also provided that CLIS and Generale Bank had no obligation to make the contributions provided for in the exchange and contribution agreement unless and until the side letter agreement became effective.

### 2. *Exchange and Contribution Agreement*

**\*18** On December 11, 1996, SMP, CDR, CLIS, Generale Bank, and Rockport Capital entered into an exchange and contribution agreement (the exchange and contribution). Under this agreement, CLIS and Generale Bank agreed to contribute assets to SMP in exchange for preferred membership interests in SMP. According to the exchange and contribution agreement, CLIS was to contribute its SMHC stock and the $79 million receivable.[FN28]Generale Bank was to contribute $974 million in receivables. Schedule 1 of the exchange and contribution agreement described the $79 million receivable and the $974 million in receivables as follows:

#### *Holdings-CLIS Debt*

$79,912,955.34 principal amount of indebtedness, outstanding under the MGM Working Capital Credit Agreement dated as of December 30, 1993 between Metro-Goldwyn-Mayer Inc. ("MGM") and Credit Lyonnais SA. originally owing by MGM and assumed by Santa Monica Holdings Corporation (then known as MGM Group Holdings Corporation and herein "Holdings") on October 9, 1996, together with all accrued interest thereon.

#### *Holdings-GB Debt*

Indebtedness owing by Holdings to Generale Bank Nederland (formerly known as Credit Lyonnais Bank Netherlands) for borrowed money aggregating no less than $974,296,600.85, together with all accrued interests thereon, including that indebtedness evidenced by a promissory note dated December 30, 1993 in the principal amount of $965,904,188.96 and by a promissory note dated October 26, 1994. \* \* \*

CDR and CLIS represented and warranted: (1) SMHC had an authorized capitalization consisting of 200 mil-

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

lion shares of capital stock, of which 60 million shares of common stock, par value $1.00 per share, were issued and outstanding; (2) the aggregate amount of capital CLIS contributed to MGM Holdings from the date of the creation thereof to the date of MGM Holdings's liquidation equaled approximately $605 million; and (3) CLIS had received no payment of principal on the $79 million receivable and had not written down any of the debt for accounting or tax purposes. Generale Bank also represented and warranted that it had received no payment of principal on the $974 million in receivables and had not written down the loans for accounting or tax purposes. CDR retained control of SMHC's tax return filing obligations for all taxable years or other taxable periods ending on or before December 31, 1996.

On December 12, 1996, White & Case faxed to Mr. Lerner and his associates Schedules 1.6(b) and (c) to the exchange and contribution agreement and a revised deposit account agreement. Schedule 1.6(b) lists the "U.S. Video Film Rights" to 65 films (identified by title only),

the rights to 26 development projects, and the rights to the Carolco preferred stock and $33,111,856.98 aggregate principal amount of the Carolco subordinated notes.FN29

### 3. *SMP LLC Agreement*

On December 10, 1996, Rockport Capital and Mr. Lerner formed SMP pursuant to a limited liability company agreement (the SMP LLC agreement). The SMP LLC agreement indicated that among the purposes for which SMP was formed was "to produce and distribute filmed entertainment products and to own interests in entities engaged in such activities".

**\*19** The SMP LLC agreement provided that the members of SMP would have the following membership interests:

|          | Common interest | Preferred interest | Common capital account | Preferred capital account |
|----------|-----------------|--------------------|------------------------|---------------------------|
| Rockport | 50%             | 50%                | $50,000                | $50,000                   |
| Lerner   | 50              | 50                 | 50,000                 | 50,000                    |

The agreement provided for 3 types of interests-Common I, Common II, and Preferred. Members holding Common I interests had exclusive voting rights in SMP. Members holding preferred interests had no voting rights; however, they had the right to convert all their preferred interests into Common II interests on or after December 10, 2001.FN30Members holding Common II interests also had no voting rights in SMP.

Under the SMP LLC agreement, if the members holding preferred interests exercised their conversion rights, SMP had the right to redeem all the preferred interests at a price equal to the sum of the preferred capital accounts for all holders of preferred interests. SMP also had the option to convert the preferred interests into debt of SMP beginning on December 31, 1997, and on conversion, the debt would have a principal amount equal to $5 million for a term of 5 years at an interest

rate of 8 percent per annum.

Mr. Lerner was appointed SMP's manager. The SMP LLC agreement provided that no member could sell, assign, transfer or dispose of, directly or indirectly, by operation of law or otherwise (including by merger, consolidation, dividend, or distribution) any membership interest, without the prior written consent of SMP's manager. It also provided that no member could retire or withdraw from SMP without SMP's manager's written consent except in certain defined circumstances.

Pursuant to the SMP LLC agreement, with certain exceptions, each SMP member (including any additional members) agreed that it would not, and would not cause any of its affiliates to, at any time, reveal to any other person or use in any way detrimental to SMP any nonpublic, confidential, or proprietary information relating to the business and affairs of SMP that was acquired or

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

T.C. Memo. 2005-104                                                                                      Page 23
T.C. Memo. 2005-104, 2005 WL 1111792 (U.S.Tax Ct.), 89 T.C.M. (CCH) 1157, T.C.M. (RIA) 2005-104, 2005
RIA TC Memo 2005-104
**T.C. Memo. 2005-104, (U.S.Tax Ct.)2005 WL 1111792**

otherwise received by such person in connection with the transactions contemplated in the LLC agreement.

### a. *Amendment No. 1*

Mr. Lerner and Rockport Capital executed an amendment ("Amendment No. 1") to the SMP LLC agreement dated as of December 11, 1996, which admitted CLIS and Generale Bank as new members of SMP. Amendment No. 1 recited that CLIS would contribute its SMHC stock and the $79 million receivable to SMP, and Generale Bank would contribute $974,296,600.85 of principal indebtedness owing by SMHC, in exchange for preferred interests in SMP.[FN31] CLIS and Generale Bank executed ratification certificates agreeing to all the terms of the SMP LLC agreement as amended by Amendment No. I.

### b. *Amendment No. 2*

Mr. Lerner, as manager of SMP and as a director of Rockport Capital, executed a second amendment ("Amendment No. 2") to the SMP LLC agreement dated as of December 11, 1996, admitting Somerville S Trust as a member of SMP. Amendment No. 2 required Somerville S Trust to contribute $19.8 million in cash to SMP in exchange for a 99.5-percent common interest in SMP (to be held as a Common I interest).

**\*20** Mr. Lerner, as trustee of Somerville S Trust, executed a document entitled "Assignment" dated December 10, 1996, in which Somerville S Trust contributed $19.8 million in cash and marketable securities to SMP.FN32

The members of SMP had the following membership interests in SMP after December 11, 1996:

|  | Common interest 1 | Preferred interest 2 | Common capital account | Preferred capital account |
|---|---|---|---|---|
| CLIS | 0% | 36.76% | $0 | $1,875,000 |
| Generale Bank | 0 | 61.27 | 0 | 3,125,000 |
| Somerville | 99.50 | 0 | 19,800,000 | 0 |
| Rockport | 2.25 | 0.85 | 50,000 | 50,000 |
| Lerner | 2.25 | 0.85 | 50,000 | 50,000 |

FN1. The common membership interests in SMP do not add up to 100 percent.

FN2. The preferred membership interests in SMP do not add up to 100 percent.

### 4. *Deposit Account Agreement*

On December 11, 1996, Rockport, CDR, and Chase Manhattan Bank entered into a deposit account agreement (the deposit account agreement) pursuant to which Rockport agreed to place $5 million in a blocked account to be paid to Generale Bank and CLIS upon the exercise of the put under the side letter agreement. Pursuant to the deposit agreement, upon notice from CDR directing a distribution to be made, Chase Manhattan Bank was irrevocably directed to distribute the amount specified in the notice. Rockport Capital irrevocably agreed that no amount on deposit in the deposit account could be distributed at the direction of Rockport Capital. The deposit agreement provided that on January 2, 1998, the bank would withdraw and pay to Rockport Capital all funds then on deposit, if no withdrawal had been made by then.

### 5. *Advisory Fee Agreement*

On December 11, 1996, Rockport Capital executed a letter (the advisory fee agreement) agreeing to pay CLIS

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

an advisory fee of $5 million and an additional advisory fee equal to three-quarters of 1 percent of the tax losses, if any, in excess of $1 billion that would be allocated to all members of SMP other than Generale Bank, CLIS, Rockport, or their affiliates as of the exchange and contribution agreement closing date. In the advisory fee agreement, Rockport agreed that "notwithstanding any provision of the * * * [letter agreement] to the contrary, the Effective Date will not occur unless Rockport has made the payment, if any, required by the preceding paragraph."

### 6. Consent

Prior to becoming members of SMP, CLIS and Generale Bank required Mr. Lerner, as manager of SMP, to execute a document (the consent) to provide advance consent to transfer CLIS's and Generale Bank's preferred interests and to withdraw from SMP.[FN33] White & Case drafted the consent on behalf of CLIS and Generale Bank and dated it "_____, 1996".[FN34]

Prior to CLIS's and Generale Bank's becoming members of SMP, Mr. Lerner, as manager of SMP, signed the consent agreeing to CLIS's and Generale Bank's transfer of preferred interests in SMP and withdrawal as members of SMP.

### D. Assignment to Santa Monica Finance, B.V.

**\*21** On December 23, 1996, Mr. Geary sent Mr. Lerner:

(i) A facsimile of an instrument assigning Generale Bank's 61.27-percent preferred interest in SMP to Santa Monica Finance, B.V.; and (ii) an executed ratification certificate from the latter entity.

### E. Exercise of the Put

On December 26, 1996, Mr. Geary, pursuant to the instructions of Mr. Jouannet, sent facsimiles to William Ponce, Gary Mazzola, and Celia Murphy at Chase Manhattan Bank, and to Mr. Lerner, transmitting notices from CLIS and Santa Monica Finance, B.V., exercising their rights under the side letter agreement and the deposit account agreement.[FN35]The $5 million that Somerville S Trust had deposited with Chase Manhattan Bank was duly paid to CLIS and Generale Bank. Per an informal agreement between Rockport Capital and Somerville S Trust, Somerville S Trust became the purchaser and owner of the preferred interests.

### VI. Film Rights Contributed to SMHC

### A. Film Titles and Development Projects

The following film titles and development projects were listed in Schedule 1.6(b) of the exchange and contribution agreement as assets of SMHC:

U.S. Video Film Rights

| | | | |
|---|---|---|---|
| 1. | Alley Cat | 7. | Battle of the Valiant |
| 2. | Astro Zombies | 8. | Beast, The |
| 3. | Auditions | 9. | Blood Brothers |
| 4. | Avenger | 10. | Blood Castle |
| 5. | Banana Monster | 11. | Cardiac Arrest |
| 6. | Battle of the Last Panzer | 12. | Carthage in Flames |
| 13. | Cold Steel for Tortuga | 41. | Octavia |
| 14. | Conqueror and the Empress | 42. | Platypus Cove |
| 15. | Crimson | 43. | Summer Camp Night- |

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

|       |                              |       | mare                     |
|-------|------------------------------|-------|--------------------------|
| 16.   | Demoniac                     | 44.   | Bombay Talkie            |
| 17.   | Duel of Champions            | 45.   | Courtesans of Bombay     |
| 18.   | Equinox                      | 46.   | Hullabaloo over Georgia  |
| 19.   | Erotkill                     | 47.   | Shakespeare Wallah       |
| 20.   | Escape from Hell             | 48.   | Nasty Hero               |
| 21.   | Escape from Venice           | 49.   | To Love Again            |
| 22.   | Fear                         | 50.   | Sticks and Stones        |
| 23.   | Fist of Fear, Touch of Death | 51.   | This Time I'll Make You Rich |
| 24.   | Fraulein Devil               | 52.   | Danger Zone              |
| 25.   | Headless Eyes                | 53.   | Hunter's Blood           |
| 26.   | Invincible Gladiators        | 54.   | Sidewinder One           |
| 27.   | Invisible Dead               | 55.   | Firefight                |
| 28.   | Jungle Master                | 56.   | House of Terror          |
| 29.   | Oasis of Zombies             | 57.   | Ninja Hunt               |
| 30.   | Return of the Conqueror      | 58.   | Ninja Showdown           |
| 31.   | Return of the Zombies        | 59.   | Ninja Squad              |
| 32.   | SS Camp 5                    | 60.   | Outlaw Force             |
| 33.   | SS Experimental Love Camp    | 61.   | Plutonium Baby           |
| 34.   | The Sword & The Cross        | 62.   | Terror on Alcatraz       |
| 35.   | Throne of Vengeance          | 63.   | The Visitants            |
| 36.   | Tiger of the Seven Seas      | 64.   | War Cat                  |
| 37.   | Tormentor                    | 65.   | White Ghost              |
| 38.   | White Slave                  |       |                          |
| 39.   | Zombie                       |       |                          |
| 40.   | Mother & Daughter: Loving War |      |                          |

Development Projects

|     |                    |     |                   |
|-----|--------------------|-----|-------------------|
| 1.  | Atlantis           | 14. | Karma Sutra       |
| 2.  | Captain's Daughter | 15. | "M"               |
| 3.  | Child Prostitution | 16. | Marriage License  |
| 4.  | Detroit Boogie     | 17. | Nobody's Boy      |
| 5.  | Deadly Vision      | 18. | Pied Piper        |
| 6.  | Dubrovsky          | 19. | Price of Passion  |

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

| 7. | Shining City | 20. | Prince and the Pauper |
| 8. | $1.98 Man | 21. | Princess and the Pea |
| 9. | Ballhouse Jam | 22. | Scorched Season |
| 10. | Cinderella | 23. | Snow Queen |
| 11. | Golden Goose | 24. | Strike on Babylon |
| 12. | Goldilocks & 3 Bears | 25. | Tom Sawyer |
| 13. | Jack & the Bean Stalk | 26. | Treasure Island |

B. *History of the EBD Film Library*

1. *Epic Productions*

**\*22** In the late 1980s, through some intermediate steps of ownership, Credit Lyonnais created Epic Pictures Enterprises (Epic Pictures) and Epic Productions, Inc. (Epic Productions). Epic Pictures was created in 1987 or 1988 to take possession of and manage certain motion picture assets. Epic Productions took possession of the stock of Epic Pictures and managed that company after it was created. In 1992, Credit Lyonnais lost confidence in the existing management of Epic Productions and hired John Peters to replace that management and serve as its CEO.[FN36]Mr. Peters worked as Epic Productions' CEO from 1992 until July 1998.

In late 1993 or early 1994, Credit Lyonnais began acquiring other entertainment assets, particularly film libraries, from companies to which Credit Lyonnais had lent money. (When loans from Credit Lyonnais became distressed, Credit Lyonnais would acquire the film assets in workouts, bankruptcies, or other proceedings.) To take possession of, or title to, these film assets, Credit Lyonnais created approximately six companies, including Alpha Library Co., Inc. (Alpha) and Epsilon Library Co., Inc. (Epsilon). After Credit Lyonnais acquired these film assets, it turned them over to Epic Productions to manage. As a result, Epic Productions eventually was managing over 1,000 films (the CDR library).

Credit Lyonnais's overall goal was to liquidate the film assets that it acquired rather than to simply consolidate these assets and pursue business in the entertainment realm. By late 1995, Credit Lyonnais instructed Epic Productions to begin planning the liquidation of the

CDR library; this became the focus of Epic Productions' business operations.

2. *EBD (Rotterdam) Finance, B.V.*

On December 18, 1995, CDR incorporated EBD (Rotterdam) Finance, B .V.(EBD), as a special-purpose entity to take over the so-called EBD film-related portfolio which was excluded from the sale of CLBN to Generale Bank.[FN37]

3. *Selection of Film Titles for CDR*

In 1996, during Epic Productions' efforts to sell the CDR library, someone at either Credit Lyonnais or EBD contacted Mr. Peters and instructed him to find some low-value films and development projects within the CDR library.[FN38]Mr. Peters selected the "U.S. Video Film Rights" to the 65 film titles and the rights to the 26 development projects that were listed in Schedule 1.6(b) of the exchange and contribution agreement.

4. *Assignments Before the Contributions to SMHC*

As described below, a number of documents were executed providing for transfers and assignments of the 65 film titles and 26 development projects that Mr. Peters had selected.

According to a document entitled "Assignment" dated as of December 10, 1996, Alpha assigned and transferred to CLIS: (i) The "U.S. Video Film Rights" to 15 film titles; and (ii) eight development projects for "$0.25 and other good and valuable consideration."FN39According to this document, Alpha made no express or implied warranties or representa-

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

tions with respect to these assets.

***23** According to a second document entitled "Assignment" dated as of December 10, 1996, Epsilon assigned and transferred to CLIS 18 development projects for "$0.25 and other good and valuable consideration."According to this document, Epsilon made no express or implied warranties or representations with respect to these assets.

According to a third document entitled "Assignment" dated as of December 10, 1996, EBD assigned and transferred to CLIS the "U.S. Video Film Rights" to 50 film titles for "$0.50 and other good and valuable consideration."[FN40]According to this document, EBD made no express or implied warranties or representations with respect to these assets.

According to a fourth document entitled "Assignment", dated as of December 10, 1996, EBD, on behalf of itself and its subsidiaries, Alpha, Epsilon, and Epic Pictures (collectively "the EBD group"), assigned and transferred to CLIS the "U.S. Video Film Rights" to 65 film titles (the EBD film rights) and 26 development projects (collectively "the EBD film library") for "$1 and other good and valuable consideration".[FN41]

According to a fifth document entitled "Resolutions of Credit Lyonnais International Services", effective December 10, 1996, CLIS assigned, transferred, and contributed all its rights and interests in the EBD film library to the capital of SMHC.

5. *Storage Conditions of the EBD Film Library*

In 1996, many of the films in the EBD film library were stored at "the Epic warehouse", which Epic Productions owned. The Epic warehouse was a metal shell building, about 30,000 square feet, located near the airport in Burbank, California, about 5 or 6 miles from Epic Productions' offices. At this location, film materials were stored on metal racks along with other materials, including reels of film, posters, publicity materials, cardboard cassette boxes, cassette inventory, old files, an ambulance, and an old Cadillac convertible. Unlike regular film laboratories and facilities, the Epic warehouse was not a temperature- and humidity-controlled facility; it was not bonded; and it did not have good inventory control.

At one time, Epic Productions had a full-time employee who supervised and provided security at the Epic warehouse; however, as of sometime before 1996, Epic Productions had no supervision or security at the Epic warehouse. For this and other reasons, Epic Productions stored no film materials in the Epic warehouse that it regarded as highly valuable or irreplaceable. If Epic Productions had master film material for valuable films, it stored them in secure laboratories with temperature and humidity controls.

VII. *Due Diligence for the CDR Transaction*

A. *James Rhodes*

Sometime in 1996, Mr. Lerner hired an attorney, James Rhodes, to assist with some of the due diligence on the "corporate side" for the transaction between Rockport Capital and CDR. Mr. Rhodes continued his work into 1997, tying up loose ends and following up with White & Case and Mr. Jouannet to complete the Ackerman group's files.

***24** On December 11, 1996, Mr. Rhodes faxed to Mr. Wofford at White & Case a revised draft of a "Basis Chronology", which contained an analysis of the bases of all the assets involved in the transaction between Rockport Capital and CDR. The basis chronology included a section analyzing the basis of the MGM Group Holdings stock, and it listed three transactions affecting the basis of MGM Group Holdings' stock: (i) MGM Holdings's purchase of 98.5 percent of MGM Group Holdings stock in the 1992 foreclosure sale for $483,489,000; (ii) Credit Lyonnais's acquisition of Sealion's 1.5-percent stock interest in MGM Group Holdings that had been pledged to Credit Lyonnais as security for a $150 million loan to Sealion; and (iii) MGM Holdings's contribution of Carolco securities in the face amount of $60 million to MGM Group Holdings on September 28, 1996.

On May 12, 1997, Mr. Wofford sent a facsimile cover

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

sheet to Mr. Rhodes which stated:

> This letter is to confirm that, to our knowledge, none of Credit Lyonnais International Services ("CLIS"), Generale Bank Nederland ("GB"), or any affiliate of Credit Lyonnais S.A. or Consortium de Realisation ("CDR") derived any U.S. tax benefit from the contribution of the stock of Santa Monica Holdings Corporation or the Holdings-CLIS Debt (as defined in the Exchange and Contribution Agreement (the "Agreement") by and among Santa Monica Pictures, L.L.C. (the "Company"), CDR, CLIS, GB and Rockport Capital Incorporated, dated as of December 11, 1996) pursuant to the Agreement or the subsequent disposition by CLIS and GB of interests in the Company.

### B. *Troy & Gould*

In June 1997, Mr. Lerner engaged the law firm of Troy & Gould, P.C., in Los Angeles, California, to perform due diligence on the EBD film library. Two highly regarded entertainment lawyers at Troy & Gould, Gary Concoff and Jonathan Handel, conducted the due diligence. Before engaging Troy & Gould, Mr. Lerner received no documentation tracing the chain of title for the EBD film rights.

### 1. *Chain-of-Title and Record Search*

Troy & Gould contacted individuals at certain law firms and at various entities (principally Epic Productions) that were believed to have held interests in the EBD film library. On December 9, 1997, Mr. Handel sent Mr. Lerner a memorandum containing Troy & Gould's conclusions regarding the nature of the rights that SMHC acquired in the EBD film library. The memorandum summarizes its conclusions as follows:

> The documentation is too fragmentary to draw conclusions with any semblance of confidence. As a matter of general characterization, it would seem that Santa Monica Holdings is intended to have acquired domestic video rights for a term of years to the subject pictures and all rights to the subject development

projects. The domestic rights appear to include Canada as to some but not all pictures. The term of the rights varies from picture to picture.

> Again, the foregoing characterization is subject to the caveat that we have no documentation whatsoever on *most* of the subject pictures and projects, and the documentation we do have is incomplete. In addition, there are outright gaps in the chain of title as to groups of pictures; that is, certain documents relating to transfers of libraries are missing.

> **\*25** For the foregoing reasons, it is not possible to determine what rights have effectively been acquired. It also is unclear who possesses the rights other than domestic video in the various pictures, and who possesses the reversion rights in domestic video.

The memorandum related that Epic Productions provided chain-of-title documentation for only 15 of the 65 film titles (and 22 of 26 development projects), and that many of the 15 film titles for which Troy & Gould received documentation appeared to be the subject of domestic video rights licenses to Embassy and Concorde, but that some of those licenses expired in May 1997.[FN42]

Troy & Gould stated that rights to completed pictures in the EBD film library were apparently acquired by three entities, Epic, Sultan (or its predecessor, Nelson), and Trans World Entertainment; however, Troy & Gould could not determine how these entities acquired rights from other entities appearing in the chain of title, e.g., Embassy. Troy & Gould concluded that this failure represented a significant gap in the chain of title.

Troy & Gould pointed out: "There is no evidence * * * that the Epic entities actually transferred their rights in the subject pictures to EBD, despite the fact that EBD subsequently purported to transfer rights in the pictures"; and "The documentation of the chain of title thus appears unsatisfactory as to the Epic pictures."

Troy & Gould characterized the various assignments of film assets from Alpha, Epsilon, and EBD to CLIS as "quitclaim assignments; that is, the transferors dis-

T.C. Memo. 2005-104                                                                                       Page 29
T.C. Memo. 2005-104, 2005 WL 1111792 (U.S.Tax Ct.), 89 T.C.M. (CCH) 1157, T.C.M. (RIA) 2005-104, 2005
RIA TC Memo 2005-104
**T.C. Memo. 2005-104, (U.S.Tax Ct.)2005 WL 1111792**

claimed all warranties and representations as to the assets."Moreover, although the assignments referred to all right, title, and interest in the film assets, the attached schedules referred only to " 'U.S. Video Film Rights' '. Troy & Gould also indicated that it had no documentation confirming CLIS's assignment of the EBD film library to SMHC; it characterized this lack of documentation as "another significant gap in the chain of title." Troy & Gould expressed further concerns that the term "U.S. Video Film Rights" in Schedule 1.6(b) of the exchange and contribution agreement was not defined and that the exchange and contribution agreement contained no explicit statement that SMHC owned those rights.

## 2. *Access Letters*

While Troy & Gould was conducting its due diligence on the EBD film library, it was also attempting to obtain laboratory and facility access letters to the physical materials of certain film titles in order to enter the laboratories and facilities and examine those physical materials.

## VIII. *Other Film Activities*

In 1997, 1998, and 1999, SMHC (largely through the efforts of Mr. Lerner, sometimes working with Michael Herz, the vice president of Troma Entertainment, Inc.) investigated and acquired a number of film titles and film libraries in addition to the film library acquired in connection with the CDR transaction. A June 16, 1999, memo that Mr. Lerner sent to Mr. Ackerman reported on the film libraries that SMHC had acquired, summarizing the "initial library and acquisitions", the number of titles, and their "Cost" as follows:

| Library | Number of Titles | Cost |
|---|---:|---:|
| | | • |
| MGM (original) | 80 | $5,000,000 |
| Wisdom | 8 | 120,000 |
| City Lights | 15 | 115,000 |
| Five Stones | 5 | 75,000 |
| Vista Street | 24 | 470,000 |
| Moving Picture Factory | 33 | 320,000 |
| Total | 165 | |
| New Production Total | 2 | $615,000 |
| Total | 167 | $6,715,000 |

**\*26** The "Wisdom" library, which Crown Capital purchased in November 1997 from Wisdom Entertainment, Ltd., contained eight karate films. The "City Lights" library, purchased by Crown Capital in September 1997 from Nevada Media Partners, Inc., contained 15 full-length feature films. The "Five Stones" library, purchased by SMHC in October 1998 from Five Stones, Inc., contained five film titles. The "Vista Street" library, purchased by SMHC in March 1999 from Marketing Media Corp. d/b/a Vista Street Entertainment, contained 24 film titles. The "Moving Picture Factory" library, purchased by SMHC in October 1998 from The

Moving Picture Co., Inc., contained 34 film titles.

SMHC also investigated a number of film titles and film libraries that, for one reason or another, it did not acquire.

## IX. *Relationship With TroMetro Films, LLC*

### A. *John H. van Merkensteijn*

John H. van Merkensteijn was Mr. Lerner's longtime friend, client, and business associate. In the 1970s, Mr.

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

T.C. Memo. 2005-104                                                                                                  Page 30
T.C. Memo. 2005-104, 2005 WL 1111792 (U.S.Tax Ct.), 89 T.C.M. (CCH) 1157, T.C.M. (RIA) 2005-104, 2005
RIA TC Memo 2005-104
**T.C. Memo. 2005-104, (U.S.Tax Ct.)2005 WL 1111792**

Lerner had represented Mr. van Merkensteijn in some transactions. Since then, they have stayed in contact and have been friends. Mr. van Merkensteijn participated in transactions with Mr. Lerner both before and after 1996.

### B. TroMetro Films, LLC

On December 15, 1997, Mr. van Merkensteijn formed TroMetro Films, LLC (TroMetro), to be part of a distribution relationship with SMHC and Troma and to purchase receivables from SMP. Mr. van Merkensteijn had no office of his own for TroMetro; instead, he had items sent to Crown Capital's office.

### C. TroMetro's Purchases of SMP's Receivables

In 1997 and again in 1998, TroMetro purchased from SMP portions of the $974 million in receivables that Generale Bank had contributed to SMP in 1996.

#### 1. First Note Purchase Agreement

As of December 19, 1997, TroMetro and SMP entered into a note purchase agreement (the first note purchase agreement) in which TroMetro agreed to purchase "SMP's right, title and interest in and to the $150,000,000 Note" (the $150 million receivable). The consideration for the $150 million receivable was: (i) A certified check of $230,000; and (ii) a promissory note that TroMetro executed in an unspecified amount. SMP agreed to deliver to TroMetro, at the closing of the transaction, a $150 million note endorsed by SMP and payable to the order of TroMetro.

As of December 19, 1997, Mr. van Merkensteijn, as manager of TroMetro, executed an "Unsecured Promissory Note" payable to SMP in the amount of $2,284,000 (the $2,284,000 Trometro note) in connection with TroMetro's purchase of the $150 million receivable. The terms of this note provided that interest would accrue at 7 percent per annum, that interest and principal would be fully amortized over 5 years, and that interest and principal payments would be due and payable in five equal annual installments beginning December 19, 1998.

In connection with the sale of the $150 million receivable at the end of 1997, Mr. Lerner executed a $150 million note (the $150 million note) representing a portion of the $974 million in receivables that Generale Bank had contributed to SMP. The note stated that MGM Group Holdings owed CLBN $150 million.[FN43] Mr. Lerner backdated the note as of December 30, 1993, and signed it as president of MGM Group Holdings; however, Mr. Lerner was not the president, or an officer, of MGM Group Holdings on that date.

**\*27** As a result of the sale of the $150 million receivable, SMP reported the following information on its 1997 Form 1065, U.S. Partnership Return of Income, with respect to the $150 million receivable:

| | |
|---|---|
| Date acquired | 12/30/93 |
| Date sold | 12/19/97 |
| Sales price | $2,514,000 |
| Cost or other basis | $150,000,000 |
| Gain or (Loss) for entire year | ($147,486,000) |

The $147,486,000 loss flowed through to Somerville S Trust.[FN44]

#### 2. Second Note Purchase Agreement

As of December 10, 1998, TroMetro and SMP entered into a second note purchase agreement (the second note purchase agreement) in which TroMetro agreed to purchase "10% of SMP's right, title and interest in and to the Note, representing a $81,590,418 share of the face

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

amount of the Note" (the $81 million receivable).[FN45] The consideration for the $81 million receivable was: (i) A $150,000 certified check; and (ii) a $1.25 million promissory note from TroMetro.

As of December 10, 1998, Mr. van Merkensteijn, as manager of TroMetro, executed an "Unsecured Promissory Note" payable to SMP in the amount of $1.25 million (the $1.25 million TroMetro note) in connection with TroMetro's purchase of the $81 million receivable. The terms of this note provided that interest would accrue at 7 percent per annum, that interest and principal would be fully amortized over 5 years, and that interest and principal payments would be due and payable in five equal annual installments beginning December 10,

1999.

As of December 10, 1998, Mr. Lerner, as manager of SMP, and Mr. van Merkensteijn, as manager of Tro-Metro, signed a document entitled "Assignment." Pursuant to this document, SMP assigned to TroMetro, and TroMetro purchased and assumed from SMP, SMP's right, title, and interest in the $81 million receivable.

As a result of the sale of the $81 million receivable, SMP reported the following information on its 1998 Form 1065 with respect to the $81 million receivable:

| | |
|---|---:|
| Date acquired | 12/30/93 |
| Date sold | 12/10/98 |
| Sales price | $1,400,000 |
| Cost or other basis | $81,590,418 |
| Gain or (Loss) for entire year | ($80,190,418) |

The $80,190,418 loss flowed through to Somerville S Trust.

December 21, 1998, TroMetro paid SMP $150,000 pursuant to the second note purchase agreement. TroMetro never made any additional cash payments on the $1.25 million TroMetro note.

### 3. *Purchase Price Determinations*

Mr. van Merkensteijn testified that the purchase price for the $150 million receivable and the $81 million receivable was determined as percentages of the total value of SMHC's assets, after applying a discount. He testified that the total value of the assets in this calculation was based on an appraisal that Mr. Lerner had obtained from Sage Entertainment.[FN46]Mr. van Merkensteijn did not obtain his own appraisal of SMHC's assets.

### 4. *Payments on the TroMetro Notes*

On December 21, 1998, TroMetro made a $557,046.35 payment to SMP on the $2,284,000 TroMetro note. This payment consisted of $397,166 principal and $159,880.35 interest. It was the only cash payment Tro-Metro ever made on the $2,284,000 TroMetro note. On

### X. *Distribution Agreements*

**\*28** In 1997, SMHC entered into a distribution agreement with TroMetro which, in turn, entered into a distribution agreement with Troma. The distribution agreements covered a portion of the EBD film library and several of SMHC's acquired libraries.

### A. *The TroMetro Distribution Agreement*

As of December 23, 1997, SMHC and TroMetro entered into a distribution agreement (the TroMetro distribution agreement). Pursuant to this agreement, SMHC gave TroMetro a license to distribute 33 of the 65 film titles within the EBD film library, as well as the "Wisdom" library and the "City Lights" library.[FN47]TroMetro never paid any royalties to SMHC pursuant to the Tro-Metro distribution agreement.

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

T.C. Memo. 2005-104                                                                                                      Page 32
T.C. Memo. 2005-104, 2005 WL 1111792 (U.S.Tax Ct.), 89 T.C.M. (CCH) 1157, T.C.M. (RIA) 2005-104, 2005
RIA TC Memo 2005-104
**T.C. Memo. 2005-104, (U.S.Tax Ct.)2005 WL 1111792**

*B. The Troma Distribution Agreement*

As of December 23, 1997, TroMetro and Troma Entertainment, Inc. (Troma), an independent production and distribution company in New York City, entered into a distribution agreement (the Troma distribution agreement), covering the same film titles as the TroMetro distribution agreement.[FN48]Troma never paid any royalties to TroMetro pursuant to the Troma distribution agreement.

*C. Troma Entertainment, Inc.*

Michael Herz and Lloyd Kaufman started Troma while they were students at New York University Law School in 1974.[FN49]Troma is owned by Messrs. Herz and Kaufman, a private company called QIC controlled by Alan Quasha, and Foster Partnership.

In the early 1980s, Troma began distributing its films with a film called "Squeeze Play." Troma eventually produced 25 to 30 films and acquired a number of films through purchases and distribution deals. Troma currently has 800 to 850 film titles.[FN50]All of Troma's film titles are available on its website, and there are distribution materials such as advertising slicks for them. Not all of Troma's films, however, are in current distribution.[FN51]

*D. Troma's Distribution of the EBD Film Library*

*1. Distribution History*

SMHC and SMP distributed no films prior to forming their relationship with Troma. Troma was the only distributor of SMHC films. Of the 65 film titles in the EBD film library, Troma ultimately distributed six films: "Astro Zombies", "Banana Monster", "Battle of the Last Panzer", "Escape from Hell", "Fist of Fear, Touch of Death", and "Plutonium Baby".[FN52]

Several of these distributions ran into legal troubles. On March 27, 1998, Epic Productions informed Troy & Gould that SMHC's rights had expired in "Astro Zombies", "Banana Monster", and "Fist of Fear, Touch of Death".[FN53] Moreover, on June 23, 1999, a representative of Gazotskie Films, Inc., informed Troma Entertainment that SMHC "does not have, nor has it ever had, any rights" relating to "Banana Monster" (a.k.a."Schlock"), and requested that Troma cease and desist its distribution of that film title. Also, on October 23, 1999, Jack H. Harris, the president of Worldwide Entertainment Corp., informed Troma that SMHC's rights in the film title "Astro Zombies" had actually expired in 1987, and requested that Troma cease and desist its distribution of that film.

*2. Distribution Revenue and Expenses*

**\*29** In the course of distributing SMHC films, Troma incurred expenses (e.g., for advertising slicks and media costs) which SMHC either advanced or reimbursed pursuant to the TroMetro and Troma distribution agreements. Periodically, Troma sent Crown Capital (on behalf of SMHC) statements of revenue and expenses and invoices regarding these expenses and the distribution of SMHC films.[FN54]

Mr. Herz testified that the agreement with TroMetro and SMHC had always been for Troma to retain any net revenue from its distribution activities to fund additional distribution expenses rather than to remit royalties.FN55SMHC reported and received no income from licensing video rights to film titles or film financing during 1997 and 1998.

*XI. Transactions With Imperial Credit Industries, Inc.*

In 1997, the Ackerman group engaged in discussions with Imperial Credit Industries, Inc., culminating in the formation of Corona Film Finance Fund, LLC.

*A. Imperial Credit Industries, Inc.*

Before 1992, Imperial Bank acquired or started six different operating businesses. In 1991, Imperial Bank decided to take two of those six businesses public, including a residential mortgage business and thrift and loan. In 1992, Imperial Bank successfully combined those

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

T.C. Memo. 2005-104                                                                    Page 33
T.C. Memo. 2005-104, 2005 WL 1111792 (U.S.Tax Ct.), 89 T.C.M. (CCH) 1157, T.C.M. (RIA) 2005-104, 2005
RIA TC Memo 2005-104
**T.C. Memo. 2005-104, (U.S.Tax Ct.)2005 WL 1111792**

businesses and took them public as Imperial Credit Industries, Inc. (Imperial).[FN56]

During 1996 and 1997, Imperial was a diversified financial services company. It was involved in franchise lending, residential lending, income property lending, asset-based lending, and warehouse lines for mortgage bankers. Imperial's investments included, among other things, an equipment leasing company, a boutique investment bank, and an auto financing company. In 1996, Imperial had 10 operating divisions. Film finance was not one of Imperial's operating divisions.

B. *Shopping for Tax Deals*

At some point in 1997, Imperial sold its interests in Franchise Mortgage Acceptance Corp. (FMAC) and Southern Pacific Funding Corp. (SPFC), resulting in capital gains to Imperial-approximately $300 million from FMAC and $150 million from SPFC. In the planning stage of these transactions, Kevin Villani, as Imperial's CFO, was asked to develop a plan with favorable offsetting tax implications.

On August 27, 1997, at a meeting of Imperial's board of directors, Wayne Snavely, who was Imperial's CEO and chairman, and Mr. Villani reported that Imperial had significant taxable capital gains to be realized from securities sales in 1997. Mr. Villani was requested to develop a plan for presentation to the Board that would include potential investments with favorable offsetting tax implications.

C. *Proposed Transaction With SMP*

Mr. Lerner was on Imperial's board of directors during 1996, 1997, and 1998. Mr. Lerner was aware that Imperial was actively looking for a transaction that would generate large capital losses to offset its capital gains.

On October 7, 1997, Mr. Lerner sent Mr. Villani a memorandum discussing a proposal whereby Imperial would purchase a 25-percent interest in SMP for $5 million. Mr. Lerner represented that SMP had "assets totaling $49 million (with zero liabilities) including: $29

million in film library assets (appraised value) and $20 million in cash[.] ICII's 25% share of the assets would equal approximately $12 .25 million, a multiple of the proposed investment". The memorandum stated: "Rockport intends to use * * * [SMP] as a platform to finance and build a film library of significant size that should enable * * * [SMP] to capitalize on a changing dynamic that is occurring in the film industry."The memorandum also stated:

*30 *Tax Attributes.*In addition to the foregoing, the Company may realize income tax benefits on the disposal of its assets in the form of capital losses. Based on a 25% ownership interest, * * * [Imperial's] share of such losses would be approximately $400 million. We anticipate that the parties would enter into a tax sharing agreement providing for a sharing of the benefits attributable to this loss[.]

Imperial received and considered this memorandum.

On October 24, 1997, Mr. Lerner sent Mr. Villani an email stating:

I am preparing a short term sheet for the film partnership investment we discussed last week. I haven't heard any more from KPMG and I assume that they have no more comments. The two issues we need to tie down are the size of the investment and the compensation formula. A quarter of the partnership would give * * * [Imperial] a loss of about $430 million. The board should approve the deal in broad outlines and we should then work out the details as quickly as possible since time is running out on the year and you have a lot of things to do. * * *

On October 27, 1997, Mr. Lerner faxed Mr. Villani a confidential letter outlining the proposed transaction between SMP and Imperial:

1. * * * [Imperial] will acquire 25 percent of SMP for $5.0 million (25 percent of SMP's cash assets), payable in cash at the Closing. * * * [Imperial] may also have the option to increase its interest in SMP on agreed terms.

2. Any tax benefits derived by * * * [Imperial] or

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

T.C. Memo. 2005-104                                                                                          Page 34
T.C. Memo. 2005-104, 2005 WL 1111792 (U.S.Tax Ct.), 89 T.C.M. (CCH) 1157, T.C.M. (RIA) 2005-104, 2005
RIA TC Memo 2005-104
**T.C. Memo. 2005-104, (U.S.Tax Ct.)2005 WL 1111792**

its affiliates associated with an ownership interest in SMP, including the sale or disposition of any of its assets, will be shared with SMP's current partners on a 50-50 basis. Amounts received by SMP's partners as a result of the sharing of tax benefits will be available for investments with * * * [Imperial] on a deal by deal basis. We anticipate that * * * [Imperial's] share of SMP's potential tax losses will exceed $430 mil- lion.

On October 29, 1997, at a second meeting of Imperial's board of directors, Mr. Lerner proposed that Imperial invest in SMP. Mr. Snavely testified that the proposed investment in SMP was supposed to result in favorable tax treatment.

On November 19, 1997, at a third meeting of Imperial's board of directors, Mr. Lerner formally offered Imperial a 25-percent equity interest in SMP in exchange for a $5 million cash investment. At this meeting, Mr. Lerner distributed a handout that described SMP. He discussed SMP's assets (including its film rights), and he explained SMP's securitization and other financing plans. Mr. Lerner also discussed "the potential market for se-

curitization of film libraries and the due diligence performed to date by * * * [Imperial's] external accountants." After discussing this proposal, Imperial's board resolved to invest in SMP.[FN57]

D. *Proposed Transaction With Corona*

1. *Formation of Corona Film Finance Fund, LLC*

As of November 5, 1997, Mr. Lerner, on behalf of himself, Peridon Corp. (Peridon), and SMP, executed an "Operating Agreement" for the creation of Corona Film Finance Fund, LLC (Corona) as a limited liability company (the Corona LLC agreement). The initial members of Corona were Mr. Lerner, Peridon, and SMP. Mr. Lerner contributed $5,000 cash, Peridon contributed $10,000 cash, and SMP contributed $250,000 cash and the $79 million receivable. As of November 5, 1997, Corona's capital accounts and percentage interests were as follows:

|           | Capital Account | Percentage Interest |
|-----------|----------------:|--------------------:|
| Imperial  |              $0 |               0.00% |
| SMP       |       1,550,000 |               99.00 |
| Mr. Lerner|           5,000 |                0.33 |
| Peridon   |          10,000 |                0.67 |
| Total     |      $1,565,000 |              100.00 |

**\*31** The Corona LLC agreement recited that the purposes for Corona's formation were "to finance the production and exploitation of filmed entertainment products and to own interests in entities engaged in such activities" and "to make investments in connection with the foregoing activities and otherwise." The Corona LLC agreement appointed Mr. Lerner as its manager and authorized him to act on behalf of Corona to appoint employees, officers, or additional managers, and to bind the company in dealings with third parties.[FN58]

2. *The Corona Transaction*

On December 11, 1997, Mr. Lerner sent an email to Irv Gubman, Imperial's general counsel, proposing that the previously discussed transaction be done through Corona rather than SMP. The email states:

Dear Irv. I have thought about our conversation last night and the risk at this point in time. I suggest the following: Lets just do the transaction for a loss of 70 mil (the amount you need, or perhaps a little more or less) through, as we discussed, a new partnership. This reduces the risk related to size. I like this structure much better as it solves your problem today. We can take next year as it comes. Thus, the plan would be as follows: We will create a new partnership

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

T.C. Memo. 2005-104, 2005 WL 1111792 (U.S.Tax Ct.), 89 T.C.M. (CCH) 1157, T.C.M. (RIA) 2005-104, 2005
RIA TC Memo 2005-104
**T.C. Memo. 2005-104, (U.S.Tax Ct.)2005 WL 1111792**

[Corona] into which we will transfer high basis debt. * * * [Imperial] will buy a part of our partnership interest for a price related to the value of the partnership's assets. This will be much less than the amount we originally discussed, probably around $500,000. On the pricing, my partner wants to keep the pricing the same, which we should discuss. In any event, think about this and let me know. We can get this done quickly as I have the entities set up. Thanks, Perry.

Mr. Lerner testified that he was uncomfortable with the large size of the capital loss resulting from the proposed transaction with SMP; he suggested a smaller capital loss. He testified that he purposely told Imperial that it would be very expensive for them because he felt that SMP should profit from Imperial's capital loss.

On December 12, 1997, Mr. Lerner sent a second email to Irv Gubman concerning the proposed transaction with Corona. In this email, Mr. Lerner recommended that Imperial purchase part of SMP's partnership interest for an amount "sufficient to give it a share of the basis equal to around 60-65 million dollars. This loss will be triggered if the * * * [$79 million receivable] is sold. * * * (I think that most of this should be claimed in 1997 as we have a buyer for it by the end of the year.)"The email further states:

5. * * * [Imperial] will need to put capital in for the tax sharing, above and some debt to increase basis. * * * Paul [Lasiter] understands this point. I want to use paart [sic] of the cash to invest with The Lew Horowitz organization to finance movie production. This will come out of our share of the tax sharing payment. * * *

On or about December 12, 1997, drafts were prepared of a purchase agreement and an amendment and restatement of the Corona LLC agreement. In the purchase agreement, SMP agreed to sell and Imperial agreed to purchase 80 percent of SMP's interest in Corona. Mr. Gubman reviewed these drafts and made a handwritten notation on the draft amendment and restatement of Corona's LLC agreement which proposed that "if Imperial's Allocated Losses are disallowed, then upon li-

quidation of the Company [Corona] all moneys contributed to the Company by Imperial shall be returned to Imperial and accrued interest shall be paid thereon at the Treasury (IRS) rate."[FN59]

**\*32** On December 17, 1997, at a fourth meeting of Imperial's board of directors, Mr. Snavely announced that Mr. Lerner had submitted a revised proposal under which Imperial could invest in Corona rather than SMP. Imperial's board reviewed and approved the revised proposal. Mr. Snavely testified that tax losses were driving the Corona transaction and were the primary reason in 1997 for Imperial's investing in the Corona transaction.

3. *Initial Purchase of SMP's Interest in Corona*

SMP and Imperial executed a purchase agreement (the purchase agreement), as of December 15, 1997, providing for Imperial's purchase from SMP of a 79.2-percent membership interest in Corona. According to the purchase agreement, Imperial was to pay $1,252,000 for the membership interest, of which $212,000 was to be paid in cash and the $1.04 million balance was to be paid with a note. In connection with the purchase agreement, Imperial executed a $1.04 million promissory note (the $1.04 million note) dated December 15, 1997, payable to SMP. On December 18, 1997, Imperial paid $212,000 to SMP. No payments of principal or interest were ever made on the $1.04 million note.[FN60]

In an amendment and restatement dated as of December 15, 1997, Corona's LLC agreement was amended and restated to reflect the admission of Imperial as a new member of Corona. This document reflected Imperial's agreement to pay SMP a fee of 20 percent of the tax losses received from Corona. This fee was to be structured as a contribution by Imperial to Corona and a distribution from Corona to SMP. As a result of Imperial's purchase of SMP's membership interest in Corona, Corona's capital accounts and percentage interests were restated as follows:

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

T.C. Memo. 2005-104                                                                              Page 36
T.C. Memo. 2005-104, 2005 WL 1111792 (U.S.Tax Ct.), 89 T.C.M. (CCH) 1157, T.C.M. (RIA) 2005-104, 2005
RIA TC Memo 2005-104
**T.C. Memo. 2005-104, (U.S.Tax Ct.)2005 WL 1111792**

|                | Capital Account | Percentage Interest |
|----------------|-----------------|---------------------|
| Imperial       | $1,240,000      | 79.20%              |
| SMP            | 310,000         | 19.80               |
| Mr. Lerner     | 5,000           | 0.33                |
| Peridon Corp.  | 10,000          | 0.67                |
| Total          | $1,565,000      | 100.00              |

On its November 5 to December 15, 1997, partnership tax return, Corona reported Imperial's initial purchase of SMP's interest as a $64,130,364 capital reduction by SMP and a $64,130,364 capital contribution by Imperial. Corona reported these amounts at tax values, not ac-

$1,252,000

63,489,061

(62,237,061)

The $62,237,061 loss that SMP reported flowed through to Somerville S Trust and then through to Mr. Ackerman, who claimed it on his tax return.

### 4. *Additional Purchase of SMP's Interest in Corona*

On December 23, 1997, Imperial purchased from SMP an additional 14.65-percent interest in Corona pursuant to an amendment to purchase agreement. With this purchase, Imperial had acquired a total interest in Corona of 93.85 percent. Imperial paid $36,700 in cash for the additional interest and increased the amount of its promissory note to SMP by $180,050 for a total note

counting book values. On its tax return for the taxable year ended December 31, 1997, SMP reported the sale of its interest in Corona to Imperial as follows:

Sales price

Basis

Long-term capital loss

payable of $1,220,050 (the $1,220,050 note). Imperial made no payments of principal or interest on this note.FN61

**\*33** On December 23, 1997, the members of Corona executed an amendment to the amended and restated Corona LLC agreement, providing for Imperial's purchase of the 14.65-percent additional interest in Corona. According to this amendment, Corona's capital accounts were restated as follows:

|                | Capital account | Percentage interest |
|----------------|-----------------|---------------------|
| Imperial       | $1,469,000      | 93.85               |
| SMP            | 81,000          | 5.15                |
| Mr. Lerner     | 5,000           | 0.33                |
| Peridon Corp.  | 10,000          | 0.67                |
| Total          | $1,565,000      | 100.00              |

On its partnership tax return for the period December 16 to 31, 1997, Corona reported Imperial's additional purchase as an $11,864,117 capital reduction by SMP and an $11,864,117 capital contribution by Imperial.

On its partnership tax return for the taxable year ended

December 31, 1997, SMP reported the sale of the additional 14.65-percent interest in Corona to Imperial as follows:

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

| | |
|---:|---|
| $216,750 | Sales price |
| 11,864,117 | Basis |
| (11,647,367) | Short-term capital loss |

This $11,647,367 loss flowed through to the Somerville S Trust and then through to Mr. Ackerman, who claimed it on his tax return.

### 5. *Sale of the $79 Million Receivable*

On December 29, 1997, Mr. Lerner, on behalf of Corona, and Mr. van Merkensteijn, on behalf of Tro-Metro, executed a note purchase agreement providing for Corona's sale of the $79 million receivable to Tro-Metro. According to this agreement, the purchase price to be paid by TroMetro was $1,144,000, to consist of $120,000 cash and a $1,024,000 promissory note payable by TroMetro to Corona.[FN62]

On December 29, 1997, the $120,000 cash amount was paid by wire transfer. Mr. van Merkensteijn, on behalf of TroMetro, executed a $1,024,000 promissory note dated December 29, 1997 (the $1,024,000 TroMetro note).[FN63] On December 10, 1998, TroMetro paid $205,191 principal and $82,600 interest on the $1,024,000 TroMetro note. No other cash payments were made on the $1,024,000 Trometro note.

On its partnership tax return for the period December 16 to 31, 1997, Corona reported a $78,768,955 long-term capital loss on the sale of the $79 million receivable. In computing this loss, Corona reported a $1,144,000 sale price and $79,912,955 basis for the $79 million receivable. The loss flowed through to Imperial in the amount of $74,671,378 and to SMP in the amount of $4,097,577. SMP's $4,097,577 loss then flowed through to Somerville S Trust and finally through to Mr. Ackerman. On Schedules K-1 attached to its return, Corona reported the sale of the $79 million receivable as a $74,671,378 decrease in Imperial's capital account and a $4,097,577 decrease in SMP's capital account.

### 6. *Imperial's Capital Contribution*

On January 15, 1998, Corona's members executed a second amendment to the amended and restated Corona LLC agreement, providing that "At the end of any year in which there are Allocated Losses to Imperial, Imperial shall promptly contribute cash in an amount equal to 20.0% of such Allocated Loss."During taxable year 1998, Imperial made a $14,595,652 capital contribution in cash to Corona. This contribution was made in connection with the 20-percent fee that Imperial had agreed to pay SMP for the tax losses that it received from the Corona transaction. SMP later received this $14,595,652 fee.

### 7. *Treasury Bills*

**\*34** In 1997, Imperial had insufficient basis in Corona to recognize the tax losses that were going to flow through from Corona. Consequently, Imperial and Corona devised a scheme, starting in 1997, in which Imperial would purchase U.S. Treasury bills each year-end and simultaneously enter into a repurchase agreement to sell those Treasury bills back at the beginning of the next year. At each yearend, in order to increase its tax basis in Corona, Imperial temporarily assigned the Treasury bills and repurchase agreement to Corona. Imperial repeated the Treasury bill transactions for its 1998 through 2001 taxable years.

### XII. *Subsequent Transactions Involving TroMetro and Troma*

#### A. *Capital Contribution Agreement*

As of March 1, 1999, SMHC and TroMetro entered into a capital contribution agreement. Pursuant to this agreement, TroMetro contributed, assigned, transferred, and conveyed to SMHC all the interests that TroMetro owned and held in the $81 million receivable, the $150 million receivable, and the $79 million receivable. In exchange, TroMetro received a right to receive 20 percent of all classes of stock of SMHC (or its successor),

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

exercisable by TroMetro any time after March 1, 2001 (the TroMetro stock option).

### B. *Assumption Agreement*

As of September 1, 1999, SMP, SMHC, and TroMetro entered into an assumption agreement. Pursuant to this agreement, SMP assumed SMHC's obligation under the TroMetro stock option.

### C. *Transfer and Assignment of the Carolco Securities*

On September 1, 1999, SMHC transferred and assigned to SMP the Carolco preferred stock ($30 million face amount) and the Carolco subordinated notes ($30 million face amount).

### D. *SMHC and Troma Merger*

#### 1. *SMHC Merges Into Troma*

As of September 1, 1999, Troma's stockholders and board of directors approved actions in connection with the issuance of common and preferred stock to SMHC. As of September 2, 1999, SMHC and Troma entered into a purchase agreement. Pursuant to this agreement, SMHC purchased 1,070.6 shares of Troma common stock and 400 shares of Troma Series B convertible preferred stock in exchange for all the assets listed on Schedule 3.3 of the agreement and $2.22 million in cash (the SMHC and Troma merger). The assets listed on Schedule 3.3 were the EBD film rights, the EBD development projects, the "City Lights" library (except for 1 specific film), the "Wisdom" library, the "Moving Pictures" library (except for 4 specified films), the "Five Stones" library, and the "Vista Street" library.[FN64]

#### 2. *SMHC's Dissolution*

On December 10, 1999, SMHC was dissolved. SMP thereafter became the owner of 1,070.6 shares of Troma common stock and 400 shares of Troma Series B convertible preferred stock.[FN65]

### 3. *Tax Return Treatment of the Transaction*

On its amended 1999 corporate income tax return, SMHC reported that on December 10, 1999, a "C" reorganization took place between SMHC and Troma whereby Troma acquired all of SMHC's assets solely in exchange for Troma voting stock (the C reorganization).[FN66] SMHC also reported that "Immediately prior to the 'C' reorganization * * * [SMP], the sole shareholder made a capital contribution consisting of obligations of the company having a face value and adjusted basis of $738,307,459."SMHC reported that "Subsequent to the asset transfer, * * * [SMHC] liquidated and distributed the Troma Entertainment, Inc. stock (which it received in exchange for its assets) to its sole shareholder * * * [SMP]."

**\*35** On its amended 1999 partnership return, SMP reported its total basis in the Troma stock as $1,409,759,123.

### 4. *Termination of the Distribution Agreements*

On June 21, 2001, in connection with the SMHC and Troma merger, TroMetro sent to Mr. Herz of Troma and Mr. Lerner of SMP a letter confirming for SMP's and Troma's records: (1) The consideration that was due and payable by TroMetro to SMHC pursuant to the TroMetro distribution agreement for the period December 23, 1997, to September 2, 1999, was waived; and (2) the consideration receivable by TroMetro from Troma pursuant to the Troma distribution agreement for the period December 23, 1997, to September 2, 1999, was waived. In this letter, TroMetro asked SMP and Troma to confirm for TroMetro's records that: (1) The agreement to the termination of the TroMetro and Troma distribution agreements; and (2) the agreement to waive any consideration due under those distribution agreements.[FN67]

At some point thereafter, the TroMetro distribution agreement and the Troma distribution agreement were terminated. Both TroMetro and SMHC waived any rights under those agreements to all royalties that had accrued between December 23, 1997, and September 2, 1999.

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

### E. *Letter Agreement With TroMetro*

On March 29, 2001, Mr. van Merkensteijn, on behalf of TroMetro, and Mr. Lerner, on behalf of SMP, entered into a letter agreement. Pursuant to this letter agreement, TroMetro deferred its right to exercise the TroMetro stock option for no more than 6 months.

### F. *Troma Finance, LLC*

As of December 12, 2001, Troma Finance, LLC (Troma Finance), SMP, and TroMetro entered into an "Operating Agreement of Troma Finance LLC". Pursuant to this agreement, Troma Finance was formed and TroMetro was designated as its manager. [FN68]

As of December 12, 2001, Troma Finance and TroMetro executed a document entitled "Capital Contribution and Assignment and Assumption Agreement" between Troma Finance, SMP, and TroMetro.[FN69]Pursuant to this agreement, SMP agreed to contribute to Troma Finance: (i) $3.4 million in cash, (ii) the $2,284,000 TroMetro note, (iii) the $1.25 million TroMetro note, (iv) 1,070.6 shares of Troma common stock, and (v) 400 shares of Troma Series B convertible preferred stock.[FN70]TroMetro agreed to contribute to Troma Finance: (i) The TroMetro stock option, and (ii) its 75-percent interest in the Action Entertainment Co. (a New York general partnership). Troma Finance assumed TroMetro's obligations under: (i) A $150,000 note issued by TroMetro to IFG Film Fund, LLC, (ii) the $1,024,000 TroMetro note, (iii) the $2,284,000 TroMetro note, and (iv) the $1.25 million TroMetro note.

### XIII. *Business Characteristics of SMP, Corona, and SMHC*

#### A. *SMP*

SMP has never had any employees. Until December 1997, SMP had no bank account. During the taxable years ended December 31, 1997 and 1998, SMP had no separate office of its own; it used the same business address as Crown Capital.

**\*36** SMP neither received nor reported any income from film financing, film library licensing, or video rights licensing during its taxable years ended 1997 and 1998.

#### B. *Corona*

Corona has never had any employees. During the taxable years ended December 31, 1997 and 1998, Corona had no separate office of its own; it used the same business address as Crown Capital.

Corona received no income from film financing, film library licensing, or video rights licensing during its taxable years ended December 31, 1997 and 1998.

#### C. *SMHC*

SMHC had no employees from December 11, 1996, until it was dissolved in 1999. All its work was done by Crown Capital. SMHC had no bank account from December 11, 1996 until December 1998. During the taxable years ended December 31, 1997 and 1998, SMHC did not have a separate office of its own; it used the same business address as Crown Capital.

### XIV. *Partnership Tax Returns*

#### A. *SMP*

Following an extension to October 15, 1998, SMP filed its 1997 partnership tax return, which it dated October 14, 1998. Following an extension to October 15, 1999, SMP filed its 1998 partnership tax return, which it dated October 14, 1999. SMP thereafter filed an amended 1998 partnership tax return, which it dated October 22, 1999. During the taxable years at issue, SMP reported Mr. Lerner, Rockport Capital, Somerville S Trust, Generale Bank, and CLIS as having varying interests in SMP's profits, losses, and ownership of capital.

On its 1997 tax return, SMP reported that the adjusted basis of the $974 million in receivables from Generale Bank was $974,296,601; that the adjusted basis of the $79 million receivable was $79,912,955; and that the

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

T.C. Memo. 2005-104                                                                                   Page 40

T.C. Memo. 2005-104, 2005 WL 1111792 (U.S.Tax Ct.), 89 T.C.M. (CCH) 1157, T.C.M. (RIA) 2005-104, 2005
RIA TC Memo 2005-104

**T.C. Memo. 2005-104, (U.S.Tax Ct.)2005 WL 1111792**

adjusted basis of the SMHC stock was $665 million. On its 1998 return, SMP reported that the adjusted basis of one portion of the $974 million in receivables was $81,590,418; that the adjusted basis of the remaining portion was $512,793,227; and that the adjusted basis of the SMHC stock was $665 million.

On Schedule D, Capital Gains and Losses, of its 1997 partnership tax return, SMP reported its sales of the $150 million (face value) notes receivable to TroMetro, and its sales to Imperial of 14.8 and 79.2-percent interests in Corona. As described in more detail *supra*, SMP reported a long-term capital loss of $147,486,000 on its sale of the receivable; a short-term capital loss of $11,647,367 with respect to the sale of the 14.8-percent Corona interest; and a long-term capital loss of $62,237,061 with respect to the sale of the 79.2-percent Corona interest.

On Schedule D of its 1998 partnership tax return, SMP reported its sale of $81,590,418 (face value) notes receivable. As described in more detail *supra*, SMP reported a long-term capital loss of $80,190,418 on this sale.

### B. *Corona*

Following an extension to October 15, 1998, Corona filed its 1997 partnership tax return (for the period December 16, 1997, to December 31, 1997), which it dated October 14, 1998. Corona reported Mr. Lerner, Peridon, SMP, and Imperial as having varying interests in Corona's profits, losses, and ownership of capital. Corona reported Mr. Lerner as its tax matters partner.

**\*37** Corona reported a $79,912,955 basis in the $79 million receivable. As described in more detail *supra*, on Schedule D of its 1997 partnership tax return Corona reported selling this receivable for a long-term capital loss of $78,768,955.

### C. *Mr. and Mrs. Ackerman*

Peter and Joanne Ackerman filed joint Federal income tax returns for 1997 and 1998. On their 1997 return, the Ackermans reported a net long-term capital loss from

SMP of $213,715,813 and a net short term capital loss from SMP of $11,545,023.

Among other gains and losses, the $213,715,813 net long-term capital loss included these items: a $147,486,000 loss that flowed through from SMP to Somerville S Trust to the Ackermans when SMP sold the $150 million receivable in 1997; a $62,237,061 loss that flowed through from SMP to Somerville S Trust to the Ackermans when SMP sold 79.2 percent of its interest in Corona in 1997; and a $4,097,577 loss that flowed through from Corona to Somerville S Trust to the Ackermans when Corona sold the $79 million receivable in 1997.[FN71]

The $11,545,023 net short-term capital loss flowed through from SMP to the Ackermans when SMP sold 14.65 percent of its interest in Corona to Imperial in 1997.[FN72]

On their 1998 return, the Ackermans reported a net long-term capital loss from SMP of $80,190,418, which flowed through from SMP to Somerville S Trust to the Ackermans when SMP sold the $81 million receivable to TroMetro in 1998.[FN73]

### XV. *Notices of Final Partnership Administrative Adjustment*

### A. *SMP*

On January 24, 2003, respondent issued Notices of Final Partnership Administrative Adjustment (FPAAs) to SMP for its taxable years ended December 31, 1997 and 1998.

For 1997, respondent disallowed SMP's claimed long-term capital loss of $147,486,000 on the 1997 sale of the $150 million receivable. Respondent also disallowed SMP's claimed short-term capital loss of $11,647,367 and long-term capital loss of $62,237,061 on the sales of its interests in Corona. Respondent determined instead that SMP recognized long-term capital gain of $2,514,000 on the sale of the receivable, and short-term capital gain of $198,941 and long-term capital gain of $1,034,809 on the sales of its interests in

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Corona.[FN74]

Respondent determined that, pursuant to section 6662(h), the 40-percent accuracy-related penalty for gross valuation misstatements applies to all of SMP's partnership adjustments for 1997. Alternatively, respondent determined that, pursuant to section 6662(a), the 20-percent accuracy-related penalty applies on the grounds of negligence or disregard of rules and regulations, a substantial understatement of income tax, or a substantial valuation misstatement.

For 1998, respondent disallowed SMP's claimed long-term capital loss of $80,190,418 on the 1998 sale of the $81 million receivable. Respondent determined instead that SMP recognized long-term capital gain of $1.4 million on this sale.[FN75]Respondent determined that, pursuant to section 6662(h), the 40-percent accuracy-related penalty for gross valuation misstatements applies to all of SMP's partnership adjustments for 1998 (except for the aforementioned long-term capital gain adjustment of $211,407). Alternatively, respondent determined that, pursuant to section 6662(a), the 20-percent accuracy-related penalty applies on the grounds of negligence or disregard of rules and regulations, a substantial understatement of income tax, or a substantial valuation misstatement.

### B. *Corona*

**\*38** On January 24, 2003, respondent issued an FPAA to Corona for its taxable year ended December 31, 1997. Respondent disallowed Corona's claimed long-term capital loss of $78,768,955 on the sale of the $79 million receivable. Respondent determined instead that Corona recognized a long-term capital gain of $1,144,000 on this sale. Respondent determined that, pursuant to section 6662(h), the 40-percent accuracy-related penalty for gross valuation misstatements applies to all of Corona's partnership adjustments for 1997. Alternatively, respondent determined that, pursuant to section 6662(a), the 20-percent accuracy-related penalty applies on the grounds of negligence or disregard of rules and regulations, a substantial understatement of income tax, or a substantial valuation misstatement.

### OPINION

As becomes apparent from the foregoing findings, the facts in these cases are a virtual labyrinth. At the heart of the labyrinth, where one might expect to find, if not a Minotaur, then at least an old movie lion, we find high-basis, low-value assets (said to have spawned startling losses) and some B-grade films. To help thread the labyrinth, we briefly recap some salient facts.

In 1996, Mr. Lerner was involved with the Safari consortium's failed bid to acquire MGM. Subsequently, Mr. Lerner was contacted by CDR's representative, Rene Claude Jouannet, who had been assigned the task of selling the assets in MGM's parent company, MGM Group Holdings (later renamed SMHC). Messrs. Lerner and Jouannet struck a deal: Rockport Capital, Mr. Lerner, Generale Bank, and CLIS would join together as purported members of a limited liability company, SMP, which elected to be treated as a partnership for Federal tax purposes. In exchange for common interests in SMP, Rockport Capital and Mr. Lerner would contribute $20 million cash or marketable securities. In exchange for preferred interests in SMP, Generale Bank would contribute its $974 million in receivables from SMHC, and CLIS would contribute its $79 million receivable and SMHC stock. At the time of these contributions, the receivables and SMHC stock had purported bases totaling over $1.7 billion. These properties, however, had little, if any, value.

As part of the transaction between CDR and the Ackerman group, CDR negotiated a side letter agreement in which Rockport Capital agreed to purchase Generale Bank's and CLIS's (sometimes, collectively, the banks) preferred interests in SMP upon written notice from those entities (put rights). The banks' put rights were exercisable during a 1-year period beginning December 31, 1996. The deal closed on December 11, 1996. Less than 3 weeks later, on December 31, 1996 (the first day of the 1-year put period), the banks exercised their put rights. Somerville S Trust (standing in the shoes of Rockport Capital) purchased the banks' preferred interests in SMP.

In 1997 and again in 1998, SMP sold to TroMetro por-

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

tions of the $974 million in receivables that Generale Bank had contributed. SMP reported a $147,486,000 loss on the sale of the $150 million receivable in 1997 and a $80,190,418 loss on the sale of the $81 million receivable in 1998.[FN76]These losses flowed through to Somerville S Trust under the partnership tax rules. Also in 1997, Mr. Lerner negotiated a deal with Imperial, wherein SMP contributed the $79 million receivable to a new limited liability company, Corona, which also elected partnership tax treatment, and SMP then sold 79.2- and 14.65-percent membership interests in Corona to Imperial.[FN77]The transactions produced losses for SMP of $62,237,061, and $11,647,367, respectively, which flowed through to Somerville S Trust. In 1997, Corona sold the $79 million receivable to TroMetro, generating a $78,768,955 loss, $74,671,378 of which flowed through to Imperial and $4,097,577 of which flowed through to SMP and then to Somerville S Trust.FN78

**\*39** The core issue is whether respondent has properly disallowed these claimed losses. Petitioner's claims to the losses rest on the partnership tax rules, which are contained in subchapter K (secs. 701 to 777) of the Code. Although the operation of these rules is not directly in dispute, the effects of these rules permeate the transactions in question and inform our analysis. We start with an overview of these rules.

### I. *Partnership Tax Rules*

#### A. *In General*

A partnership is not subject to Federal income tax at the partnership level; instead, persons carrying on business as partners are liable for income tax only in their separate or individual capacities. Sec. 701; see secs. 702, 704 (providing rules for determining partners' distributive shares), sec. 703 (providing rules for computing taxable income of a partnership). A partner must take into account his or her distributive share of each item of partnership income, gain, loss, deduction, and credit.[FN79]Sec. 702(a); *Vecchio v. Commissioner,* 103 T.C. 170, 185, 1994 WL 424091 (1994). A partner's distributive share of partnership loss (including capital

loss) is allowed only to the extent of the partner's adjusted basis in his or her partnership interest at the end of the partnership taxable year in which the loss occurred. Sec. 704(d); *Oden v. Commissioner,* T.C. Memo.1981-184, affd. without published opinion 679 F.2d 885 (4th Cir.1982).

Generally, when property is contributed to a partnership in exchange for a partnership interest, neither the partnership nor any of its partners recognize gain or loss. Sec. 721(a). The partner's basis in a partnership interest acquired by a contribution of property to the partnership is the amount of any money contributed plus the contributing partner's adjusted basis in other contributed property at the time of the contribution ("outside basis"). Sec. 722. Similarly, the partnership's basis in property contributed to a partnership by a partner is the contributing partner's adjusted basis in the property at the time of the contribution. Sec. 723. Each partner's proportionate share of the partnership's basis in its property is referred to as "inside basis." Cf. *Gindes v. United States,* 228 Ct.Cl. 632, 661 F.2d 194, 197 n. 9 (1981).

Under section 704(c)(1)(A), items of income, gain, loss, and deduction with respect to property contributed to a partnership by a partner are specially allocated among the partners so as to take account of any variation between the partnership's basis in the contributed property and its fair market value at the time of contribution (this variation is sometimes referred to as built-in gain or loss). See sec. 1.704-3, Income Tax Regs. (providing special rules for allocating items between noncontributing and contributing partners). This rule is generally designed to prevent transfers of built-in gain or loss from the contributing partner to the other partners.

If the contributing partner transfers his partnership interest, built-in gain or loss must be allocated to the transferee partner as it would have been allocated to the transferor partner. Sec. 1.704-3(a)(7), Income Tax Regs. If the partnership has made a one-time election under section 754, adjustments are made with respect to the transferee partner's inside basis, essentially so as to approximate the result of a direct purchase of the property by the transferee partner.[FN80]See H. Conf. Rept. 108-755, at 401 (2004). Consequently, if the partnership

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

**T.C. Memo. 2005-104, (U.S.Tax Ct.)2005 WL 1111792**

has made a section 754 election, the transferee partner is not allocated any existing built-in gain or loss in the property. On the other hand, if the section 754 election is not made, inside basis in partnership property is not adjusted upon the transfer of a partnership interest. Sec. 743(a). Consequently, in the absence of a section 754 election, the transferee partner may be allocated the built-in gain or loss when the partnership disposes of the property.[FN81]

### B. *Claimed Application of Partnership Tax Rules*

**\*40** Petitioner's position is that when the banks contributed the high-basis, low-value properties (the receivables and SMHC stock) to SMP in exchange for preferred interests, the transaction was a nontaxable event under section 721; SMP received bases equal to the banks' bases in the contributed properties. When the banks sold their preferred interests to Somerville S Trust, their inside basis in the contributed parties went to Somerville S Trust, as a transferee partner, pursuant to section 704(c). Because SMP made no election under section 754, Somerville S Trust's inside basis in the contributed properties was not adjusted. When SMP subsequently sold portions of the $974 million in receivables from Generale Bank, Somerville S Trust was allocated the losses on those sales.

The Ackerman group created a nearly identical scenario when SMP contributed the $79 million receivable to Corona in exchange for a membership interest. Petitioner's position is that SMP received an outside basis in Corona equal to SMP's basis in the $79 million receivable. SMP then sold portions of its Corona membership interest to Imperial at a substantial loss. Under section 704(c), Imperial succeeded to SMP's inside basis in the $79 million receivable. When the $79 million receivable was sold to TroMetro, Imperial (and to some extent SMP) was allocated the substantial loss from that sale, effectively duplicating the loss that SMP had realized on the sales of its Corona membership interest.

### II. *Burden of Proof*

Generally, in actions to redetermine respondent's part-

nership-level adjustments in an FPAA, as in other actions in this Court, the burden of proof is on petitioner, unless otherwise provided by statute or determined by the Court. Rules 142(a), 240(a); *Saba Pship. v. Commissioner,* T.C. Memo.2003-31.

Respondent has pleaded new matter in his amendments to answer, filed April 23, 2004; specifically, that SMP's reported tax basis in its SMHC stock should be adjusted to zero and that SMP's sales of receivables to TroMetro should be treated as sales of an option to acquire an equity interest in SMHC or its successor. Under Rule 142(a), respondent bears the burden of proof with respect to this new matter.[FN82]

In certain cases, the burden of proof shall be on the Commissioner if, in any court proceeding, the taxpayer introduces credible evidence with respect to any factual issue relevant to ascertaining the liability of the taxpayer for any tax imposed by subtitle A or B of the Code. Sec. 7491(a)(1).[FN83] Nonetheless, in the case of a partnership, corporation, or trust, section 7491(a)(1) applies only if the taxpayer meets the net worth limitations that apply for awarding attorney's fees pursuant to section 7430; i.e., a corporation, trust, or partnership whose net worth exceeds $7 million is ineligible for the benefits of section 7491(a)(1). Secs. 7491(a)(2)(C), 7430(c)(4)(A)(ii); 28 U.S.C. sec. 2412(d)(1)(B) and (2)(B) (as in effect on Oct. 22, 1986). Petitioner has not alleged, and the record does not establish, that SMP or Corona meets these requirements. Accordingly, section 7491(a) does not apply. See H. Conf. Rept. 105-599, at 240, 242 (1998), 1998-3 C.B. 747, 994, 996 (stating that the taxpayer has the burden of proving it meets the requirements in sec. 7491(a)(2)).

**\*41** Except for the items raised as new matter in respondent's amendment to answer, we conclude that petitioner bears the burden of proof with respect to the factual issues in these cases. In any event, we do not resolve any of the issues solely on the basis of placement of the burden of proof. Instead, we decide the issues on the basis of the preponderance of the evidence.

### III. *Economic Substance*

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

T.C. Memo. 2005-104                                                    Page 44
T.C. Memo. 2005-104, 2005 WL 1111792 (U.S.Tax Ct.), 89 T.C.M. (CCH) 1157, T.C.M. (RIA) 2005-104, 2005
RIA TC Memo 2005-104
**T.C. Memo. 2005-104, (U.S.Tax Ct.)2005 WL 1111792**

*A. Parties' Contentions*

Respondent does not dispute the operation of the partnership basis and loss provisions in these cases. Respondent also does not challenge whether SMP and Corona were formed as bona fide partnerships or whether those entities should be respected for Federal tax purposes. Cf. *ASA Investerings Pship. v. Commissioner,* 201    F.3d    505    (D.C.Cir.2000),    affg.    T.C. Memo.1998-305. Instead, respondent contends that substance over form principles, including the step transaction doctrine, require the various transactions at issue to be recast as direct sales of the high-basis, low-value receivables and SMHC stock (thereby negating any transfers of built-in losses among purported partners).

More particularly, respondent contends that after the Ackerman group failed to acquire New MGM, Mr. Lerner developed a plan to acquire the tax benefits associated with the debt and stock of MGM Group Holdings. Pursuant to this plan, Generale Bank and CLIS would contribute the high-basis, low-value receivables and SMHC stock to SMP in exchange for preferred interests, followed by a sale of the preferred interests to Mr. Ackerman's entities. Because the only purpose for the transaction was tax reduction, respondent argues, "Generale Bank and CLIS should be disregarded as members of SMP and their 'contributions' to SMP followed by their 'sale' of the preferred membership interests to Rockport should be recast as a direct sale of the high basis/low value assets to Rockport for $10 million."[FN84]

Petitioner insists that the form of the transaction in question should be respected. Petitioner argues that there were valid business reasons, apart from tax reasons, for the transaction. Petitioner argues that the Ackerman group and the banks entered into the transaction as part of a plan to partner in a film distribution business. Petitioner contends that the partnership form was chosen for valid business reasons, because it was the only vehicle flexible enough to accommodate these business objectives, as well as the complexities of the transaction itself.

*B. General Legal Principles*

It is well established that the "incidence of taxation depends upon the substance of a transaction" rather than its mere form. *Commissioner v. Court Holding Co.,* 324 U.S. 331, 334, 65 S.Ct. 707, 89 L.Ed. 981 (1945). In determining the substance of a transaction for Federal tax purposes, we are guided by the foundational principles that the U.S. Supreme Court stated in *Gregory v. Helvering,* 293 U.S. 465, 469, 55 S.Ct. 266, 79 L.Ed. 596 (1935): "The legal right of a taxpayer to decrease the amount of what otherwise would be his taxes, or altogether avoid them, by means which the law permits, cannot be doubted. * * * But the question for determination is whether what was done, apart from the tax motive, was the thing which the statute intended."See also *Knetsch v. United States,* 364 U.S. 361, 365, 81 S.Ct. 132, 5 L.Ed.2d 128 (1960); *Commissioner v. Court Holding Co.,supra* at 334.

**\*42** Under *Gregory v. Helvering,supra,*"it is immaterial whether we are talking about 'substantial economic reality,' 'substance over form,' 'sham' transactions, or the like; rather the question is whether under the statute and regulations here involved the transaction affects a beneficial interest other than the reduction of taxes."*United States v. Ingredient Tech. Corp.,* 698 F.2d 88, 94 (2d Cir.1983).

The mere fact that the parties to the transaction might take favorable tax consequences into account is not of itself fatal to the transaction. *Frank Lyon Co. v. United States,* 4 35 U.S. 561, 580, 98 S.Ct. 1291, 55 L.Ed.2d 550 (1978). As Judge Learned Hand observed in *Chisholm v. Commissioner,* 79 F.2d 14, 15 (2d Cir.1935), revg. 29 B.T.A. 1334 (1934):

a man's motive to avoid taxation will not establish his liability if the transaction does not do so without it. It is true that * * * [the Supreme Court] has at times shown itself indisposed to assist such efforts, and has spoken of them disparagingly; but it has never, so far as we can find, made that purpose the basis of liability; and it has often said that it could not be such. The question always is whether the transaction under scrutiny is in fact what it appears to be in form; a mar-

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

riage may be a joke; a contract may be intended only to deceive others; an agreement may have a collateral defeasance. In such cases the transaction as a whole is different from its appearance. True, it is always the intent that controls; and we need not for this occasion press the difference between intent and purpose. We may assume that purpose may be the touchstone, but *the purpose which counts is one which defeats or contradicts th e a pparent transaction,* not the purpose to escape taxation which the apparent, but not the whole, transaction would realize. * * * [Citations omitted; emphasis added.]

In applying these general legal principles, courts have developed a number of more particularized judicial doctrines including: The sham transaction doctrine, the substance over form doctrine, the step transaction doctrine, and the economic substance doctrine. In the instant cases, we focus on the economic substance doctrine.FN85

"An activity will not provide the basis for deductions if it lacks economic substance."*Ferguson v . Commis sioner,* 29 F.3d 98, 101 (2d Cir.1994), affg.*Peat Oil & Gas Associates v. Commissioner,* 100 T.C. 271, 1993 WL 95582 (1993). In general, transactions lack economic substance if they " 'can not with reason be said to have purpose, substance, or utility apart from their anticipated tax consequences." ' *Lee v. Commissioner,* 155 F.3d 584, 586 (2d Cir.1998) (quoting *Goldstein v. Commissioner,* 364 F.2d 734, 740 (2d Cir.1966), affg. 44 T.C. 284, 1965 WL 1297 (1965)), affg. in part and remanding in part on another ground T.C. Memo.1997-172.FN86

In *Frank Lyon Co. v . United States,supra* at 583-584, the U.S. Supreme Court held that a transaction has economic substance if "there is a genuine multiple-party transaction with economic substance which is compelled or encouraged by business or regulatory realities, is imbued with tax-independent considerations, and is not shaped solely by tax-avoidance features that have meaningless labels attached". See *Newman v. Commissioner,* 902 F.2d 159, 163-164 (2d Cir.1990) (analyzing each of these factors), vacating and remanding T.C. Memo.1988-547. Courts have construed this language

to involve a consideration of two related factors, the subjective business purpose and objective economic substance of the transaction. See, e.g., *Lerman v. Commissioner,* 939 F.2d 44, 53-54 (3d Cir.1991), affg. *Fox v. Commissioner,* T.C. Memo.1988-570; *Casebeer v. Commissioner,* 909 F.2d 1360, 1363 (9th Cir.1990), affg. in part, revg. in part, and remanding on another ground 89 T.C. 1229, 1987 WL 257438 (1987); *Kirchman v. Commissioner,* 862 F.2d 1486, 1492 (11th Cir.1989), affg. *Glass v. Commissioner,* 87 T.C. 1087, 1986 WL 22053 (1986); *Rice's Toyota World, Inc. v. Commissioner,* 752 F.2d 89, 91, 94 (4th Cir.1985), affg. in part, revg. in part, and remanding on another ground 81 T.C. 184, 1983 WL 14860 (1983); *Winn-Dixie Stores, Inc. & Subs. v. Commissioner,* 113 T.C. 254, 279-280, 1999 WL 907566 (1999), affd. 254 F.3d 1313 (11th Cir.2001).

### C. *Summary of Conclusions*

**\*43** On the basis of all the evidence in the record, we conclude that the transaction whereby the banks purported to become partners in SMP, only to exit some 3 weeks later, was not in substance what it appeared to be in form. The exclusive purpose of this apparent transaction, we conclude, was to transfer to the Ackerman group enormous tax attributes associated with the banks' high-basis, low-value receivables and SMHC stock. To that end, the banks purported to join SMP as partners, contributing these receivables and stock.

To transfer the tax attributes, however, the banks had to do more than enter into the partnership; they also had to exit the partnership, leaving their receivables behind. And so they did, as soon as possible, by "putting" their partnership interests to one of the Ackerman group members. In essence, then, the parties purposed that the banks should join the partnership so as to withdraw from it. It is this schizophrenic purpose which "defeats or contradicts the apparent transaction".*Chisholm v. Commissioner,* 79 F.2d at 15.

We conclude that, in substance, the banks did not become partners of SMP; rather, they transferred their high-basis, low-value receivables and SMHC stock,

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

along with whatever associated tax attributes might survive the transfer, to the Ackerman group for $10 million. In the following discussion, we describe in detail the basis for our conclusions, focusing on the purposes and economic realities of the transactions in question.

### D. *Subjective Business Purpose*

Under the first factor of the economic substance doctrine, subjective business purpose, we must determine whether there was a business purpose for engaging in the transaction other than tax avoidance. See *Bail Bonds by Marvin Nelson, Inc. v. Commissioner,* 820 F.2d 1543, 1549 (9th Cir.1987), affg. T.C. Memo.1986-23.

Petitioner contends that both the banks and the Ackerman group had legitimate, nontax reasons for CDR, Generale Bank, and CLIS to become partners. More particularly, petitioner claims that the banks were interested in partnering with Messrs. Lerner and Ackerman in a "film distribution" business based in the U.S. Petitioner claims that the 65 film rights that the banks contributed to SMHC were valuable assets and were contributed to SMHC as a viable "starter" library for a larger library that the Ackerman group envisioned. Petitioner contends that he and Mr. Ackerman assumed that the banks wanted to continue this relationship into the future and were surprised when the banks exercised their put rights and departed SMP about 3 weeks after purporting to become partners.

### 1. *Banks' Purposes*

At the outset, we note the dearth of direct evidence as to the banks' purposes in entering into the transactions with the Ackerman group. In asserting that the banks were interested in partnering with Messrs. Lerner and Ackerman in a U.S.-based film distribution business, petitioner relies exclusively on his own self-serving testimony.[FN87]Except for the testimony of Sean Geary, CDR's counsel in the transaction with the Ackerman group, petitioner offered no testimony from any representative on the CDR side of the transaction. As we explain in more detail below, Mr. Geary's testimony, in most respects, contradicts petitioner's assertions. In pertinent part, Mr. Geary testified that, to his knowledge, the banks had no intent to produce or distribute film products with the Ackerman group.

**\*44** Petitioner claims, however, that the banks' long-term intentions were known only by one individual, Mr. Jouannet, who is deceased. Petitioner claims that the banks' "intentions went to the grave with Rene Claude Jouannet".[FN88] We are unpersuaded that other knowledgeable witnesses could not have been found among the living. In 1996, Credit Lyonnais, CDR, Generale Bank, and CLIS appear to have been very large banking institutions. It also appears that Credit Lyonnais and CDR were quasi-governmental entities which were subject to considerable oversight by the French government. It seems implausible that all direct knowledge of the particulars of the transaction with the Ackerman group would have resided in one person, Mr. Jouannet. Indeed, representatives of Generale Bank and CLIS executed the various agreements with the Ackerman group. These representatives included Bruno Hurstel of CDR, Richard Devin, chairman of CLIS, and members of the executive board of Generale Bank.[FN89]Petitioner called none of these individuals to testify as to the banks' intentions in the transaction with the Ackerman group. We infer that such testimony would have been unfavorable to petitioner. See *Wichita Terminal Elevator Co. v. Commissioner,* 6 T.C. 1158, 1165, 1946 WL 298 (1946), affd. 162 F.2d 513 (10th Cir.1947).

Notwithstanding these evidentiary gaps, there is a great deal of other evidence in the record which shows that the banks did not intend to enter into any film distribution business with Messrs. Lerner and Ackerman.

### a. *Banks' Prior History With Film Business*

The question arises why the banks in 1996 would have wanted to pursue a film business with anyone, much less with Messrs. Lerner and Ackerman. The Credit Lyonnais group's prior experiences in the film business had not been positive. Beginning in 1991, the Credit Lyonnais group had immersed itself in the fortunes of MGM; it proved to be a financial disaster. Because of its loans and advances to MGM, the Credit Lyonnais

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

group was unable to extricate itself from that company's financial perils. Ultimately, the Credit Lyonnais group was forced to wrest control of MGM from Mr. Parretti and foreclose on the stock interests in MGM. From that point until 1996, the Credit Lyonnais group had to maintain a constant supervisory presence at MGM in an effort to right that company and recoup its loans and advances. To do that, however, the Credit Lyonnais group had to continue advancing MGM significant amounts to keep it alive. The 1993 restructuring and the infusion of a new management team helped MGM to recover; however, by the end of 1995, the Credit Lyonnais group was finished with the film business and MGM. The Credit Lyonnais group had lent the MGM companies upwards of \$2 billion. It recouped a portion of that amount on the sale of New MGM in 1996; however, more than \$1 billion in outstanding indebtedness remained owing from MGM Group Holdings. The Credit Lyonnais group had little or no hope of recovering anything on this amount.

**\*45** In 1995 and 1996, the Credit Lyonnais group was financially distressed. Upon the intervention of the French government, CDR was formed for the specific purpose of liquidating the Credit Lyonnais group's "bad" investments and loans, particularly its investments and loans in the filmed entertainment area. These "bad" assets included MGM, MGM Holdings, and MGM Group Holdings, and the loans and advances to those companies. CDR's goal was to realize whatever amount it could on those "bad" assets. Indeed, with respect to MGM Group Holdings, CDR's representative, Mr. Jouannet, was assigned the task of realizing whatever value he could in that company, as quickly as possible. Seemingly, this objective would not be realized if Generale Bank and CLIS were locked up in a film distribution business with the Ackerman group.

The film rights that the banks ultimately contributed to SMHC were culled from the 1,000-film CDR library. John Peters of Epic Productions testified that these CDR films were acquired from distressed companies to which Credit Lyonnais had lent money. The films were acquired in numerous workouts, bankruptcies, or other similar proceedings. Credit Lyonnais had turned the

films over to Epic Productions and Mr. Peters to manage; however, by late 1995, Credit Lyonnais instructed Epic Productions to begin planning the liquidation of the CDR library. The whole focus of Epic Productions' business operations became "the ultimate liquidation of this 1,000 film plus library." Mr. Peters testified that Credit Lyonnais did not intend to pursue a film distribution business with respect to these films. On the contrary, its overall goal was to liquidate the film assets that it had acquired.

### b. Banks' Regulatory Environment

In 1996, the regulatory environment was not conducive to the banks' investing in a partnership for film distribution. A number of witnesses, including Mr. Geary and Bahman Naraghi (an employee of Credit Lyonnais), testified that under U.S. banking laws, the Credit Lyonnais group faced a 5-year deadline to divest itself of its nonbanking, MGM entertainment assets. An October 4, 1994, memorandum prepared by Deloitte & Touche for Credit Lyonnais regarding MGM states that Credit Lyonnais's business strategy with respect to MGM "must take into account CL's obligation to have sold its stake in MGM no later than May 7, 1997, due to the American regulations concerning investments in non-financial enterprises by banks."[FN90]Presumably, this same deadline (May 7, 1997) or a similar 5-year deadline would apply to any supposed film venture with the Ackerman group.

### c. Why the Ackerman Group?

We further question what would motivate the banks to enter into a film distribution business with Messrs. Lerner and Ackerman. Neither of those individuals had any experience in running a film distribution business. Mr. Lerner was a tax lawyer; nothing in his background reveals any special credentials in film distribution. Mr. Ackerman was involved in a number of financing transactions involving "major" motion picture companies; however, Mr. Ackerman gave no indication that his experience in financing extended to the particulars of running a film distribution business. Plus, the record sug-

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

gests that the banks had misgivings about the Ackerman group's economic underpinnings.[FN91]

#### d. *Inattention to Film Rights in Negotiations*

**\*46** Although the Ackerman group and CDR exchanged numerous documents over the course of their negotiations, we find scant reference to any film distribution business or film rights. There is no evidence that the parties actively negotiated over the particulars of the purported film business or the specific film rights that would be contributed to SMHC. The first and only reference to a purported film distribution business appears in the drafts of the SMP LLC agreement that Shearman & Sterling drafted on Rockport Capital's behalf. Those drafts, including the final draft, describe the purpose for which SMP was formed as being, inter alia, to produce and distribute filmed entertainment products. With respect to this provision, Mr. Geary testified that, to his knowledge, the banks had no intent to produce or distribute film products through the transaction with the Ackerman group. He testified that he did not discuss this provision with his client, and that in any event CDR would not have asked to remove this provision because "we didn't care too much what was in here."

#### e. *Selection of EBD Film Rights*

Mr. Peters testified that in 1996, during Epic Productions' efforts to sell the CDR library, someone at either Credit Lyonnais or EBD instructed him to find some low-value films and development projects within the CDR library. The idea was to find some titles and development projects that in Mr. Peters' view had very little value, so that removal of those rights would have no significant impact on the CDR library's overall value. For example, Mr. Peters testified that he selected films with rights that were about to expire in the near future (e.g., in 1 or 2 years) and predominantly films that were low-budget, exploitation genre films. In addition, the totality of rights to the film assets was not removed from the CDR library; instead, only some subgroup (e.g., domestic home video or domestic cassette rights) was removed. Ultimately, Mr. Peters selected the

"U.S. Video Film Rights" to the 65 film titles and the rights to the 26 development projects listed in Schedule 1.6(b) of the exchange and contribution agreement.

On the basis of Mr. Peters' testimony, it is reasonable to conclude that the Credit Lyonnais group had no intentions of contributing a viable "starter" film library to SMHC or to partner in a film distribution business with respect to those assets or the CDR library, generally. Instead, the selection process that Mr. Peters described strongly suggests that CLIS contributed the film assets to SMHC for a far different purpose.[FN92]

#### f. *Conclusion*

In light of these various considerations, we are not persuaded that the banks had any intention of partnering with Messrs. Lerner and Ackerman in a film distribution business. To the contrary, it is clear that the Credit Lyonnais group desired to end its failed relationship with its distressed filmed entertainment assets and companies. CDR's role as Generale Bank's and CLIS's representative in the transaction with the Ackerman group reflects the banks' interest in liquidating their receivables and SMHC stock.

#### 2. *Ackerman Group's Purposes*

**\*47** Petitioner claims that he and Mr. Ackerman wanted to join with the banks in a film distribution business and understood that the banks reciprocated this interest. Petitioner contends that he and Mr. Ackerman assumed that the banks wanted to continue this relationship into the future. Petitioner testified that to their considerable surprise, the banks elected instead to exercise their put option.

Petitioner's claimed understanding of the deal with CDR is based entirely on his testimony.[FN93]We find Mr. Lerner's testimony self-serving, contrived, and ultimately not credible. The bulk of the evidence in the record contradicts petitioner's testimony and his purported understanding.

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

### a. *Mr. Lerner's and Mr. Ackerman's Backgrounds*

As previously noted, as far as the record reveals, Messrs. Lerner and Ackerman were tax and financial professionals with no experience in running a film distribution business. Cf. *Ferguson v. Commissioner,* 29 F.3d at 102 (citing inexperience of a partnership's promoters in the relevant business as one indicator of lack of economic substance in the partnership). Although Messrs. Lerner and Ackerman appear to have been the principal negotiators on behalf of the Safari consortium in its failed bid to purchase New MGM, we have virtually no information regarding the companies that joined the Safari consortium or precisely what their interests were.[FN94]It appears that Deyhle Media Group and Capella Films had a substantial stake in that proposed acquisition and, in fact, had initiated the dialogue with Messrs. Lerner and Ackerman.

More importantly, beyond the testimonies of Messrs. Lerner and Ackerman, we have no independent basis for determining the precise roles that Messrs. Lerner and Ackerman played in the Safari bid and what their motivations were. Petitioner claims that he and Mr. Ackerman joined the Safari consortium to further their long-range goals of building a substantial film library. It is equally plausible, however, that Messrs. Lerner's and Ackerman's roles in the Safari consortium were consistent with the areas of their respective expertise: Mr. Lerner as a tax expert and Mr. Ackerman as an expert in putting together financing for film company acquisitions. In any event, one thing is clear from the Ackerman group's involvement in the MGM transaction: At some point, the Ackerman group began eyeing the substantial built-in tax losses that the Credit Lyonnais group had in the MGM companies and began exploring the possible ways in which it could exploit those built-in losses.

### b. *Focus on Tax Attributes*

As early as May 31, 1996, when Kaye Scholer submitted its preliminary legal conclusions on MGM, Mr. Lerner had been fully apprised of the potential of acquiring considerable built-in losses in an acquisition in-

volving the MGM companies. The Kaye Scholer memorandum also provided a roadmap to structuring a partnership transaction that would allow CDR to transfer its built-in losses (totaling approximately $1.4 billion) to a purported "Investor" by utilizing a partnership that would fail to make a section 754 election. According to the memorandum, the transaction "would increase the amount receivable by CDR over a straight purchase."

**\*48** Mr. Lerner's first written contact with CDR regarding a possible deal, a letter dated September 11, 1996, began by confirming Rockport Capital's interest in "the U.S. tax attributes which may relate to the direct and indirect investments by Credit Lyonnais, S.A., and * * * [CDR] in Metro-Goldwyn-Mayer, Inc." The letter goes on to state that "Rockport wishes to examine the Attributes so that it can propose to the CDR certain structures incorporating the Attributes * * * which will be of mutual benefit". The letter makes no mention of any films or partnering to conduct any film distribution business.

During the negotiations with CDR, the Ackerman group's entire focus was on the banks' tax basis in the SMHC receivables and stock. The Ackerman group's only point of negotiation became directed towards obtaining representations from Generale Bank and CLIS regarding their tax bases in the receivables and SMHC stock, and that they had not written down their bases for tax or accounting purposes.

Mr. Lerner's own tax experience also gave him a general appreciation of the tax significance of contributing high-basis properties to a partnership and failing to make a section 754 election. In fact, Mr. Lerner marketed to Imperial, and then implemented, a tax plan that virtually mimicked the CDR transaction in attempting to exploit these tax aspects.

### c. *Nature of EBD Film Rights*

Mr. Lerner testified that the Ackerman group was interested in acquiring filmed entertainment assets and building a large film library which "would be an extraordinary asset to hold for a very long time."Mr. Lern-

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

er's testimony appears implausible when we consider the film rights that Schedule 1.6(b) of the exchange and contribution agreement purportedly provided. Schedule 1.6(b) refers to "U.S. Video Film Rights". Those purported rights, however, did not encompass the kind of rights that one might associate with a long-term film library investment. Indeed, the term "U.S. Video Film Rights" seemingly refers only to video distribution rights in the United States. SMHC did not own all the rights to the various film titles. As Troy & Gould's investigation later revealed, many of the distribution rights had expired or were set to expire shortly after CLIS contributed them to SMHC. We do not believe that the failure to define more specifically the EBD film rights in the LLC agreement consistent with Mr. Lerner's stated purpose was simply an oversight. The Ackerman group was well represented in the transaction with CDR. Presumably, such important matters would have been addressed if the Ackerman group were in fact focused on starting a film library with the EBD film rights.

Responding to Mr. Peters's testimony that the films selected for the EBD library were films of no significant value, petitioner seems to suggest that the banks may have conspired to defraud the Ackerman group. The bulk of the evidence in the record, however, suggests strongly that the selection of the EBD film rights was not a product of any fraud by the banks. On the contrary, for the reasons described below, we are led to the conclusion that the Ackerman group was either fully aware of the nature of the film titles that CLIS contemplated contributing to SMHC or simply did not care about the nature of those film rights.

**\*49** First, although the parties exchanged numerous drafts of various documents between October 16, 1996, and December 10, 1996, none of those drafts alludes to any film rights, generally, or the EBD film rights, specifically. The first listing of the EBD film rights appears to have been given to the Ackerman group on December 12, 1996, one day after the purported closing on the CDR transaction.[FN95]Before then, there appears to have been no mention or interest in those film rights on the part of the Ackerman group in their negotiations

with CDR. Mr. Lerner, for his part, could not recall when he was given a listing of the EBD film rights.

Second, even though the Ackerman group conducted due diligence in the CDR transaction, the focus of this due diligence was on Generale Bank's and CLIS's tax bases in the contributed receivables and SMHC stock. Prior to the closing on the CDR transaction, due diligence with respect to the contributed film rights was largely nonexistent.[FN96]Indeed, the only evidence of due diligence on the film rights is an appraisal that Sage Entertainment conducted. Mr. Lerner testified that approximately 4 to 6 weeks before the closing on the CDR transaction, he hired Steve Kutner of Sage Entertainment to appraise the EBD film library, that he had a large number of discussions with him about various approaches to valuation, and that Mr. Kutner appraised the EBD film library at \$29 million.[FN97]Mr. Lerner testified that, on the basis of Mr. Kutner's valuation, he felt "very comfortable that with the investment we were making at least we had assets worth as much as we were investing and that it could be considerably more if managed properly."

Other than Mr. Lerner's testimony, we have no basis for gauging Mr. Lerner's reliance on this appraisal. Although Mr. Kutner's appraisal report would seem to form a critical part of his case, petitioner did not call Mr. Kutner as a witness. Consequently, Mr. Kutner's appraisal report has not been received into evidence and cannot be relied upon for establishing the value of the film library.

The appraisal report itself indicates that it is limited to a financial analysis of the film library and its potential earnings. The report states that Mr. Kutner did not physically inspect the materials for the various film titles, and he assumed that the legal and physical status of the EBD film library "is in good condition". The report does not provide any analysis of the rights that SMHC acquired in the film titles (except for the general reference to "U .S. Video Film Rights") and appears to assume that SMHC actually owned the full bundle of rights associated with the EBD film titles. The report also appraised the EBD film library "as if it was free and clear of debt and under responsible ownership and

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

competent management". Presumably, however, when the EBD film library was assigned to SMHC, it became subject to the $1 billion debt that SMHC owed.

On the basis of the evidence in the record, we have no great confidence that the appraisal report, as offered, was completed, or was given to Mr. Lerner, before the closing on the transaction with CDR. The photocopy of the appraisal report that is in the record is undated, except for a cover letter from Mr. Kutner to Mr. Lerner dated December 9, 1996-just 2 days before the closing of the CDR transaction and after most of the details of the transaction were already established. The appraisal report anachronistically refers to the 65 film titles as the "Santa Monica Holdings, Inc. Film Library" and states that SMHC owns those 65 film titles; however, the 65 film titles were not assigned to CLIS or SMHC (from CLIS) until December 10, 1996.[FN98]The appraisal letter also alludes to other information which the record demonstrates was not apparent on December 9, 1996. For example, as previously discussed, there is no indication that the EBD film titles were ever identified to Mr. Lerner (or through him, to Mr. Kutner) before December 12, 1996. Also, Mr. Kutner's cover letter alludes to certain limitations and caveats relating to the future distribution plans for the library, "which are more fully set forth in the section of the Appraisal styled 'Limiting Conditions for the Appraisal." ' The appraisal report in the record, however, does not contain any section entitled "Limiting Conditions for the Appraisal."

**\*50** Mr. Kutner's $29 million valuation of the EBD film titles appears highly inflated. Indeed, that valuation greatly exceeds (by more than three times) the highest value ($9 million) that petitioner's expert (Steven Wagner) arrived at in valuing the EBD film titles.[FN99]Mr. Kutner's valuation takes into account technologies (e.g., DVD) that the other experts in these cases opined were either not foreseen in 1996, were only latently observable at that time, or were no longer viable.[FN100]In doing so, Mr. Kutner's appraisal went beyond what Mr. Lerner understood to have been a valuation based on VHS videotape sales projections. Indeed, Mr. Lerner testified that "six or seven years ago when we did all this all we knew about were VHS videotapes.""At that

time, we focused on what the technology was thinking that there might be additional technology, so we valued it only in terms of what we thought the then existing technology might be and hoping that additional technology would come along to enhance the value."Without Mr. Kutner's testimony or some corroborating evidence, we are not persuaded that the Sage Entertainment appraisal was made in good faith or that Mr. Lerner relied upon it in the course of the CDR transaction.

The nature of the rights, if any, that SMHC obtained in the EBD film titles was, and remains, patently unclear. On December 9, 1997, Troy & Gould concluded that there were significant gaps in the chain-of-title documentation for the EBD film titles and rights to some of the film titles had expired or were expiring. Troy & Gould concluded that: "it is not possible to determine what rights have effectively been acquired. It also is unclear who possesses the rights other than domestic video in the various pictures, and who possesses the reversion rights in domestic video."This point is clearly illustrated when we consider that two of the EBD film titles that Troma attempted to distribute, "Astro Zombies" and "Banana Monster", were the subject of immediate cease and desist letters. SMHC was also informed that the rights to a third film that Troma attempted to distribute, "Fist of Fear, Touch of Death", had also expired.

Further, it appears that the physical elements for a number of the EBD film titles do not exist and that the general physical condition of the materials for the remaining film titles is suspect. Indeed, Mr. Peters testified that the physical materials for many of the film titles were stored at the Epic warehouse, which was not a temperature- or humidity-controlled facility, and was not bonded, subject to inventory control, or otherwise secured.

It is clear that by December 9, 1997, when Troy & Gould gave their conclusions on the EBD film library, Mr. Lerner was well aware that there were major problems with the EBD film rights and that the film library had very little value. If, as petitioner claims, the EBD film rights were an integral part of a film business with CDR, then these conclusions would have revealed some very deep-seeded shenanigans on the part of CDR, Gen-

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

erale Bank, and CLIS. One would suspect that, in these circumstances, Messrs. Lerner and Ackerman would have been very upset. Nonetheless, in April 1998, we find Mr. Lerner meeting with a representative of Generale Bank. Mr. Lerner testified that he was interested in reviving Generale Bank's participation in SMP's film activities and had written a letter expressing this interest. The letter from Mr. Lerner states: "I would like to acquire additional film assets from GB and would like their active participation in our partnership."FN101

**\*51** On the basis of the evidence in the record, it appears that the Ackerman group was largely unconcerned with the supposed film assets that were to form the foundation of their proposed film business with CDR. There is no evidence that they ever requested or received any information regarding the EBD film rights. Although the record contains numerous drafts of various documents relating to the CDR transaction, none of those drafts contain any specific reference to the EBD film rights. Consequently, it is reasonable to conclude that the Ackerman group did not care what film rights CLIS contributed to SMHC and that the contribution of the EBD film rights was largely incidental to Generale Bank's and CLIS's contributions of the high-basis, low-value receivables and SMHC stock.

After the closing of the CDR transaction, Mr. Lerner, Mr. Herz, and the law firm of Troy & Gould made efforts to confirm the titles to the films and obtain physical elements for the films. We are unpersuaded, however, that these efforts amounted to much more than window-dressing. Mr. Peters testified that he perceived Troy & Gould's investigation to be abnormal considering the age of the film titles, the original production cost of the films, and the distressed nature of the companies that were the source of the films. He testified that although Troy & Gould's efforts might be completely appropriate with respect to other kinds of films, they "might not be so appropriate" with respect to the EBD film titles.

Beyond its due diligence process, Troy & Gould and Mr. Herz expended considerable effort to obtain facility and laboratory access letters. Those efforts extended into 1998, even after Troy & Gould provided Mr. Lerner with its legal conclusions regarding the EBD film titles.

Given the nature of the particular film titles and Troy & Gould's revelations, we are unpersuaded that these efforts, too, were not mere window-dressing.

#### d. *Purported Interest in CDR Library*

Petitioner also claims that he and Mr. Ackerman were interested in adding the 1,000-film CDR library to SMHC, and that they thought that having an indirect interest in that company and being partners with the banks would put them in a better position to acquire that library. Other than his self-serving testimony, petitioner points to no evidence to suggest that the parties to the transaction either discussed or contemplated any dealings involving the general CDR library. In fact, there is no indication that the Ackerman group was given any sort of preference in 1997 when CDR was being sold.FN102

Petitioner also testified that CDR asked for the $5 million advisory fee in connection with the remaining film titles in the CDR library as a "guaranty payment" to enable the Ackerman group to work with CDR. He testified that the Ackerman group was willing to pay that fee "because we thought we would be able to get our hands on a much larger library, and certainly we did pursue it at a later time."The advisory fee agreement indicates, however, that the advisory fee was paid specifically as an inducement for CDR, Generale Bank, and CLIS to execute the letter agreement and exchange and contribution agreement. None of the various legal documents that the parties exchanged contains any reference to a guaranty or any assurances regarding the CDR library. One would expect some legal representations regarding this matter if the $5 million advisory fee was in fact paid as a guaranty for the CDR library.

#### e. *Purported Springboard for New Library*

**\*52** Petitioner contends that he and Mr. Ackerman were interested in using SMHC for its historical significance to build a new film library. We cannot agree. For all intents and purposes, MGM Group Holdings' association with the MGM operating company ended when Mr. Kerkorian acquired that company. Any potential name

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

recognition in that company was obliterated when MGM Group Holdings changed its corporate name to "Santa Monica Holdings Corporation" on October 15, 1996. In addition, in a letter agreement with P & F Acquisition dated October 10, 1996, CDR, MGM Holdings, and MGM Group Holdings agreed that they would not use any of MGM's trademarks; i.e., "MGM," "Metro-Goldwyn-Mayer," the "MGM lion logo," or any trademarks related thereto. Without these trademarks, Mr. Lerner seemingly would have been hard-pressed to capitalize on MGM's historical underpinnings using SMHC. Finally, there is no evidence that SMHC's purported film business was ever, in fact, bolstered by its prior status as the MGM parent company.

### f. *Acquiring NOLs for a Film Business*

Petitioner also contends that he and Mr. Ackerman were interested in using the net operating losses (NOLs) in SMHC to offset future income from their prospective film business. We are unpersuaded that the Ackerman group had any legitimate interest in SMHC's NOLs. Although there were sizeable NOLs in SMHC when CLIS contributed the SMHC stock to SMP, the use of those NOLs was not guaranteed. Use of the NOLs was subject to the tax attribute rules of section 382. Under those rules, use of the NOLs would be contingent on structuring a transaction in such a way as to meet the "ownership change" rules of section 382(g). On this record, we cannot rule out the possibility that CLIS's contribution of the SMHC stock to SMP constituted an "ownership change" for purposes of section 382(g) so that the NOLs were unavailable after that point.FN103

Although petitioner claims that his due diligence efforts for the transaction with CDR were directed at determining the potential use of the NOLs in SMHC, the focus of his due diligence was not on the NOLs, but on the built-in tax losses in the receivables and SMHC stock. Mr. Lerner hired James Rhodes to assist in the Ackerman group's due diligence process. Mr. Rhodes' due diligence investigation appears to have been focused exclusively on the banks' bases in the SMHC receivables and stock. For example, Mr. Rhodes' "Basis Chrono-

logy" contained an analysis of the bases in the SMHC receivables and stock; it does not mention any NOLs.FN104Also, on May 12, 1997, Mr. Rhodes received a letter from White & Case, confirming that the banks had not derived any U.S. tax benefit from the contribution of the SMHC receivables and stock or the exercise of their put rights. Shearman & Sterling also conducted due diligence on behalf of the Ackerman group. Like Mr. Rhodes's investigation, Shearman & Sterling's investigation focused on the tax bases in the SMHC receivables and stock. See, e.g., Exhibit 166-J. The memoranda that Shearman & Sterling prepared for Mr. Lerner discussed, among other things, section 382. These memoranda, however, were focused on that section's potential application to the built-in losses in the stock of MGM Holdings (and MGM Group Holdings) and not NOLs.FN105

### g. *Contemporaneous Expression of Purpose*

**\*53** On December 12, 1996, the day after the transaction with CDR purportedly closed, Mr. Lerner faxed to Jerry Carlton of O'Melveny & Myers an article entitled "GE Capital Wins Bid for a Portfolio of Bad Loans from Credit Lyonnais". The article was from the December 12, 1996, issue of the Wall Street Journal and discussed General Electric's purchase of a \$190.3 million portfolio of "bad" French property loans from Credit Lyonnais. In an attached memorandum letter to Mr. Carlton, Mr. Lerner explains that "Attached is an article from today's Wall Street Journal \* \* \* describing a transaction similar to ours. This gives good support for our business purpose for doing the deal."The article states in relevant part:

U.S. financial-services giant General Electric Capital Corp. won the bidding for a portfolio of Credit Lyonnais's bad French property loans, which have a book value of one billion francs (\$190.3 million). The transaction was another sign that competition is heating up among U.S. vulture funds seeking to take advantage of France's long-running real-estate crisis.

The sale was carried out by Consortium de Realisation, an entity set up last year by the French state to

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

take on most of Credit Lyonnais's nonbanking assets as part of a rescue plan for the crippled state-owned bank. * * *

The sale of the bundle of 127 lines was the first by CDR, with more expected to follow. French banks and insurers have been severely hurt by their exposure to the domestic real-estate market, but for a long time they refused to write down their loans.

### 3. *Conclusion*

In sum, the Credit Lyonnais group had a very troubled history in the film business. In 1996, they were seeking to dispose of their troubled film assets as expeditiously as possible. At some point, Messrs. Lerner and Jouannet struck a deal involving a purported acquisition of MGM Group Holdings (SMHC) and the formation of a limited liability company. Although petitioner claims that Mr. Jouannet wanted to enter into a film distribution business with the Ackerman group, the evidence in the record and the testimony suggest otherwise. In fact, Mr. Jouannet worked for CDR, which had the assigned task of liquidating Credit Lyonnais's losing film assets and loans, including MGM and MGM Group Holdings. Mr. Jouannet's goal was to realize whatever he could, as fast as he could. He was not interested in any film venture with the Ackerman group. The banks did not contribute a viable "starter" film library to SMHC, as petitioner suggests. Instead, what petitioner claims to have been the cornerstone of a supposed film venture turns out to be nothing more than a jumble of lackluster film titles. We conclude that the Ackerman group and the banks did not intend to partner with one another in any film distribution business.

### E. *Objective Economic Substance*

Under the second factor of the economic substance doctrine, objective economic substance, we must determine whether the transaction had any economic significance beyond the creation of tax benefits. See, e.g., *Casebeer v. Commissioner,* 909 F.2d at 1365.Our inquiry must consider " 'whether the transaction has any practicable

economic effects other than the creation of income tax losses." ' *Jacobson v. Commissioner,* 915 F.2d 832, 837 (2d Cir.1990) (quoting *Rose v. Commissioner,* 868 F.2d 851, 853 (6th Cir.1989), affg. 88 T.C. 386, 1987 WL 49274 (1987)), affg. in part, revg. in part, and remanding T.C. Memo.1988-341; see also *Rosenfeld v. Commissioner,* 706 F.2d 1277, 1282 (2d Cir.1983) (holding that courts must consider "whether there has been a change in the economic interests of the relevant parties."), affg.T.C. Memo.1982-263.

**\*54** Viewed according to their objective economic effects rather than their form, Generale Bank's and CLIS's contributions to SMP in exchange for partnership interests were economically inconsequential events. The banks' purported partnering with SMP had no meaningful economic significance other than as an "ephemeral incident" to serve as a conduit for the banks' built-in losses. *Helvering v. Gregory,* 69 F.2d 809, 811 (2d Cir.1934), affd. 293 U.S. 465, 55 S.Ct. 266, 79 L.Ed. 596 (1935). Moreover, the purported partnering offered the Ackerman group no realistic economic benefits apart from tax consequences. For the reasons described below, we conclude that the transaction's objective economic reality and consequences belie its form.

### 1. *Economic Significance of Banks' "Contributions"*

Petitioner argues that whether or not the banks intended to enter into a film business with the Ackerman group, "all parties recognized that the banks were committed as partners from the time they signed the partnership documents."Petitioner's argument might be construed to suggest that the banks' contributions to SMP and their receipt of preferred interests had objective economic significance beyond petitioner's asserted business purpose for the transaction and the existence of the Ackerman group's tax considerations. We disagree. The banks' tightly wrapped and virtually guaranteed exercise of their put rights negates whatever economic significance might otherwise have attached to the banks' joining SMP. The faint illusion of a partnership interest cannot cloak the reality that the banks planned, and had every economic incentive, to exit the partnership as expeditiously as possible. In substance, the Ackerman group

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

paid the banks $10 million ($5 million as an up-front "advisory fee" and $5 million upon the banks' exercise of their put rights) in exchange for the banks' high-basis, low-value receivables and SMHC stock so that the banks could "monetize", and the Ackerman group could attempt to exploit, the tax attributes associated with these assets.

### a. *Advisory Fee and Put Price*

All the various agreements between the Credit Lyonnais group and the Ackerman group were tied to the side letter agreement, the deposit account agreement, and the advisory fee deposit. For example, the side letter agreement provides that it shall become effective (the "Effective Date") on the date on which all the following conditions have first been satisfied: (1) Each of the parties shall have signed a counterpart of the side letter agreement and each of Rockport Capital and CDR shall have received a full set of counterparts; and (2) Rockport Capital shall have deposited in a specified account $5 million; i.e., the sum of the preferred capital accounts of Generale Bank and CLIS on the closing date. The side letter agreement further specifies that "The parties hereto agree that, notwithstanding any provision of the * * * [exchange and contribution agreement], CDR, Generale Bank, and CLIS shall have no obligation to make the Contributions as defined in * * * [that agreement] unless and until the Effective Date has occurred hereunder."The deposit account agreement, in turn, provides that Rockport Capital shall on "the Effective Date deposit in the Deposit Account the amount required to be deposited therein" pursuant to the side letter agreement.

**\*55** Pursuant to the advisory fee agreement, "To induce CDR, CLIS and GB to execute the Letter Agreement" and the exchange and contribution agreement, Rockport Capital agreed to pay CLIS on the "Effective Date" in U.S. dollars and immediately available funds "(x) an advisory fee of $5,000,000 and (y) an additional advisory fee equal to 3/4 of 1% of the tax losses, if any, in excess of $1 billion that have been allocated to all members of the Company other than GB, CLIS, Rockport or their affiliates" as of the closing date on the exchange and

contribution agreement. In similar fashion, the advisory fee agreement provides that "Rockport hereby agrees that notwithstanding any provision of the Letter Agreement to the contrary, the Effective Date will not occur unless Rockport has made the payment, if any, required by the preceding paragraph."

### i. *Banks' Understanding*

Sean Geary of White & Case was CDR's principal U.S. counsel in the sale of New MGM and its lawyer in the transaction with Rockport Capital.[FN106]He testified that at all times Mr. Jouannet had in mind a price for the CDR transaction of approximately $10 million.

The bottom-line result of the banks' purported partnering with SMP, and the exercise of their put some 3 weeks later, was that the banks received their anticipated $10 million price for the CDR transaction. The advisory fee was paid to the banks up front, as a precondition to the CDR transaction's becoming effective.[FN107]Mr. Geary testified that during the course of the negotiations with the Ackerman group, Mr. Jouannet and other individuals at the banks began to worry "whether Lerner and his people were good for" the $5 million put price. They therefore decided that the put price should be placed in escrow in connection with the closing on the transaction with the Ackerman group. To this end, Mr. Geary drafted a "Deposit Account Agreement", which was designed to guarantee payment of the put price in the event that the put option was exercised.

Mr. Geary testified that, in the transaction with the Ackerman group, the banks were relying on the side letter agreement that gave Generale Bank and CLIS the right to put ("monetize") their preferred interests in SMP to Rockport Capital-"the side letter was always a precondition to CDR or Credit Lyonnais signing anything else."He explained that Generale Bank and CLIS did not care about the various provisions in the agreements: "Because they were going to exercise their put."For example, with respect to the SMP LLC agreement's reference to a film production and distribution business, Mr. Geary testified that "I certainly can tell you that I was

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

of the belief when I received this that I didn't care from my client's perspective what was in here other than a couple of things that I marked up and sent back, the transfer provisions and one of the confidentiality provisions."

Mr. Geary testified that, as of December 11, 1996, he knew that Generale Bank and CLIS were going to exercise the put on December 31, 1996, the earliest possible date for the put's exercise. "I knew * * * [Mr. Jouannet] was going to exercise the put. He had a year to exercise the put. I clearly knew from the very beginning he was exercising the put.""As I've tried to say, I always knew that the put was going to be exercised at some point. * * * That was clearly my understanding of the deal."

**\*56** We found Mr. Geary's testimony exceptionally credible, thorough, and persuasive. His testimony shows convincingly that the banks had no intention of partnering with the Ackerman group and had planned from the beginning to exercise the put rights in the side letter agreement as expeditiously as possible.

### ii. *Ackerman Group's Understanding*

Petitioner claims the he and Mr. Ackerman had no pre-arranged understanding with CDR that the banks would exercise their put rights. Petitioner claims that he and Mr. Ackerman had every hope and expectation that the banks would remain their partners for an extended period. We find, however, that they did have a prearranged understanding.

First, as Mr. Geary testified, the banks were relying on the side letter agreement with Rockport Capital and fully intended to exercise their put rights to accomplish their overall goal of disposing of their interests in SMHC. Mr. Lerner was intimately engaged in the negotiation and drafting process at all levels, including in his one-on-one negotiations with Mr. Jouannet. It defies reason that Mr. Lerner would have been unaware of the banks' plans. Every aspect of the Credit Lyonnais group's history and of the negotiation and drafting process pointed towards the banks' exercising their put rights. In fact, the totality of facts in the record persuades us that the banks' exercise of their put rights was integral to the Ackerman group's plans, was fully contemplated by them, and was part of the deal.

Also, in one of the drafts of the SMP LLC agreement that emerged in the course of the negotiations, Mr. Geary commented that CDR would require Mr. Lerner to provide consents at closing permitting the transfer of Generale Bank's and CLIS's preferred interests to a CDR affiliate and the subsequent transfer of those interests to Rockport Capital, pursuant to the side letter agreement.[FN108] See Exhibit 173-J, J001736. Mr. Geary testified that he wanted to make it clear that the manager (i.e., Mr. Lerner) consented to the transfers "because they were what was being planned."Before closing on the transaction with CDR, Mr. Lerner executed a consent giving effect to Mr. Geary's comments. The consent was predated "_____, 1996." FN109We infer from Mr. Geary's comments and this consent that there was an understanding on the part of Mr. Lerner that Generale Bank and CLIS would exercise their put rights at the earliest possible point, on December 31, 1996.

### iii. *Negotiation and Drafting Process*

Petitioner suggests that the "intensity and duration of the negotiations" between the Ackerman group and CDR connotes substance to the banks' purported partnering with SMP. In support of this suggestion, petitioner points to the numerous drafts of the letter agreement, the side letter agreement, supplementary terms, the exchange and contribution agreement, the SMP LLC agreement, the deposit account agreement, the interest option agreement, and the advisory fee agreement.

**\*57** As described more fully below, our careful review of the numerous drafts to which petitioner alludes does nothing to bolster petitioner's claims but leads us to two conclusions: (1) That the Ackerman group was focused exclusively on obtaining the high-basis, low-value receivables and SMHC stock from the banks and getting assurances from Generale Bank and CLIS regarding their tax bases in those assets; and (2) that CDR, Generale Bank, and CLIS were focused exclusively on establishing the put rights, guaranteeing full payment on

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

T.C. Memo. 2005-104, 2005 WL 1111792 (U.S.Tax Ct.), 89 T.C.M. (CCH) 1157, T.C.M. (RIA) 2005-104, 2005
RIA TC Memo 2005-104
**T.C. Memo. 2005-104, (U.S.Tax Ct.)2005 WL 1111792**

those rights, securing an advance consent to transfer the put rights and withdrawal from SMP, and reserving whatever value might be recovered on the Carolco securities.

Between October 16 and November 21, 1996, the parties exchanged a draft term sheet and numerous drafts of a letter agreement embodying the basic terms that Messrs. Lerner and Jouannet had agreed upon in their discussions. In these various documents, it was contemplated that Generale Bank would contribute its $974 million in receivables and CLIS would contribute its MGM Group Holdings (SMHC) stock (and in later drafts, the $79 million receivable) to "Newco" (a prefiguration of SMP) in exchange for preferred interests. Rockport Capital and its associates would contribute cash and securities to Newco in an agreed amount to enhance and monetize the value of Generale Bank's and CLIS's preferred interests.[FN110] This proposed transaction "would require Generale Bank and CLIS simply to transfer their respective assets to a Newco in exchange for preferred interests which will be monetized."The drafts provided that after 5 years the preferred interests were convertible into Newco common membership interests and provided that, if the conversion right were exercised, Newco could redeem all of the preferred interests at their liquidation value. Throughout the course of the drafting process, these fundamental features of the deal between CDR and Rockport Capital did not materially change, and they were incorporated into the various agreements.[FN111]

In these various drafts, CDR was not focused on the letter agreement but was instead focused on the side letter agreement, which gave Generale Bank and CLIS the right to put their preferred interests in "Newco" to Rockport Capital. Mr. Geary testified that by the time of the draft letter agreement, "clearly there was going to be a second letter, a put letter. That's what I understood to be monetized. There was a put available. We didn't have to wait, you know, for the time of the deal."According to Mr. Geary, it was unimportant to CDR or Mr. Jouannet what the letter agreement said about the terms of the preferred interests and the conversion rights, because CDR was relying on the side letter agreement that re-

quired Rockport Capital to purchase all of Generale Bank's and CLIS's preferred interests for $5 million.

Other than this "put" agreement, four points of negotiation developed from CDR's perspective:

**\*58** First, CDR insisted that the $5 million advisory fee be paid as a condition to closing on the exchange and contribution agreement and the $5 million put price be deposited in a blocked account before closing, thus guaranteeing payment when the put rights were exercised. The banks decided that the put price should be placed in escrow in connection with the closing on the CDR transaction. Mr. Geary drafted a deposit account agreement, which was designed to guarantee payment of the put price when the put rights were exercised.[FN112]

Second, CDR wanted an earlier put period than the Ackerman group had proposed. In an early revised draft of the side letter agreement, the Ackerman group proposed: "The Put will be effected upon two days written notice from a Seller to Purchaser given no earlier than December 31, 1997 directing that the Put be effected."CDR, however, insisted on the following put period: "The Put will be effected no earlier than December 31, 1996 and no later than December 31, 1997 upon two days written notice from a Seller to Purchaser directing that the Put be effected."

Third, CDR wanted assurances that Generale Bank or CLIS could transfer their preferred interests to an affiliate and withdraw from SMP without triggering the transfer and withdrawal restrictions in the SMP LLC agreement.[FN113] Mr. Geary therefore demanded that consents by SMP's manager would be required at closing, permitting the transfer of Generale Bank's and CLIS's preferred interests to a CDR affiliate and the subsequent transfer of those interests to Rockport Capital pursuant to the side letter agreement.

CDR was also concerned that communications with the affiliate might cause problems with the stringent confidentiality provision in the agreement.[FN114] Mr. Geary therefore insisted on an exception to the confidentiality provision for information that is disclosed on a confid-

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

ential basis to a proposed transferee of some or all of the membership interests of a member.

Fourth, CDR became very focused on the Carolco securities and wanted to retain whatever value might be realized on those securities. Indeed, following the basic agreement that the parties reached on November 21, 1996, CDR proposed several variations of an agreement tied to the Carolco securities. Initially, CDR had proposed alternate classes of preferred interests in Newco (SMP), Class A and B preferred interests, which would be issued to Generale Bank and CLIS along with 5 percent of the common interests to Generale Bank and CLIS.[FN115] The parties agreed that Somerville S Trust and Mr. Lerner would have options to acquire: (i) The Class B preferred interests at a price equal to the lesser of $7 million or the value of the Carolco subordinated notes; and (ii) the 5-percent common interests at a price equal to the lesser of $3 million or the value of the Carolco preferred stock. Both options were exercisable for a period of 12 months after the earlier of 5 years from the date of issue or the liquidation of the Carolco subordinated notes and the Carolco preferred stock, respectively.[FN116]Eventually, the parties eliminated the alternate classes of preferred stock and the issuance of 5 percent of the common interests to Generale Bank and CLIS; they agreed instead to certain preferred distributions and an additional contingent put price tied to the liquidation value of the Carolco subordinated notes and Carolco preferred stock.[FN117]Through these provisions, CDR effectively tied up any value that might be realized on the Carolco securities.

**\*59** On the other hand, the Ackerman group was primarily concerned with certain representations and warranties that they wanted with respect to Generale Bank's and CLIS's tax basis in the receivables and SMHC stock. This concern is apparent in an early draft of the letter agreement, in which the Ackerman group proposed:

3. *Certain Representations and Warranties of CLIS and GB.* (a) CLIS hereby represents and warrants that CLIS's basis computed under United States Federal income tax principles in the stock of Holdings is not less than $ _____.

(b) GB hereby represents and warrants that GB's basis computed under United States Federal income tax principles in the Note [SMHC's $1.050 billion debt obligations to Generale Bank] is not less than $ _____.

Mr. Geary testified that he had never seen representations and warranties like these. He found that these items were too complicated and exposed Generale Bank and CLIS to all sorts of liabilities. Consequently, he had these open-ended representations and warranties removed. Later, the Ackerman group proposed a "Rider 12A" to the exchange and contribution agreement providing the following representation and warranty: SMHC "shall not have made any payment on the Holdings-CLIS Debt or Holdings-GB Debt and neither the Holdings-CLIS Debt nor the Holdings-GB Debt has been written down for accounting or tax purposes."In the final draft of the exchange and contribution agreement, Generale Bank and CLIS warranted and represented that they had received no payment of principal on the $974 million in receivables and the $79 million receivable, respectively, and that those receivables had not been written down for accounting or tax purposes. Pursuant to this final draft, the Ackerman group was entitled to indemnification from CDR of up to $10 million for any breaches of these representations or warranties.

### b. *Redemption and Liquidation Rights*

Petitioner contends, however, that Generale Bank and CLIS had an interest in maximizing their return from a redeveloped SMHC. Petitioner points to the redemption rights (and ostensibly the conversion rights) provided in the letter agreement and distilled into the SMP LLC agreement. Under the SMP LLC agreement, Generale Bank and CLIS were given conversion rights for their preferred interests in SMP which were exercisable on or after December 10, 2001.[FN118]The preferred interests were convertible into nonvoting Common II interests.FN119In the event that SMP received a conversion notice, it had the option to redeem the preferred interests, in whole but not in part, at a redemption price equal to the sum of the preferred capital accounts for all holders of preferred interests.[FN120]In explaining the

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

T.C. Memo. 2005-104                                                                              Page 59
T.C. Memo. 2005-104, 2005 WL 1111792 (U.S.Tax Ct.), 89 T.C.M. (CCH) 1157, T.C.M. (RIA) 2005-104, 2005
RIA TC Memo 2005-104
**T.C. Memo. 2005-104, (U.S.Tax Ct.)2005 WL 1111792**

conversion feature, Mr. Lerner testified: "Credit Lyonnais was very concerned that the company would become increasingly valuable over the period of time that we were adding film libraries to it, and they wanted the opportunity to convert from a preferred stock position, which had fixed value plus return, to a full equity position". He added, "They were willing to let's say remain in a preferred position for awhile, but ultimately they wanted the option to get more of the animal, which is to say increase their interests to a level where they could participate in what we thought would be the equity build up of the investment."

**\*60** We cannot agree that the conversion right denotes any long-term commitment on the part of Generale Bank and CLIS, or that it otherwise lent economic substance to the banks' purported SMP interests. The conversion feature appears in the initial draft term sheet that Shearman & Sterling prepared at the request of Mr. Lerner. This item does not appear to have been an item that was specifically negotiated by CDR or Mr. Geary or one that they really cared about. Indeed, Mr. Geary testified that although the conversion feature was always part of the deal between Rockport Capital and CDR, Generale Bank and CLIS were relying on the side letter agreement because they did not want to have to wait for the conversion of their preferred interests into common stock which would take 5 years.

Furthermore, as explained below, when considered in conjunction with SMP's option to convert the banks' preferred interests into debt, it does not appear that the banks' conversion feature would have been likely to provide any meaningful inducement for the banks to remain in SMP.

### c. *SMP's Conversion Option*

SMP had the option to convert the banks' preferred interests, in whole but not in part, into debt of SMP. SMP could exercise this conversion right any time on or after December 31, 1997 (the last date by which the banks could exercise their put option). If the conversion right w exercised, the resulting debt (so-called "preferred debt") would have a $5 million principal amount and a

5-year term; it would bear interest at an 8-percent annual rate, payable annually from one year after the issuance of preferred debt to the maturity thereof. If the conversion option were exercised, SMP would have the option of redeeming the preferred debt, upon 30 days' notice, at 100 percent of the principal amount ($5 million) plus any accrued and unpaid interest.

The preferred debt option effectively allowed Mr. Lerner to control whether the banks would remain as partners in SMP beyond the put period. If the banks did not exercise their put rights by December 31, 1997, Mr. Lerner could convert the banks' preferred interests into preferred debt at any time between January 31, 1997, and December 10, 2001 (the date that the banks' conversion rights would accrue). If SMP exercised the preferred debt option, the result would be the economic equivalent of an interest-free loan by the banks of the $5 million put purchase price from December 31, 1996 (the date the banks could have exercised their put rights and claimed the $5 million put price) until the conversion of the preferred interests into preferred debt. Taking into consideration the time value of money, the banks would appear to have had every economic incentive to exercise their put option as soon as possible, on December 31, 1996, for $5 million.[FN121]If the banks remained in SMP beyond the put period, SMP could convert the banks' membership interests into preferred debt, and the banks' potential payback would be limited to the same $5 million that they could have received almost immediately by exercising the put option.

**\*61** Presumably, this conversion feature was of little concern to the banks, because as we have found, they intended to exercise their put option as soon as possible anyway. The debt conversion feature would appear to have provided SMP added assurance, however, that the banks would exercise their put option, which was an essential part of the Ackerman group's plan to acquire the banks' built-in losses.

### d. *Distribution Rights*

Petitioner also points to certain distribution rights that the banks were given in their preferred interests in

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

SMP. Amendment No. 1 to the SMP LLC agreement provided that SMP would make annual distributions to its members of all "Excess Cash Flow" according to the following priorities:

(i) *First.*The holders of Preferred Interests shall receive *pro rata* in accordance with their respective Preferred Capital Accounts the lesser of (x) Excess Cash Flow and (y) an amount equal to 8% of the balance of the Preferred Capital Accounts on the last day of the Fiscal Year (such amount being referred to herein as a *"Full Distribution"* ) *plus* the sum of the Unpaid Distributions with respect to any prior annual distributions to such holders.[FN122]

(ii) *Second.*The holders of Common Interests shall receive *pro rata* in accordance with their respective Percentage Common Interests an amount equal to Excess Cash Flow minus the amount of any distributions made to holders of Preferred Interests pursuant to paragraph (i) above.

Under the LLC agreement, the term "Excess Cash Flow" means, with respect to any Fiscal Year: (x) the sum of (1) Operating Cash Flow, (2) net cash proceeds from the sale of any asset of the Company other than in the ordinary course of business, (3) cash proceeds of any payment in respect of debt owing to the Company (including debts of Members or Affiliates of Members) and (4) capital expenditures that the Company committed to make in prior Fiscal Years but has determined not to make, less (y) the sum of (1) payments on any debt obligation of the Company and (2) capital expenditures that the Company has committed to make in the relevant period.[FN123]

Like the conversion rights, these distribution rights were not a point of negotiation between the parties; the language addressing these distribution rights appears to have been drafted by Shearman & Sterling, on behalf of Rockport Capital. Because the distribution rights were contingent on SMP's generating excess cashflow, there was no guarantee that SMP would ever make distributions. It was highly unlikely that SMP would generate excess cashflow. In the first place, SMP was not an operating company. As a practical matter, it could not and

would not generate operating cashflow; its only assets were the $20 million in cash and the SMHC receivables and stock. SMP's purported film distribution business was in SMHC, a separate corporate entity that was, by and large, devoid of assets and completely insolvent. Inasmuch as Mr. Lerner controlled both SMP and SMHC, if the banks failed to exercise their put rights, it is highly unlikely that Mr. Lerner would allow SMP to generate excess cashflow, triggering these distribution rights.[FN124]Instead, if SMHC were to generate any income, Mr. Lerner could effectively lock up that income in SMHC, wait out the put period, and convert the banks' preferred interests into preferred debt, which could then be redeemed for $5 million.

### e. *Carolco Securities*

**\*62** Petitioner points to Generale Bank's and CLIS's interest in receiving the future value of the Carolco securities that SMHC held as evidencing economic substance in the banks' preferred SMP membership interests. Petitioner points out that even after Generale Bank and CLIS exercised their put rights, SMP continued to treat Generale Bank and CLIS as partners, sending those entities Schedules K-1 for each year from the time the banks made their contributions.

Generale Bank's and CLIS's retained interest in the Carolco securities does not reflect a long-term commitment to SMP or SMHC or lend substance to their purported membership interests. Although the Carolco securities were to be held in SMHC, whatever value might have been realized on the Carolco securities had nothing to do with SMHC, SMP, or any prospective film distribution business. Instead, Generale Bank and CLIS had tied up whatever value that remained in the Carolco securities as a contingent amount in their put purchase price.

Amendment No. 1 also gave the banks certain preferred distribution rights to any value that might be realized from a liquidation of the Carolco securities.[FN125] Petitioner points to these preferred distribution rights and claims that the existence of these rights denotes some economic incentive on the part of the banks to stay in SMP. Nonetheless, these preferred distribution rights

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

T.C. Memo. 2005-104                                                   Page 61
T.C. Memo. 2005-104, 2005 WL 1111792 (U.S.Tax Ct.), 89 T.C.M. (CCH) 1157, T.C.M. (RIA) 2005-104, 2005
RIA TC Memo 2005-104
**T.C. Memo. 2005-104, (U.S.Tax Ct.)2005 WL 1111792**

parallel, almost precisely, the terms of the contingent put price for the banks' preferred interests. They afforded the banks no additional advantage from remaining in the SMP partnership rather than exercising their put rights on December 31, 1996–in either case, the banks would receive whatever value might be realized on any liquidation of the Carolco securities. Because we find that the banks had every economic incentive to exercise their put rights, these preferred distribution rights are irrelevant.

To the extent that petitioner may be suggesting that Generale Bank and CLIS continued as partners in SMP because of the contingent payment amount, we disagree. When Generale Bank and CLIS exercised their put rights at the end of December 1996, they divested themselves of whatever remaining interests they had in SMP. The contingent payment amount was not a continuing partnership interest; instead, that amount was part of an open transaction which was tied to Generale Bank's and CLIS's exercise of the put rights. Moreover, the fact that SMP continued to send Generale Bank and CLIS Schedules K-1 cannot obscure that those entities effectively exited SMP on December 31, 1996. The only question at that point was whether Generale Bank and CLIS would receive any additional payment for their preferred interests on account of the Carolco securities.

Petitioner points to a document entitled "Amendment No. 3", which provides that Generale Bank and CLIS, as the original holders of the preferred interests in SMP, would have continuing interests in certain annual distributions relating to the liquidation of the Carolco subordinated notes and the Carolco preferred stock that SMHC held.[FN126] These distribution rights closely track the distribution rights that were originally provided in Amendment No. 1 and, likewise, parallel the contingent put price in the side letter agreement.[FN127] Insofar as the exercise of the put rights already established the banks' rights to the contingent payment amount, as part of an open transaction, the distribution rights in Amendment No. 3 are redundant and unnecessary. The banks were already entitled to any value that might be realized on the Carolco securities. There was no need to "rejoin" SMP to receive their

contingent put price.

**\*63** Further, it is unclear whether Generale Bank or CLIS ever acceded to the execution of Amendment No. 3. Petitioner claims that he executed this amendment to the SMP LLC agreement after speaking to Mr. Jouannet sometime in 1997. Mr. Lerner claims that he instructed his attorneys at Shearman & Sterling to prepare this amendment, which he then signed as manager of SMP. No representative of Generale Bank or CLIS signed this amendment. There is no evidence that Generale Bank or CLIS was aware of this amendment. Mr. Jouannet never asked Mr. Geary to review Amendment No. 3, even though Mr. Geary testified that Mr. Jouannet would have asked him to review such a document prior to having CDR's interest affected by it.

2. *Economic Benefits for the Ackerman Group*

"Economic substance depends on whether, from an objective standpoint, the transaction was likely to produce economic benefits aside from tax deductions." *Winn-Dixie Stores, Inc. v. Commissioner,* 113 T.C. at 285 (citing *Kirchman v. Commissioner,* 862 F.2d at 1492; *Bail Bonds by Marvin Nelson, Inc. v. Commissioner,* 820 F.2d at 1549). Courts have refused to recognize the tax consequences of transactions which do not appreciably affect the taxpayer's beneficial interests except for tax reduction. See, e.g., *Knetsch v. United States,* 364 U.S. at 366; *ACM Pship. v. Commissioner,* 157 F.3d 231, 248 (3d Cir.1998), affg. in part, revg. in part, dismissing in part, and remanding on other grounds T.C. Memo.1997-115.

In exchange for the banks' "contributions" to SMP, the Ackerman group paid an upfront $5 million advisory fee to CLIS and irrevocably agreed to purchase the banks' preferred interests for $5 million, which it placed in a blocked account upon the closing of the transaction. As explained in greater detail below, however, these inducements exceeded the value of the contributions that the banks made to SMP. The SMHC receivables and stock that Generale Bank and CLIS contributed to SMP did not add any appreciable value to that enterprise. Any value that might have existed in those contributed

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

T.C. Memo. 2005-104                                                                                                          Page 62
T.C. Memo. 2005-104, 2005 WL 1111792 (U.S.Tax Ct.), 89 T.C.M. (CCH) 1157, T.C.M. (RIA) 2005-104, 2005
RIA TC Memo 2005-104
**T.C. Memo. 2005-104, (U.S.Tax Ct.)2005 WL 1111792**

properties was contingent on SMHC's ability to generate income. All objective indications are that SMHC had no such ability and could not reasonably have been expected to have any such ability, without a mass infusion of new capital.

At the time of the transaction between the banks and the Ackerman group, SMHC held only three significant "assets": (1) The EBD film library; (2) the Carolco securities; and (3) large amounts of unused NOLs. On the basis of all the evidence in the record, we conclude that none of these assets had any significant value. The EBD film library was a "broken" collection of B film titles with missing physical elements, a fragmented chain-of-title history, and limited or expiring distribution rights. The banks had effectively tied up any value that SMHC might realize on the Carolco securities. Use of the NOLs in SMHC was dependent on avoiding an ownership change for purposes of section 382 and, more importantly, was dependent on SMHC's generating income, which could not occur without new capital.

**\*64** Whatever intangible value might have arisen from the banks' participation in the enterprise is obviated by the parties' prearrangement and the economic reality (just discussed) that the banks would exit the partnership as soon as possible-which they did, 20 days into their purported film business with the Ackerman group. Thus, given the absence of appreciable value in the contributed properties and the banks' intentions of exiting the partnership, the objective realities of the transaction compel the conclusion that, apart from tax benefits, the Ackerman group had no reasonable expectation of recouping the $10 million they paid the banks as an inducement to enter into the partnering transaction. Consequently, the economic realities lead us to conclude that this $10 million amount was paid, not as an inducement for entering into the partnership, but for the $1.7 billion in tax attributes that the Ackerman group acquired in the transaction.

In the discussion that follows, we explain in detail the basis for our conclusion that SMHC's three assets (the EBD film library, the Carolco securities, and the unused NOLs) had no significant value at the time of the transaction in question.

### 3. *EBD Film Library*

The parties have offered expert witnesses to opine on the value of the EBD film library at the time of the transaction in question. As explained below, after carefully considering this expert testimony, we conclude that the EBD film library had no significant value at the time of the transaction in question.

#### a. *Petitioner's Expert*

Steven L. Wagner is a principal at Deloitte & Touche. He specializes in business valuation and issues relating to the entertainment industry. Mr. Wagner is accredited by the Association for Investment Research and Management as a chartered financial analyst, is an accredited member (business valuation) of the American Society of Appraisers, and has participated in the financial advisory services industry for more than two decades.

Mr. Wagner submitted an expert report appraising, as of December 11, 1996, the 65 film titles that CLIS contributed to SMHC on December 10, 1996. His report assumes: (a) That all the physical elements associated with the 65 film titles are available, and (b) alternatively, that physical elements for only some of the film titles are available. In estimating the fair market value of the EBD film titles, Mr. Wagner relied upon the income approach. Because of the market limitations associated with B film titles, Mr. Wagner forecast income only for VHS (Video Home System) sales into the rental market.

#### i. *Income Projections*

Mr. Wagner projected the number of gross units shipped per film title on the basis of information obtained from Adams Media Research (AMR), a media and entertainment data research firm.[FN128]Mr. Wagner isolated the AMR data for 270 film titles that he found to be comparable to the EBD film titles.[FN129] Using "STARmeter" ratings found on the "Internet Movie Database ('IMDb')," Mr. Wagner then separated the 270 film titles into two groups: (i) titles with more well-known actors; and (ii) titles with lesser-known

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

[FN130] He further categorized the 270 film titles according to genre (action, adventure, drama, horror, science fiction, suspense, and thriller). Within each categorization, he computed high, low, mean, and median units shipped, as well as wholesale price statistics.

**\*65** Mr. Wagner separated the EBD film titles into: (i) Titles with more well-known actors and (ii) titles with lesser-known actors. He categorized them according to genre. Using the median gross units shipped from comparable film titles in the AMR data, Mr. Wagner projected gross units shipped for the EBD film titles.[FN131]

On the basis of discussions with industry participants, Mr. Wagner projected that the unit return rate for units shipped to the rental market would be 7.5 percent of the gross units shipped. On the basis of the median wholesale prices per unit for comparable AMR film titles, Mr. Wagner projected a $59 wholesale price per unit for the EBD film titles.[FN132] On the basis of discussions with industry participants, Mr. Wagner opted for a 3-year release pattern (on average, just under two film titles per month) for the EBD film titles.[FN133] Mr. Wagner also opted for an even release pattern for each title for each genre; i.e., if there were 9 horror film titles, then 3 horror film titles would be released each year. On the basis of discussions with industry participants, Mr. Wagner determined that 80 percent of a film title's revenue would be received in the first year of release and 20 percent would be received in the second year of release.

Incorporating these figures, Mr. Wagner computed gross sales data for the EBD film library on title-by-title and year-by-year bases.

### ii. Cost Projections

Mr. Wagner projected costs for distributing the EBD film titles including VHS conversion, duplication, distribution (including shipping and packaging), cover art, and marketing costs.[FN134] Mr. Wagner projected VHS conversion costs of $3,200 per film title and duplication and distribution costs of $2.50 per unit. On the basis of discussions with industry insiders, including Michael Herz, Mr. Wagner projected cover art and marketing

costs as $7,500 per film title.

### iii. Net Cashflows

To arrive at a net annual cashflow, Mr. Wagner deducted total projected expenses from projected revenues for each EBD film title. He then aggregated the net cash flows for the EBD film titles to arrive at a net cashflow for the entire EBD film library. He applied a 40-percent tax rate to come up with the after-tax cashflows for the EBD film library.

### iv. Valuations

Mr. Wagner discounted the after-tax cashflows to December 11, 1996, using a real weighted average cost of capital of 10 percent (rounded), arriving at a present value of $6.8 million for the EBD film library. He also projected a $2.3 million amortization tax benefit for the acquisition cost of the EBD film library. Using these figures, Mr. Wagner calculated a $9.1 million value, as of December 11, 1996, for the 65 film titles in the EBD film library. Alternatively, Mr. Wagner calculated a $6.9 million value, as of December 11, 1996, for the 52 film titles in the EBD film library with confirmed physical materials.

### v. Market Approach

**\*66** Mr. Wagner did not rely on a market approach to value the EBD film library because of the difficulty in finding comparable film libraries. Nonetheless, he reviewed several film and television libraries that were sold in the 1990s: (1) In 1990, MCA, Inc., sold 3,100 feature film titles and 14,000 TV episodes to Matsushita Electric for $6.1 billion ($356,725 per title); (2) in 1993, New Line sold 200 features to Turner Broadcasting for $500 million ($2.5 million per title); (3) in 1995, Matsushita Electric sold 3,200 features and 14,000 TV episodes to Seagram Co., Ltd., for $5.7 billion ($331,395 per title); (4) in 1996, Credit Lyonnais sold 1,500 features and 4,100 TV episodes to Mr. Kerkorian for $1.3 billion ($232,143 per title); and (5) in 1997, Orion/Samuel Goldwyn sold 2,000 features to MGM for

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

T.C. Memo. 2005-104, 2005 WL 1111792 (U.S.Tax Ct.), 89 T.C.M. (CCH) 1157, T.C.M. (RIA) 2005-104, 2005
RIA TC Memo 2005-104
**T.C. Memo. 2005-104, (U.S.Tax Ct.)2005 WL 1111792**

$573 million ($286,500 per title).[FN135] On the basis of this information, Mr. Wagner concluded that the approximately $140,000 price per title that he determined for the 65 EBD film titles "appears to be not unreasonable."

### b. *Respondent's Expert*

Richard L. Medress is the founder and president of Cineval, LLC, an independent consulting practice that specializes in theatrical and television film library valuations. Mr. Medress has more than 15 years of experience in the entertainment industry and has valued a number of major studio and independent film libraries for owners, lenders, and potential investors. Before establishing his own consulting business in 1995, Mr. Medress was a vice president in the Entertainment Industries Group and in the Corporate Finance Division at Chemical Bank (now JP Morgan Chase). Mr. Medress is a member candidate of the American Society of Appraisers.

Mr. Medress submitted an expert report appraising the 65 EBD film titles, as of December 11, 1996, under two scenarios. Under scenario 1, Mr. Medress assumed that SMHC owned the domestic home video distribution rights to all 65 film titles, in perpetuity. Under scenario 2, Mr. Medress adjusted his valuation for the possibility that two of the film titles represent the same film, and that the distribution rights to certain other film titles expired shortly before or after December 11, 1996. Mr. Medress relied on an income approach, forecasting income for VHS sales in the rental market and in the sell-through market (i.e., distributor's sale of video units directly to retailers (e.g., Wal-Mart)).[FN136]

### i. *Income Projections*

Mr. Medress prepared income projections for a 10-year period from 1996 through 2006, on the basis of "reasonable assumptions of demand" for the EBD film titles in 1996. Mr. Medress assumed that most of the film titles in the EBD film library were previously released in video in the United States, that demand for the film titles was constrained by their age and their having

been previously exploited in video, and that the distribution of many titles in the library was constrained by their sexual and shock exploitation subject matter.FN137

**\*67** In scenario 1, Mr. Medress projected 10 film titles in rental and 55 film titles in sell-through. In scenario 2, Mr. Medress projected 10 film titles in rental for each of the years in the projection period, 47 sell-through film titles in 1997, and 45 sell-through film titles for each of the years 1998 through 2006.[FN138]

Mr. Medress assumed that in 1997 (the first full year after SMP acquired SMHC) 500 units would be shipped for each of the 10 film titles distributed in the rental market, and that this amount would decline by 2.5 percent per annum as the film titles continued to age. For scenario 1, Mr. Medress divided the film titles distributed in the sell-through market into 10 "Group 1" film titles and 45 "Group 2" film titles. For scenario 2, Mr. Medress divided the film titles distributed in the sell-through market into 9 "Group 1" and 38 "Group 2" film titles for 1997, and 9 "Group 1" and 36 "Group 2" film titles for 1998 through 2006. Mr. Medress assumed, in both scenarios, that 5,000 units would be shipped for each of the "Group 1" film titles and 100 units would be shipped for each of the "Group 2" film titles, and that after 1997 the unit shipments would decline by 2.5 percent per annum.[FN139]

Having determined that shipments of rental units that had been in release for some time would have a low return rate, Mr. Medress assigned the EBD film titles a 5-percent return rate. For the EBD film titles distributed in the sell-through market, Mr. Medress assumed a 20-percent return rate, which he regarded as "typical of sell-through product." [FN140]

Because of the age of the EBD film titles, Mr. Medress selected a $44.95 wholesale price for rental units, which was at the lower end of the range for direct-to-video titles released by independent studios. On the basis of his industry knowledge, Mr. Medress used a $7.99 wholesale price for sell-through units.

Mr. Medress did not incorporate a release pattern into

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

T.C. Memo. 2005-104                                                                      Page 65
T.C. Memo. 2005-104, 2005 WL 1111792 (U.S.Tax Ct.), 89 T.C.M. (CCH) 1157, T.C.M. (RIA) 2005-104, 2005
RIA TC Memo 2005-104
**T.C. Memo. 2005-104, (U.S.Tax Ct.)2005 WL 1111792**

his projections; he assumed that income would be received evenly over his 10-year projection period (with the exception of the annual 2.5-percent decay rate discussed above).

Incorporating these figures, Mr. Medress computed gross sales data for the EBD film library on a year-by-year basis.

### ii. *Cost Projections*

On the basis of his industry knowledge, Mr. Medress projected $2.75 in manufacturing, packaging, and shipping costs per unit and marketing costs equal to 10 percent of gross sales. Mr. Medress also projected administrative overhead at what he termed an "appropriate" rate of 10 percent of gross sales.[FN141] Mr. Medress did not project any conversion costs.

### iii. *Net Cashflows*

After deducting manufacturing, packaging, shipping, and marketing costs, Mr. Medress derived net receipts for the EBD film library from its projected distributions in the rental and sell-through markets for each of the years in the 10-year projection period. Mr. Medress combined the net receipts for the rental and sell-through distributions and subtracted his projected overhead from these yearly figures.

**\*68** Mr. Medress calculated a terminal value for the EBD film library based on projected cashflows for 2006, assuming that units shipped would continue to decline beyond 2006 at an annual rate of 2.5 percent. Mr. Medress then computed the total cashflows for each year in his projection period, including the terminal value of the EBD film library in his 2006 projections. Mr. Medress applied a 44.5-percent (combined Federal and New York State) tax rate and added an amortization tax benefit for each of the years in his projection period to arrive at net after-tax cashflows.[FN142]

### iv. *Valuations*

Mr. Medress determined the present value of future cashflows using a discount rate of 11.8 percent calculated on an industry basis with the buildup method, adjusting for inflation, company size, and the fact that a film library of completed film titles does not have the same business risk as the full range of business activities of companies engaged in film production and distribution.

Under scenario 1, Mr. Medress concluded that the fair market value of the 65 EBD film titles, as of December 11, 1996, was $1.6 million (rounded). Under scenario 2, Mr. Medress determined that the fair market value of the EBD film titles, as of December 11, 1996, was $1.5 million (rounded).

### v. *Market Approach*

Mr. Medress did not use a market approach in valuing the EBD film library. Nonetheless, as a reality check on his conclusions, he compared the average value per title from his analysis ($24,219) with the average price per title from the sale of the LIVE Entertainment film library ($68,000), which occurred approximately 4 months after December 11, 1996. Mr. Medress opined that the $68,000-price per title represents: "an amount that investors were willing to pay for a library that included many titles that were significantly stronger than the titles in the SMHC Film Library."In considering the lesser quality of the EBD film titles, Mr. Medress concluded that his estimate of $24,219 per title for the EBD film rights appeared reasonable.

### c. *Court's Analysis*

### i. *Reconciliation of Expert Opinions*

Both experts used an income approach, a discounted cashflow analysis, in valuing the EBD film rights. In their discounted cashflow analyses, both experts made sales projections based on the number of VHS units shipped in the rental or sell-through market. In valuing the EBD film rights, both experts relied on information from AMR and the IMDb database. Both experts assumed that SMHC had no responsibility for residual payments to guilds, participations to talent, or shares to

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

T.C. Memo. 2005-104, 2005 WL 1111792 (U.S.Tax Ct.), 89 T.C.M. (CCH) 1157, T.C.M. (RIA) 2005-104, 2005
RIA TC Memo 2005-104
**T.C. Memo. 2005-104, (U.S.Tax Ct.)2005 WL 1111792**

producers.

Neither expert relied on projections for sales in the DVD format. Neither expert relied on the revenue-sharing pricing model (Rentrak) for the rental market that evolved after 1996. Neither expert considered direct sales of videos via the Internet. Neither expert assigned any value to the 26 development projects or the sequel rights to any of the EBD film titles.

**\*69** Mr. Wagner and Mr. Medress are reasonably close in their estimated return rates (7.5 percent vs. 5 percent, respectively) for distributed units in the rental market. Mr. Wagner does not question Mr. Medress' estimated 20-percent return rate for distributed units in the sell-through market. The experts do not question each other's weighted average cost of capital, discount rate, or tax rate figures. The experts are also in basic agreement as to manufacturing, packaging, and shipping costs ($2.50 per unit to $2.75 per unit); however, they disagree on marketing costs and whether, and to what extent, overhead expense should be considered. In making his income projections, Mr. Medress considered the sexual and shock exploitation nature of some of the EBD film titles; Mr. Wagner did not. The experts express general disagreement regarding their respective methodologies and what assumptions should be considered in projecting an income stream for the EBD film titles.

### ii. *Exclusion of Certain Film Titles*

Both experts present alternative valuations that exclude certain film titles from the EBD film library. With respect to some film titles, their exclusions overlap.

Relying on the records that Troy & Gould obtained, Mr. Wagner determined that the following 13 film titles in the EBD film library did not have confirmed physical materials: "Alley Cat", "Bombay Talkie", "Cardiac Arrest", "Courtesans of Bombay", "Escape from Venice", "Equinox", "Mother & Daughter: Loving War", "Nasty Hero", "Outlaw Force", "Sticks and Stones", "Throne of Vengeance", "War Cat", and "Zombie".[FN143] On the record before us, we believe that the absence of

physical materials for these film titles is a fact that was reasonably discoverable on December 11, 1996. We also believe that the hypothetical willing buyer would not have paid for rights to film titles that did not have confirmed physical materials. Consequently, our valuation of the EBD film library does not account for the 13 film titles that Mr. Wagner identified as not having confirmed physical materials.

In making his scenario 2 projections, Mr. Medress excluded 9 film titles, including: "Bombay Talkie", "Courtesans of Bombay", "Danger Zone", "Hullabaloo Over Georgia", "Hunter's Blood", "Mother & Daughter: Loving War", "Octavia", "Shakespeare Wallah", and "Sticks and Stones".[FN144] An internal memorandum that Troy & Gould prepared during its due diligence confirms that the distribution rights to those film titles were set to expire before or shortly after December 11, 1996. The Troy & Gould memorandum indicates that the distribution rights to the film title "Danger Zone" were set to expire on or about January 26, 1997; that the distribution rights to the film titles "Bombay Talkie", "Courtesans of Bombay", "Hullabaloo over Georgia", and "Shakespeare Wallah" were set to expire on or before October 24, 1996; that the distribution rights to the film title "Hunter's Blood" were set to expire on or about June 3, 1997; that the distribution rights to the film title "Mother & Daughter: Loving War" were set to expire no later than March 31, 1997; that the distribution rights to the film title "Octavia" were set to expire on or about March 7, 1996; and that the distribution rights to the film title "Sticks and Stones" were set to expire on or about January 12, 1995.[FN145]In the Court's view, a hypothetical willing buyer would not pay for rights that were expired or expiring. Since this information was reasonably discoverable as of December 11, 1996, we exclude the film titles that Mr. Medress identified from our valuation of the EBD film library.[FN146]

### iii. *Analysis of Expert Opinions*

**\*70** In projecting gross units shipped for the EBD film titles, Mr. Medress selected arbitrary figures: In the rental market, 500 units for each film title; and in the

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

sell-through market, 5,000 units for "Group 1" film titles and 100 units for "Group 2" film titles. Mr. Medress indicates that he relied on his industry experience in arriving at these figures; however, he does not specifically explain how he derived the figures on that basis. Mr. Medress also indicates that he incorporated into his projections certain assumptions relating to the previous distribution history and certain characteristics (such as age and content) of the EBD film titles; he fails to explain, however, precisely how these assumptions influenced or justified his projections.

Moreover, Mr. Medress does not indicate which film titles he considered for distribution in the rental and sell-through markets, and which film titles are in "Group 1" and "Group 2." He does not explain the method that he used to divide the film titles into groups or what accounts for the vast difference in units shipped between "Group 1" and "Group 2" film titles (5,000 units vs. 100 units, respectively). Mr. Wagner, on the other hand, made his income projections by comparing data from AMR, using IMDb database star ratings and genre categorizations.

Although Mr. Wagner relied on objective data to reach his conclusions, his valuation fails to consider certain factors that we find relevant to the valuation of the EBD film titles. First, in making his projections, Mr. Wagner assumed that none of the EBD film titles had been previously distributed.[FN147] Mr. Medress, on the other hand, assumed that most of the EBD film titles had been released in video in the United States before 1996. In making these assumptions, both experts researched existing databases of film distribution information and other sources. Mr. Wagner found no record of previous unit sales for the EBD film titles in the rental market but admits that "it is not possible to precisely ascertain

whether the titles are in the early or late portion of their lifespan."Mr. Medress found incomplete and unsatisfactory information regarding the distribution history of the EBD film titles in both the rental and sell-through markets. Mr. Medress determined, however, that most of the EBD film titles were previously distributed, relying on a number of different sources.

Mr. Medress relied on a letter from Michael Herz, on behalf of Troma, to Troy & Gould which identified previous distributors of 37 EBD film titles. These film titles included: "Alley Cat", "Astro Zombies", "Avenger", "The Beast", "Bombay Talkie", "Cardiac Arrest", "Courtesans of Bombay", "Danger Zone", "Escape from Hell", "Fear", "Firefight", "Fist of Fear, Touch of Death", "Headless Eyes", "House of Terror", "Hullabaloo Over Georgia", "Hunter's Blood", "Invisible Dead", "Mother & Daughter: Loving War", "Nasty Hero", "Ninja Hunt", "Ninja Showdown", "Ninja Squad", "Oasis of Zombies", "Octavia", "Outlaw Force", "Platypus Cove", "Plutonium Baby", "Shakespeare Wallah", "Sidewinder One", "Summer Camp Nightmare", "Terror on Alcatraz", "This Time I'll Make You Rich", "Tiger of the Seven Seas", "To Love Again", "The Visitants", "White Ghost", and "Zombie". Mr. Medress also searched the IMDb Pro database and found that the following film titles had also been previously distributed: "Banana Monster", "Battle of the Last Panzer", "Blood Brothers", "Crimson", "Demoniac", "Duel of Champions", "Equinox", and "Return of the Zombies".[FN148] Finally, Mr. Medress purchased 47 used video tapes of EBD film titles; the packaging materials indicated that those film titles were distributed prior to 1996. The film titles included:

| | |
|---|---|
| Alley Cat | Mother & Daughter: Loving War |
| Astro Zombies | Nasty Hero |
| Avenger | Ninja Hunt |
| Banana Monster | Ninja Showdown |
| Battle of the Last Panzer | Ninja Squad |
| Battle of the Valiant | Oasis of Zombies |

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

T.C. Memo. 2005-104                                                                 Page 68
T.C. Memo. 2005-104, 2005 WL 1111792 (U.S.Tax Ct.), 89 T.C.M. (CCH) 1157, T.C.M. (RIA) 2005-104, 2005
RIA TC Memo 2005-104
**T.C. Memo. 2005-104, (U.S.Tax Ct.)2005 WL 1111792**

| | |
|---|---|
| Bombay Talkie | Octavia |
| Cardiac Arrest | Outlaw Force |
| Courtesans of Bombay | Platypus Cove |
| Crimson | Plutonium Baby |
| Danger Zone | Return of the Zombies |
| Demoniac | Shakespeare Wallah |
| The Beast | Sidewinder One |
| Erotikill | SS Experimental Love Camp |
| Escape from Hell | Summer Camp Nightmare |
| Fear | Terror on Alcatraz |
| Firefight | This Time I'll Make You Rich |
| Fist of Fear, Touch of Death | To Love Again |
| Fraulein Devil | Tormentor |
| Headless Eyes | The Visitants |
| House of Terror | War Cat |
| Hullabaloo over Georgia | White Ghost |
| Hunter's Blood | Zombie |
| Invisible Dead | |

**\*71** Insofar as any of the EBD film titles were previously released to the rental market, we believe that this would have a significant effect on demand for those film titles and also would tend to influence their distribution to the sell-through market at lower price points as opposed to the rental market with its higher price points. For this reason, Mr. Wagner's expert report grossly overstates the income projections for the EBD film titles.

We were also troubled by Mr. Wagner's assumptions that 80 percent of the projected revenues from the EBD film library would be generated in the film title's first year of release and 20 percent would be generated in the second year of release. Mr. Wagner's assumptions effectively frontload his unit projections into the first 2 years of distribution. In combination with his 3-year release pattern, these assumptions have the effect of projecting all cashflows for the EBD film library into a 4-year period (1997, 1998, 1999, and 2000). Since we are not persuaded that the hypothetical willing buyer of

the EBD film library would distribute all the EBD film titles in so short a period, we are led to conclude that Mr. Wagner's revenue assumptions overstate the present values of projected cashflows from the EBD film library.

Mr. Wagner assumed a median \$59 wholesale price for the rental market, whereas Mr. Medress used a \$45 wholesale price at the lower end of the spectrum of wholesale prices. Given the age and nature of the EBD film rights, Mr. Medress' lower wholesale price is more reasonable.

Mr. Wagner determined that the film titles in the EBD film library were produced "several" years before the valuation date. Specifically, three of the film titles were produced in the 1950s, 12 in the 1960s, 25 in the 1970s, 24 in the 1980s, and 1 in the 1990s:

| | | | |
|---|---|---|---|
| Alley Cat | 1982 | Invisible Dead | 1971 |

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

| | | | |
|---|---|---|---|
| Astro Zombies | 1967 | Jungle Master | 1972 |
| Auditions | 1995 | Mother & Daughter: Loving War | 1980 |
| Avenger | 1961 | Nasty Hero | 1987 |
| Banana Monster | 1971 | Ninja Hunt | 1987 |
| Battle of the Last Panzer | 1969 | Ninja Showdown | 1987 |
| Battle of the Valiant | 1963 | Ninja Squad | 1987 |
| Beast, The | 1971 | Oasis of Zombies | 1983 |
| Blood Brothers | 1974 | Octavia | 1984 |
| Blood Castle | 1971 | Outlaw Force | 1987 |
| Bombay Talkie | 1970 | Platypus Cove | 1986 |
| Cardiac Arrest | 1980 | Plutonium Baby | 1987 |
| Carthage in Flames | 1959 | Return of the Conqueror | 1964 |
| Cold Steel for Tortuga | 1965 | Return of the Zombies | 1973 |
| Conqueror and the Empress | 1964 | Shakespeare Wallah | 1965 |
| Courtesans of Bombay | 1985 | Sidewinder One | 1977 |
| Crimson | 1973 | SS Camp 5 | 1976 |
| Danger Zone | 1951 | SS Experimental Love Camp | 1976 |
| Demoniac | 1974 | Sticks and Stones | 1970 |
| Duel of Champions | 1961 | Summer Camp Night-mare | 1987 |
| Equinox | 1971 | Terror on Alcatraz | 1986 |
| Erotkill | 1973 | The Sword & The Cross | 1958 |
| Escape from Hell | 1979 | The Visitants | 1988 |
| Escape from Venice | 1979 | This Time I'll Make You Rich | 1975 |
| Fear | 1988 | Throne of Vengeance | 1964 |
| Firefight | 1987 | Tiger of the Seven Seas | 1963 |
| Fist of Fear, Touch of Death | 1981 | To Love Again | 1980 |
| Fraulein Devil | 1977 | Tormentor[s], The | 1971 |
| Headless Eyes | 1971 | War Cat | 1987 |
| House of Terror | 1972 | White Ghost | 1986 |
| Hullabaloo over Georgia | 1978 | White Slave | 1986 |
| Hunter's Blood | 1987 | Zombie | 1979 |
| Invincible Gladiators | 1964 | | |

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

**\*72** It is clear from these production dates and Mr. Wagner's observations that the EBD film library represented a library of older film titles. Both experts agree that older film titles, except perhaps for classics, would be less in demand than recent productions.

In making his income projections, Mr. Wagner considered the age of the EBD film titles in choosing between the higher mean and lower median gross units shipped from the AMR data: "Typically, this step in the process would have been performed using the mean. However, the SMH titles were older; and therefore; the number of gross shipments was determined to be lower than the mean indication from the AMR data."On this basis, Mr. Wagner used the median gross units shipped and median wholesale prices per unit that the AMR data suggested. Nonetheless, it appears that most, if not all, of the 270 film titles in the AMR data were recently produced. For this reason, we are not persuaded that choosing the median over the mean gross units shipped and wholesale prices per unit from the AMR data properly accounts for the age of the EBD film titles. Instead, the age of the EBD film titles suggests that the gross units shipped and wholesale prices per unit for those film titles would be at the lower end of the spectrum of the AMR data. Insofar as Mr. Wagner relies on the median data, he has overstated his projections.

Although Mr. Wagner did not assume any theatrical releases (e.g., releases to movie theaters) in his expert report, in his rebuttal report he points to certain data indicating that 16 of the EBD film titles were theatrically released in the U.S. domestic market and 22 of the film titles were theatrically released in the international market.[FN149]Mr. Wagner did not incorporate this data into his valuation analysis; however, he posits that these theatrical releases would enhance his valuation of the EBD film titles because of increased consumer awareness. After examining the additional data that Mr. Wagner presented, we cannot agree.

Mr. Wagner's data indicates that all but one of the domestic theatrical releases occurred between 1951 and 1980. The only exception is "Summer Camp Nightmare," which had an April 1987 release date. Likewise,

most of the international theatrical releases occurred between 1960 and 1979. Two films were released in 1983, two in 1985, and one ("Nasty Hero," which has no confirmed physical materials) in 1992. Given the significant time period between these supposed theatrical releases and 1996, we are not convinced that the film titles would have benefited from a theatrical release. Moreover, we are not convinced that the international theatrical release of admittedly "B" film titles would translate into increased consumer demand in the U.S. domestic market.

### iv. *Conclusion*

In general, we found both expert opinions unsatisfactory. On the one hand, Mr. Medress' methodology contains considerable gaps; for instance, he fails to explain certain important assumptions and conclusions. Mr. Medress' methodology appears highly subjective. On the other hand, Mr. Wagner's methodology offers an objective basis for estimating the initial gross units shipped for the EBD film titles; however, his income projections are highly overstated. Importantly, Mr. Wagner did not account for any previous distribution of the EBD film titles.

**\*73** Despite our misgivings about Mr. Medress' methodology, we are persuaded that his income projections for the EBD film titles are more realistic than Mr. Wagner's highly overstated projections. If we were relying solely on the expert opinions, we would conclude that the EBD film rights had a value as of December 11, 1996, which did not exceed the value Mr. Medress determined in his scenario 2; i .e., \$1.5 million. Nonetheless, we find that certain additional factors, which the experts did not consider, indicate a much lower value.

In making their respective valuations, both experts were hampered by the lack, or inconsistency, of information relating to the EBD film titles. Neither expert inspected the physical materials for the EBD film titles. Neither expert considered whether the existing physical materials were capable of reproduction. Neither expert considered the impact of chain-of-title and copyright issues relating to the EBD film titles. The record demonstrates,

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

however, that there were significant gaps in the chain-of-title for most, if not all, of the EBD film titles. Even a cursory review of available information as of December 11, 1996, would have demonstrated these gaps. Moreover, CLIS's contribution of the film rights to SMHC and the transfers leading up to that contribution do not establish specifically what rights SMHC obtained in the EBD film titles. In the Court's view, a hypothetical willing buyer either would have demanded some reasonable assurance of SMHC's rights in the EBD film titles or would have required a substantial discount to account for the gaps in the chain-of-title and possible liabilities for illegal distribution.[FN150]

At trial, John Peters of Epic Productions testified regarding the nature and the condition of the EBD film titles that CLIS contributed to SMHC. Mr. Peters was charged with selecting the EBD film titles for CLIS's contribution to SMHC; he was instructed to select film titles that would not affect the overall value of the CDR library. He selected films that had very little value, films with distribution rights that were set to expire, and low-budget exploitation-genre films. Mr. Peters selected only the "U.S. Video Film Rights" for the EBD film titles. Mr. Peters testified that many of the physical materials for the EBD film titles were stored at the Epic warehouse, a facility that was not secured and was not temperature- or humidity-controlled. Mr. Peters's testimony and his unique knowledge of the nature and condition of the EBD film titles seriously undermine petitioner's position that the EBD film titles had a value in the range of $6.9 to $9 million.

The veracity of Mr. Peters's testimony is confirmed by SMHC's treatment of the EBD film titles following their contribution. SMHC, as the purported owner of the EBD film rights, did not regard those film rights as having any value. Indeed, following CLIS's contribution of the EBD film library to SMHC, SMHC reported on its draft financial statements for the period ended December 10, 1996, that the value of the EBD film library was not material to its financial statements.[FN151]In a document entitled: "Accounting in Santa Monica Holdings Book", dated June 1, 1997, Bruno Hurstel of CDR reiterated that CLIS's contribution of the EBD film library

to SMHC on December 10, 1996, was "without amount". Also, consistent with its accounting of the contribution, SMHC did not list the EBD film rights as an asset of value on its corporate tax return for the period October 9 to December 31, 1996.[FN152]

**\*74** These additional factors indicate that the EBD film rights had very little, if any, value and were in an unsatisfactory condition when they were transferred from CLIS to SMHC. In light of the expert opinions and these additional factors, we conclude that the EBD film rights had no material or consequential value as of December 11, 1996.

Petitioner claims that the EBD film rights still have considerable value. The record does not bear out this claim. The Ackerman group and Troma have realized little or nothing on the EBD film rights. SMP and SMHC distributed none of the EBD film titles. Troma distributed 6 of the film titles but with very little success. For example, Troma began distributing "Battle of the Last Panzer" on May 25, 1999, and had $2,034.71 in total VHS sales through 2000 and $182.97 during 2001. Troma began distributing "Escape from Hell" o n May 25, 1999, and had $6,496.64 in total VHS sales through 2000 and $3,867.24 during 2001. It had $10,726.90 in total DVD sales during 2000 and $2,529.23 during 2001.[FN153] Troma began distributing "Plutonium Baby" on October 24, 2000, and had $767.98 in VHS sales through 2000 and $66.48 during 2001. Realization of these amounts would hardly justify the distribution expenses that Troma likely incurred.[FN154]

### 4. *Carolco Securities*

The parties dispute whether the Carolco securities had any value as of December 11, 1996. Petitioner contends that as of December 11, 1996, the Carolco securities had some indeterminable value, perhaps as high as $10 million. Respondent contends that the Carolco securities had no value. As explained below, we agree with respondent.

By November 1995, Carolco faced serious financial problems.[FN155]Once a powerhouse in motion picture

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

production, in 1995 and 1996 Carolco was insolvent and unable to continue movie production. Its 1993 financial restructuring had proven unsuccessful, and Carolco decided to sell its film library, certain projects, and its movie studio. In the fall of 1995, Carolco accepted a $47.5 million offer from Twentieth Century Fox, foreclosing any possibility of Carolco's continuing as a going concern. On November 10, 1995, Carolco filed a chapter 11 bankruptcy petition.FN156

Prior to December 11, 1996, the Debtors' and Creditors' Committee had filed its first and second plans of reorganization.FN157Under each of those plans, the holders of Carolco subordinated notes were in class 10 and the holders of Carolco preferred stock were in class 12. In the planned liquidation of Carolco, holders of class 10 and 12 assets were to receive nothing. According to the second plan of reorganization, the liquidation of Carolco commenced with the sale of the Carolco film library and continued with the sale of certain projects, Carolco's studio, and other assets. As a result of the sale of these items, Carolco would hold approximately $60 million cash, which was the largest asset in the bankruptcy proceeding. Other than this cash asset, the only remaining assets of significant value were certain projects and litigation claims. A disclosure statement accompanying the second plan of reorganization dated December 3, 1996, presented three scenarios showing a range of possible outcomes from the Carolco liquidation. Carolco estimated that under any of the three scenarios, class 9 through 13 creditors, including holders of the Carolco securities, would receive nothing from the bankruptcy. Considering the information available as of December 11, 1996, it was highly unlikely that SMHC would recover anything on the Carolco securities. Clearly, the plans of reorganization and the disclosure statement (which projected a "best case" scenario for the Carolco liquidation) showed no recovery at all to the holders of Carolco securities.

**\*75** On SMHC's draft financial statements for the period ended December 10, 1996, it reported a charge of $60,075,000, which was the entire carrying value of the Carolco securities, and indicated that the purpose for this charge was to write down the Carolco securities to

net realizable value due to the bankruptcy of Carolco.FN158In a June 1, 1997, accounting of SMHC's book accounts, Mr. Hurstel reiterated that there was a contribution by MGM Holdings of the Carolco securities to the capital of SMHC; however, this contribution was accounted for on SMHC's books as "without amount". Similarly, on SMHC's corporate income tax return for the taxable period October 9 to December 31, 1996, the Carolco securities were not listed as assets on Schedule L, Balance Sheets, as of December 31, 1996.FN159SMHC's reporting position confirms our understanding of the value of the Carolco securities on December 11, 1996.

Petitioner nonetheless claims that there was some chance of recovery on that date, and that the Carolco securities had value. Petitioner first contends that the holders of the Carolco securities had the right to object to confirmation of the plan of reorganization on any grounds that might cause it not to be confirmed. See 11 U.S.C. sec. 1128(b) (2000) (a party in interest may object to confirmation of a plan of reorganization). According to petitioner, "An objection could be made on 'any ground,' and it is possible that a creditor or interest holder could negotiate a better return or distribution from the plan in return for dropping its objection, even if it were a nuisance settlement."Petitioner's assertions appear to be nothing more than speculation. We cannot agree that SMHC's right to object to any plan of reorganization necessarily equates with some element of "real value" in the Carolco securities.

Petitioner also points to a report from Harch Capital Management, Inc. (Harch Capital), dated December 3, 1996, which concluded that the Carolco subordinated notes could have a value between $4 million and $6 million, and the Carolco preferred stock could have a value between $3 million and $5 million. We place little reliance on that report. In the first instance, the Harch Capital report was not offered into evidence for the truth of the matters asserted therein. The Harch Capital report is a 4-paragraph, 1-page document, which contains no analysis or explanation regarding the valuation figures. Harch Capital states: "we are aware that Carolco is in bankruptcy and that claims have been made

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Case 1:08-cv-00279-HHK    Document 9-2    Filed 07/22/2008    Page 73 of 135

T.C. Memo. 2005-104                                                                                    Page 73
T.C. Memo. 2005-104, 2005 WL 1111792 (U.S.Tax Ct.), 89 T.C.M. (CCH) 1157, T.C.M. (RIA) 2005-104, 2005
RIA TC Memo 2005-104
**T.C. Memo. 2005-104, (U.S.Tax Ct.)2005 WL 1111792**

with respect to the instruments in question", but otherwise suggests that it did not factor into its "valuation", any of the plans of reorganization that were filed in the bankruptcy court. In fact, the date of the report is the same date that the second plan of reorganization and its attached disclosure statement were filed with the bankruptcy court.

Petitioner also relies on the fact that shares of Carolco stock were trading in the market on December 11, 1996, and have continued to trade until the trial date. According to a rebuttal report that Mr. Wagner submitted, 61,000 shares of Carolco stock were traded on December 11, 1996. That report reveals, however, that Carolco stock was trading at $0.002 per share on that date. In considering this trading, Mr. Wagner opined that the value of the Carolco securities was "greater than zero." Mr. Wagner makes no effort to place any more precise value on the Carolco securities, and he fails to explain how this market trading equates with any possible recovery by SMHC on those securities.

**\*76** Petitioner points to the negotiations between CDR and the Ackerman group, in which CDR sought to retain whatever value might be realized in the Carolco securities. Petitioner contends that these negotiations indicate that the Carolco securities had some value. It is unclear from the record, however, precisely what CDR's intentions were with respect to the Carolco securities. Clearly, at the time these negotiations were ongoing, it was highly unlikely that the banks (through SMHC) would recover anything on the Carolco securities. Any recovery at that time would have been highly speculative and contingent on events that were not foreseeable. Even if we were to assume that CDR's interest indicates some value in the Carolco securities, we have no clear indication of what that value might be.

Finally, any value that might have been realized on the Carolco securities would not go to the Ackerman group. Indeed, Mr. Lerner testified that the Ackerman group evaluated the Carolco securities, but they were concerned only with the potential negative aspects of those securities; i.e., liabilities. He testified that the Ackerman group had very little control over the Carolco securities since Carolco was "in bankruptcy proceedings, number

one, and, number two, the ultimate value would accrue to the benefit of Credit Lyonnais, which was fine with us."Mr. Lerner testified that because of the various ways in which CDR laced any realizable value in the Carolco securities to Generale Bank's and CLIS's preferred interests, it was unlikely that any value from the Carolco securities would go to SMP or the Ackerman group.

### 5. Net Operating Losses

The parties agree that the unused NOLs in SMHC might have had some potential, but speculative, value to an acquirer of that company; however, we have no reasonable basis upon which to determine what that value, if any, might be.[FN160] Any value that might exist in the NOLs was highly dependent on the acquirer's meeting the requirements of section 382, which limits the amount of taxable income that might be offset by NOLs in the case of an "ownership change". Moreover, even if these requirements had been met and the NOLs had been preserved, SMHC would have had to have generated sufficient taxable income against which to use the NOLs. As of December 11, 1996, without additional capitalization, this prospect was, for the most part, unrealistic.

### 6. Conclusion

We conclude that SMHC's assets (the EBD film library, the Carolco securities, and the unused NOLs) had no significant value as of the date the banks made their "contributions" of SMHC receivables and stock to SMP.[FN161] Consequently, without an infusion of new capital, SMHC had no realistic income-generating capacity to create value in the SMHC receivables and stock. Given the absence of appreciable value in the contributed properties and the banks' intentions of exiting the partnership, we are not convinced that the Ackerman group entered into the transaction with any realistic expectation of realizing any economic return on the approximately $10 million that they had paid the banks as an inducement to enter the transaction. Instead, the Ackerman group incurred this $10 million "cost" not as

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

https://web2.westlaw.com/print/printstream.aspx?prft=HTMLE&destination=atp&sv=Split...   7/21/2008

part of a real-world economic investment but in the hopes of reaping enormous tax benefits and fees from the banks' built-in losses. Consequently, the economic realities lead us to conclude that this $10 million amount was paid, not as an inducement for entering into the partnership but for the $1.7 billion in tax attributes that the Ackerman group acquired in the transaction.

### F. Other Considerations

#### 1. SMP's Other Film-Related Activities

**\*77** After the CDR transaction, SMP acquired the "City Lights" library, the "Wisdom" library, the "Moving Picture" library, the "Five Stones" library, and the "Vista Street" library. Petitioner suggests these acquisitions should have some bearing upon our evaluation of the CDR transaction. We disagree. There is no evidence to suggest that these acquisitions were contemplated at the time of the CDR transaction; these acquisitions are entirely unrelated to any supposed film venture with the banks. In any event, the acquisitions are relatively insignificant when compared to the enormous tax losses that the Ackerman group claims to have reaped from the CDR transaction and the $14,595,652 fee that Imperial paid SMP for its share of tax losses on the Corona transaction.[FN162]

Petitioner also points to a number of discussions that he had in 1997, 1998, and 1999, which related to certain film-related transactions and activities.[FN163] According to Mr. Lerner, however, none of these transactions actually resulted in a transaction between SMP, SMHC, and the other companies. Further, although petitioner submitted various exhibits indicating his contacts with the various parties, we have no basis from which to evaluate the content or the scope of the alleged discussions and negotiations. At best, the Ackerman group's various attempts to engage in film activities through SMP might be relevant in determining whether SMP was a bona fide partnership for Federal tax purposes; however, respondent does not dispute that SMP is a bona fide partnership. These film-related activities are unrelated to the CDR transaction and do not persuade us that the banks intended to enter a film distribution busi-

ness with the Ackerman group, as petitioner claims.

#### 2. Relationship Between the Parties

We are not persuaded that Mr. Jouannet's interests, and those of CDR, were necessarily adverse to the interests of the Ackerman group and SMP, at least insofar as the tax characterization of the transaction was concerned. As previously discussed, Mr. Jouannet's job was to realize whatever value he could in the Credit Lyonnais group's "bad" investments and loans, as quickly as possible. Whatever value might be realized from these "bad" investments and loans depended in large part on structuring a deal whereby the potential buyer could exploit the associated tax attributes. At least to this degree, Mr. Jouannet's and Mr. Lerner's interests coincided.

#### 3. Ackerman Group's Exploitation of Tax Attributes

The Corona transaction and the sales of receivables to TroMetro clearly denote the long-term objectives of the Ackerman group in entering into the transaction with CDR. The sales of the receivables to Mr. Lerner's friend, colleague, and business associate, Mr. van Merkensteijn, were an essential component to realizing the built-in losses in the receivables.[FN164]The sales of the receivables resulted in substantial losses that passed through from SMP to Somerville S Trust to Mr. Ackerman: A $147,486,000 loss on the sale of the $150 million receivable in 1997; a $80,190,418 loss on the sale of the $81 million receivable in 1998; and a $4,097,577 loss on the sale of the $79 million receivable in 1997. But these losses were not enough for the Ackerman group.

**\*78** In 1997, Mr. Lerner actively marketed a tax deal to Imperial, which was searching for tax losses to offset substantial gains that it expected to realize. Mr. Lerner was a director at Imperial and offered Imperial a stake in SMP's purported "film business." From the beginning, however, Imperial was interested in one thing only, a piece of the more than $1 billion in built-in losses that SMP possessed. Mr. Lerner proposed that Imperial would purchase a 25-percent ownership in-

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

terest in SMP; upon disposal of SMP's high-basis assets, Imperial would be allocated approximately $400 million in losses. As part of this deal, Imperial would enter into a tax-sharing agreement providing for a payment for the benefits attributable to this loss.

Although Imperial approved this deal, Mr. Lerner got nervous and proposed an alternative tax deal in which SMP would form a new limited liability company, Corona, by contributing the $79 million receivable. Imperial would purchase a substantial portion of SMP's membership interest and would receive a smaller, but still significant, tax-loss allocation on Corona's sale of the high-basis $79 million receivable. In exchange for the tax losses, Imperial would "contribute" back to Corona 20 percent of the tax losses that it received; i.e., $14,595,652. SMP received this purported contribution as a fee for the tax losses.[FN165]At the end of the day, the Ackerman group and Imperial had effectively duplicated the built-in loss that was inherent in the $79 million receivable with both the contributor (SMP) and the transferee partner (Imperial) receiving tax-loss allocations: SMP realized $62,237,061 and $11,647,367 losses, respectively, on the sales of portions of its Corona membership interest; Imperial realized a $74,671,378 loss (and SMP realized a $4,097,577 loss) on the sale of the $79 million receivable.

For these reasons, we conclude that the only purpose for the banks' participation was to transfer built-in losses to the Ackerman group taking advantage of the section 704(c) special allocation rules and to subsequently market those losses to other "investors" in the Ackerman group's purported film enterprise. As a result of the transaction with CDR and the section 704(c) rules, the Ackerman group acquired $974,296,601 in claimed basis in the receivables from Generale Bank, $79,912,955 in claimed basis in the $79 million receivable, and $665 million in the SMHC stock.

### 4. *Congressional Intent*

Petitioner contends that, notwithstanding these considerations, we should respect the form of the transactions between the Ackerman group, CDR, Generale Bank,

and CLIS. Petitioner argues that the transfer of tax basis from Generale Bank and CLIS to Somerville S Trust is contemplated and, in fact, prescribed under section 704(c). Petitioner concludes that section 723 and the partnership basis rules control the outcome of these cases.

Petitioner suggests that formalistic compliance with statutory provisions necessarily entitles the taxpayer to the tax benefits provided therein. We disagree.[FN166]Under *Gregory v. Helvering,* 293 U.S. at 469,"the substance of transactions is to be determined uniformly in relation to the meaning and intendment" of the Federal tax laws. *Weller v. Commissioner,* 270 F.2d 294, 298 (3d Cir.1959), affg. 31 T.C. 33, 1958 WL 893 and *Emmons v. Commissioner,* 31 T.C. 26, 1958 WL 892 (1958); see also *Jacobson v. Commissioner,* 96 T.C. 577, 590, 1991 WL 43437 (1991), affd. 963 F.2d 218 (8th Cir.1992).

**\*79** In enacting subchapter K, Congress adopted an aggregate rule for contributed property. In other words, Congress required partners to divide the gain or loss, depreciation, or depletion with respect to contributed property among the partners in a manner which attributes precontribution appreciation or depreciation in value to the contributor. H. Conf. Rept. 2543, 83d Cong., 2d Sess., at 58 (1954). In enacting this aggregate rule, however, Congress did not envision contributions to a partnership made solely for the purpose of subsequently transferring inside basis to another partner. Indeed, the purpose of section 704(c) is to prevent the shifting of tax consequences among partners with respect to precontribution gain or loss, sec. I.704-3(a)(1), Income Tax Regs., and not to perpetrate a massive shift in basis from transitory "partners" to other partners as part of a transaction lacking economic substance.

The purpose for the CDR transaction was purely and simply to transfer built-in losses from CDR to the Ackerman group. CDR wanted to realize some amount on the banks' built-in losses. The Ackerman group wanted to acquire the built-in losses to exploit the tax attributes. To these ends, the parties entered into a prearranged series of transactions wherein the banks contributed high-basis assets to SMP in exchange for preferred in-

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

terests in that company and then immediately sold their preferred interests to the Ackerman group.

Notwithstanding its form, the transaction did not, in substance, represent contributions of property in exchange for partnership interests, ingredients obviously contemplated in sections 704(c) and 723. The contribution provisions of subchapter K do not contemplate giving effect to a transitory partnership "contribution" that has no economic significance apart from trafficking in tax attributes. Cf. *United States v. Stafford,* 727 F.2d 1043, 1048 (11th Cir.1984) (stating that the purpose of the contribution rules is "to facilitate the flow of property from individuals to partnerships that will use the property productively.").

In *Wilkinson v. Commissioner,* 49 **T.C.** 4, 1967 WL 1286 (1967), the taxpayers were obligees on installment notes made by their own corporation. They wished to liquidate the corporation. Doing so, however, would have caused a deemed disposition of the notes (because the obligor and obligee on the notes would then be merged) and would have triggered tax on the deferred gains in the notes. In an attempt to avoid this result, the taxpayers hit upon a scheme: they would first assign the notes to a partnership in which they were members; then, after their corporation was liquidated, the partnership could assign the notes back to them. Under section 721, they would recognize no gain on the transfer to the partnership; under section 731, there would be no tax on the partership's reassigning the notes to them. In fact, there would never be any tax to anyone: "the installment obligations would simply vanish for tax purposes."*Wilkinson v. Commissioner,supra* at 12.This Court observed: "We cannot believe that a hurriedly organized tour through sections 721 and 731 could yield such an absurd result."*Id.* We reasoned that "the transparent device of making a formal assignment * * * to the partnership" was not controlling. *Id.* at 10.Instead, after examining the "realities" of the transaction, we concluded that the taxpayer's assignment of the notes to the partnership was "not intended to have any economic significance" and should be disregarded *Id.* at 11.

**\*80** Similarly, in the instant case, the transaction between the banks and the Ackerman group carried the seeds of its own undoing: it depended upon the banks' withdrawing from the very partnership they purported to join. The banks' "contributions" to the partnership were not intended to have any economic significance apart from transferring built-in tax losses. The transaction, if respected, would produce tax results not contemplated by subchapter K: staggering capital losses would be allocated to partners in the absence of any economic losses, to be used to shelter unrelated income not only for themselves but also for other taxpayers to whom, for a fee, the Ackerman group might market the losses. To paraphrase *Wilkinson:* We cannot believe that a romp down the yellow brick road of subchapter K can yield these absurd results.

### G. *Conclusion*

We conclude that the transaction whereby the banks purported to partner with the Ackerman group lacked economic substance. The Ackerman group and the banks did not intend to partner in a film distribution business. Rather, the transaction was designed to transfer built-in tax losses to the Ackerman group for $10 million. The economic realities of the transaction align with this intent. Consequently, we disregard Generale Bank's and CLIS's purported contributions to SMP. Cf. *Rice's Toyota World, Inc. v. Commissioner,* 752 F.2d at 95 (holding that the Tax Court correctly ignored labels applied by the taxpayers and determined that a transaction was in substance a fee paid for tax benefits).

### IV. *Step Transaction Doctrine*

Respondent contends that the step transaction doctrine applies to disallow petitioner's claimed losses. Whether this contention is viewed as an alternative argument, or merely as a particularization of respondent's substance over form argument, the results are identical: We disregard the banks' purported contributions to SMP. Nevertheless, for the sake of completeness, and because the parties have briefed legal precedents involving the step transaction doctrine, we address the parties' arguments in this regard.

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

A. *Legal Principles*

The step transaction doctrine embodies substance over form principles; it treats a series of formally separate steps as a single transaction if the steps are in substance integrated, interdependent, and focused toward a particular result. *Penrod v. Commissioner,* 88 T.C. 1415, 1428, 1987 WL 49335 (1987)."Where an interrelated series of steps are taken pursuant to a plan to achieve an intended result, the tax consequences are to be determined not by viewing each step in isolation, but by considering all of them as an integrated whole."*Packard v. Commissioner,* 85 T.C. 397, 420, 1985 WL 15389 (1985).

There is no universally accepted test as to when and how the step transaction doctrine should be applied to a given set of facts; however, courts have applied three alternative tests in deciding whether to invoke the step transaction doctrine in a particular situation: the "binding commitment," the "interdependence," and the "end result" tests. *Cal-Maine Foods, Inc. v. Commissioner,* 93 T.C. 181, 198-199, 1989 WL 87697 (1989); *Penrod        v.        Commissioner,supra        at* 1429-1430.Respondent relies in the instant cases on the "end result" and "interdependence" tests.

**\*81** Under the "end result" test, the step transaction doctrine will be invoked if it appears that a series of separate transactions is made up of prearranged parts of a single transaction, cast from the outset to achieve the ultimate result. *Greene v . United S tates,* 13 F.3d 577, 583 (2d Cir.1994); *Associated Wholesale Grocers, Inc. v. United States,* 927 F.2d 1517, 1523 (10th Cir.1991). The end result test is particularly pertinent to cases involving a series of transactions designed and executed as parts of a unitary plan to achieve an intended result. *Kanawha Gas & Utils. Co. v. Commissioner,* 214 F.2d 685, 691 (5th Cir.1954), revg. 19 T.C. 1017, 1953 WL 248 (1953). The series of closely related steps in such a plan is merely the means by which to carry out the plan, and the steps will not be separated.*Id.* In the Second Circuit, the prearranged plan need not be legally binding but must at least constitute an informal agreement or understanding between the parties. *Greene v. United States,supra* at 583;*Blake v. Commissioner,* 697 F.2d

473, 478-479 (2d Cir.1982), affg. T.C. Memo.1981-579.

Under the "interdependence" test, the step transaction doctrine will be invoked where the steps in a series of transactions are so interdependent that the legal relations created by one transaction would have been fruitless without a completion of the series. *Am. Bantam Car Co. v. Commissioner,* 11 T.C. 397, 405, 1948 WL 50 (1948), affd. 177 F.2d 513 (3d Cir.1949). We must determine whether the individual steps had independent significance or whether they had significance only as part of a larger transaction. *Greene v. United States,supra* at 584;*Penrod v. Commissioner,supra* at 1430.In making this determination, we rely on a reasonable interpretation of objective facts.*King Enters., Inc. v. United States,* 189 Ct.Cl. 466, 418 F.2d 511, 516 (1969); *Cal-Maine Foods, Inc. v. Commissioner,* 93 T.C. 181, 199, 1989 WL 87697 (1989).

B. *Parties' Arguments*

Invoking the "end result" test, respondent argues that Generale Bank's and CLIS's contributions of the high-basis, low-value receivables and SMHC stock to SMP, and Somerville S Trust's purchase of Generale Bank's and CLIS's preferred interests were really component parts of a single transaction intended from the outset to transfer to the Ackerman group the built-in tax losses in the SMHC receivables and stock. Invoking the "interdependence" test, respondent argues that Generale Bank's and CLIS's contributions of the SMHC receivables and stock and Somerville S Trust's purchase of Generale Bank's and CLIS's preferred interests were so interdependent that either transaction alone would have been fruitless without the other. Respondent argues that these transactions should be recast as a direct sale of the high-basis, low-value receivables to Somerville S Trust.

Petitioner argues that the "end result" test is inapplicable. Petitioner argues that Generale Bank's and CLIS's contributions of SMHC receivables and stock and Somerville S Trust's purchase of Generale Bank's and CLIS's preferred interests were not merely a series of steps in a single transaction designed to transfer tax attributes but were instead designed for SMP to acquire a

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

**T.C. Memo. 2005-104, (U.S.Tax Ct.)2005 WL 1111792**

film library. Petitioner also argues that the "interdependence" test is inapplicable. Petitioner argues that Generale Bank's and CLIS's contributions of SMHC receivables and stock and Somerville S Trust's purchase of Generale Bank's and CLIS's preferred interests were not so interdependent that either transaction alone would have been fruitless without the other. Petitioner contends that there was no formal or informal agreement or understanding to carry out a prearranged sale transaction via SMP.

## C. *Court's Analysis*

**\*82** Whether we apply the "end result" test or the "interdependence" test, we conclude that the step transaction doctrine applies to Generale Bank's and CLIS's contributions of the SMHC receivables and stock and Somerville S Trust's purchase of Generale Bank's and CLIS's preferred interests in SMP. For the reasons discussed in more detail above, we find that Generale Bank's and CLIS's contributions were made solely for the purpose of transferring built-in tax losses to the Ackerman group. The Ackerman group could not obtain the built-in tax losses through a direct purchase of the SMHC receivables and stock, but could only obtain those losses by interposing a partnership and manipulating the partnership basis rules. From the beginning, both parties planned and understood that CLIS would receive a \$5 million advisory fee and that the banks would exercise their put rights at the earliest possible point (December 31, 1996), exiting the partnership. The contributions, the payment of the advisory fee, and the exercise of the put rights were mutually interdependent steps taken to dispose of Generale Bank's and CLIS's "bad" investments in the SMHC receivables and stock and to transfer the built-in tax losses to the Ackerman group.

Petitioner argues, however, that respondent's attempted application of the step transaction doctrine is prohibited under certain judicial precedents. Petitioner contends that the step transaction doctrine cannot be applied to invent steps that did not occur or replace a taxpayer's chosen route with the Commissioner's preferred route when no steps are eliminated. Petitioner relies on

*Greene v. United States,* 13 F.3d 577 (2d Cir.1994); *Redding v. Commissioner,* 630 F.2d 1169 (7th Cir.1980), revg. and remanding 71 T.C. 597, 1979 WL 3801 (1979); *Grove v. Commissioner,* 490 F.2d 241 (2d Cir.1973), affg. T.C. Memo.1972-98; *Turner Broad. Sys., Inc. & Subs. v. Commissioner,* 111 T.C. 315, 1998 WL 892635 (1998); *Esmark, Inc. & Affiliated Cos. v. Commissioner,* 90 T.C. 171, 1988 WL 5887 (1988), affd. without published opinion 886 F.2d 1318 (7th Cir.1989). We conclude that these precedents are legally and factually distinguishable from the instant cases.

*Greene v. Commissioner,supra,* and *Grove v. Commissioner,supra,* like *Blake v. Commissioner,supra* at 478-479, addressed the application of the step transaction doctrine in situations where the taxpayer "contributed" a substantially appreciated asset to a charitable or tax-exempt entity to sell. In *Blake,* the critical inquiry in the court's step transaction analysis was whether the transactions were undertaken pursuant to an advance understanding. In *Blake,* because the Court of Appeals for the Second Circuit determined that the Tax Court's finding of a prearranged understanding was not clearly erroneous, it upheld the Commissioner's proposed application of the step transaction doctrine. The court distinguished *Grove,* in which the court declined to apply the step transaction doctrine, as a case where there was not even an informal agreement among the parties as to future disposition of the contributed asset. *Id.* at 479. Like the transaction in *Blake,* and unlike the transactions in *Greene* and *Grove,* Generale Bank's and CLIS's contributions of the high-basis, low-value receivables and SMHC stock to SMP, and Somerville S Trust's purchase of Generale Bank's and CLIS's preferred interests in SMP, occurred as part of a prearranged understanding between the Ackerman group, CDR, and the banks.

**\*83** In *Redding v. Commissioner,supra,* the Court of Appeals for the Seventh Circuit held that the step transaction doctrine did not justify treating the distribution of stock warrants, and the exercise of those warrants, as steps in a single transaction involving the distribution solely of stock for purposes of section 355(a)(1). In *Redding,* the corporation had no prearranged under-

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

standing with its shareholders that they would exercise the stock warrants; during the subscription period the shareholders had the option of exercising the stock warrants or not. Unlike the parties to the transaction in *Redding,* the Ackerman group, CDR, and the banks had decided on a predestined course-the banks would exercise their put rights, effectively transferring their built-in tax losses to the Ackerman group for cash. Although the banks were not legally obligated to exercise their put rights, there was an understanding that they would do so. The banks had every intention of exercising those rights and no economic incentive to stay in SMP.

We also find the instant cases distinguishable from *Esmark Inc. & Affiliated Cos. v. Commissioner,supra,* and *Turner Broad. Sys., Inc. & Subs. v. Commissioner,supra.*In *Esmark Inc.,* we determined that a tender offer and redemption were part of an overall plan and a prearranged understanding between Mobil and the taxpayer. Nonetheless, the taxpayer, which was a publicly held company, could in no way bind its shareholders to an agreement to sell their shares, and each shareholder independently decided to sell or retain the taxpayer's stock. The shareholders were not a part of the understanding between Mobil and the taxpayer. Thus, the existence of the shareholders gave the individual steps in the multi-step transaction independent significance; Mobil's acquisition of the taxpayer's shares was not a foregone conclusion. By contrast, in the instant cases, there were no independent parties that might upset the planned transactions. Pursuant to the side letter agreement, Rockport Capital was bound to purchase the banks' preferred interests on the exercise of their put rights. Pursuant to the deposit account agreement, the $5 million put price for the preferred interests was guaranteed. Although the banks were not legally obligated to exercise their put rights, there was an understanding that they would do so. The banks had every intention and economic incentive to do so.

Unlike the transactions in *Turner Broadcasting Sys., Inc.* and *Esmark Inc.,* the transaction with CDR was engaged in solely to accomplish a reduction in taxes and did not involve the type of legitimate tax choices that courts have traditionally upheld. Unlike *Turner Broad-*

*casting Sys., Inc.* and *Esmark Inc.,* the instant cases do not involve attempts by the Commissioner to add steps that did not occur. Unlike the transactions in *Turner Broadcasting Sys., Inc.* and *Esmark Inc.,* the form of the CDR transaction in the instant cases does not align with its substance. Under the circumstances, we find respondent's proposed direct-sale recharacterization to be consistent with our conclusion that the true substance of the transaction between the Ackerman group and CDR was a transfer of built-in tax losses for cash.

**\*84** Petitioner claims, however, that there were legitimate business reasons for structuring the transaction as a contribution to a partnership for preferred interests. Petitioner claims: "Viewed from the broader perspective, a partnership structure was the only arrangement by which the stock of Santa Monica Holdings Corporation, the obligor on two large debts, and the debts themselves could be consolidated in the same hands."We might agree that such goals could provide legitimate reasons for using the partnership form. But where, as here, the banks intended to immediately exit the partnership, petitioner's argument loses its force. The interposition of the partnership contribution was unnecessary to accomplish the Ackerman group's acquisition of the SMHC receivables and stock. Indeed, the Ackerman group easily could have accomplished this acquisition in one step, in a direct purchase of the SMHC receivables and stock, with the same effect (apart from tax consequences). In these circumstances, we cannot agree that *Turner Broadcasting* or *Esmark* precludes the application of the step transaction doctrine. Cf. *W. Coast Mktg. Corp. v. Commissioner,* 46 T.C. 32, 1966 WL 1133 (1966); Rev. Rul. 70-140, 1970-1 C.B. 73.

### D. *Conclusion*

We conclude that the step transaction doctrine applies to Generale Bank's and CLIS's contributions of SMHC receivables and stock to SMP and Somerville S Trust's purchase of Generale Bank's and CLIS's preferred interests in SMP. We conclude that those transactions should be recast as direct sales of the SMHC receivables and stock from Generale Bank and CLIS to Somerville S Trust followed by Somerville S Trust's

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

contribution of the receivables and stock to SMP for its preferred interests.

### V. *Basis Arguments*

Respondent makes alternative arguments relating to the SMHC receivables; i.e., the $974 million in receivables from Generale Bank and the $79 million receivable from CLIS. In essence, respondent argues that even if we were to respect the form of the transaction, the banks' purported contributions of the SMHC receivables to SMP should not create basis in SMP, because the receivables were worthless when the banks made the purported contributions. Although this argument, if successful, would prove fatal to all the built-in losses associated with all the SMHC receivables, respondent singles out the $79 million receivable for additional punishment: Respondent argues that SMP obtained no basis in the $79 million receivable, because it was not bona fide debt of SMHC and could not be contributed to SMP. For the sake of completeness, we address each of these alternative arguments below.

### A. *Worthlessness Issue*

For the reasons described below, we hold that the SMHC receivables were worthless when Generale Bank and CLIS purportedly contributed them to SMP. Consequently, the receivables did not constitute a "contribution of property" within the meaning of section 721 and the partnership basis rules; SMP obtained no basis in the SMHC receivables pursuant to section 723.

### 1. *Contribution of Worthless Assets*

**\*85** Respondent's threshold legal premise is that a contribution of worthless debts does not constitute a "contribution of property" f or purposes of section 721 and the partnership basis rules. Respondent contends that when worthless assets are contributed to a partnership "there is no contribution in the true sense of the word as nothing of value is transferred to it."In making this contention, respondent relies on our holding in *Sea-*

*board Commercial Corp. v. Commissioner,* 28 T.C. 1034, 1957 WL 1131 (1957). In *Seaboard Commercial Corp.,* we held that a transfer of worthless stock to a corporation was not a "contribution to capital" within the meaning of the corporate carryover basis rules.FN167We stated that it would be "a perversion of the statutory language" to consider a contribution of a worthless asset as coming within the phrase "contribution to capital".*Id.* at 1054.We further stated: "A contribution of zero would not really be a contribution".*Id.*

Petitioner contends that the SMHC receivables constitute "property" within the meaning of section 721 and the partnership basis rules, irrespective of whether the receivables were worthless. Petitioner cites *Crane v. Commissioner,* 331 U.S. 1, 67 S.Ct. 1047, 91 L.Ed. 1301 (1947), for the proposition that the term "property" is to be construed broadly. Petitioner contends that the term "property" encompasses "whatever may be transferred." In making his contentions, petitioner relies on *United States v. Stafford,* 727 F.2d 1043 (11th Cir.1984).

In *United States v. Stafford,supra* at 1052, the Court of Appeals for the Eleventh Circuit held that the term "contribution of property" in section 721 did not contemplate as a prerequisite the legal enforceability of the rights asserted as "property". The Court of Appeals then concluded that a letter of intent that was contributed to a partnership was a "contribution of property" within the meaning of section 721. *Id.* at 1052.In doing so, however, the Court of Appeals assumed arguendo that the factfinder on remand would determine that the letter of intent had value. *Id.* The Court of Appeals explained that "If the item asserted as property is valueless," then section 721 will not apply. *Id.* at 1052 n. 14.

We hold that a contribution of a worthless debt is not a "contribution of property" f or purposes of section 721 or the partnership basis rules. See *Hayutin v. Commissioner,* T.C. Memo.1972-127 (suggesting that a contribution of a worthless note to a partnership would not be a true contribution since nothing of value was transferred to the partnership), affd. 508 F.2d 462 (10th Cir.1974); McKee et al., Federal Taxation of Partner-

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

ships and Partners, par. 4.02[1], at 4-15 (3d ed. 1997) ("Regardless of how broadly the term 'property' is defined under § 721, it is obvious that § 721 does not apply unless the person receiving the partnership interest surrenders something of value to the partnership.").

### 2. *Worthlessness of Debts*

**\*86** Respondent argues that the $974 million in receivables from Generale Bank and the $79 million receivable from CLIS were worthless at the time of Generale Bank's and CLIS's contributions to SMP because the SMHC assets underlying them had no value. We agree.

The parties agree that in determining whether the receivables (debts from SMHC's perspective) were worthless when they were contributed to SMP, the principles of section 166(a)(1) apply by analogy.[FN168]Under those principles, a debt becomes worthless when identifiable events clearly mark the futility of any hope of further recovery. See *James A. Messer Co. v. Commissioner,* 57 T.C. 848, 861, 1972 WL 2501 (1972). A worthless debt lacks both potential value and current liquid value. *Id.* Whether a debt has become worthless is a question of fact to be determined on the basis of objective factors, not on the taxpayer's subjective judgment as to the worthlessness of the debt. *LaStaiti v. Commissioner,* T.C. Memo.1980-547. We examine only facts and circumstances that were known or reasonably could have been known at the time of the asserted worthlessness. See *Halliburton Co. v. Commissioner,* 93 T.C. 758, 774, 1989 WL 154241 (1989), affd. 946 F.2d 395 (5th Cir.1991).

For a debt to be entirely worthless, it must have lost its " 'last vestige of value." ' *Bodzy v. Commissioner,* 321 F.2d 331, 335 (5th Cir.1963) (quoting *Miami Beach Bay Shore Co. v. Commissioner,* 136 F.2d 408, 409 (5th Cir.1943), revg. and remanding an unpublished decision of this Court), revg. on another issue T.C. Memo.1962-40; *Am. Offshore, Inc. v. Commissioner,* 97 T.C. 579, 593, 1991 WL 245194 (1991); see also *Higginbotham-Bailey-Logan Co. v. Commissioner,* 8 B.T.A. 566, 578-579 (1927). A debt is not wholly

worthless if the collateral securing it has value. *Jessup v. Commissioner,* T.C. Memo.1977-289.

As discussed in detail *supra,* we have found that the EBD film rights, the Carolco securities, and the NOLs in SMHC had no material or consequential value as of December 11, 1996, when Generale Bank and CLIS "contributed" the SMHC receivables to SMP. Petitioner argues, however, that these assets had some value, even if speculative, and therefore the receivables were not *entirely* worthless.

Although the term "worthless" in section 166 has been interpreted strictly to include only debts that are "wholly worthless", see sec. 1.166-5(a)(2), Income Tax Regs., the courts have not interpreted section 166 so strictly as to include the recovery of nominal amounts. For example, in *Buchanan v. United States,* 87 F.3d 197, 200 (7th Cir.1996), the Court of Appeals for the Seventh Circuit observed that "the recovery of a tiny amount of a debt, even if fully anticipated rather than completely unpredictable, will not defeat a finding of worthlessness". Instead, a debt is worthless if on a particular date the taxpayer has "no reasonable prospect" of recovering "a significant, though in the sense merely of nontrivial, fraction" of the debt amount.[FN169]*Id.* The Court of Appeals reasoned that "Recovery of a trivial fraction of the debt would be unlikely to cover the costs of collection".*Id.*

**\*87** Petitioner, however, points to *Los Angeles Shipbuilding & Drydock Corp. v. United States,* 289 F.2d 222 (9th Cir.1961). In that case, the Court of Appeals for the Ninth Circuit held that "Nominal value of the property owned by * * * [the debtor] compared to the size of its debt * * * does not determine worthlessness, but rather worthlessness is determined by comparing the value of the property to a zero figure."*Id.* at 228.Reading *Buchanan* and *Los Angeles Shipbuilding & Drydock* together, petitioner argues: "To be considered worthless, property must be worthless in a relative and an *absolute* sense."See *Buchanan v. United States,supra* at 201.

Whether we compare the value of the EBD film rights, the Carolco securities, and the NOLs in SMHC to the

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

size of the receivables or to a zero figure, we reach the same conclusion. We conclude that the receivables were worthless both in a relative and an absolute sense.FN170We hold that Generale Bank's and CLIS's purported contributions of the SMHC receivables to SMP were not a "contribution of property" within the meaning of section 721 and the partnership basis rules, and that SMP obtained no basis in those receivables pursuant to section 723.FN171

### B. *Bona Fide Indebtedness Issue*

Respondent makes an alternative argument that the $79 million receivable did not arise as part of a bona fide debtor-creditor relationship. Respondent cites MGM Group Holdings' assumption of New MGM's $79 million in indebtedness as a condition to the sale of New MGM to Kirk Kerkorian. Respondent contends that since the $79 million receivable did not represent a bona fide debt, it could not have been contributed to SMP on December 11, 1996, and SMP could not have obtained basis in the receivable. Petitioner contends that the $79 million receivable was bona fide debt of SMHC and arose from a "real loan" obligation in connection with the 1993 restructuring.

Generally, to be recognized for Federal tax purposes, indebtedness must be bona fide and must arise from a valid debtor-creditor relationship. See *Knetsch v. United States,* 364 U.S. at 365-367;*Maxwell v. Commis sioner,* 3 F.3d 591, 595-597 (2d Cir.1993), affg. 98 T.C. 594, 1992 WL 98972 (1992). The determinative question is: "Was there a genuine intention to create a debt, with a reasonable expectation of repayment, and did that intention comport with the economic reality of creating a debtor-creditor relationship?"*Litton Bus. Sys., Inc. v. Commissioner,* 61 T.C. 367, 377, 1973 WL 2590 (1973). In determining whether indebtedness is bona fide, we must look to the substance of the transaction, not the formalities attending it. *Muserlian v. Commissioner,* 932 F.2d 109, 113 (2d Cir.1991), affg. T.C. Memo.1989-493.

In determining whether a debt is bona fide, all the facts and circumstances are considered, including: (1)

Whether a note or other evidence of indebtedness exists; (2) whether interest is charged; (3) whether there is a fixed schedule for repayments; (4) whether any security or collateral is requested; (5) whether there is any written loan agreement; (6) whether a demand for repayment has been made; (7) whether the parties' records, if any, reflect the transaction as a loan; (8) whether any repayments have been made; and (9) whether the borrower was solvent at the time of the loan. See, e.g., *Goldstein v . Commissioner,* T .C. Memo.1980-273 ( and cases cited therein).

**\*88** During the course of its relationship with MGM, the Credit Lyonnais group had lent or advanced upwards of $2 billion to the MGM companies. Before October 10, 1996, there was a realistic possibility that the Credit Lyonnais group might recover a substantial portion, or perhaps the entire amount, of their loans and advances to the MGM companies.FN172This possibility hinged on the valuable MGM film library. Any chance of recouping the loans and advances evaporated, however, when the highest bid in the New MGM sale was $1.3 billion. New MGM was still insolvent; it still owed approximately $79 million to Credit Lyonnais. Generale Bank would recover nothing on the approximately $1 billion in debt obligations that MGM Group Holdings owed Generale Bank. Stripped of the potential value in its stock in the MGM operating company, MGM Group Holdings was left hopelessly insolvent. Without its MGM stock and the valuable MGM film library, MGM Group Holdings was essentially an empty shell, devoid of any assets of value.FN173The only assets in MGM Group Holdings at this time were the Carolco securities and the NOLs. Carolco had been in bankruptcy for nearly a year; a first plan of reorganization filed on September 13, 1996, reflected that holders of the Carolco preferred stock and subordinated notes would receive nothing on Carolco's imminent liquidation. MGM Group Holdings had NOLs possibly in excess of $200 million; however, any use of the NOLs would be severely limited by MGM Group Holdings' absence of income and the interest owed on its debts, as well as the NOL limitations under section 382. These assets provided no meaningful basis for repaying the $79 million receivable, even under the best of estimates.

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Despite these infirmities, Credit Lyonnais released New MGM from its $79 million debt obligation and caused MGM Group Holdings to assume this amount.

MGM Group Holdings had a long track record of failing to repay the loans and advances that the Credit Lyonnais group had made to it. Following the 1993 restructuring, MGM Group Holdings retained approximately $962 million in debt that the MGM companies owed to the Credit Lyonnais group. After additional advances in 1994 and 1995, MGM Group Holdings owed approximately $975 million in indebtedness to CLBN, including some capitalized interest. This amount remained owing as of October 10, 1996. MGM Group Holdings paid no principal amount of this indebtedness; there is no evidence that it was ever called upon to make any repayment.

For many years, MGM Group Holdings paid no interest on its debt obligations to the Credit Lyonnais group. In connection with the 1993 financial restructuring of MGM, MGM Group Holdings and CLBN agreed that $800 million of MGM Group Holdings' debt obligations would be noninterest bearing. MGM Group Holdings paid no interest on the interest-bearing portion of the debt obligations.[FN174]

With this backdrop in mind, we conclude that Credit Lyonnais did not expect the $79 million principal amount of the receivable to be repaid when it released New MGM from, and caused MGM Group Holdings to assume, that debt obligation. Cf. *Epic Associates 84-III v. Commissioner,* T.C. Memo.2001-64 ("Indebtedness is not considered genuine, that is, a true loan, if the facts show that the parties to the loan did not intend the principal amount of the indebtedness to be repaid in full.").

**\*89** Certain other factors point to the absence of a genuine debtor-creditor relationship between Credit Lyonnais and MGM Group Holdings. First, MGM Group Holdings (or SMHC) never executed a note for its assumption of the $79 million debt. There is no indication that the Credit Lyonnais group and MGM Group Holdings established any fixed repayment schedule for the $79 million debt. There is no indication that the Credit Lyonnais group ever intended to enforce the collection

of the $79 million debt or interest on that debt.[FN175]Cf. *Estate of Flandreau v. Commissioner,* 994 F.2d 91, 93 (2d Cir.1993) (stating that there must be a real expectation of repayment and an intent to enforce collection at the time of the debt transaction), affg.T.C. Memo.1992-173.

Credit Lyonnais, CLIS, MGM Group Holdings, and New MGM were wholly owned entities in the Credit Lyonnais group. Cf. *Estate of Van Anda v. Commissioner,* 12 T.C. 1158, 1162, 1949 WL 301 (1949) (stating that debt transactions involving related parties are subject to "rigid scrutiny"), affd. 192 F.2d 391 (2d Cir.1951); see also *Hardman v. United States,* 827 F.2d 1409, 1412 (9th Cir.1987); *Hoyt v. Commissioner,* 145 F.2d 634, 636 (2d Cir.1944), affg. an unpublished decision of this Court. It is clear that MGM Group Holdings assumed New MGM's debt at Credit Lyonnais's direction as a convenient way of moving the $79 million debt out of New MGM to effectuate its sale to Mr. Kerkorian. Although MGM Group Holdings assumed New MGM's obligations on the $79 million debt, this assumption merely created the illusion of a real debt in MGM Group Holdings. Unlike New MGM, MGM Group Holdings did not have the assets to back up the $79 million receivable; it already owed approximately $974 million in receivables to Generale Bank. It had no reasonable prospect of generating any revenue to pay back any meaningful part of the $79 million receivable or, for that matter, the $974 million in receivables that Generale Bank held. For these reasons, we conclude that the $79 million receivable does not represent a bona fide indebtedness and did not arise from a genuine debtor-creditor relationship.

Petitioner contends, however, that the $79 million receivable originated in December 1993 when New MGM was created. Petitioner contends that under the original loan documents executed in 1993, MGM Group Holdings guaranteed the line of credit that gave rise to the $79 million receivable. Petitioner contends that the debt was bona fide when made and the guaranty was enforceable against SMHC after the $79 million balance was not paid by the proceeds of New MGM's sale. Petitioner contends that MGM Group Holdings' assumption

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

**T.C. Memo. 2005-104, (U.S.Tax Ct.)2005 WL 1111792**

of the unpaid $79 million obligation simply reaffirmed its preexisting obligation under the 1993 guaranty.

Petitioner is correct that the $79 million in debt obligations emanated from the 1993 working capital agreement between Credit Lyonnais and New MGM. Pursuant to that agreement, Credit Lyonnais agreed to make certain credit facilities available to New MGM to fund its cashflow requirements consistent with its business plan. MGM Group Holdings irrevocably and unconditionally guaranteed the full and timely payment of the principal of (and interest on) the loans and advances to New MGM under the working credit agreement. We cannot agree, however, that MGM Group Holdings' assumption of the $79 million receivable was part and parcel of its 1993 guaranty.

**\*90** First, under applicable State law, a guaranty is a secondary or collateral liability, not a primary obligation. See *Gen. Phoenix Corp. v. Cabot,* 300 N.Y. 87, 89 N.E.2d 238, 243 (N.Y.1949).[FN176] A guarantor's obligation matures "when there is a default on the separate and independent contract or agreement."*Columbia Hosp. v. Hraska,* 72 Misc.2d 112, 338 N.Y.S.2d 527, 529 (Civ.Ct.1972); see 63 N.Y. Jur.2d, Guaranty & Suretyship sec. 113 (1987). Although it appears that New MGM failed to make proper payment on the loans and advances under the working capital agreement, there is no indication that Credit Lyonnais ever demanded payment or treated New MGM's failure as a default under that agreement. More importantly, there is no indication that Credit Lyonnais ever called on MGM Group Holdings to make payment under its guaranty or that the guaranty was otherwise triggered.

Second, the debt assumption and agreement fundamentally changed the relationships of the various parties and resulted, critically, in a new debt obligation. Cf. *Banco Portugues do Atlantico v. Asland,* 745 F.Supp. 962, 967 (S.D.N.Y.1990) ("It is well settled that '[w]hen the terms of the contract guaranteed have been changed or the contract, as finally made, is not the one upon which the surety agreed to become bound, he will be released." ' (quoting *Smith v. Molleson,* 148 N.Y. 241, 42 N.E. 669 (N.Y.1896); *Lincoln Sav. Bank v. Murphy's Deluxe Limousine Serv., Inc.,* 161 A.D.2d 746, 556

N.Y.S.2d 102, 103 (App.Div.1990))); *Bier Pension Plan Trust v. Estate of Schneierson,* 74 N.Y.2d 312, 315, 546 N.Y.S.2d 824, 545 N.E.2d 1212 (Ct.App.1989). After Mr. Kerkorian made his $1.3 billion bid for New MGM, there was a $79 million shortfall in the amounts available to pay off Credit Lyonnais. As part of the stock purchase agreement, Mr. Kerkorian required, as a condition precedent to closing on the sale of New MGM, that this remaining debt amount be satisfied, canceled, or extinguished at or before the closing. To effectuate the sale of New MGM, Credit Lyonnais agreed to release New MGM entirely from this liability and, in turn, caused MGM Group Holdings to assume that debt amount.[FN177]This assumption did not occur as a result of MGM Group Holdings' guaranty obligations. Instead, MGM Group Holdings ostensibly became the full-fledged obligor on the $79 million receivable without any of the typical rights that a guarantor might have, such as, importantly, a right of subrogation against a revitalized New MGM.[FN178] Cf. *Putnam v. Commissioner,* 352 U.S. 82, 89, 77 S.Ct. 175, 1 L.Ed.2d 144 (1956); *In re Enron Corp.,* 307 Bankr.372, 379 (S.D.N.Y.2004); Restatement (Third) of Suretyship and Guaranty, sec. 27 (1996).

Petitioner suggests that the Credit Lyonnais group's subjective judgment that MGM Group Holdings would have value was reasonable and well-founded. Petitioner contends that the Court should not, with the benefit of hindsight, substitute its judgment for that of the Credit Lyonnais group.

We have no basis in the record for concluding that the Credit Lyonnais group made a determination that MGM Group Holdings would have value. Instead, the evidence points in the opposite direction. For many years, the Credit Lyonnais group had struggled to keep MGM afloat; to that end, it had lent enormous sums to MGM. In 1993, the Credit Lyonnais group caused MGM to be restructured into two companies with nearly $1 billion in debt being funneled into MGM Group Holdings. The only realistic chance of recovering on that debt was a lucrative sale of the MGM operating company. Once the MGM operating company was sold, however, any hope of recovering the debts disappeared. Without its MGM

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

stock and a major cash or asset infusion, it seems clear that MGM Group Holdings would have no meaningful prospective value. Looking beyond the formality of MGM Group Holdings' assumption of the $79 million debt, Credit Lyonnais's intentions here point to the absence of a genuine debtor-creditor relationship and bona fide indebtedness. See *Muserlian v. Commissioner,supra* at 113;*A.R. Lantz Co. v. United States,* 424 F.2d 1330, 1333-1334 (9th Cir.1970).

**\*91** We conclude that MGM Group Holdings' assumption of New MGM's $79 million debt obligation did not establish a valid debtor-creditor relationship with the Credit Lyonnais group and did not create a bona fide indebtedness for Federal tax purposes. Because the $79 million receivable did not represent a bona fide indebtedness, no basis was established in that receivable, and no basis carried over to SMP on CLIS's purported contribution of that receivable.

### VI. *Corona Transaction*

Respondent argues that Mr. Lerner structured the Corona transaction for the sole purpose of duplicating the built-in loss in the $79 million receivable. Respondent contends that there was no business purpose for the Corona transaction and that Mr. Lerner structured the transaction for the sole purpose of duplicating tax benefits. Respondent contends that Imperial never intended to enter into a film finance business through Corona. Petitioner contends that SMP and Imperial entered into the Corona transaction with the bona fide business purpose of film financing.

For the reasons discussed in more detail above, we conclude that SMP had no basis in the $79 million receivable when it contributed that receivable to Corona for a membership interest. Consequently, SMP's adjusted basis in its membership interest was limited to its $250,000 cash contribution to Corona. Also, since SMP had no basis in the $79 million receivable on its contribution, Corona did not obtain any basis in that receivable under section 723 when the receivable was contributed. Because SMP did not receive a substituted basis in its membership interest equal to the purported basis that

it claimed in the $79 million receivable and because Corona did not receive any carryover basis in the $79 million receivable, SMP is not entitled to the substantial losses that it claimed from the sales of its Corona membership interests to Imperial, and Corona is not entitled to the substantial loss that it claimed from the sale of the $79 million receivable to TroMetro. This analysis effectively disposes of the issues relating to the Corona transaction; however, for sake of completeness, we shall briefly address the parties' contentions with respect to this transaction.

We conclude that the Corona transaction and the subsequent sale of the $79 million receivable were part of a general scheme to obtain and exploit tax attributes in that receivable using the partnership tax rules. Mr. Lerner effectively duplicated the built-in loss that existed in the contributed $79 million receivable. SMP also received approximately $15 million from Imperial as a fee for the loss that Imperial realized on the sale of the receivable to TroMetro.

We cannot agree that the parties entered into the transaction with any intention of engaging in a film finance business. Indeed, Imperial's CEO, Wayne Snavely, testified that tax losses were driving the Corona transaction and were the primary reason in 1997 for Imperial's investing in the Corona transaction. He further testified that his analysis leading up to the Corona transaction was directed primarily to the transaction's tax aspects and that to that end he directed Imperial's chief financial officer, Kevin Villani, to get together with Imperial's accountants to see whether the Corona transactions and its tax advantages worked for Imperial.

**\*92** Mr. Snavely acknowledged that he had a personal interest in the film finance business; however, his testimony indicated clearly that film finance was not considered as a reason for Imperial's engaging in the Corona transaction. Indeed, although Imperial held substantial membership interests in Corona after its purchases of SMP's membership interests, Mr. Snavely did not know whether Corona ever financed or acquired any films, did not know of any specific business transactions in which Corona engaged, and did not recall seeing any written business plan for Corona. We conclude

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

that the Corona transaction was undertaken for the sole purpose of duplicating the built-in loss in the $79 million receivable through a sale of SMP's membership interests in Corona to Imperial and Corona's sale of the $79 million receivable to TroMetro. The evidence in the record establishes that Mr. Lerner orchestrated this plan from the beginning and was responsible for its implementation. We conclude that the Corona transaction, similar to the transaction involving CDR, was devoid of business purpose and economic substance and therefore cannot be respected for Federal tax purposes.

### VII. *Sales of Receivables to TroMetro*

Respondent also argues that substance over form principles apply to recast the sales of the $150 million, $81 million, and $79 million receivables to TroMetro as sales by SMP to TroMetro of an option to receive an equity interest in SMHC or its successor. In support of this argument, respondent relies on the facts that: (1) Mr. van Merkensteijn wanted SMHC stock and not the SMHC receivables; (2) Messrs. Lerner and van Merkensteijn had discussions regarding TroMetro as a vehicle for purchasing the receivables; (3) Mr. van Merkensteijn never expected to be paid any principal or interest on those receivables; (4) the sales were not conducted in an ordinary manner inasmuch as Mr. van Merkensteijn relied upon the Sage Entertainment appraisal; and (5) the transaction had no business purpose because Mr. van Merkensteijn did not want the receivables but wanted the stock.

Although we question Mr. van Merkensteijn's motivations for purchasing the SMHC receivables in 1997 and 1998, we are not persuaded that the facts that respondent highlights establish his proposed application of substance over form principles. Respondent appears to rely on the March 1, 1999, capital contribution agreement between SMHC and TroMetro. Pursuant to this agreement, TroMetro contributed, assigned, transferred, and conveyed to SMHC all the interests that TroMetro owned and held in the SMHC receivables in exchange for the right to receive 20 percent of all classes of stock of SMHC (or its successor), exercisable by TroMetro any time after March 1, 2001. Respondent, however,

fails to establish the necessary link between Mr. van Merkensteijn's purchase of the receivables in 1997 and 1998, and his receipt of the stock option in 1999. These transactions took place over several years, and, in the absence of some additional evidence, we are not persuaded that respondent has met his burden of proof on this issue.[FN179]Because we decide, on alternative grounds, that SMP obtained no bases in the SMHC receivables, this conclusion does not ultimately affect our decision.

### VIII. *Summary of Conclusions So Far*

**\*93** We conclude that the banks' contribution of the SMHC receivables to SMP lacked economic substance and cannot be respected for Federal tax purposes. We also conclude that SMP obtained no basis in the SMHC receivables under section 723 (because the receivables were worthless) or in the $79 million receivable (because that debt did not represent bona fide indebtedness when it was assumed by MGM Group Holdings). In addition, we conclude that the Corona transaction lacked economic substance and likewise cannot be respected for Federal tax purposes. For these reasons, we conclude: (1) SMP had no basis in the $150 million receivable and the $81 million receivable when those receivables were sold to TroMetro in 1997 and 1998; (2) SMP had no basis in the $79 million receivable when it contributed that receivable to Corona in 1997, and SMP's basis in its Corona membership interest under section 722 was limited to the $250,000 cash contribution that it made to Corona; and (3) Corona obtained no basis from SMP under section 723 in the $79 million receivable on its contribution and had no basis in that receivable when it was sold to TroMetro in 1997.[FN180]Consequently, we hold: (1) SMP is not entitled to a $147,486,000 capital loss on its sale to TroMetro of the $150 million receivable in 1997; (2) SMP is not entitled to capital losses of $11,647,367 and $62,237,061 on its sales to Imperial of portions of its Corona membership interest in 1997; (3) SMP is not entitled to a $80,190,418 capital loss on its sale to TroMetro of the $81 million receivable in 1998; and (4) Corona is not entitled to a capital loss on its sale to TroMetro of the $79 million receivable in 1997.[FN181]

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

IX. *At-Risk and Passive Activity Loss Rules*

Respondent argues, alternatively, that to the extent the losses SMP and Corona reported on their partnership tax returns are allowed, certain partnership-level determinations relating to the at-risk and passive activity loss rules must be made in this proceeding.[FN182]Petitioner argues that we do not have jurisdiction over at-risk and passive activity loss determinations in a partnership-level proceeding, and that these issues must be resolved only in an affected-item proceeding at the partner level. Because our decision in these cases results in a disallowance of the losses that SMP and Corona claimed on their partnership tax returns,[FN183] we do not decide respondent's at-risk and passive activity loss arguments.

X. *SMP's Basis in SMHC Stock*

On its Forms 1065, U.S. Partnership Return of Income, for 1997 and 1998, SMP reported that it had an adjusted basis of $665 million in its SMHC stock.[FN184] In an amendment to his answer, respondent proposes adjusting SMP's reported tax basis in its SMHC stock for these years to zero.

Petitioner agrees that this item is a partnership item but challenges its relevance to the issues in this case. Petitioner points to the fact that "SMP did not dispose of any stock during the years before the Court or claim a loss from the sale of SMHC stock."Respondent's position, however, appears more pointed-respondent challenges SMP's reporting of its SMHC stock basis rather than its impact on the loss adjustments in the FPAA.

**\*94** Section 6226(f) provides with respect to the scope of our judicial review that we shall have jurisdiction-

to determine all partnership items of the partnership for the partnership taxable year to which the notice of final partnership administrative adjustment relates, the proper allocation of such items among the partners, and the applicability of any penalty, addition to tax, or additional amount which relates to an adjustment to a partnership item.

The Treasury regulation interpreting this section provides: A court reviewing a notice of final partnership administrative adjustment has jurisdiction to determine all partnership items for the taxable year to which the notice relates and the proper allocation of such items among the partners. Thus, the review is not limited to the items adjusted in the notice. [Sec. 301.6226(f)-1T(a), Temporary Proced. & Admin. Regs., 52 Fed.Reg. 6779-01 (Mar. 5, 1987).[FN185]]

On the basis of section 6226(f) and the applicable regulation, we could construe our jurisdiction over petitioner's 1997 and 1998 taxable years to encompass SMP's reporting of its basis in SMHC stock. Nonetheless, if we were to exercise jurisdiction over this item, and if we were to decide, as respondent contends, that SMP's basis in SMHC is zero, our decision would result in no real tax adjustments at either the partnership or partner level for the partnership taxable years at issue.[FN186]Conceivably, our decision might influence SMP's reporting for subsequent taxable years, but beyond this "in terrorem" effect, it is unclear what impact such a decision would have on taxable years that are not before us in this proceeding. For this reason, we cannot agree that Congress contemplated our exercising jurisdiction over this type of adjustment. Cf. sec. 301.6226(f)-1T(b), Temporary Proced. & Admin. Regs., 52 Fed.Reg. 6788 (Mar. 5, 1987) (indicating that the reviewing court has jurisdiction to determine an issue raised by a partner relating to partnership's treatment of certain costs).

We hold that we do not have jurisdiction to determine issues related to SMP's reporting of its basis in SMHC stock for its 1997 and 1998 taxable years.

XI. *Accuracy-Related Penalties*

Respondent determined that section 6662 accuracy-related penalties apply with respect to the partnership adjustments for SMP and Corona.[FN187]In particular, with respect to SMP, respondent determined that the section 6662(h) 40-percent penalty for gross valuation misstatements applies to the underpayments that result from ad-

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

justments to the tax bases that SMP reported on its 1997 and 1998 partnership tax returns in the \$974 million in receivables, the \$79 million receivable, and SMP's membership interest in Corona. In the alternative, respondent determined that the section 6662(a) 20-percent penalty for negligence, disregard of rules or regulations, or substantial understatement applies to the underpayments that result from these adjustments.

**\*95** With respect to Corona, respondent argues that the section 6662(h) 40-percent accuracy-related penalty for gross valuation misstatements applies to the underpayment that results from an adjustment to the tax basis that Corona reported on its 1997 partnership tax return in the \$79 million receivable. In the alternative, respondent argues that the section 6662(a) 20-percent accuracy-related penalty for negligence, disregard of rules or regulations, or substantial understatement applies to the underpayment that results from this adjustment.

A. *Burden of Production*

Section 7491(c) provides that the Commissioner shall have the burden of production in any court proceeding with respect to the liability of any "individual" for any penalty, addition to tax, or additional amount imposed by the Code. Presumably on the basis of this provision, petitioner argues that "Respondent bears the burden of showing that Petitioners are liable for *any* penalties."We disagree.

Section 7491(c), if applicable, imposes upon the Commissioner only the burden of *production* with respect to penalties, and not the burden of *proof* as petitioner suggests.[FN188]See *Higbee v. Commissioner,* 116 T.C. 438, 446, 2001 WL 617230 (2001). Moreover, by its terms, section 7491(c) applies only with respect to the liability for penalties of any "individual". By contrast, section 7491(a), which provides the general rule for shifting the burden of proof to the Commissioner in certain circumstances, applies in ascertaining the liability of a "taxpayer". Plainly, by using the different terms "individual" and "taxpayer", Congress intended to distinguish the two terms. See sec. 7701(a)(14) (defining the term "taxpayer" to mean any person subject to any

internal revenue tax) and (a)(1) (defining the term "person" to mean and include an individual, a trust, estate, partnership, association, company, or corporation); see also sec. 7491(b) (limiting its application to an "individual taxpayer"); cf. *Elec. Arts, Inc. v. Commissioner,* 118 T.C. 226, 258, 2002 WL 444971 (2002) ("Ordinarily, in statutes and other legal documents, it is presumed that if the drafter \* \* \* varies the terminology, then the drafter intends that the meaning also varies.").

In any event, we conclude that respondent has satisfied any burden of production he might have under section 7491(c) with respect to the appropriateness of applying accuracy-related penalties in the instant cases. Consequently, petitioner must come forward with evidence sufficient to persuade the Court that respondent's penalty determinations are incorrect. *Higbee v. Commissioner,supra* at 447.

B. *Gross Valuation Misstatements*

A 20-percent accuracy-related penalty applies to the extent that any portion of an underpayment is attributable to any "substantial valuation misstatement". Sec. 6662(a) and (b)(3). There is a "substantial valuation misstatement" if "the value of any property (or the adjusted basis of any property) claimed on any return of tax imposed \* \* \* is 200 percent or more of the amount determined to be the correct amount of such valuation or adjusted basis (as the case may be)". Sec. 6662(e)(1)(A). In the case of a "gross valuation misstatement", the penalty increases from 20 to 40 percent. There is a "gross valuation misstatement" if the value of any property (or the adjusted basis of any property) claimed on any return of tax imposed is 400 percent or more of the amount determined to be the correct amount of such valuation or adjusted basis (as the case may be). Sec. 6662(e)(1) and (h)(2). In the case of multiple valuation misstatements, the determination of whether there is a substantial or gross valuation misstatement on a return is made on a property-by-property basis. Sec. 1.6662-5(f)(1), Income Tax Regs. There is no disclosure exception to this penalty. Sec. 1.6662-5(a), Income Tax Regs.[FN189]

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

**\*96** On its 1997 partnership tax return, SMP reported a $150 million basis in the $150 million receivable that it purportedly sold to TroMetro. As a result of this basis reporting, SMP claimed a $147,486,000 loss ($2,514,000 sale price minus $150 million adjusted basis). SMP reported a $63,489,061 basis in the 79.2-percent Corona membership interest that it sold to Imperial. As a result of this basis reporting, SMP claimed a $62,237,061 loss ($1,252,000 sale price minus $63,489,061 adjusted basis). SMP reported a $11,864,117 basis in the additional 14.65-percent Corona membership interest that it sold to Imperial. As a result of this basis reporting, SMP claimed an $11,647,367 loss ($216,750 sale price minus $11,864,117 adjusted basis).

We have concluded on alternative grounds that SMP obtained a zero basis in the $974 million in receivables from Generale Bank and the $79 million receivable from CLIS. Because the $79 million receivable had a zero basis in SMP's hands, SMP received no carryover basis under section 722 in its Corona membership interest on the contribution of that receivable to Corona. Corona received no carryover basis under section 723 in the contributed $79 million receivable. Consequently, SMP's and Corona's basis reporting for the receivables was infinitely more than 400 percent of the amount that we determined to be the correct basis in the receivables.FN190See sec. 1.6662-5(g), Income Tax Regs. ("The value or adjusted basis claimed on a return of any property with a correct value or adjusted basis of zero is considered to be 400 percent or more of the correct amount. There is a gross valuation misstatement with respect to such property, therefore, and the applicable penalty rate is 40 percent."); see also *Rybak v. Commissioner,* 91 T.C. 524, 566-567, 1988 WL 92157 (1988).

Petitioner argues that the section 6662(h) gross valuation misstatement penalty is inapplicable to the adjustments in these cases. Petitioner contends that section 6662(h) has limited application and applies only where the misstatement of adjusted basis is attributable to an overvaluation of property. Petitioner contends that the misstatements of basis in these cases are not attributable

to any overvaluation but instead are attributable to the operation of the partnership basis rules. Stated differently, petitioner's position essentially is that section 6662(e) and (h) cannot apply where the alleged gross valuation misstatement penalty is not directly attributable to an erroneous overvaluation. We disagree.

Section 6662(e) and (h) refers to an underpayment that is attributable to a "valuation misstatement". The statute defines "valuation misstatement" to include overstatements of "adjusted basis". Specifically, a substantial or gross valuation misstatement occurs where "the value of any property (*or the adjusted basis of any property* )" claimed on any tax return is at least 200 percent (for a substantial valuation misstatement or 400 percent (for a gross valuation misstatement) of "the amount determined to be the correct amount of such valuation *or adjusted basis* (as the case may be)". Sec. 6662(e)(1)(A) (emphasis added). Consequently, Congress did not limit the definition of a "valuation misstatement" to instances involving inflated valuations but included within that definition instances involving inflated adjusted bases. See sec. 1.6662-5(h)(2), *Example,* Income Tax Regs. ("Partnership P * * * claims a $40,000 basis in a depreciable asset which, in fact, has a basis of $15,000. The determination that there is a substantial valuation misstatement is made solely with reference to P by comparing the $40,000 basis claimed by P with P's correct basis of $15,000."); cf. *Garrett v . Commis sioner,* T .C. Memo.1997-231. On the basis of the statutory definition, we cannot agree with petitioner that an overvaluation is essential to the application of the section 6662(e) and (h) penalty.

**\*97** Petitioner contends: "Outside of the Second Circuit, case law covering the scope of the 'valuation' element of the accuracy-related penalty has always emphasized that it is applicable only to situations where the increased tax liability is attributable to an actual misstatement of a valuation."Petitioner relies on *Gainer v. Commissioner,* 893 F.2d 225 (9th Cir.1990), affg. T.C. Memo.1988-416, and *Todd v. Commissioner,* 862 F.2d 540 (5th Cir.1988), affg. 89 T.C. 912, 1987 WL 45310 (1987).*Gainer* and *Todd* focused on the phrase "attributable to a valuation overstatement" in former

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

section 6659(a), the precursor to section 6662(e) and (h).FN191 Pursuant to the holdings in those cases, the portion of a tax underpayment that is attributable to a valuation overstatement is to be determined after taking into account any other proper adjustments to tax liability. See *Gainer v. Commissioner,supra* at 228;*Todd v . Commissioner,* 89 T.C. 912, 916, 1987 WL 45310 (1987), affd. 862 F.2d 540 (5th Cir.1988). Thus, to the extent the taxpayer's claimed tax benefits are disallowed on grounds separate and independent from alleged valuation overstatements, the resulting underpayments of tax are not regarded as "attributable to valuation overstatements". See *Krause v. Commissioner,* 99 T.C. 132, 178, 1992 WL 178601 (1992), affd. sub nom.*Hildebrand v. Commissioner,* 28 F.3d 1024 (10th Cir.1994). Neither *Gainer* nor *Todd* dealt with the definition of a "valuation overstatement" or the application of the penalty to the reporting of inflated adjusted bases in properties.FN192

In *Gainer* and *Todd,* the taxpayers made valuation overstatements of certain property and claimed depreciation deductions and investment tax credits on the basis of these valuations. This Court and the Courts of Appeals determined, however, that the properties had not been placed in service; therefore, the taxpayers' claimed deductions were disallowed on that ground and not because of any valuation overstatement. Thus, in *Gainer* and *Todd,* this Court and the Courts of Appeals disallowed the taxpayers' tax benefits on grounds separate and apart from the alleged valuation overstatements. In the instant cases, however, each of our alternative holdings goes directly to SMP's and Corona's correct adjusted bases in the contributed SMHC receivables.

In *Gilman v. Commissioner,* 933 F.2d 143 (2d Cir.1991), affg. T.C. Memo.1990-205, the Court of Appeals for the Second Circuit applied the valuation overstatement penalty under former section 6659 to an underpayment of taxes derived from a transaction that was disregarded for lack of economic substance. Because the taxpayer was deemed to have a zero basis, the taxpayer's claimed basis was infinitely larger than the amount determined to be the correct basis (as would be any amount of claimed basis, compared to zero). Ac-

knowledging that applying the valuation overstatement penalty "somewhat strains the natural reading of the statutory phrase 'valuation overstatement' ", the court nevertheless held, consistent with other judicial precedents applying the valuation overstatement penalty in the context of tax shelter transactions, that the penalty was applicable. *Id.* at 151.The Court of Appeals observed: "application of the section 6659 penalty surely reenforces the Congressional objective of lessening tax shelter abuse." *Id.*

**\*98** The Court of Appeals in *Gilman* acknowledged that former section 6659 might require some nexus with an overvaluation but determined: "A transaction that lacks economic substance generally reflects an arrangement in which the basis of the property was misvalued in the context of the transaction."*Id.* at 152.The Court of Appeals determined that the lack of economic substance in that case was due in part to a valuation overstatement, relying on the absence of any reasonable expectation of profit and the lack of value in the property that the taxpayer purchased. *Id.* at 151; see also *Massengill v. Commissioner,* 876 F.2d 616 (8th Cir.1989), affg. T.C. Memo.1988-427.

As in *Gilman,* valuation issues form a critical part of these cases. For example, we have found that the absence of value in the properties that Generale Bank and CLIS "contributed" under the guise of the partnership rules indicates a lack of economic substance in the transaction. We have also found that the absence of value in these properties suggests a lack of economic benefit in the transaction from the Ackerman group's perspective and indicates that the Ackerman group pursued the transaction with CDR, Generale Bank, and CLIS solely for tax purposes. Moreover, in determining that the SMHC receivables were worthless when they were contributed to SMP, we have relied on an extensive examination of the values of the assets in SMHC. Consequently, to whatever extent *Gilman* may require an indirect nexus to an overvaluation of property, we conclude that such a nexus exists in these cases.

We conclude that SMP's 1997 and 1998 partnership tax return and Corona's 1997 partnership tax return contain gross valuation misstatements for purposes of section

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

6662(e) and (h).

### C. 20-Percent Accuracy-Related Penalties

Respondent determined, alternatively, that 20-percent accuracy-related penalties apply under section 6662(a) with respect to the adjustments to SMP's 1997 and 1998 partnership tax return and Corona's 1997 partnership tax return. Respondent asserts two grounds for imposing these penalties: negligence and substantial understatement of income tax. We address each of these grounds below.

### 1. Negligence

Section 6662(a)(1) imposes a 20-percent accuracy-related penalty on any portion of an underpayment of tax required to be shown on a return which is attributable to negligence or disregard of rules or regulations. For purposes of section 6662, the term "negligence" includes any failure to make a reasonable attempt to comply with Code provisions. Sec. 6662(c)."Negligence is lack of due care or failure to do what a reasonable and ordinarily prudent person would do under the circumstances."*Marcello v. Commissioner,* 380 F.2d 499, 506 (5th Cir.1967), affg. in part and remanding in part43 T.C. 168, 1964 WL 195 (1964) and T.C. Memo.1964-299; see *Neely v. Commissioner,* 85 T.C. 934, 947, 1985 WL 15422 (1985). For purposes of section 6662, the term "disregard" includes any careless, reckless, or intentional disregard.[FN193] Sec. 6662(c).

**\*99** A return position that has a reasonable basis is not attributable to negligence. Sec. 1.6662-3(a), Income Tax Regs. A reasonable basis connotes significantly more than not being frivolous or patently improper. Sec. 1.6662-3(b)(3), Income Tax Regs. The reasonable basis standard is not satisfied by a return position that is merely arguable or that is merely a colorable claim. *Id.*

Mr. Lerner is a highly educated, sophisticated tax attorney. He worked for many years at O'Melveny & Myers; at one point, he established and ran the firm's London office. Mr. Lerner also worked as a clerk/attorney-advisor with the U.S. Tax Court and as an attorney

advisor for the U.S. Treasury Department.

Mr. Lerner personally engineered a plan to transfer the built-in losses in the defunct MGM Group Holdings from Generale Bank and CLIS to the Ackerman group. This transaction had no economic substance for Federal tax purposes. Instead, the transaction was the equivalent of a sale of approximately \$1.7 billion in tax attributes from Generale Bank and CLIS to Somerville S Trust for \$10 million. To exploit these tax attributes, Mr. Lerner devised a second plan whereby SMP purportedly sold portions of the receivables from Generale Bank to Tro-Metro, which was owned by his friend, colleague, and business associate, Mr. van Merkensteijn. Mr. Lerner also devised a third plan whereby SMP transferred the \$79 million receivable to Corona for a membership interest, sold portions of its Corona membership interest to Imperial, and caused Corona to sell the \$79 million receivable to TroMetro, effectively duplicating the built-in losses in that receivable. In the course of these various transactions, SMP reaped approximately \$300 million in tax losses and Corona reaped \$79 million. SMP also received a \$14.5 million fee from Corona for the latter's tax losses in the Corona transaction. Under the circumstances, we believe that a reasonable and prudent person would recognize that these tax losses were " 'too good to be true" ', especially given that neither SMP, Corona, Somerville S Trust, nor Imperial bore the economic loss associated with these tax losses. See sec. 1.6662-3(b)(ii), Income Tax Regs.

Petitioner seeks to hide behind formal compliance with the partnership tax rules. As an experienced tax attorney, Mr. Lerner should have known that mere formal compliance with statutory provisions would not sustain transactions that have no economic substance and that are mere contrivances designed solely to exploit tax benefits. Under the circumstances, we conclude that reasonably prudent persons with Mr. Lerner's tax experience would not have conducted themselves as he did in reporting the bases in the SMHC receivables and the substantial losses from the transactions involving TroMetro and Imperial. Consequently, we sustain respondent's alternative determination that negligence penalties are appropriate in these cases.[FN194]

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

### 2. *Substantial Understatement of Income Tax*

**\*100** Section 6662(a)(2) imposes a 20-percent accuracy-related penalty on any portion of an underpayment of tax required to be shown on a return which is attributable to any substantial understatement of income tax. Sec. 6662(b)(1) and (2).

There is a "substantial understatement of income tax" for any taxable year if the amount of the understatement of the taxable year exceeds the greater of 10 percent of the tax required to be shown on the return for the taxable year, or $5,000. Sec. 6662(d)(1). For this purpose, the term "understatement" generally means the excess of the amount of the tax required to be shown on the return for the taxable year, over the amount of the tax imposed which is shown on the return. Sec. 6662(d)(2)(A).FN195 The amount of the understatement is reduced by that portion of the understatement that is attributable to the tax treatment of any item by the taxpayer for which there is or was substantial authority, if the relevant facts affecting the item's tax treatment are adequately disclosed in the return or in a statement attached to the return and there is a reasonable basis for the tax treatment of such item by the taxpayer. Sec. 6662(d)(2)(B). Petitioner relies on the substantial authority standard as a defense to the application of the understatement penalty.FN196

The substantial authority standard is an objective standard involving an analysis of the law and application of the law to relevant facts. Sec. 1.6662-4(d)(2), Income Tax Regs. There is substantial authority for a position if the weight of the authorities supporting the treatment is substantial in relation to the weight of authorities supporting contrary treatment. Sec. 1.6662-4(d)(3)(i), Income Tax Regs. Because the substantial authority standard is an objective standard, the taxpayer's belief that there is substantial authority for the tax treatment of an item is not relevant in determining whether there is substantial authority for that treatment. *Id.* Relevant authorities for this purpose are limited to materials such as applicable provisions of the Code, regulations, revenue rulings and revenue procedures, court cases, and legislative history. Sec. 1.6662-4(d)(3)(iii), Income Tax Regs.FN197

Petitioner has cited no substantial authority that might provide a basis for reducing any understatement of income tax. In the first place, the transaction between the Ackerman group and CDR, Generale Bank, and CLIS, had no economic purpose. The transaction's sole purpose was to transfer approximately $1.7 billion in built-in tax losses from the banks to Somerville S Trust in exchange for a $10 million cash payment. Although these transfers were accomplished using the partnership basis rules, it seems evident that Congress did not envision these rules' being used merely as a vehicle to transfer built-in losses from a tax-indifferent party to an interested purchaser pursuant to a prearranged plan. As relevant to these circumstances, the authorities are clear and firmly established: a transaction that lacks economic substance is not recognized for Federal tax purposes. See, e.g., *Ferguson v. Commissioner,* 29 F.3d at 101.

**\*101** Special rules apply in the case of a "tax shelter", which means a partnership or other entity, any investment plan or arrangement, or any other plan or arrangement, if a significant purpose of such partnership, entity, plan, or arrangement is the avoidance or evasion of Federal income tax. Sec. 6662(d)(2)(C)(iii). In the case of any item of a taxpayer (other than a corporation) which is attributable to a tax shelter, an understatement shall not be reduced on the basis of substantial authority unless the taxpayer reasonably believed that his tax treatment of the item was more likely than not proper. Sec. 6662(d)(2)(C)(i)(I) and (II).

We have concluded that the transaction between the Ackerman group and the Credit Lyonnais group had no economic substance, its only purpose being to transfer built-in tax losses in exchange for a $10 million cash payment. Consequently, this arrangement is considered a "tax shelter" for purposes of section 6662(d)(2)(C)(iii), and petitioner must demonstrate a reasonable belief that SMP's and Corona's tax treatment of the transactions in question was more likely than not the proper treatment. Given Mr. Lerner's education, sophistication, and tax experience, as well as the particular circumstances of these cases, we do not believe that there was such a reasonable belief.

A taxpayer is considered reasonably to believe that the

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

tax treatment of an item is more likely than not the proper tax treatment if the taxpayer reasonably relies in good faith on the opinion of a professional tax adviser; and if the opinion is based on the tax adviser's analysis of the pertinent facts and authorities and unambiguously states that the tax adviser concludes that there is a greater than 50-percent likelihood that the tax treatment of the item will be upheld if challenged by the IRS. Sec. 1.6662-4(g)(4)(B), Income Tax Regs. None of the tax opinions that petitioner purportedly relied upon in preparing SMP's and Corona's partnership tax returns unambiguously state that there is a greater than 50-percent likelihood that the tax treatment of the transactions at issue in these cases would be upheld if challenged by the IRS. Moreover, for the reasons discussed below, we conclude that Mr. Lerner did not reasonably rely on those opinions. We conclude that petitioner did not have substantial authority for his tax treatment of the transactions at issue.

### D. *Reasonable Cause*

No penalty shall be imposed under section 6662 with respect to any portion of an underpayment if it is shown that there was a reasonable cause for such portion and that the taxpayer acted in good faith with respect to such portion. Sec. 6664(c)(1).[FN198] The determination whether a taxpayer acted with reasonable cause and in good faith is made on a case-by-case basis, taking into account all pertinent facts and circumstances. Sec. 1.6664-4(b)(1), Income Tax Regs. Generally, the most important factor is the extent of the taxpayer's effort to assess his proper tax liability. *Id.* Circumstances that may indicate reasonable cause and good faith include an honest misunderstanding of fact or law that is reasonable in light of all of the facts and circumstances, including the experience, knowledge, and education of the taxpayer.[FN199]*Id.*

**\*102** In arguing that the reasonable cause exception applies, petitioner points to his efforts to verify the factual underpinnings of the contributed assets.

Petitioner points first to the memorandum that Kaye Scholer prepared in the course of Safari's failed effort to acquire New MGM. We cannot agree that Kaye Scholer's memorandum establishes reasonable cause for SMP's and Corona's reporting positions. Although Kaye Scholer's legal due diligence provided Mr. Lerner with a detailed picture of the relationships between the Credit Lyonnais group and the MGM companies and the various tax attributes that the Credit Lyonnais group possessed, that legal due diligence occurred in the context of a proposed acquisition of New MGM. It did not involve the transactions at issue in the instant cases. In addition, the Kaye Scholer investigation occurred in or about May 1996, before the sale of New MGM and MGM Holdings's dissolution, events which might have profoundly affected any of the conclusions that Kaye Scholer reached regarding the various tax attributes.FN200

Petitioner points next to what he characterizes as an extensive due diligence process involving his attorney, James Rhodes. Mr. Rhodes's due diligence process, however, was directed toward documenting the banks' historical bases in the SMHC receivables and stock and obtaining representations that the banks did not write down the receivables or stock for accounting or tax purposes or otherwise claim the tax attributes that the Ackerman group sought to obtain. See Exhibit 183-P (document entitled "Basis Chronology"). Mr. Rhodes conducted no due diligence on the more germane issues of whether SMP received a carryover basis in the SMHC receivables and stock, whether the transaction had any substance for Federal tax purposes, whether the assets underlying the SMHC receivables and stock had any value, or whether the $79 million receivable represented bona fide indebtedness.FN201

Petitioner also points to his reliance on the representations that Generale Bank and CLIS made with respect to their tax bases in the contributed SMHC receivables. In the exchange and contribution agreement, CDR, Generale Bank, and CLIS represented that they had received no payment of principal on the SMHC receivables and had not written down their loans for accounting or tax purposes. Like Mr. Rhodes's due diligence investigation, the banks' representations do not extend to the particulars of the transaction between the Ackerman group

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

and CDR or otherwise indicate that the banks had the tax bases that Mr. Lerner later claimed for the SMHC receivables.

In trying to meet the reasonable cause exception, petitioner focuses principally on his purported reliance on "outside" professional tax advice. Reliance on the advice of a professional tax adviser constitutes reasonable cause and good faith if, under all the circumstances, the reliance was reasonable and the taxpayer acted in good faith. Sec. 1.6664-4(b)(1), Income Tax Regs.; cf. *United States v. Boyle,* 469 U.S. 241, 105 S.Ct. 687, 83 L.Ed.2d 622 (1985). All facts and circumstances must be taken into account in determining whether a taxpayer has reasonably relied in good faith on the opinion of a professional tax adviser as to the treatment of the taxpayer (or any entity, plan, or arrangement) under Federal tax law. Sec. 1.6664-4(c)(1), Income Tax Regs. The advice must be based upon all pertinent facts and circumstances and the law as it relates to those facts and circumstances.Sec. 1.6664-4(c)(1)(i), Income Tax Regs. For example, the advice must take into account the taxpayer's purposes (and the relative weight of such purposes) for entering into a transaction and for structuring a transaction in a particular manner. *Id.* In addition, the taxpayer cannot establish reasonable reliance if he fails to disclose a fact that he knows, or should know, to be relevant to the proper tax treatment of an item. *Id.*

**\*103** The advice must not be based on unreasonable factual or legal assumptions (including assumptions as to future events) and must not unreasonably rely on the representations, statements, findings, or agreements of the taxpayer or any other person. Sec. 1.6664-4(c)(1)(ii), Income Tax Regs. For example, the advice must not be based upon a representation or assumption which the taxpayer knows, or has reason to know, is unlikely to be true, such as an inaccurate representation or assumption as to the taxpayer's purposes for entering into a transaction or for structuring a transaction in a particular manner. *Id.*

Petitioner points to the following items that he claims he relied upon: (1) An August 27, 1996, memorandum from Gerald Rokoff and Alvin Knott of Shearman & Sterling to Mr. Lerner; (2) an August 30, 1996, memor-

andum from Messrs. Rokoff and Knott of Shearman & Sterling to Mr. Lerner; (3) a February 21, 1997, draft memorandum from Robert Feinberg and Jeffrey N. Bilskie of Ernst & Young, LLP, to James Rhodes; (4) a May 12, 1997, memorandum of Messrs. Rokoff and Knott of Shearman & Sterling to Messrs. Lerner and Rhodes; (5) an October 10, 1997, memorandum from Messrs. Rokoff and Knott of Shearman & Sterling to Mr. Lerner and Cynthia Beerbower; (6) a February 26, 1998, memorandum from Mr. Knott of Shearman & Sterling to Mr. Lerner; (7) a May 1, 1998, memorandum prepared by Howard Levinton of Grant Thornton, LLP; and (8) a December 11, 1998, letter of opinion prepared by Joseph R. Valentino of Chamberlain, Hrdlicka, White, Williams & Martin.[FN202]We evaluate petitioner's reliance on these purported opinions in turn.[FN203]

### 1. August 1996 Memoranda From Shearman & Sterling

Sometime before August 27, 1996, Mr. Lerner hired the law firm of Shearman & Sterling, LLP, in New York City, to assist the Ackerman group in the CDR transaction. Mr. Lerner testified: "When our conversation began with Rene Claude about acquiring MGM Holdings, I already knew from the due diligence exercise before that there were, I would say, complex tax issues arising from the acquisition of that company", including tax basis and NOL issues. He testified that he asked Shearman & Sterling to give him "an analysis of the ways in which a transaction could be organized involving MGM Holdings so that any tax attributes that might have existed could be preserved."

Shearman & Sterling prepared two memoranda summarizing the anticipated U.S. tax consequences of certain hypothetical transactions involving MGM Holdings. Neither memorandum analyzes the transaction that actually occurred between the Ackerman group and CDR. Notably, the memoranda propose a section 351 corporate transaction involving MGM Holdings: "In general, the most favorable tax treatment would result if a section 351 transaction took place in 1996, and the transactions triggering both the loss and the gain took place in subsequent years."[FN204]The memoranda provide no analysis of the partnership basis rules

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

**T.C. Memo. 2005-104, (U.S.Tax Ct.)2005 WL 1111792**

(specifically section 704(c)) but instead focus on the recognition or nonrecognition of gain or loss under section 351, the consolidated loss disallowance and separate return limitation year rules under section 1502, the built-in loss limitations of section 382, the section 384(a) pre-acquisition loss rules, and the section 269(a)(2) disallowance rules for tax-motivated corporate acquisitions. The memoranda propound a series of hypothetical transactions, none of which appear to have actually occurred, and do not rely on, or analyze, the relevant facts of the CDR transaction.[FN205]Consequently, we cannot agree that these memoranda establish reasonable cause.

2. *Ernst & Young Memorandum*

**\*104** On February 21, 1997, Robert Feinberg and Jeffrey N. Bilsky of Ernst & Young, LLP, prepared a draft memorandum which it sent to Mr. Rhodes. The draft memorandum is not an opinion letter and is entitled "DRAFT". It purports to address SMP's claimed tax basis in the SMHC receivables and stock; however, it repeatedly emphasizes that the scope of its review is limited, incomplete, and cannot be relied on except for internal purposes.[FN206]For example, the draft memorandum begins:

As you know, we have not been asked to perform a comprehensive tax basis study with respect to the subject assets. Consequently, the scope of our services and related procedures have been limited to reviewing the available materials and commenting as to their relevance and reasonableness for use in determining the tax basis of the assets. To the extent that additional documents and information become available, we will need to review our analysis since it could be materially affected.

Our analysis may be used by current management of Santa Monica solely for internal purposes and may not be disclosed to third parties. When we are fully informed of the intended use of the information, including review of all related materials expected to be issued, we can further review whether disclosure to any third parties will be acceptable.

The draft memorandum ends with the following statement:

Given the limited scope of our review, and your desire for us to emphasize a quantitative as opposed to a qualitative review, please appreciate that more detailed procedures, analysis and review would be necessary before any reliance should be placed on our analysis for tax return or other tax filing purposes. We will be pleased to further discuss the opportunity for Ernst & Young LLP to become engaged to provide a more detailed analysis of tax basis.

We believe that the draft memorandum speaks for itself-any reliance on that memorandum in preparing tax returns would be plainly unreasonable.

3. *May 12, 1997, Shearman & Sterling Memorandum*

On May 12, 1997, Gerald Rokoff and Alvin Knott of Shearman & Sterling prepared a memorandum addressed to Messrs. Lerner and Rhodes discussing certain issues relating to the CDR transaction and SMP's bases in the SMHC receivables and stock. Mr. Lerner testified that this memorandum was prepared in connection with a possible merger transaction in which SMP's stock and debt interests in SMHC would be contributed to SMHC or another holding company. In connection with this proposed transaction, Mr. Lerner testified that he sought and received the advice of Shearman & Sterling as to whether the $79 million receivable and the $974 million in receivables should be treated as worthless or partially worthless, and whether the SMHC stock should be treated as worthless.[FN207]

The May 12, 1997, memorandum appears to have been prepared as part of an effort to secure an outside opinion letter or advice with respect to the CDR transaction. Indeed, the letter begins by stating: "At your request, we have prepared the following responses to the requests for additional background materials set forth in Donald Alexander's memorandum to you, dated April 9, 1997."[FN208]In this regard, the May 12, 1997, memorandum from Shearman & Sterling has a distinct quality of advocating Mr. Lerner's position rather than providing advice that might reasonably be relied upon in pre-

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

T.C. Memo. 2005-104                                                                                                    Page 96
T.C. Memo. 2005-104, 2005 WL 1111792 (U.S.Tax Ct.), 89 T.C.M. (CCH) 1157, T.C.M. (RIA) 2005-104, 2005
RIA TC Memo 2005-104
**T.C. Memo. 2005-104, (U.S.Tax Ct.)2005 WL 1111792**

paring SMP's and Corona's 1997 and 1998 partnership tax returns.

**\*105** The opinion itself deals primarily with the worthlessness issue and concludes that the SMHC receivables and stock were not worthless when those assets were contributed to SMP. In addressing that issue, Shearman & Sterling discusses *Los Angeles Shipbuilding & Drydock Corp. v. United States,* 289 F.2d 222 (9th Cir.1961) and *Higgenbotham-Bailey-Logan Co. v. Commissioner,* 8 B.T.A. 566 (1927), cases which we have discussed *supra* in the context of the worthlessness issue. In concluding that the SMHC receivables were not worthless under those cases, Shearman & Sterling relied on the faulty factual assumption that the EBD film rights and Carolco securities had considerable value.FN209 The memorandum provided the following analysis:

> Debt of a corporation, such as \* \* \* [SMHC], which has valuable assets that could be sold or exploited to pay off a portion of the debt is certainly not worthless. \* \* \* [SMHC] has retained extensive films rights and properties which had been acquired by Credit Lyonnais in connection with its lending activities. Those rights include distribution rights to approximately sixty-five films, sequel rights and film development rights. In addition, \* \* \* [SMHC] also owns approximately $60 million (face value) of the securities of Carolco, Inc., which is engaged in bankruptcy proceedings. The Company [SMP] is actively exploiting \* \* \* [SMHC's] film rights and the Company has commenced discussions with a number of parties to acquire additional film libraries. The Company is also pursuing its rights to maximize its recovery of its investment in Carolco.

> We understand that \* \* \* [SMHC's] rights in the Carolco investment have been valued at approximately $11 million. The projected income stream from the next cycle of \* \* \* [SMHC's] film rights has been estimated to have a present value of approximately $29 million and a future value in excess of $35 million. This estimate does not include sequel rights, development projects, residual values or the proceeds of subsequent distribution cycles. The members of the

Company believe that the going concern value of \* \* \* [SMHC] should be based on a market multiple of \* \* \* [SMHC's] anticipated earnings. This valuation should take into account the contribution to be made by the joint ventures under consideration and the exploitation of \* \* \* [SMHC's] additional rights. The valuation currently given for comparable companies is in the range of 8 to 15 times earnings.

When this memorandum was prepared it would have been clear, at least to Mr. Lerner, that SMP was not "pursuing its rights to maximize its recovery of its investment in Carolco."The record contains no indication of any such efforts; indeed, as of April 3, 1997, the bankruptcy court had confirmed the fourth amended plan of reorganization and also had confirmed that SMHC would receive nothing for the Carolco securities.

Shearman & Sterling's conclusions were also based, in part, on the dubious Sage Entertainment appraisal of the EBD film rights and the Harch Capital Management report regarding the Carolco securities. For the reasons discussed *supra,* we do not believe that Mr. Lerner reasonably relied on those purported appraisals. Moreover, although the memorandum was dated May 12, 1997, Mr. Lerner claims that he relied on it in October 1998 and October 1999, when SMP's and Corona's partnership tax returns were prepared and filed. Clearly, by this time, on the basis of Troy & Gould's conclusions, Mr. Lerner should have recognized that Mr. Kutner's conclusions could not be relied upon.

**\*106** The memorandum also provides some discussion of the transaction with CDR, describing it as follows:

> The Rockport Members interest in \* \* \* [SMHC] did not originate with a desire to obtain a favorable tax attribute that could be used as a tax shelter. Rather, their interest originated in a desire to acquire all the assets of MGM and, when it became clear that they would not be able to acquire all such assets, to acquire certain valuable assets that remained. \* \* \*

> The Rockport Members then decided to acquire an interest in \* \* \* [SMHC]. GB and CLIS wanted to retain some interest in \* \* \* [SMHC]. In this context,

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

the Rockport Members, GB and CLIS, each for their own valid business reasons, became members of the Company in a way that made it possible to preserve a favorable tax attribute, namely the basis of the MGM Debt and the MGM Stock.

On this basis, Shearman & Sterling concluded:

No transaction involving the Company should be recharacterized under substance over form principles. GB, CLIS and the Rockport Members became members by contributing property to the Company. At the time GB and CLIS transferred the MGM Debt and the MGM Stock to the Company, they were under no obligation to transfer any portion of their interest in the Company to any person. Thereafter, the Somerville S Trust purchased interests from GB and CLIS. GB and CLIS should not be treated as selling the MGM Debt and the MGM Stock to the Rockport Members who then contributed such property to the Company. Although courts have been willing to step transactions together, they have generally been reluctant to reverse the order of steps. [Discussing *Esmark & Affiliated Cos. v. Commis sioner,* 9 0 T.C. 171, 1988 WL 5887 (1988).]

Shearman & Sterling's description of the CDR transaction and its conclusion are based on faulty factual assumptions regarding the Ackerman group's purposes for entering into the transaction with CDR, Generale Bank, and CLIS. To wit, we have concluded that the Ackerman group entered into the transaction solely to exploit the banks' built-in losses using section 704(c). The parties did not intend to partner in any film business; the parties had a prearranged understanding that the banks would exercise their put rights and immediately exit the partnership. Petitioner cannot rely on Shearman & Sterling's "advice", which unreasonably assumes a different purpose for the transaction and its structure. Sec. 1.6664-4(c)(1)(ii), Income Tax Regs.

Shearman & Sterling's May 12, 1997, memorandum was not prepared in connection with the filing of SMP's and Corona's 1997 or 1998 partnership tax returns. Further, Mr. Lerner testified only that he relied on that memorandum in preparing *SMHC's* 1997 corporate tax return. He did not testify that he relied on the memor-

andum to prepare SMP's and Corona's returns. In any event, we conclude that any such reliance would have been unreasonable.

*4. October 10, 1997, Shearman & Sterling Memorandum*

**\*107** Gerald Rokoff and Alvin Knott of Shearman & Sterling prepared another memorandum dated October 10, 1997. The memorandum purports to summarize the anticipated tax consequences of a proposed joint venture between the Ackerman group and "GCo", a U.S. corporation.[FN210]The memorandum proposes two hypothetical structures for this joint venture, a corporate structure and a partnership structure, and outlines the anticipated tax consequences to the parties. It states: "In each proposed structure, we believe that neither party should recognize current gain or loss and that GCo, through the entity conducting the joint venture, should effectively receive a carryover tax basis in the assets of the joint venture."

The memorandum begins with a short "BACKGROUND" section that describes the New MGM transaction and the transaction with CDR. Shearman & Sterling reiterates its erroneous factual assumptions (almost verbatim) from its May 12, 1997, memorandum; i.e., that SMHC retained extensive film rights and properties, including the 65 EBD film titles, which had a present value of $29 million and a future value in excess of $35 million and that SMP was actively pursuing its rights to maximize its recovery of its investment in the Carolco securities, which had been valued at approximately $11 million.

The memorandum proposes a section 351 transaction similar to the transactions hypothesized in Shearman & Sterling's August 1996 memoranda. The memorandum discusses similar legal issues and reaches similar conclusions as in the other memoranda. The memorandum also proposes a partnership transaction in which GCo acquires 45 percent of the preferred interests and 45 percent of the common interests in the partnership from the Ackerman group for cash. Under the proposed transaction, GCo would receive an allocation of 45 percent

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

of the built-in loss with respect to the SMHC receivables and stock. Shearman & Sterling then provided the following legal analysis with respect to the transaction:

> The Proposed Partnership Transaction should not be recharacterized under the partnership anti-abuse regulation because:
>
> (a) Subchapter K, specifically section 704(c) and the regulations promulgated thereunder, contemplates and indeed mandates, the tax results set forth above; and
>
> (b) Although the parties will structure the Proposed Partnership Transaction to maximize their after-tax yield, GCo and the Rockport Members will engage in the joint venture for bona fide commercial purposes, namely to jointly develop the existing assets of the Company and GCo, and to invest together on a continuing basis through the Company.

The memorandum provides no further legal discussion; for example, there is no discussion as to whether the transaction passes muster under the economic substance doctrine or the step transaction doctrine. Moreover, the hypothetical transaction described in the memorandum differs fundamentally from the transaction involving the Ackerman group, CDR, Generale Bank, and CLIS. For instance, the proposed transaction does not contemplate that any of the partners will exit the partnership, and it assumes that the joint venture will be for bona fide commercial purposes.

**\*108** Shearman & Sterling's October 10, 1997, memorandum was not prepared in connection with the filing of SMP's and Corona's 1997 or 1998 partnership tax returns. It did not relate to a transaction that actually occurred involving SMP, Corona, or the Ackerman group, and Mr. Lerner did not testify that he specifically relied upon it in preparing SMP's and Corona's returns. We conclude that any reliance on the memorandum would have been unreasonable.

*5. February 26, 1998, Shearman & Sterling Memorandum*

Alvin Knott of Shearman & Sterling prepared another memorandum dated February 26, 1998, regarding the criteria for recharacterizing debt as equity. Mr. Lerner testified that at some point in early 1998, he was considering whether SMP should capitalize the SMHC receivables. He testified: "It's fair to say that the debt was not performing at that time", and he sought and received the advice of Shearman & Sterling on the debt versus equity issue.[FN211]

Respondent does not argue that the SMHC receivables should be recharacterized as equity. Nonetheless, the Shearman & Sterling memorandum addresses certain points that might be relevant to our decision that the $79 million receivable did not arise from a bona-fide debtor-creditor relationship. Shearman & Sterling indicates: "Of the total amount loaned to MGM pursuant to * * * [working capital agreement], $298,835,633.58, or 79% of the loan, was repaid. As late as mid-1996, and for all periods prior thereto, there was a clear expectation that the Holdings-CLIS Debt would be paid."

Shearman & Sterling concluded that the $79 million receivable represented a valid debt interest when issued because, inter alia, the parties were unrelated, the terms of the debt were largely based on terms negotiated at arm's length when the parties were unrelated, and MGM Group Holdings had the capacity to pay at least some of the debt from its assets. Shearman & Sterling did not analyze whether MGM Group Holdings' assumption of the $79 million receivable represented a new debt and whether that assumption established a valid debtor-creditor relationship. Insofar as we have concluded that the $79 million represented new debt, Shearman & Sterling's conclusions are erroneous. Credit Lyonnais, the creditor with respect to the $79 million receivable, was the parent company of CLIS. CLIS, in turn, was the sole shareholder of MGM Group Holdings when that entity assumed New MGM's $79 million debt obligation to Credit Lyonnais. MGM Group Holdings, in turn, was the sole shareholder of New MGM. All the parties were related, with Credit Lyonnais pulling the strings. The assumption of the $79 million debt was not negotiated at arm's length. After New MGM was sold, MGM Group Holdings lacked the capacity to repay the debt

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

from its assets-it had no assets of any discernible value.

Shearman & Sterling's memorandum is limited to the debt versus equity issue. It does not discuss any other relevant issues. The memorandum was not prepared in connection with the filing of SMP's and Corona's 1997 and 1998 partnership tax returns. It was offered into evidence only for the purpose of showing that Mr. Lerner relied on it in characterizing the SMHC receivables as debt on SMP's 1998 partnership tax return. We conclude that this memorandum does not provide reasonable cause for SMP's or Corona's tax treatment with respect to the relevant issues in these cases.

### 6. *Grant Thornton Memorandum*

**\*109** The Ackerman group hired the accounting firm of Grant Thornton, LLP, as its accountants for SMP and SMHC. Howard Levinton, who was a tax partner at Grant Thornton, was assigned to SMP and SMHC. In connection with the preparation of SMP's and SMHC's tax returns, Mr. Levinton prepared a memorandum dated May 1, 1998, concerning the tax issues regarding SMP. Mr. Lerner testified: "I was particularly interested in his analysis of the fact that Credit Lyonnais unexpectedly put the interest to us easily a year ahead of what I expected it. Not that I expected it at all. I thought that was very relevant in the preparation of the return because it affected any number of issues."Mr. Lerner testified that he relied on this memorandum with respect to SMP's 1997 partnership tax return.

Initially, we question whether Mr. Lerner ever received the memorandum that Mr. Levinton prepared, let alone whether he relied upon it with respect to SMP's 1997 return. The memorandum is not addressed to Mr. Lerner but is addressed to "File" and is entitled "Inter Office Memorandum". The memorandum is not an opinion letter, and there is no indication that Mr. Levinton prepared the memorandum intending that Mr. Lerner rely on it with respect to SMP's 1997 return. Although petitioner listed Mr. Levinton as a potential witness in his pretrial memorandum, petitioner did not call Mr. Levinton to testify.

In reaching his conclusions, Mr. Levinton relies on a number of assumptions, including: (1) SMP was formed to exploit the remaining film libraries owned directly by CLIS; (2) Generale Bank and CLIS demanded the side letter agreement because of the absence of a clearly defined exit strategy; and (3) after Generale Bank and CLIS joined SMP as partners, the French government, exercising its rights to regulate its banking industry, determined that Generale Bank and CLIS should cease their involvement in the movie business. Petitioner failed to establish that any of these assumptions are accurate. The evidence in the record indicates that SMP was formed to facilitate the transfer of $1.7 billion of built-in losses from Generale Bank and CLIS to the Ackerman group and that the banks demanded the side letter agreement because they full intended and planned to exit SMP as expeditiously as possible. There is no evidence that the banks exited SMP as a result of the French government's intervention.

Mr. Levinton examined the operation of the partnership tax rules, including sections 721, 722, 723, and 704(c), as well as the regulations thereunder. He concluded that "assuming the form of the transaction is respected, Rockport would succeed to the position of CLIS and GB with respect to the built in loss attributable to their contributed property."

Mr. Levinton referred to Shearman & Sterling's May 12, 1997, memorandum, agreeing: "The debt will not be worthless."Mr. Levinton pointed out that upon the formation of SMP, the contributed stock and debt were "valued" at $5 million in the aggregate and that this might present an argument as to whether the debts were nominal or "de minimis"; however, he concludes that $5 million is not nominal or "de minimis" compared to $0. Mr. Levinton did not discuss the value of the assets underlying the debts and stock and assumed, without any explanation, that the stock and debt had a value of $5 million.

**\*110** Mr. Levinton alluded to Generale Bank's and CLIS's put rights in the side letter agreement and observed:

Cast in its most unfavorable light, it could be argued

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

that, at the same time CLIS and GB were negotiating to enter the LLC; they were negotiating to exit the LLC. The ultimate fact to be drawn from that unfavorable assumption is that CLIS and GB never intended to be, and never in fact were, true partners. If the participation of CLIS and GB as partners in the transaction is ignored, then Rockport would be deemed to have purchased the stock and debt from GB and CLIS on December 31 rather than the Preferred Interests, and such stock and debt would then be considered to have been contributed to the LLC at a basis equal to the purchase price to Rockport paid to CLIS and GB rather than the $1.7 billion. In other words, CLIS's and GB's transitory ownership of LLC member interests would be disregarded.

Mr. Levinton then examined whether the partnership antiabuse regulation or the step transaction doctrine would apply to disregard Generale Bank's and CLIS's contributions to SMP and recast the transactions as a direct sale of the high-basis receivables and SMHC stock. Mr. Levinton concluded that these legal theories would not apply because: (1) Generale Bank and CLIS intended to become members of SMP and to remain participants in a film venture; (2) it was only an extraneous and unforeseen circumstance that caused Generale Bank and CLIS to exercise their put rights; (3) Generale Bank and CLIS had no immediate intention to sell their preferred interests to Rockport or anyone else; and (4) the relationships created through the contributions of debt and stock were bona fide and not undertaken in a manner designed to shift a tax loss to, or create a tax loss for, a U.S. taxpayer.[FN212]

For the reasons discussed in great detail in this opinion, Mr. Levinton's assumptions about Generale Bank's and CLIS's intentions to partner in a film venture with the Ackerman group are erroneous and contrary to what we have found to be Mr. Lerner's understanding of the CDR transaction. Consequently, we cannot agree that Mr. Lerner reasonably relied on Mr. Levinton's memorandum in filing SMP's 1997 partnership tax return.

*7. Opinion From Chamberlain Hrdlicka*

In 1998, Mr. Lerner sought and received the advice of Chamberlain, Hrdlicka, White, Williams & Martin (Chamberlain Hrdlicka) concerning the tax issues regarding SMP. Joseph R. Valentino of Chamberlain Hrdlicka prepared a memorandum to Mr. Lerner dated December 11, 1998, regarding the adjusted basis for Federal income tax purposes that SMP had in the SMHC receivables and stock.

The Chamberlain Hrdlicka memorandum consists of 19 pages. Eleven of the 19 pages are dedicated to a statement of facts. These facts are for the most part undisputed and relate primarily to the history of MGM and the SMHC receivables and stock. Of the remaining eight pages in the memorandum, six are dedicated to "QUALIFICATIONS AND LIMITATIONS" to the opinion. This section of the opinion states, among other things, that "our understanding is based upon certain assumptions [42 in toto] that you have allowed us to make, the accuracy of which we have not independently investigated."These assumptions include, among many others:

**\*111** 33. At the time of the Exchange Agreement, CLIS, GBN, and Consortium [CDR] intended for CLIS and GBN to join together with Lerner, Rockport, and Somerville in the present conduct of an enterprise to form a valid partnership and to share in the profits and losses therefrom under the terms of the LLC Agreement.

34. At the time of the Exchange Agreement, none of CLIS, GBN, and Consortium intended for CLIS and GBN to acquire its interest in the Company solely to receive a specific return on its investment independent of the Company's performance and success.

35. The payments made to CLIS under the * * * [advisory fee agreement] were not intended to reimburse either CLIS, GBN, or Consortium for their expenses associated with acquiring an interest in the Company.

36. The income and loss allocations provisions and the distribution provisions in the LLC Agreement, including its amendments, gave both CLIS and GBN a

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

true economic interest in the Company's profits and losses and were not merely artifices to pay CLIS and GBN a specified return on its interest in the Com- pany.

37. Each of Rockport, Lerner, Somerville, CLIS, and GBN formed the Company with the intent to de- velop and promote the remaining entertainment assets held by CL following the MGM Sale, the Carolco Notes, and the Carolco Stock with a view towards making an economic profit apart from tax con- sequences.

42. The Third Amendment was duly executed by the Company's Manager so that the Company and each of its Members are bound by the provisions of the Third Amendment under applicable local laws.

For the reasons discussed in this opinion, we conclude that CDR, Generale Bank and CLIS did intend for the banks to exercise their put rights and to exit SMP as ex- peditiously as possible, that Mr. Lerner had this same understanding, and that the interests of all parties were directed towards the banks' transferring their built-in losses to the Ackerman group for a $10 million cash payment. Because the Chamberlain Hrdlicka opinion is grounded on erroneous factual assumptions that Mr. Lerner knew were untrue, we cannot agree that he reas- onably relied on that opinion in preparing SMP's and Corona's 1997 and 1998 partnership tax returns.

The last section of the opinion, which contains Cham- berlain Hrdlicka's legal conclusions, is two pages long. Chamberlain Hrdlicka concludes that SMP had a $551,600,856 basis in the SMHC stock, a $79,912,955.34 basis in the $79 million receivable that CLIS contributed, and a $975,494,909.84 basis in the $974 million in receivables that Generale Bank contrib- uted. Chamberlain Hrdlicka reaches these conclusions without any legal analysis or citation to the Code, the regulations, or caselaw. Instead, Chamberlain Hrdlicka states simply: "In reaching our opinions, we have con- sidered the business and tax purposes for the Transac- tions and have analyzed the Tax Laws (as defined be- low) as they relate to the facts and circumstances de- scribed in this letter associated with the Transactions in

the manner described in, and required by, Treas. Reg. §§ 1.6662-4(d)(3) and 1.6664-4(c)." It defines the term "Tax Laws" as "existing provisions of the Code, the Treasury Department regulations promulgated thereun- der (final, temporary, and proposed), published revenue rulings and revenue procedures of the Internal Revenue Service * * *, reports, and statements of congressional committees and members, and judicial decisions". Chamberlain Hrdlicka, however, does not cite the par- ticular items that it purportedly relied upon. In fact the only citation in the opinion is to section 1.6662-4(d)(3) and 1.6664-4(c), Income Tax Regs., relating to substan- tial authority and reasonable cause. Under these circum- stances, we cannot agree that the Chamberlain Hrdlicka opinion provides any basis for reliance.

**\*112** Chamberlain Hrdlicka's opinion concludes by stat- ing:

A number of issues raised by the matters addressed in this letter, including matters upon which we have stated our opinions, are complex and have not been definitively resolved by the Tax Laws. The opinions that we state in this letter are based upon our inter- pretation of existing law and our belief regarding what a court should conclude if presented with the relevant issues properly framed. But we can give no assurances that our interpretations will prevail if the issues become the subject of judicial or administrative proceedings. Realizing the tax consequences set forth in this letter is subject to the risk that the IRS may challenge the tax treatment and that a court could sus- tain the challenge. Because the Company would bear the burden of proof required to support items chal- lenged by the IRS, in rendering our opinions, we have assumed that the Company, or other appropriate tax- payer, will undertake the effort and expense to present fully the case in support of any matter that the IRS challenges.

We conclude that Mr. Lerner did not reasonably rely on the Chamberlain Hrdlicka opinion in preparing SMP's and Corona's 1997 and 1998 partnership tax returns.FN213

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

### 8. *Conclusion*

We conclude that the advice that petitioner claims he relied upon in preparing SMP's and Corona's 1997 and 1998 partnership tax returns does not satisfy the reasonable cause exception and does not provide a basis for avoiding the accuracy-related penalties.

### XII. *Evidentiary Matters*

#### A. *Daubert Issues*

The parties have submitted expert opinions (in addition to those previously discussed) that they assert are relevant. Petitioner submitted the expert report and testimony of Todd Crawford of Deloitte & Touche, LLP, Houston, Texas. Respondent submitted the expert reports and testimonies of Louise Nemschoff and Alan C. Shapiro. Before trial, the parties filed respective motions in limine to the expert opinions of Mr. Crawford, Ms. Nemschoff, and Mr. Shapiro. At trial, we conditionally admitted the expert reports and testimonies of these witnesses and took the parties' objections under advisement, affording the parties an opportunity to brief their objections in relation to the issues in these cases.

Under rule 702 of the Federal Rules of Evidence:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based on sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

In *Daubert v. Merrell Dow Pharms., Inc.,* 509 U.S. 579, 597, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), the U.S. Supreme Court held that, under the Federal Rules of Evidence, the trial judge must ensure as a precondition to admissibility that any and all scientific testimony rests on a reliable foundation and is relevant. In *Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 149, 119 S.Ct.

1167, 143 L.Ed.2d 238 (1999), the Supreme Court extended this requirement to all expert matters described in Rule 702, Fed.R.Evid.[FN214] Under *Daubert* and *Kumho Tire Co.,* a trial court bears a "special gatekeeping obligation" to ensure that any and all expert testimony is relevant and reliable. *Caracci v. Commissioner,* 118 T.C. 379, 393, 2002 WL 1023378 (2002). In exercising this function, trial judges have "considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable."*Kumho Tire Co. v. Carmichael,supra* at 152; see also *Haarhuis v. Kunnan Enters., Ltd.,* 177 F.3d 1007, 1014-1015 (D.C.Cir.1999).

#### 1. *Mr. Crawford*

**\*113** Mr. Crawford is a certified public accountant and a lead tax services partner at Deloitte & Touche. He has 20 years' tax experience relating to acquisitions, mergers, reorganizations, and other complex corporate/entity transactions. From 1990 to 2002, Mr. Crawford served as a member of Arthur Andersen's National Mergers and Acquisitions and Subchapter C Team.

Mr. Crawford's expert report addresses two questions: (1) Whether unused NOLs of a target company are taken into account in determining its value to a hypothetical willing buyer and hypothetical willing seller; and (2) whether unused NOLs of SMHC (totaling \$260,098,293) had potential value to that company and the amount of that value as of December 11, 1996. Mr. Crawford concluded that based on his research and experience: (1) Unused NOLs of a target company are taken into account in determining the value of a target to an acquirer; and (2) NOLs of SMHC would have had value to a hypothetical willing buyer and hypothetical willing seller of that company prior to the transactions that occurred on December 11, 1996. He concluded that the NOLs in SMHC would have had a value in the range of \$620,000 to \$1,245,000. In arriving at this range, Mr. Crawford first propounded a reasonable, projected utilization of NOLs by a hypothetical acquirer; second, he applied a present value analysis to the projected utilization of NOLs back to December 11, 1996, using a rate (10 percent) that estimated the weighted av-

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

erage cost of capital during that period; and third, he applied a 98- to 99-percent risk-related discount to that result.[FN215]

At trial, respondent essentially conceded that NOLs might have some potential, but speculative, value to an acquirer if the acquisition were properly structured within the strictures of section 382. We extrapolate from respondent's concession that the NOLs in SMHC likewise might have had some potential, but speculative, value to an acquirer. The parties dispute, however, Mr. Crawford's valuation of the NOLs in SMHC.

In making his valuation conclusions, Mr. Crawford relied exclusively upon his experience in corporate NOL transactions. Mr. Crawford, however, has no specific background in valuation; nothing in his testimony or report indicates that he is qualified to value the NOLs in SMHC. Indeed, it appears that critical elements of Mr. Crawford's valuation, including his income projections, his weighted average cost of capital, and his discount rate, were lifted from Mr. Wagner's expert report. Further, although Mr. Crawford testified that his experience in corporate NOL transactions involves valuations of NOLs, he failed to explain whether he personally makes or reviews, or has any substantial role in making or reviewing, those valuations. He also failed to correlate his valuation methodology to his purported experience in valuing NOLs and to explain whether he makes, reviews, or relies upon valuations similar to the valuation in his expert report. Although Mr. Crawford states that he selected a 98- to 99-percent risk-related discount rate "in the interest of determining a conservative value", he admitted that his selection was inherently subjective and that the value he arrived at reflects a speculative value.

**\*114** Ultimately, we are led to the conclusion that Mr. Crawford's expert testimony lacks a sufficiently reliable basis upon which to reach an opinion as to the value of the NOLs in SMHC. See *United States v. Fredette,* 315 F.3d 1235, 1240 (10th Cir.2003) ("a witness 'relying solely or primarily on experience' must 'explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts.'' (quoting Fed.R.Evid. 702, Adv. Comm. Note.)). Ac-

cordingly, we exclude Mr. Crawford's expert report and testimony.[FN216]

### 2. *Ms. Nemschoff*

Ms. Nemschoff is an entertainment attorney who has represented a wide variety of institutional and individual clients in both domestic and international transactions in film, television, the visual arts, publishing, music, and multimedia. She has been in practice for more than 25 years. She has published a number of articles and spoken extensively in the U.S. and Europe on various aspects of copyright, trademark, and entertainment law, including the transfer of film rights and chain-of-title issues.[FN217]She serves on the arbitration panel and the legal committee of the International Film & Television Alliance (IFTA), formerly known as the American Film Marketing Association.[FN218]

### a. *Ms. Nemschoff's Expert Opinion*

Ms. Nemschoff submitted her report and testimony on the following matters:

(1) the contractual terms, legal documentation of ownership and pre-closing research that would be reasonably and customarily expected in connection with the acquisition of rights in motion pictures;

(2) the steps customarily taken by a transferee of film rights to protect its ownership in the acquired rights;

(3) any deficiencies and discrepancies in the legal documentation obtained and research undertaken by SMP in connection with its acquisition of the "U.S. Video Film Rights" in 65 film titles and 26 development projects purportedly owned by SMHC, including discrepancies in the ownership of rights as disclosed by U .S. Copyright Office records; and

(4) any deficiencies and discrepancies in the steps taken by SMP to protect its rights in these assets.

Ms. Nemschoff concluded that the steps taken by SMP and SMHC contrast sharply with those that would nor-

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

T.C. Memo. 2005-104, 2005 WL 1111792 (U.S.Tax Ct.), 89 T.C.M. (CCH) 1157, T.C.M. (RIA) 2005-104, 2005
RIA TC Memo 2005-104
**T.C. Memo. 2005-104, (U.S.Tax Ct.)2005 WL 1111792**

mally be expected from a party undertaking such a transaction in a number of key areas, including identification of the film titles and the rights being acquired, warranties and representations regarding ownership, chain of title, delivery materials, and recordation of the transaction. She opined that the acquisition was conducted in a manner that strongly suggests a lack of concern on SMP's part with respect to its ownership of the film titles or its ability to exploit them. Instead, she observed that SMP apparently adopted the relatively risky strategy of acquiring the film titles with only minimal information as to the film titles themselves, the rights being acquired, and the availability of the physical materials necessary for their exploitation. Ms. Nemschoff's conclusions were based primarily, if not solely, on her experience as an entertainment attorney.

### b. Petitioner's Arguments

**\*115** In his motion in limine and on brief, petitioner argues that we should exclude Ms. Nemschoff's expert report and testimony under *Daubert v. Merrell Dow Pharms., Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), and *Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1993). First, petitioner argues that Ms. Nemschoff's report is unreliable because it broadly asserts what is typical and customary with respect to film-transfer transactions but fails to support that assertion with a survey, proper sampling of the industry, or any other type of study among companies acquiring rights, or with any outside reliable source such as a treatise, contract form book, practice guide, or material she may have published. Relying upon *Daubert* and *Kumho Tire,* petitioner contends that Ms. Nemschoff's legal practice and experience are insufficient to establish the requisite degree of reliability under rule 702, Federal Rules of Evidence. Petitioner contends that there is an insurmountable analytical gap between Ms. Nemschoff's opinions as to what are typical and customary steps in transferring film rights and her conclusion that a failure to take such steps in the transaction with CDR indicates SMP's lack of interest in acquiring and exploiting film rights. Finally, petitioner claims that certain flaws in Ms. Nemschoff's legal practice and experience undermine her

ability to comment on what is typical and customary in transfers of film rights. Notably, petitioner contends that Ms. Nemschoff has not identified how many times she has drafted or reviewed a contract or worked on matters involving films or film libraries.

### c. Court's Analysis

Personal experience and knowledge can be a reliable and valid basis for expert testimony in many cases. See *Kumho Tire Co. v. Carmichael,supra* at 150;*United States v. Fredette,supra* at 1239-1240;*Groobert v. President of Georgetown Coll.,* 219 F.Supp.2d 1, 7 (D.D.C.2002). Ms. Nemschoff has more than 25 years of relevant legal experience in the entertainment industry. As an entertainment attorney, Ms. Nemschoff deals primarily with film and television rights. She has been involved in the sale and purchase of media libraries (including individual media rights), in the licensing of media rights, and in copyright registration, renewal, and restoration of media rights. She has negotiated, drafted, and reviewed a large number of distribution agreements. As a member of IFTA's legal committee, Ms. Nemschoff has participated in developing and updating model agreements or form agreements for distribution. She has also given advice on chain-of-title issues to filmmakers and others seeking production financing. She has mediated disputes involving media rights and, in that context, has seen a number of single-picture and multi-picture distribution agreements and the kinds of disputes that arise from those agreements. Ms. Nemschoff has been involved in qualifying distributors for errors and omissions insurance, which requires opining that the chain of title on a film is clear and that there have been no violations of copyrights or defamation problems. In some cases, this process required creating agreements to establish the chain of title for a film.

**\*116** We conclude that Ms. Nemschoff's experience in the entertainment industry provides a reliable basis for commenting on what is typical and customary in the transfer of film rights and for analyzing the deficiencies and discrepancies in the transfer of the EBD film library from CLIS to SMHC. With respect to petitioner's specific concerns regarding Ms. Nemschoff's experience in

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

drafting contracts and working on film or film library transfers, we believe those concerns go more to the weight to which her opinion is entitled than to its admissibility under *Daubert v. Merrell Dow Pharms., Inc.,supra,* and *Kumho Tire Co. v. Carmichael,supra.*FN219

Although we conclude that Ms. Nemschoff's opinion is admissible into evidence, we do not need to rely on her opinion to reach our conclusions in these cases. For the reasons discussed in more detail above, we find ample evidence in the record to show that the Ackerman group's investigation of SMHC's film rights before the CDR transaction was not only deficient but essentially nonexistent. We reach our conclusions primarily on the basis of that evidence. We refer to Ms. Nemschoff's report and testimony only as additional support for our conclusions.

### 3. *Mr. Shapiro*

Mr. Shapiro has a Ph.D. in economics and is a professor of banking and finance at the Marshall School of Business, University of Southern California. Mr. Shapiro has held a number of professorial positions and has taught banking, finance, and economics at a number of institutions in the U.S. and abroad. Mr. Shapiro has authored numerous articles and books on banking, finance, and economics, and he has testified in a number of court proceedings.

#### a. *Mr. Shapiro's Expert Opinion*FN220

Mr. Shapiro submitted his report and testimony on the following matters:

(i) the value of the SMHC stock that CLIS contributed to SMP at the time it was contributed;

(ii) the value of the $79,912,955 of indebtedness that MGM Group Holdings owed to CLIS and the $974,296,600 of indebtedness that MGM Group Holdings owed to Generale Bank at the time those items were contributed to SMP; and

(iii) the value of SMHC's interest in the Carolco securities at the time the SMHC stock was contributed to SMP.

Mr. Shapiro concluded:

(i) the stock that CLIS contributed to SMP had no value at the time it was contributed;

(ii) the $79,912,955 of indebtedness that SMHC owed to CLIS and the $974,296,600 of indebtedness that SMHC owed to Generale Bank had no value at the time those items were contributed to SMP; and

(iii) the Carolco securities that SMHC owned had no value at the time the SMHC stock was contributed to SMP.

In reaching his conclusions, Mr. Shapiro conducted an economic analysis of the CDR transaction and the events leading up to that transaction.

Mr. Shapiro first observed that as of October 10, 1996, the only asset in SMHC was the Carolco securities, which he determined were worthless.FN221In Mr. Shapiro's opinion, because there was no value in any underlying assets in SMHC, the SMHC stock and the approximately $1 billion in indebtedness were also worthless as of October 10, 1996.

**\*117** Second, Mr. Shapiro opined that it would not be rational for CLIS to contribute the EBD film library to SMHC in its capacity as an equity holder of SMHC because: (1) The face amount of SMHC's debt was greater than the value of its assets as of December 10, 1996; and (2) SMHC's creditors with priority claims would capture the value of any contribution.FN222Moreover, although debt holders may generally have an incentive to make additional investments to a company in proportion to their claims, he observed that it would not be rational for one of the debt holders on its own to undertake an investment that would benefit it in an amount less than the cost of the investment. Thus, because Generale Bank held a more significant debt claim in SMHC, he opined that it would not be rational for CLIS to contribute the EBD film library in its capacity as a debt holder of SMHC. Mr. Shapiro concluded that "the true

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

economic reality of this transaction is that CLIS contributed the Film Rights to SMP and not to SMHC."FN223

Third, because the Carolco securities had no value and the contribution of film rights was in economic reality to SMP and not SMHC, Mr. Shapiro concluded that there were no assets of value supporting the contributed debts, and, therefore, those debts were worthless.

### b. *Court's Analysis*

Under Rule 702, Fed.R.Evid., expert testimony is admissible where it assists the Court to understand the evidence or to determine a fact in issue.*ASAT, Inc. v. Commissioner,* 108 T.C. 147, 168, 1997 WL 143914 (1997). Expert testimony that expresses a legal conclusion does not assist the Court and is not admissible. *Alumax, Inc. v. Commissioner,* 109 T.C. 133, 171, 1997 WL 599603 (1997), affd. 165 F.3d 822 (11th Cir.1999); *Hosp. Corp. of Am. & Subs. v. Commissioner,* 109 T.C. 21, 59, 1997 WL 412127 (1997); *FPL Group, Inc. & Subs. v. Commissioner,* T.C. Memo.2002-92. Moreover, an expert who is merely an advocate of a party's position does not assist the Court to understand the evidence or to determine a fact in issue. *Sunoco, Inc. & Subs. v. Commissioner,* 118 T.C. 181, 183, 2002 WL 404292 (2002); *Snap-Drape, Inc. v. Commissioner,* 105 T.C. 16, 20, 1995 WL 412145 (1995), affd. 98 F.3d 194 (5th Cir.1996). Determining whether expert testimony is helpful is a matter within the sound discretion of the Court. See *Laureys v. Commissioner,* 92 T.C. 101, 127, 1989 WL 4225 (1989). After reviewing Mr. Shapiro's report and testimony, we are not persuaded that it is helpful to the Court in understanding the evidence or determining a fact in issue.

In the first instance, we question the relevance and reliability of Mr. Shapiro's "economic reality" analysis in evaluating CLIS's contribution of film rights to SMHC. Mr. Shapiro concluded, with little elaboration, that CLIS contributed the film rights to SMP instead of SMHC. Because the film rights were contributed to SMP, Mr. Shapiro concluded that SMHC had no value in those assets as of December 11, 1996. In reaching

these conclusions, Mr. Shapiro superimposes his view of "economic reality" to a level that wholly ignores the legal effect (apart from tax considerations) of CLIS's contribution to SMHC and SMHC's existence as a separate corporate entity from SMP. SMHC, as opposed to SMP, was the legal owner of whatever film rights CLIS contributed to it and continued to hold those rights until its merger with Troma. Presumably, since the film rights resided in SMHC after the CLIS contribution, debtholders would be entitled to whatever value those film rights had, if any. Mr. Shapiro concludes, however, that because the film rights were in SMP, SMHC had no assets of value and therefore the receivables from Generale Bank and CLIS were worthless. Under the circumstances, Mr. Shapiro's views of "economic reality" are largely academic, disregard elements of CLIS's contribution, and cannot form the basis for determining the facts in issue. Those views are not helpful to the Court in understanding any evidence or determining a fact in issue.FN224

**\*118** In Mr. Shapiro's expert report, he indicates that he was asked to provide an expert opinion on the value of SMHC stock, the value of the receivables that Generale Bank and CLIS contributed to SMP, and the value of SMHC's interest in the Carolco securities. After reviewing Mr. Shapiro's report and testimony, however, we find that Mr. Shapiro has gone well beyond the scope of his engagement, reaching conclusions on the substance over form issues that this Court must decide.

In his expert report, Mr. Shapiro analyzed the possibility that the $5 million put purchase price and the $5 million advisory fee were paid as arm's-length consideration for Generale Bank's and CLIS's receivables. In scattershot fashion, he concludes, without any elaboration, that SMP paid the $5 million advisory fee for the EBD film rights and not the receivables; that there is a question whether the $5 million put purchase price and $5 million advisory fee were paid as consideration for Generale Bank's and CLIS's contributions of the receivables; but that "Considering that SMP received the Film Rights, as well as tax benefits from the transaction with a potential value in the hundreds of million of dollars, it is very unlikely that the $10,000,000 figure represents

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

the fair market value of the debt."Mr. Shapiro's expert report provides no basis for reaching these conclusions other than speculation. He did not identify the tax benefits that he alluded to and, indeed, testified that he based his conclusions on a discussion with respondent's counsel regarding SMP's "trying to take a writeoff on this debt". Similar to other portions of Mr. Shapiro's report, these statements have the distinct quality of advocacy.

For the reasons stated above, we conclude that Mr. Shapiro's expert report and testimony are not admissible into evidence. We shall grant petitioner's motion in limine as it relates to that expert report and testimony.

### B. *Mr. Jouannet's Response*

At trial, we admitted a letter from Mr. Lerner dated November 21, 1997, requesting a confirmation from Mr. Jouannet:

In order to respond to a question asked by our auditors, we would appreciate receiving a letter from you confirming that, to the best of your recollection: (i) when GB and CLIS entered into the Santa Monica Pictures LLC agreement, they intended at the time to be partners with Rockport Capital Inc. and (ii) their decision to dispose of their interests was made subsequent to the date of that agreement (December 11, 1996). I recall that the interests were transferred at the end of 1996.

In connection with that letter, petitioner offered a second letter, which petitioner alleges was Mr. Jouannet's response to Mr. Lerner. The exhibit reads:

Pursuant to your letter of November 21, 1997, relating to the transactions that I negotiated with you during the last quarter of 1996, my recollection is as follows:

I/ Generale Bank Nederland NV (GB) and Credit Lyonnais International Services SA (CLIS) under the instructions of their affiliate Consortium de Realisation (CDR) entered into an Exchange and Contribution Agreement with Rockport Capital Incorporated whereby they contributed stock of Santa Monica Holding Corp (SMH) and indebtedness owing by

SMH to GB and CLIS in exchange for preferred interests in Santa Monica Pictures LLC. That agreement was passed on December 11, 1996.

**\*119** 2/ Subsequent to entering into the LLC agreement CDR (and eonsequently GB and CLIS) opted, as I understand it for reasons in relation to its 1996 year end accounts, to dispose of their preferred interests in the LLC at the end of their financial year pursuant to the right granted to them by a Letter Agreement entered with Rockport simultaneously with the Exchange and Contribution Agreement.

To the best of my recollection notice of such decision to assign, was given to Rockport in the second half of December 1996 and the transfer became effective on December 31st 1996.

Respondent objected to this response on hearsay grounds. The Court sustained respondent's objection. On brief, petitioner seeks to have the Court reconsider its ruling.

Because Mr. Jouannet is deceased and unavailable to testify, petitioner offered this exhibit under rule 807, Federal Rules of Evidence, as an exception to the hearsay rule. Rule 807, Federal Rules of Evidence, provides that a statement not specifically covered by the hearsay exceptions of rules 803 or 804, Federal Rules of Evidence, but having equivalent circumstantial guarantees of trustworthiness, is not excluded by the hearsay rule, if the Court determines: (a) The statement is offered as evidence of a material fact; (b) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (c) the general purposes of the Federal Rules of Evidence and the interests of justice will best be served by admission of the statement into evidence.[FN225] To ensure that this "residual exception" to the hearsay rule does not emasculate the body of law underlying the Federal Rules of Evidence, it is to be used very rarely and only in exceptional circumstances. *Goldsmith v. Commissioner,* 86 T.C. 1134, 1140, 1986 WL 22137 (1986); *Gaw v. Commissioner,* T.C. Memo.1995-531.

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

T.C. Memo. 2005-104                                                                    Page 108
T.C. Memo. 2005-104, 2005 WL 1111792 (U.S.Tax Ct.), 89 T.C.M. (CCH) 1157, T.C.M. (RIA) 2005-104, 2005
RIA TC Memo 2005-104
**T.C. Memo. 2005-104, (U.S.Tax Ct.)2005 WL 1111792**

We are not persuaded that Mr. Jouannet's response to Mr. Lerner's letter has circumstantial guarantees of trustworthiness equivalent to those in the other hearsay exceptions. Mr. Jouannet's response was made to Mr. Lerner's inquiry regarding CDR's intentions in its transaction with the Ackerman group. The response appears to have been written as an accommodation to Mr. Lerner; there is no guarantee that the accommodation did not extend to the substance of the response. We are not convinced that Mr. Jouannet gave his response as a "disinterested" party. Moreover, Mr. Jouannet's response is not contemporaneous with CDR's transaction with the Ackerman group.

We also are not persuaded that Mr. Jouannet's response is more probative on the point for which it is offered than any other evidence that petitioner could have procured through reasonable efforts.[FN226]Although the record reflects that Mr. Jouannet was the principal negotiator on the CDR side of the transaction, we are not convinced that other individuals at CDR, Generale Bank, or CLIS could not have testified regarding the intentions of the banks.

**\*120** Finally, petitioner points to the fact that Mr. Jouannet is deceased and is unavailable to testify as a basis for admitting the response. We are not persuaded that rule 807 of the Federal Rules of Evidence contemplates admitting hearsay evidence solely on the basis that the declarant is deceased. See *Estate of Temple v. Commissioner,* 65 T.C. 776, 1976 WL 3728 (1976). We are not persuaded that the general purposes of the Federal Rules of Evidence and the interests of justice will best be served by admitting Mr. Jouannet's response.[FN227]

In light of the foregoing,

> *An appropriate order will be issued granting respondent's motion in limine to exclude the expert report and testimony of Todd Crawford, denying petitioner's motion in limine to exclude the expert report and testimony of Louise Nemschoff, and granting petitioner's motion in limine to exclude the expert report and testimony of Alan C. Shapiro, at Docket No. 6163-03 a decision will be entered for respondent and at Docket No. 6164-03 an appro-*

*priate order of dismissal and decision will be entered.*

> FN1. This debt represented part of the approximately $2 billion that the Credit Lyonnais group had previously lent or advanced to MGM during its brief, unprofitable relationship with MGM, first as lenders to MGM and then, after foreclosing, as owners of MGM. Credit Lyonnais had transferred the approximately $1 billion of debt from the MGM operating company to Santa Monica Holdings Corp. (SMHC) (or more precisely to its predecessor, MGM Group Holdings Corp.) partly to facilitate the 1996 sale of the MGM operating company to Kirk Kerkorian.

> FN2. More precisely, the $5 million advisory fee was to be paid to one of the Credit Lyonnais group members, Credit Lyonnais International Services (CLIS).

> FN3. More precisely, the commitment to purchase the Credit Lyonnais group's preferred interests was made by one of the Ackerman group members, Rockport Capital, Inc.

> FN4. Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the taxable years at issue and, in certain references, as amended. All Rule references are to the Tax Court Rules of Practice and Procedure.

> FN5. In our findings of fact, we use terms such as "indebtedness" or "contributions" only for convenience and not to denote any legal significance.

> FN6. This claimed loss essentially duplicated losses that Santa Monica Pictures, LLC (SMP) had claimed from its sale to Imperial Credit Industries, Inc. (Imperial), of SMP's ownership interest in Corona Film Finance Fund, LLC (Corona). Most of Corona's claimed loss passed through for the benefit of Imperial. As a "fee"

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

T.C. Memo. 2005-104     Page 109

T.C. Memo. 2005-104, 2005 WL 1111792 (U.S.Tax Ct.), 89 T.C.M. (CCH) 1157, T.C.M. (RIA) 2005-104, 2005 RIA TC Memo 2005-104

**T.C. Memo. 2005-104, (U.S.Tax Ct.)2005 WL 1111792**

for the tax benefits it received, Imperial paid, indirectly to SMP through Corona, almost $15 million.

At some point in these proceedings, Imperial filed a bankruptcy petition. Consequently, any partnership items of Imperial, including the loss that passed through from Corona, became nonpartnership items on the date the bankruptcy petition was filed. Sec. 301.6231(c)-7(a), Temporary Proced. & Admin. Regs., 66 Fed.Reg. 50561 (Dec. 4, 2001). Imperial is not a party to these proceedings.

FN7. In the notice of final partnership administrative adjustment issued to Corona for its 1998 taxable year, respondent determined, as the lone adjustment in that FPAA, an $80 million increase in Corona's reported distributions. Respondent concedes that this adjustment is no longer a partnership item and that this Court lacks jurisdiction to redetermine that adjustment. Based upon that concession, the Court will dismiss the taxable year 1998 as moot at Docket No. 6164-03.

FN8. Corona claimed a $78,768,955 capital loss from the sale of the $79 million receivable in 1997. We do not have jurisdiction over the portion of this loss that passed through to Imperial; i.e., $74,671,378. See *supra* note 5.

FN9. On SMP's FPAA for 1998, respondent also determined a $211,407 adjustment for certain long-term capital gain that SMP did not pass through on its 1998 partnership tax return. Respondent does not seek to impose accuracy-related penalties pursuant to sec. 6662 with respect to this adjustment.

FN10. The Credit Lyonnais group's loans to MGM and eventual ownership of MGM are described in detail *infra.*

FN11. As we discuss *infra,* Mr. Jouannet

played a significant role in the transaction in which the Ackerman group acquired SMHC.

FN12. The actual name is "Generale Banque." We follow the parties' convention in referring to it in Anglicized fashion as "Generale Bank." Sometimes, in quoted material, the reference is to "Generale Banque" or "GB."

FN13. To finance this purchase price, Pathe Communications Corp. relied, in part, on its available lines of credit from CLBN.

FN14. The name of this agreement did not necessarily control the amount that was advanced under the agreement.

FN15. The name of this agreement did not necessarily control the amount that was advanced under the agreement. Amounts available under the $145 million facility agreement were in addition to amounts available under the $250 million facility.

FN16. The parties agreed to a purchase price equal to the aggregate principal amount outstanding on the debt, together with all interest, fees, and other amounts then due and owing.

FN17. The name of this agreement did not necessarily control the amount that was advanced under the agreement.

FN18. Credit Lyonnais selected a 5-year business plan because of U.S. laws requiring the bank to divest itself of MGM within 5 years of acquisition.

FN19. As part of the 1993 restructuring, MGM Group Holdings Corp. retained its accrued tax attributes, including its accrued net operating losses (NOLs). The 1993 restructuring included the appointment of a new management team under Frank Mancuso as chief executive of-ficer.

FN20. On May 1, 1993, Carolco and MGM

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

entered into two distribution agreements; a
"Domestic Output Agreement", and an
"International Output Agreement", in which
MGM was to distribute Carolco films.

FN21. Between Jan. 15, 1994, and Oct. 15,
1995, Carolco issued additional securities to
MGM Holdings in lieu of quarterly interest
payments on the Carolco subordinated notes.

FN22. At the time, the five or six "major" mo-
tion picture companies were producing virtu-
ally all the motion pictures exhibited in the
world, and this consolidation was jeopardizing
the ability of Deyhle Media Group, and other
distributors, to acquire motion picture content
for distribution. Deyhle Media Group was in-
terested in acquiring New MGM to assure a
continuous flow of motion picture product.

FN23. Mr. Lerner testified that this valuation
did not take into account corporate taxes, over-
head, and remake rights of several important
pictures such as the "James Bond", "Pink Pan-
ther", and "Rocky" movies.

FN24. Generale Bank (CLBN's successor) was
to be paid $611,064,366.42 (which included ac-
crued interest) for the amounts that New MGM
owed under the CLBN term loan.

FN25. Mr. Geary explained that "by this time
[the time of the draft letter agreement] clearly
there was going to be a second letter, a put let-
ter. That's what I understood to be monetized.
There was a put available. We didn't have to
wait, you know, for the time of the deal."

FN26. Over the course of the drafting process,
the parties agreed to a $5 million put price and
a $5 million advisory fee.

FN27. Any written or facsimile notice was re-
quired to have an attached instrument of as-
signment, a copy of which was attached as
"Exhibit A" to the put agreement. Exhibit A
provided that any assignment and transfer of

the preferred interests to Rockport Capital was
to be effective upon payment to the seller of
the cash purchase price provided in the put
agreement.

FN28. As previously noted, on Oct. 15, 1996,
MGM Group Holdings had changed its name to
Santa Monica Holdings Corp. (SMHC).

FN29. The exchange and contribution agree-
ment (including its attached schedules) did not
define the term "U.S. Video Film Rights".

FN30. Members holding preferred interests
could immediately convert their preferred in-
terests to Common II interests if certain re-
quired annual distributions of excess cashflow
were not made.

FN31. From this point forward, the documents
in the record (including the relevant tax re-
turns) refer to $974,296,600.85 in indebtedness
owing by SMHC. Previous documents alluded
to a principal debt of $975,494,909.84. For our
purposes, we refer to the $974 million in re-
ceivables from Generale Bank.

FN32. Amendment No. 2 indicated that the
$19.8 million in cash and marketable securities
would be held by Somerville S Trust "for the
sole and exclusive benefit of the LLC and that
said amount shall heretofore be deemed as-
signed to and owned by the LLC." It also indic-
ated that on or before Dec. 31, 1997, this
amount plus interest would be paid to an ac-
count established in the name of SMP.

FN33. CLIS and Generale Bank planned to
transfer the preferred interests to a CDR affili-
ate, Santa Monica Finance B.V., before the put
under the side letter agreement was exercised.

FN34. Mr. Lerner executed two other consents
for the transfer of preferred interests and the
withdrawal of an unnamed "Member" of SMP.
These consents were also predated "_____, 1996".

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

FN35. Mr. Geary exercised Generale Bank's and CLIS's rights under the side letter agreement and deposit account agreement on Dec. 26, 1996; however, the put period did not commence until Dec. 31, 1996.

FN36. As chief executive officer (CEO) at Epic Productions, John Peters had frequent contact with individuals associated with Credit Lyonnais, including Hank de Kaiser in Rotterdam, Mr. Jouannet and Michelle la Brund in Paris, and Bruno Hurstel, who was a director on Epic Productions' board.

FN37. The record is unclear on the precise role that EBD played vis-a-vis Epic Productions, although it appears that EBD was in some respect higher on the Credit Lyonnais/CDR chain than Epic Productions.

FN38. Mr. Peters testified that the individual who contacted him from Credit Lyonnais or EBD was likely Hank de Kaiser, Mr. Jouannet, Bruno Hurstel, or Michelle la Brund.

FN39. The assignment, including its attached schedule, did not define the term "U.S. Video Film Rights"; it identified the films only by titles.

FN40. The assignment, including its attached schedule, did not define the term "U.S. Video Film Rights"; it identified the films only by titles.

FN41. The assignment, including its attached schedule, did not define the term "U.S. Video Film Rights"; it identified the films only by titles.

FN42. From its examination of these film titles, Troy & Gould determined that the licenses were for a term of years, in most cases 10 years from delivery, and that it appeared for the most part that the licenses had recently expired or would soon expire. Troy & Gould concluded that "as to pictures for which the video license

to Embassy or Concorde has expired, it would appear that * * * [SMHC] has no rights whatsoever, unless there are other assignments (for which we have no documentation) into our chain of title from the producers or other rights holders."

FN43. The note purchase agreement restated that "SMP is the holder of two Promissory Notes issued by * * * [SMHC] in the respective principal amounts of $815,904,188.96 and $150,000,000".

FN44. On Dec. 29, 1997, Somerville S Trust contributed all its outstanding member interests in Somerville, LLC to SMP. This contribution was reflected on SMP's 1997 partnership tax return as a $145,236,168 increase in Somerville S Trust's capital account in SMP.

FN45. The second note purchase agreement stated that SMP was the holder of an $815,904,188.96 promissory note that SMHC had issued.

FN46. At some point, Mr. Lerner had asked Sage Entertainment for an opinion valuing the EBD film library. He had obtained an opinion from Steve Kutner of that company valuing the library at approximately $29 million.

FN47. The 33 film titles from the EBD film library were: "Astro Zombies", "Auditions", "Avenger", "Banana Monster", "Battle of the Last Panzer", "Battle of the Valiant", "The Beast", "Blood Brothers", "Blood Castle", "Carthage in Flames", "Cold Steel for Tortuga", "Dual of Champions", "Escape From Hell", "Fear", "Fist of Fear, Touch of Death", "Headless Eyes", "Invincible Gladiators", "Return of the Conqueror", "Return of the Zombies", "SS Experimental Love Camp", "The Sword and the Cross", "Tiger of the Seven Seas", "Tormentor", "White Slave", "Octavia", "Platypus Cove", "Hullabaloo Over Georgia", "To Love Again", "This Time I'll

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Make You Rich", "Danger Zone", "Sidewinder One", "Ninja Showdown", and "Ninja Squad".

FN48. On Nov. 2, 1998, TroMetro and Troma entered into an addendum, to which SMHC acknowledged and consented, amending the Troma distribution agreement. Pursuant to this addendum, the "Moving Pictures" library and the "Five Stones" library were added to the Troma distribution agreement. No addendum was made to the TroMetro distribution agreement.

FN49. Mr. Lerner was introduced to Mr. Herz by Mr. van Merkensteijn.

FN50. There are several stars in Troma's films, including Billy Bob Thornton and Kevin Costner. The character "Toxic Avenger" is Troma's 'Mickey Mouse', having been featured in four action movies and a children's cartoon that Troma distributed.

FN51. About 200 to 220 of Troma's film titles have actually been authored and digitized and are out in U.S. distribution on DVD. The remaining film titles are not in distribution because the process of preparing them for distribution is costly, and because Troma needs to be sure that the market can absorb the number of films that it presents for distribution on a monthly basis.

FN52. Troma created distribution materials for the eight film titles in the "Wisdom" library.

FN53. Epic Productions informed SMHC that its rights in "Headless Eyes" had also expired.

FN54. For example, Troma sent Crown Capital (on behalf of SMHC) a statement of revenue and expenses as of June 30, 1998, showing no revenues, $234,000 in expenses, and an advance payment of $230,000. Troma also sent Crown Capital an invoice for creation of distribution materials (including production of press and media) for the "Wisdom" library for the

period June 1 to 30, 1998, showing expenses of $44,000. Troma sent to "TroMetro-Santa Monica" a statement of revenue and expense as of Dec. 31, 1998, for films that Troma distributed on behalf of TroMetro and SMHC. This statement shows $23,250 in revenue, $6,907.91 in distribution expenses, and a $16,342.09 amount due TroMetro. On Nov. 4, 1998, Troma sent Crown Capital another invoice for $103,025 on the release of video and DVD for "Banana Monster", "Fist of Fear, Touch of Death", "Astro Zombies", "Battle of Last Panzer", and "Escape from Hell". This invoice requested a $50,000 advance payment.

FN55. In at least one case, the statement to "TroMetro-Santa Monica" as of Dec. 31, 1998, states "Check Enclosed" for the amount of revenues exceeding distribution expenses. Mr. Herz testified that he did not think a check was in fact sent to TroMetro or SMHC, given the agreement to retain net revenue.

FN56. At one point, Imperial Bank owned 100 percent of Imperial; after spinning Imperial out, however, Imperial Bank's ownership interest fell to 40 percent.

FN57. Regarding this proposal, Mr. Snavely testified:

There was discussions [sic] about an opportunity for us to invest in this business, and we did have some expertise in securitization, and there were discussions about acquiring film libraries, all of which was interesting, but we were also interested in making sure that it fit our tax strategies.

FN58. On Dec. 16, 1997, the secretary of state of Delaware certified: "Corona Film Finance Fund LLC is duly formed under the laws of the State of Delaware and is in good standing and has a legal existence so far as the records of this Office show as of the sixteenth day of December, A.D.1997."

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

FN59. This notation was the only significant comment that Mr. Gubman made on the draft amendment and restatement of the Corona LLC agreement.

FN60. Pursuant to the $1.04 million note, interest was to accrue at a rate of 8 percent per annum and was payable semiannually on June 15 and December 15 of each year. Imperial agreed to pay the outstanding principal amount of the $1.04 million note together with accrued and unpaid interest thereon on Dec. 15, 2002.

FN61. Pursuant to the $1,220,050 note, interest was to accrue at a rate of 8 percent per annum and was payable semiannually on June 15 and December 15 of each year. Imperial agreed to pay the outstanding principal amount of the $1,220,050 note together with accrued and unpaid interest thereon on Dec. 15, 2002.

FN62. In arriving at a purchase price for the $79 million receivable, Mr. van Merkensteijn testified that he used the same pricing formula as in TroMetro's purchases of the $150 million and $81 million receivables, and he similarly relied on the Sage Entertainment appraisal of SMHC's film assets.

FN63. At some point, Mr. van Merkensteijn, on behalf of TroMetro, executed a second promissory note also dated Dec. 29, 1997, in the amount of $1.180 million (the $1.180 million TroMetro note). Mr. van Merkensteijn testified that the first note was corrected to reflect a different amount. The $1,024,000 TroMetro note in the record has the handwritten notation "Cancelled" on its first and last pages.

FN64. Schedule 3.3 included the film title "Mommy's Epitaph", which was not a part of any of SMHC's film libraries. It also included a 22-film library that SMHC was to acquire for $485,000; however, SMHC did not acquire this library. As a result, on Sept. 2, 1999, SMHC and Troma amended the asset purchase agreement with SMHC agreeing to contribute an additional $630,000 to Troma's capital in lieu of the 22-film library.

FN65. Apparently, the stock certificates previously issued to SMHC were marked "Void," and new stock certificates were issued to SMP.

FN66. On its amended 1999 partnership return, SMP reported that the C reorganization between SMHC and Troma occurred on Sept. 2, 1999.

FN67. Mr. Lerner signed this letter on June 21, 2001; Mr. Herz signed it but did not date it.

FN68. Mr . Lerner testified that Troma Finance was formed with a view of consolidating all the ownership interests in Troma into one entity for purposes of making a sale of the company. According to Mr. Lerner, Mr. van Merkensteijn was negotiating with a certain party for the sale of Troma, and "he wanted to make sure that all of the ownership interests were in one entity so he wouldn't have to keep going back around".

FN69. SMP did not execute this document.

FN70. In lieu of a cash contribution, Mr. Lerner, as manager of SMP, executed a $3.4 million promissory note dated Dec. 12, 2001.

FN71. On its 1997 return, SMP reported a net long-term capital loss of $213,715,689 on Schedule D, Capital Gains and Losses. From this amount, SMP passed through net long-term capital gains of $62 to Mr. Lerner and $62 to Rockport Capital, and a net long-term capital loss of $213,715,813 to Somerville S Trust.

FN72. The sale of the 14.8-percent interest in Corona resulted in a $11,647,367 loss on SMP's 1997 tax return. SMP reported a net short-term capital loss of $11,544,902. From this amount, SMP passed net short-term capital gains of $60 to Mr. Lerner and $61 to Rockport Capital and a short-term capital loss of

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Case 1:08-cv-00279-HHK    Document 9-2    Filed 07/22/2008    Page 134 of 135

T.C. Memo. 2005-104                                                          Page 114
T.C. Memo. 2005-104, 2005 WL 1111792 (U.S.Tax Ct.), 89 T.C.M. (CCH) 1157, T.C.M. (RIA) 2005-104, 2005
RIA TC Memo 2005-104
**T.C. Memo. 2005-104, (U.S.Tax Ct.)2005 WL 1111792**

$11,545,023 to Somerville S Trust.

FN73. On Schedule D of its 1998 return, SMP reported a net long-term capital loss of $79,979,011; however, it passed through a net long-term capital loss of $80,190,418; i.e., the entire amount of the loss that it reported on the sale of the $81 million receivable. SMP reported $211,407 as its share of net long-term capital gain from other partnerships, estates, and trusts. SMP failed to pass this amount through

to its members via Sch. K, Partners Share of Income, Credits, Deductions, etc.

FN74. Respondent computed SMP's short-term capital gain (STCG) and long-term capital gain (LTCG) from the sales of its interests in Corona as follows:

|  | STCG | LTCG | Total |
|---|---|---|---|
| Amount realized ($248,700 cash + $1,220,050 note) | $236,763 | $1,231,987 | $1,468,750 |
| Adjusted basis (($250,000 cash + $0 basis in note) (94-percent interest)) | 37,822 | 197,178 | 235,000 |
| Gain on sale of Corona interest | 198,941 | 1,034,809 | 1,233,750 |

FN75. Respondent also determined that $211,407 of pass-through gain that SMP reported on Sch. D of its partnership tax return for 1998 should have been passed through to its members.

FN76. TroMetro paid $230,000 and gave a $2,284,000 note in exchange for the $150 million receivable. TroMetro paid $150,000 and gave a $1.25 million note in exchange for the $81 million receivable. TroMetro paid $397,166 principal and $159,880.35 interest on the $2,284,000 note. No additional amounts were paid on these notes.

FN77. Imperial paid $212,000 cash and gave a $1.04 million note for the 79.2-percent membership interest and paid $36,700 cash and increased its note to $1,220,050 for the 14.65-percent membership interest.

FN78. Mr. van Merkensteijn paid $120,000 and

gave a $1,024,000 note (revised to $1.180 million) in exchange for the $79 million receivable. Mr. van Merkensteijn paid $205,191 principal and $82,600 interest on this note. He paid no additional amounts. Imperial paid $14,595,652 as a fee for the tax losses that it received from the Corona transaction.

FN79. A partner's distributive share is generally determined by reference to the partnership agreement; however, if the allocations in the partnership do not have "substantial economic effect" (as determined under sec. 704 and the regulations), those allocations are disregarded. See *Estate of Ballantyne v. Commissioner*, 341 F.3d 802, 805 (8th Cir.2003), affg. T.C. Memo.2002-160. If the partnership agreement provides no allocation or the allocations provided therein lack substantial economic effect, a partner's distributive share of partnership items shall be determined in accordance with the partner's interest in the partnership

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

(determined by taking into account all facts and circumstances). Sec. 704(b).

FN80. More exactly, under sec. 743(b), in the case of a transfer of a partnership interest by sale or exchange: (a) The partnership increases its basis in partnership property by the same amount as the transferee partner's outside basis in his partnership interest exceeds his inside basis in partnership property; and (b) the partnership decreases its basis in partnership property by the same amount as the transferee partner's inside basis in partnership property exceeds the transferee partner's outside basis in his partnership interest. In the case of property contributed to the partnership by a partner, the sec. 704(c) rules apply in determining the transferee partner's inside basis in partnership property. Sec. 743(b) (flush language). The increase and decrease in the partnership's basis constitutes an adjustment with respect to the transferee partner only. Sec. 743(b) (flush language).

FN81. Recent legislation has limited the ability to transfer losses among partners. In the American Jobs Creation Act of 2004 (AJCA 2004), Pub.L. 108-357, sec. 833(a) and (b), 118 Stat. 1589, Congress amended secs. 704(c) and 743 effective for contributions and transfers after the date of enactment. With respect to sec. 704(c), AJCA 2004 sec. 833(a) provides that the built-in loss in contributed property is taken into account only in determining the amount of items allocated to the contributing partner; in determining the amount of items allocated to other partners, the partnership's basis in partnership property shall be treated as being equal to its fair market value at the time of contribution. With respect to sec. 743, AJCA 2004 sec. 833(b) provides that, in the case of a sale or exchange of a partnership interest, the adjustment to partnership basis is mandatory if the partnership has a "substantial built-in loss" immediately after the sale or exchange. There is a sub-

stantial built-in loss if the partnership's basis in partnership property exceeds by more than $250,000 the fair market value of such property. AJCA 2004 sec. 833(b)(3). Because of their effective date, these new rules do not apply to the transactions at issue in the instant cases.

FN82. Petitioner contends that respondent's pretrial memorandum raises certain issues, generally relating to the bona fides of the $79 million receivable, that constitute new matter. We disagree. The issues in question relate to the adjustments determined in the FPAAs.

FN83. Sec. 7491 was added to the Code in the Internal Revenue Service Restructuring and Reform Act of 1998, Pub.L. 105-206, sec. 3001, 112 Stat. 726, and is effective with respect to court proceedings arising in connection with examinations commencing after July 22, 1998. The parties agree that the examination in these cases commenced after July 22, 1998.

FN84. Respondent also argues that the so-called partnership antiabuse regulation, sec. 1.701-2, Income Tax Regs., applies to recast the banks' contributions of the high-basis, low-value receivables and SMHC stock as direct sales of those assets to Rockport Capital (or its affiliate Somerville S Trust). In general, the antiabuse regulation permits the Commissioner to recast partnership transactions that make inappropriate use of the partnership tax rules. Petitioner contends that the antiabuse regulation is invalid. Because we decide these cases utilizing existing judicial doctrines, we need not and do not decide whether the partnership antiabuse regulation is valid or whether it applies to any of the transactions in these cases. Cf. *Jade Trading, LLC v. United States,* 60 Fed. Cl. 558, 562 (2004).

FN85. In a separate section *infra,* we discuss the application of the step transaction doctrine.

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

T.C. Memo. 2005-104, 2005 WL 1111792 (U.S.Tax Ct.), 89 T.C.M. (CCH) 1157, T.C.M. (RIA) 2005-104, 2005
RIA TC Memo 2005-104
**T.C. Memo. 2005-104, (U.S.Tax Ct.)2005 WL 1111792**

FN86. In *Jacobson v. Commis sioner,* 915 F.2d
832, 837 (2d Cir.1990), affg. in part, revg. in
part, and remanding T.C. Memo.1988-341, the
Court of Appeals for the Second Circuit stated
that a transaction is devoid of economic sub-
stance " 'if it is fictitious or if it has no busi-
ness purpose or economic effect other than the
creation of tax deductions." ' (quoting *De-
Martino v. Commissioner,* 862 F.2d 400, 406
(2d Cir.1988), affg. 88 T.C. 583, 1987 WL
49286 (1987)); see also *Ferguson v. Commis-
sioner,* 29 F.3d 98, 101 (2d Cir.1994), affg. 100
T.C. 271, 1993 WL 95582 (1993).

FN87. Mr. Ackerman testified to his under-
standing of the deal with CDR; however, his
testimony was based on what Mr. Lerner had
told him. Mr. Ackerman had no discussions
with Mr. Jouannet or any other representative
of CDR, and the documents indicate that he
had no involvement in the negotiation and
drafting process.

FN88. Petitioner sought to introduce a letter
from Mr. Jouannet to Mr. Lerner written in
1997, which discussed the transaction with the
Ackerman group. Because that letter is subject
to an evidentiary objection, we discuss that let-
ter *infra.*

Petitioner also points to a Feb. 27, 1997, let-
ter that Mr. Jouannet sent to Danny Rosett,
Senior Vice President, Financial Operations,
at New MGM regarding SMHC's financial
statements. (This letter was purportedly sent
in response to a Feb. 18, 1997, memorandum
from Mr. Rosett. Mr. Rosett's memorandum
is not a part of the record, and we have no
basis for determining its content.) In his let-
ter, Mr. Jouannet states:

Furthermore the description of the disposal
by CLIS of the Company as a *sale* is not ex-
actly what occurred. What exactly happened
was an Exchange and Contribution Agree-
ment on December 11, 1996, whereby among

other things CLIS contributed to an unrelated
company formed by Rockport Capital Inc.
and called Santa Monica Pictures LLC all its
stock in Santa Monica Holdings (and the
$79.9 M$ debt of Santa Monica Holdings) in
exchange for 36.76% of the Preferred In-
terests of Santa Monica Pictures LLC.

On the basis of this letter, petitioner contends
that it is clear that Mr. Jouannet believed that
CLIS had not sold SMHC or the $79 million
receivable but had entered into a partnership
arrangement with the Ackerman group. We
cannot agree.

The letter itself merely discusses the form
that the transaction took, i.e., that CLIS
entered into an exchange and contribution
agreement with SMP and contributed its
SMHC stock and the $79 million receivable.
It does not address the more cogent question
of whether there was an understanding that
CLIS would exercise its put rights on Dec.
31, 1996. Moreover, in the absence of some
corroboration, we must question the letter's
reliability. As discussed *infra,* we are not
persuaded that Mr. Jouannet's interests, and
those of CDR, were necessarily adverse to
the interests of the Ackerman group and
SMP, at least insofar as the tax characteriza-
tion of the transaction was concerned. Fur-
ther, Mr. Jouannet, as a representative of
CDR, was bound by the confidentiality pro-
vision of the LLC agreement; any statement
to New MGM confirming a sale by CLIS of
SMHC might be construed as a breach of that
agreement. (New MGM was not a party to
the CDR transaction, and any disclosure to
that entity was not covered under any of the
exceptions in the confidentiality provision.)
Finally, Mr. Jouannet's statement, insofar as
it might be construed to favor petitioner's po-
sition, would appear inconsistent with the
testimony of Mr. Geary, discussed *infra.*

FN89. Mr. Hurstel was the secretary and treas-

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

urer of SMHC, was on the board of directors of Epic Productions, and was a representative of CDR.

FN90. On the basis of this evidence, it would appear that the 5-year period commenced May 7, 1992, when Credit Lyonnais acquired MGM-Pathe as part of a foreclosure on outstanding debts.

FN91. Mr. Geary testified that, during the negotiations with the Ackerman group, Mr. Jouannet and other individuals in the Credit Lyonnais group began to worry "whether Lerner and his people were good for" the $5 million put price.

FN92. Petitioner contends that "Mr. Peters' testimony and demeanor suggested an effort to hurt Petitioners" and questions the accuracy and good faith of that testimony. Apart from these general assertions, petitioner provides no basis for concluding that Mr. Peters fabricated his testimony. Mr. Peters was subject to petitioner's cross-examination; nothing in his testimony suggested any bad faith or fabrication. Despite petitioner's protestations, we find Mr. Peters's testimony credible, thorough, and very persuasive on the relevant points.

FN93. As previously noted, Mr. Ackerman also testified to his understanding of the CDR transaction, but his testimony was based on what Mr. Lerner had told him.

FN94. Petitioner listed Mark Seiler as a witness in his pretrial memorandum; however, he did not call Mr. Seiler as a witness at trial.

FN95. The final draft of the exchange and contribution agreement in the record has an attached Schedule 1.6(b), which is a list of the EBD film titles and development projects. The record contains a facsimile dated Dec. 12, 1996, from White & Case to Mr. Lerner and several other persons, transmitting an attached

Schedule 1.6(b) to the exchange and contribution agreement. From the serial numbers on the pages of this faxed attachment, which also appear on the pages of Schedule 1.6(b) attached to the exchange and contribution agreement (but which do not correlate with the serial numbers on the other pages of the exchange and contribution agreement), it appears that White & Case actually sent this attached schedule to the Ackerman group on Dec. 12, 1996, one day after the purported closing on the transaction.

FN96. In the exchange and contribution agreement, CDR and CLIS represented and warranted: "Schedule 1.6(b) attached hereto sets forth all the assets held by * * * [SMHC], all of which assets are held free of all material Encumbrances created by * * * [SMHC]. * * * [SMHC] has good title to all such assets."Schedule 1.6(b), of course, contains a listing of the EBD film titles and development projects. The exchange and contribution agreement provides indemnification from CDR (capped at $2 million) for any material breach of this representation and warranty. See Exhibit 188-J, J001341, 1344. It is patently unclear what is meant by the term "good title" and whether these provisions afford any meaningful rights with respect to the EBD film library. Petitioner's representatives, Troy & Gould, acknowledged this "recitation" of good title; however, they concluded:

despite this recitation, we do not have documentation of the assignment [from CLIS to SMHC]. Moreover, the term 'U.S. Video Film Rights' is nowhere defined in the Agreement, and the Agreement contains no explicit recitation that Santa Monica Holdings owns such rights. Rather, this phrase appears only as the heading on the Schedule; the phrase does not appear in the body of the Agreement.

This is another significant gap in the chain of title.

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Despite the obvious infirmities in SMHC's rights to the EBD film titles, there is no indication that the Ackerman group ever claimed any indemnification under this provision.

FN97. Mr. Kutner did not include in this figure the value of second-cycle exploitation or other rights, which he opined could increase the value of the EBD film library by as much as 40 to 50 percent.

FN98. The appraisal report states: "The opinions, conclusions, and estimates of value presented in this report are based, in part, on assumptions and financial data furnished to me by Santa Monica Holdings, Inc., which I have assumed to be correct and current."Inasmuch as SMHC did not own the 65 film titles before Dec. 10, 1996, or have any known relationship to those film titles, Mr. Kutner's purported reliance on information from SMHC seems dubious.

FN99. We discuss the valuation conclusions of petitioner's expert, Steven Wagner, in more detail *infra*.

FN100. For example, Mr. Kutner projected $1,320,000 in DVD revenue. Although DVD technology was predicted to emerge at some point after 1996, the success of that technology was not readily foreseen. For that reason, petitioner's expert projected no revenue from DVD sales in his valuation. Mr. Kutner also projected $1,100,000 in royalty income from laserdisc sales. According to petitioner's expert, laserdisc sales in 1996 were relatively insignificant, even though the technology had been around for a few years. Neither petitioner's expert nor respondent's expert (Richard Medress) took laserdisc sales into account. Mr. Kutner also projected $2,410,000 in royalty income from the revenue-sharing (Rentrak) model for the rental market. Under this model, video rental stores would pay a small fee up front to buy

a rental film and would then share a portion of the rental fees with Rentrak. In 1996, however, the rental market still operated on a front-end sales model; i.e., video rental stores made a one-time payment up front (e.g., $59 per copy) to purchase copies of a film, which they could then rent an unlimited number of times. Neither petitioner's expert nor respondent's expert projected any revenue from the revenue-sharing (Rentrak) model.

FN101. After Troy & Gould reached its conclusions, Mr. Lerner sold portions of the $974 million in receivables from Generale Bank to his friend, colleague, and business associate, Mr. van Merkensteijn. In determining a purchase price for the receivables, Mr. van Merkensteijn testified that he relied on the Sage Entertainment $29 million appraisal. By this time, however, it would have been clear, at least to Mr. Lerner, that this appraisal was grossly overstated.

FN102. According to petitioner, Generale Bank and CLIS were still partners in SMP at that time.

FN103. Petitioner claims, without explanation, that an ownership change for purposes of sec. 382(g) occurred when the banks withdrew from SMP and that the NOLs were "substantially diminished". Petitioner claims, again without explanation, that "SMHC's net operating losses were not used because the SMHC library was not sold, but rather was combined with the Troma film library in a 'C' reorganization in 1999. That reorganization completely eliminated the net operating losses."

FN104. Mr. Lerner testified that he hired Mr. Rhodes to investigate whether any transfers occurred using the NOLs in SMHC. He testified that he was concerned that "if there had been a transaction which had either disposed of or written down or taken a tax benefit in respect of any of those interest, that it would have-

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

T.C. Memo. 2005-104
T.C. Memo. 2005-104, 2005 WL 1111792 (U.S.Tax Ct.), 89 T.C.M. (CCH) 1157, T.C.M. (RIA) 2005-104, 2005
RIA TC Memo 2005-104
**T.C. Memo. 2005-104, (U.S.Tax Ct.)2005 WL 1111792**

Page 119

might have been treated as a transfer affecting the use of the net operating loss in * * * [SMHC]." According to Mr. Lerner, the best indication of such a transfer affecting the use of the NOLs is whether there has been a basis step-up or stepdown. We find petitioner's testimony specious.

FN105. In the context of the proposed transactions in the memoranda, Shearman & Sterling concluded that "Holdings and Group will undergo an ownership change" for purposes of sec. 382.

FN106. Mr. Geary has practiced law at White & Case for more than 30 years. He represented Credit Lyonnais and CDR for many years before the CDR transaction and had a very significant role with those companies vis-a-vis MGM. In fact, from January 1992 until New MGM was sold in 1996, Mr. Geary served on the board of directors of MGM-Pathe (and its successors). Although Mr. Geary's expertise was primarily in bank finance, his representation of Credit Lyonnais and CDR was much broader-he did "all their auditing on a big picture basis."Mr. Geary drafted the stock purchase agreement for the New MGM sale.

FN107. On Dec. 12, 1996, Mr. Lerner, on behalf of Rockport Capital, faxed to Citicorp Trust, a document requesting Citicorp Trust to wire $5 million from Somerville S Trust's account to an account at Chase Manhattan Bank on Dec. 13, 1996. It appears that this amount represented the $5 million advisory fee that the Ackerman group was obligated to pay CLIS.

The Ackerman group also agreed to pay the banks an additional advisory fee equal to 3/4 of 1 percent of the tax losses, if any, in excess of $1 billion that would be allocated to all members of SMP other than Generale Bank, CLIS, Rockport, or their affiliates as of the exchange and contribution agreement closing date. The record is unclear whether

the Ackerman group ever paid the banks any additional amount of advisory fee.

FN108. Mr. Geary's comments were faxed to Mr. Lerner and his representatives at Shearman & Sterling.

FN109. When questioned about the date on the consent, Mr. Lerner testified that the consent was part and parcel of the banks' put rights."It allowed them to implement the put if it were exercised. Notice it was undated. And as part of the implementation of the put, if they were to exercise it, it was requested that 1 sign this."When pressed about the "1996" date on each of the consents, Mr. Lerner testified that "I would say it's undated."

FN110. The Ackerman group originally proposed that Generale Bank would acquire MGM Group Holdings stock, would contribute the $974 million in receivables to MGM Group Holdings, and would then contribute the MGM Group Holdings stock to Newco for preferred interests. In the draft term sheet, the Ackerman group proposed an alternative transaction (involving CLIS's contribution of MGM Group Holdings stock) "if CLIS's current basis in Group stock is significant".

FN111. At certain points, the identities of the parties changed. For instance, CDR was substituted for Generale Bank and CLIS at certain points. A CDR affiliate, Santa Monica (Rotterdam) Finance B.V., at one point was to hold the preferred interests for Generale Bank or CLIS. In the early drafts, Rockport Advisors was identified as an initial member in Newco rather than Rockport Capital.

FN112. At one point, the deposit account agreement was changed to provide that the depositing bank would withdraw and pay to Rockport Capital any funds still on deposit on Jan. 2, 1998.

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

FN113. Pursuant to the transfer provisions: No member could sell, transfer, or dispose of its membership interest without the manager's written consent; no member could retire or withdraw from SMP without the manager's written consent, except in certain defined circumstances; and no person could become a member of SMP without the manager's written consent and the new member's assumption of all the terms and conditions of the LLC agreement.

FN114. The confidentiality provision provided that SMP's members would not reveal to any other person any nonpublic, confidential, or proprietary information relating to SMP's business that was acquired in connection with the transactions contemplated by the LLC agreement.

FN115. The Class B preferred interests were given a $7 million capital account and certain annual distribution rights.

FN116. Mr. Geary became concerned with the proposed options on the alternate Class B preferred and 5 percent common stock interests. Mr. Geary was uncertain what economic motivation anyone might have for exercising the call option and indicated to Mr. Lerner and his representatives that "any explanation of such motivations may leave unanswered questions in Paris". Given this problem, Mr. Geary added a paragraph 16 to a new draft of the side letter agreement giving CLIS the right to require Rockport Capital to purchase its Common 11 and Class B preferred membership interests in SMP at prices tied to the liquidation value of the Carolco securities. At the conclusion of the drafting process, however, the parties did not execute the interest option agreement and paragraph 16 was removed from the side letter agreement.

FN117. The pertinent events and times for measuring the contingent amount were set forth

in detailed paragraphs in the side letter agreement defining "the SN Liquidation Date," "the SN Measurement Date," "the PS Measurement Date," and "the PS Liquidation Value."

FN118. The agreement provided that the conversion right would be immediately exercisable in the event SMP failed to make a certain required distribution.

FN119. The preferred interests were convertible on a basis equal to the "Convertible Percentage", which the LLC agreement provided would initially equal 45 percent.

FN120. Amendment No. 1 credited $3,125,000 to Generale Bank's preferred capital account and $1,875,000 to CLIS's preferred capital account.

FN121. The SMP LLC agreement provided that each preferred interest holder's capital account would be credited with the holder's distributive share of "Net Income". Under the LLC agreement, SMP's "Net Income" was allocated first to each holder of preferred interests in an amount equal to 8 percent of the balance of the holder's preferred capital account on the last day of the partnership's fiscal year. It does not appear, however, that these adjustments would have affected the put price: The side letter agreement defines the put purchase price, in relevant part, as an amount equal to: "the amount of the Preferred Capital Account as described in the Limited Liability Company Agreement of the Company and as in effect on the EC [exchange and contribution agreement] Closing Date * * * for the original holder or holders of such Preferred Interests". We construe this language to mean that the put price would equal the original $5 million credited to the banks' preferred capital accounts, unadjusted for any "Net Income" adjustments to those accounts that might subsequently occur. With that being said, the banks had no incentive to stick around until Dec. 31, 1997, as opposed to

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Dec. 31, 1996.

FN122. With respect to any annual distribution made to holders of preferred interests, the term "Unpaid Distribution" means: "the amount equal to the Full Distribution minus the Excess Cash Flow; *provided,* that such amount shall not be deemed to be an Unpaid Distribution if such amount has been previously distributed to holders of Preferred Interests."

FN123. "Operating Cash Flow" is defined as: "the gross revenues of the Company from its businesses that are actually received less the expenses associated with such businesses that are actually paid."

FN124. The LLC agreement appointed Mr. Lerner manager of SMP and authorized him to manage the business and affairs of SMP. Mr. Lerner was given the ability to act on behalf of SMP in connection with its day-to-day affairs or otherwise. His powers included, specifically, the power to convert the preferred interests into preferred debt or to redeem the preferred interests (in the case of conversion notice), and to appoint employees, officers, or additional managers of SMP.

FN125. With respect to the Carolco subordinated notes, Amendment No. 1 provided that as promptly as practicable after the "SN Liquidation Date", SMP would distribute to holders of preferred interests *pro rata* in accordance with their respective preferred capital accounts the lesser of: (i) $7 million; and (ii) the "SN Liquidation Value." With respect to the Carolco preferred stock, Amendment No. 1 provided that as promptly as practicable after the "PS Liquidation Date", SMP would distribute to the holders of preferred interests *pro rata* in accordance with their respective preferred capital accounts the lesser of: (i) $3 million, and (ii) the "PS Liquidation Value".

FN126. Apparently, on the basis of this docu-

ment, Mr. Lerner, on behalf of SMP, continued to send Schedules K-1 to Generale Bank and CLIS.

FN127. Pursuant to the side letter agreement, Generale Bank and CLIS were entitled to receive a "Contingent Amount" on the exercise of their put rights. This contingent amount was payable to the banks by Rockport Capital on (1) the "SN Liquidation Date" in an amount equal to each seller's percentage of the lesser of $7 million and the "SN Liquidation Value" and (2) the "PS Liquidation Date" in an amount equal to each seller's percentage of the lesser of $3 million and the "PS Liquidation Value".

FN128. AMR provided information for film titles that were released direct-to-video by independent distributors for the period 1994 through Sept. 30, 1996.

FN129. Mr. Wagner assumed that the EBD film titles would be comparable to film titles that were released direct-to-video by independent studios.

FN130. According to IMDb, its STARmeter rankings provide a snapshot of an actor's popularity based on input from IMDb users; the ratings are based on several statistical indicators, including the frequency and number of people who access a person's web page or credits on the IMDb database. Mr. Wagner analyzed IMDb's STARmeter rankings using information from 2004.

FN131. Mr. Wagner applied a "discount" to the expected performance of foreign-language films in the EBD film library. He calculated this discount by comparing the average performance of foreign-language films to various other genres and applying this relationship (percentage of foreign-language units to other genre units) to his film title categorizations. Mr. Wagner also revised the data for film titles in the horror genre and the well-known actors/

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

action genre category to account for drops in
units shipped in those categories in 1996.

FN132. Mr. Wagner projected a lower $47
wholesale price per unit for the less well-
known actors/horror genre, because distributors
had lowered prices in 1996 to induce additional
unit sales in this category.

FN133. Mr. Wagner determined that for a typ-
ical release pattern, a distributor releases up to
three film titles per month depending on the
other film titles that the distributor is releasing.

FN134. In estimating these costs, he assumed
that the buyer of the EBD film library already
had a distribution structure; therefore, the costs
associated with maintaining a distribution
structure were not included.

FN135. The film library that New Line sold to
Turner Broadcasting included the film titles:
"Teenage Mutant Ninja Turtles", "Misery", and
"City Slickers". The film library that Orion/
Samuel Goldwyn sold to MGM included the
Academy Award-winning film titles:
"Amadeus", "Platoon", "Dances With
Wolves", and "The Silence of the Lambs".

FN136. Mr. Medress analyzed the possibility
of distributing the EBD film titles in DVD
format; however, he concluded that releasing
those film titles in DVD format did not make
economic sense on the basis of the estimates in
place in 1996.

FN137. According to Mr. Medress, certain
video chains (e.g., Blockbuster) and retailers
(e.g., Wal-Mart) would not stock film titles of
this nature.

FN138. Mr. Medress does not identify which
10 film titles from the EBD film library would
be distributed in the rental market. Typically,
as the figures reflect, units sell at higher price
points in the rental market (e.g., $44.95) than
in the sell-through market (e.g., $7.99).

FN139. Mr. Medress does not explain his divi-
sion of the EBD film library into "Group 1"
and "Group 2" film titles or identify which film
titles were placed into those respective groups.

FN140. Mr. Medress assumed that 98 percent
of returned units would be recycled into sales;
he made an adjustment in the following year
for the manufacturing costs of the returned units.

FN141. Mr. Medress projected overhead for the
EBD film library at a rate that he regarded as
"typical" of a small distribution company. He
assumed that the EBD film library was, or
would be, part of a business that distributed
other films, resulting in lower overhead costs.

FN142. Mr. Medress amortized the projected
purchase price for the EBD film titles on a pro
rata basis according to the projected gross re-
ceipts from the film titles.

FN143. Mr . Wagner made no sales projections
for the film titles "Escape from Venice" and
"Equinox", because those film titles were not
included in the IMDb database. In addition,
Mr. Medress treated the film titles "Return of
the Conqueror" a nd "Throne of Vengeance" a s
the same film in making his scenario 2 projec-
tions. From other information that Mr. Medress
submitted, it also appears that the film titles
"Equinox" and "The Beast" may be the same film.

FN144. We have already excluded the film
titles "Bombay Talkie", "Courtesans of Bom-
bay", "Mother & Daughter: Loving War", and
"Sticks and Stones" because of the absence of
confirmed physical materials for those film titles.

FN145. This information from Troy & Gould is
consistent with John Peters's testimony that, on
the instructions of CDR or EBD, he selected
film titles with rights that were expired or ex-

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

T.C. Memo. 2005-104, 2005 WL 1111792 (U.S.Tax Ct.), 89 T.C.M. (CCH) 1157, T.C.M. (RIA) 2005-104, 2005
RIA TC Memo 2005-104
**T.C. Memo. 2005-104, (U.S.Tax Ct.)2005 WL 1111792**

piring.

FN146. Petitioner contends that even if the rights to some of the EBD film titles "expired within two years after the transaction, there would still be some value to those rights on the transaction date."Petitioner provides no evidentiary basis for his contention, which appears to rest on speculation. We are not persuaded by petitioner's contention. It is reasonable to assume that a hypothetical buyer would not pay any significant amount for rights that were subject to such an attenuated distribution period, especially with film titles that were admittedly older "B" film titles.

FN147. In his rebuttal report, Mr. Wagner claims that he treated the EBD film titles as if they were near the middle of their lifespan; i .e., factoring in some level of previous distribution. Nonetheless, in making his income projections, Mr. Wagner relied on AMR data, which provides information only for initial release shipments and seemingly does not factor in any previous distribution of AMR film titles. Mr. Wagner suggests that he factored in the age of the EBD film titles by relying on the median, rather than the higher mean, gross units shipped that he gleaned from the AMR data. We are not convinced that Mr. Wagner's use of the median gross units shipped data somehow compensates for the age of the EBD film titles. Indeed, Mr. Wagner points out that the mean figures were higher because a few of the AMR film titles did well, driving the mean beyond the median.

FN148. Mr. Medress obtained point-of-sales data from Nielsen VideoScan for 11 of the EBD film titles; however, his agreement with that company precludes him from revealing the film titles. Mr. Medress also reviewed the Video Source Book editions for 1985, 1987, 1989, 1992, and 1996, which indicated that 60 of the EBD film titles were listed as available in 1992 or earlier. Mr. Medress indicates that

the Video Source Book is consistent with the information he obtained from other sources.

FN149. Mr. Wagner found data for two other theatrical releases but could not determine whether those film titles were released to the domestic or international market.

FN150. Bahman Naraghi, who has considerable experience in the filmed entertainment business, testified that a company's rights in its motion pictures play a critical part in the filmed entertainment business, because "That's what is valued." He testified that chain-of-title confirms the validity of those rights and provides the basis for proper copyright filing and protection of copyrights. He testified that copyrights secure the fundamental rights on any given film title in the form of intellectual property in all jurisdictions of the world that observe copyright laws and, therefore, guarantee the right to receive income derived from the exploitation of film rights.

FN151. Petitioner contends that SMHC's financial statements are not relevant to the valuation of the EBD film rights, because the financial statements were completed after Dec. 11, 1996. SMHC's financial statements correspond to the period ended Dec. 10, 1996, and presumably reflect SMHC's treatment of the EBD film rights during that time period. Although the financial statements were completed after Dec. 10, 1996, financial statements are invariably completed after the financial period to which they relate. Petitioner points to no event that changed the value of the film rights between Dec. 10, 1996, and the date the financial statements were completed. We find that SMHC's treatment of the EBD film library on its financial statements is a relevant consideration in determining the value of the EBD film library as of Dec. 11, 1996.

FN152. I n fact, in 1997, Mr. Lerner was willing to sell a 25-percent interest in SMP to Im-

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

perial for $5 million. Mr. Lerner represented to Imperial that SMP had "assets totaling $49 million (with zero liabilities) including: $29 million in film library assets (appraised value) and $20 million in cash[.] ICII's 25% share of the assets would equal approximately $12.25 million, a multiple of the proposed investment". The $5 million sale price, however, effectively represented 25 percent of the $20 million cash asset with no value assigned to the film assets.

FN153. From these figures, it appears that the EBD film titles had higher sales figures when they were distributed in DVD format. Although DVD format was foreseeable in 1996, its potential was still virtually unknown. For that reason, none of the experts in these cases relied upon DVD sales in valuing the EBD film library.

FN154. On Nov. 4, 1996, Troma sent an invoice to Crown Capital requesting $103,025 for the release of video and DVD for "Banana Monster", "Fist of Fear, Touch of Death", "Astro Zombies", "Battle of Last Panzer", and "Escape from Hell".

FN155. For example, Carolco's consolidated balance sheets for 1993 and 1994, show that liabilities exceeded assets, thereby indicating negative net worth. These balance sheets also show that the total stockholders' deficiency (negative net worth) increased from $21.07 million in 1993 to $64,521,000 million in 1994. Carolco's consolidated statements of operations for 1993 and 1994, show net losses of $63,958,000 million in 1993 and $43,451,000 million in 1994. Carolco's consolidated statements of cashflows for 1993 and 1994, show that net operating cashflow was negative $6,322,000 for 1993 and negative $47,113,000 for 1994.

FN156. In the bankruptcy proceedings, Canal+ made a $58 million offer for Carolco's assets, which the bankruptcy court subsequently ap-

proved on Mar. 21, 1996.

FN157. The first plan of reorganization was filed on Sept. 13, 1996, and the second plan of reorganization was filed on Dec. 3, 1996.

FN158. The draft financial statements state:

The aggregate carrying value of these securities on the date contributed was $60,075,000. As Carolco is currently in bankruptcy proceedings, the Company has recorded a charge of $60,075,000 in these consolidated financial statements reflecting the write-down of these securities to net realizable value.

FN159. After CDR ceded control of SMHC's tax return filing obligations and after the bankruptcy court had confirmed the fourth amended plan of reorganization, Mr. Lerner commenced reporting the Carolco securities as assets with value on SMHC's corporate tax returns. For example, on SMHC's corporate income tax return for the year ended Dec. 31, 1997, the Carolco securities were shown as an asset in the ending balance column of Schedule L. On SMHC's corporate income tax return for the year ended Dec. 31, 1998, the Carolco securities are shown in both the beginning and ending balance columns of Schedule L.

FN160. Petitioner submitted the expert report and testimony of Todd Crawford of Deloitte & Touche. Mr. Crawford opined that the NOLs might have had a value in the range of $620,000 to $1,245,000, after applying a 98- to 99-percent risk-related discount. Mr. Crawford admitted at trial that his valuation was subjective and speculative. For the reasons discussed *infra*, we conclude that Mr. Crawford's analysis is unreliable and not admissible into evidence.

FN161. SMHC's draft consolidated balance sheets for the period ended Dec. 10, 1996, showed SMHC's only assets to consist of prop-

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

erty and equipment in the amount of $69,000. Similarly, SMHC's tax return for the period ended Dec. 31, 1996, showed that its assets then totaled $69,113.

FN162. The film libraries consisted of 85 film titles, for which the Ackerman group paid a total of $1.1 million.

FN163. The discussions involved: (1) A possible distribution deal between SMHC and Orion in 1997; (2) a possible sale by the Jones Entertainment Group in 1997 of the rights to 5 film titles; (3) negotiations in 1997 with CitiCorp Ventures, which was interested in acquiring a film library for use in its chain of theaters; (4) a possible distribution relationship with UnaPix Entertainment in 1997; (5) negotiations with Comcast Corp., regarding the distribution of SMHC's films in connection with its cable business; (6) a possible acquisition of the Crossroads film library in 1997; (7) negotiations with Atlas Entertainment in 1997 and 1998 regarding the development of a production capacity inside of SMHC; (8) a business proposal to establish an African-American film distribution company with C. O'Neill Brown in 1998; (9) a possible transaction with Reisher Entertainment in 1998; (10) a possible acquisition of the feature film library of the Modern Times Group in 1998; (11) negotiations with Frank Klein, who was president of PEC Israeli Economic Corp. in 1998; (12) negotiations regarding the sale of Polygram Filmed Entertainment in 1998; (13) a possible merger of SMHC with, or acquisition by, Artisan Entertainment in 1998; (14) a possible business venture with Regent Entertainment, Inc. in 1998; (15) negotiations for the purchase of film titles from Silver Screen International and Aries Entertainment, Inc., in 1999; and (16) a possible film deal involving Broadcast.com. in 1999. Petitioner also points to discussions with Alan Cole Ford, formerly of MGM, regarding his acquisition of Paul Kagan Associates.

FN164. In connection with his purchase of the receivables from SMP in 1997 and 1998, Mr. van Merkensteijn paid a total amount of approximately $1 million to SMP, either as cash downpayments or as principal and interest payments on his notes to SMP. In connection with his purchase of the $79 million receivable, Mr. van Merkensteijn paid approximately $400,000 ($120,000 as a cash down payment and $287,791 as principal and interest on his note). Besides the sales of the receivables, the Ackerman group had other dealings with TroMetro and Mr. van Merkensteijn. For example, on Dec. 7, 1998, SMP purportedly purchased a 50-percent interest in Railcar Management Partners, LLC, which Mr. van Merkensteijn owned, for $1.4 million (approximately the same amount that Mr. van Merkensteijn paid altogether for his purchases of the receivables). Given Mr. van Merkensteijn's close relationship with Mr. Lerner, evidenced in part by his sharing office space with Crown Capital, we cannot foreclose the possibility that SMP funneled back Mr. van Merkensteijn's purchase payments or "financed" TroMetro's purchases of the receivables in 1997 and 1998.

FN165. Mr. Lerner testified that SMP would receive "A very large payment" for the tax losses, roughly "$15 million."

FN166. In response to such a contention, the Court of Appeals for the Second Circuit has stated:

Having satisfied the formal requirements of what it sees as the applicable rules, SuCrest urges us to understand its elaborate machinations as a legitimate ploy to hold down taxes and directs us to the maxim that a person is entitled to arrange his taxes so as to pay only that which is due. But, of course, the taxpayer is not permitted to avoid taxes which *are* due and the invocation of the phrase tells us nothing about what must ultimately be rendered unto the I.R.S. any more than So-

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

crates solved the thorny problems of justice by defining it to require that we give every person his due. [*United States v. Ingredient Tech. Corp.,* 698 F.2d 88, 94 (2d Cir.1983).]

FN167. Sec. 113(a)(8)(B) of the 1939 Code provided that if property were acquired by a corporation as paid-in surplus or as a contribution to capital, then the corporation's basis would be the same as it was in the transferor's hands.

FN168. Sec. 166(a)(1) allows a deduction for any debt which becomes worthless within the taxable year.

FN169. See Rev. Rul. 71-577, 1971-2 C.B. 129 (recovering one or two cents on the dollar represents a trivial amount).

FN170. Petitioner also contends that there was "potential value" in SMHC. Petitioner claims that "Messrs. Ackerman and Lerner (through Rockport) had expressed an interest in SMHC stock and had presented a proposal to the Banks which would entail the continuation and rejuvenation of that company, rather than its destruction."For the reasons stated *supra,* we find that the Ackerman group, CDR, and the banks did not intend to engage in any film business. Moreover, SMHC was virtually devoid of assets, and any recovery in that company would have required an infusion of new capital.

FN171. Respondent argues, alternatively, that under sec. 1016(b), Generale Bank's and CLIS's bases in the SMHC receivables should have been adjusted to account for worthlessness deductions that Generale Bank and CLIS could have taken, but did not. Sec. 1016(b) provides that, in the case of substituted basis property, proper adjustments to basis shall be made in respect of the period during which the property was held by the transferor, donor, or grantor. We cannot agree that sec. 1016(b) re-

quires an adjustment for bad debt deductions that could have been taken, but were not. None of the specified adjustments in sec. 1016(a) refers to sec. 166 bad debt deductions. In any event, because we decide that the receivables were worthless when they were contributed to SMP, a contribution of those worthless receivables would not give rise to any substituted basis under the partnership basis rules (e.g., sec.723).

FN172. Alan Cole Ford, a member of MGM's management team, testified that the Credit Lyonnais group had the hope and expectation of realizing $2 billion on the sale of the MGM operating company. In considering the disposition of MGM, the Credit Lyonnais group had prepared a document entitled "Project Lion, Presentation to Consortium de Realisation", which recorded a range of values of approximately $1.6 to $2.0 billion for MGM.

FN173. SMHC's draft financial statements for the period ended Dec. 10, 1996, paint a very bleak picture of SMHC's history and future. The financial statements report that SMHC (i) had experienced recurring operating losses, (ii) had an accumulated deficit, and (iii) generated insufficient cashflow to fund its debt servicing requirements. The financial statements also show that SMHC had debt held by affiliates of Credit Lyonnais which was due and payable July 15, 1997, and which was not expected to be extended and that SMHC's sole shareholder, CLIS, had not committed to providing further funding of SMHC's debt obligations.

FN174. In the Forms 5472, "Information Return of a 25% Foreign-Owned U.S. Corporation or a Foreign Corporation Engaged in a U.S. Trade or Business", included in its consolidated income tax returns for the periods ended Dec. 31, 1991, Dec. 31, 1992, Dec. 31, 1993, Dec. 31, 1994, Dec. 31, 1995, and Oct. 8, 1996, MGM Holdings (and its subsidiaries) reported that no interest was paid on amounts owed by

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

MGM Holdings and its subsidiaries to Credit Lyonnais and CLBN. In the Form 5472 for its consolidated income tax return for the period ended Dec. 31, 1996, MGM Group Holdings (and its subsidiaries) reported that no interest was paid on the $1,051,031,234 reported as owed by MGM Group Holdings and its subsidiaries to Credit Lyonnais and Generale Bank.

FN175. There is no indication that Credit Lyonnais or CLIS charged any interest, or that MGM Group Holdings (or SMHC) paid any interest, on the $79 million receivable.

FN176. The working capital agreement, MGM Group Holdings' guaranty, and the debt release and assumption agreement each recite that the terms of the agreement shall be construed in accordance with and governed by the laws of the State of New York.

FN177. The debt release and assumption agreement provides:

The Parent [MGM Group Holdings] hereby assumes principal of the Loans under the Credit Agreement in the amount of $79,912,955.34 effective as of the date hereof, immediately prior to the sale of Stock pursuant to the Stock Purchase Agreement and for all purposes of the Credit Agreement shall be treated as a Borrower, as such term is defined under the Credit Agreement and all references to Borrower shall be deemed to refer to and include MGM Parent.

FN178. Pursuant to its guaranty under the working capital agreement, MGM Group Holdings was entitled to "all rights of subrogation otherwise provided by law in respect of any payment it may make or be obligated to make under this Guaranty". Exhibit 72-J, J000071.

FN179. Respondent's argument was raised as new matter in the amendment to answer. Consequently, respondent bears the burden of proof

as to this issue. Rule 142(a).

FN180. We also conclude that the step transaction doctrine applies to recast the banks' contributions of the SMHC receivables and stock as direct sales of those properties from the banks to Somerville S Trust, followed by Somerville S Trust's contributions of the SMHC receivables and stock to SMP in exchange for preferred interests in SMP. Presumably, Somerville S Trust would be entitled to a cost basis totaling $10 million in the SMHC receivables and stock, which would carry over to SMP under sec. 723. The parties have not addressed the manner in which the $10 million basis amount would be divided among the receivables and stock; because we decide on alternative grounds that SMP received a zero basis in the SMHC receivables, we need not decide this issue.

FN181. Corona claimed a $78,768,955 capital loss on this transaction. We do not have jurisdiction over the $74,671,378 portion of the loss that Corona claimed on its 1997 return. See *supra* note 7. As a practical matter, the effect of our holding is to disallow the $4,097,577 portion of the claimed loss that flowed through to SMP.

FN182. Under sec. 465, respondent argues that to the extent the losses SMP reported on its sales of the $150 million and $81 million receivables are allowed, those losses arose from a film activity that was a separate activity from its other investment activities for purposes of applying the at-risk limitation rules. Respondent argues that to the extent the loss Corona reported on its sale of the $79 million receivable is allowed, that loss arose from a film activity that was a separate activity from its portfolio investment activities for purposes of applying the at-risk limitation rules.

Additionally, under sec. 469, respondent argues that to the extent the losses SMP repor-

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

ted on its sales of the $150 million and $81 million receivables and the portions of its Corona membership interests, and any flow-through losses from Corona, are allowed, those losses arose from a film trade or business that cannot be combined with other trade or business activities in SMP. Respondent argues that to the extent the loss Corona reported on its sale of the $79 million receivable is allowed, that loss arose from a film trade or business that cannot be combined with other trade or business activities in SMP.

FN183. See *supra* note 6.

FN184. SMP's adjusted basis in its SMHC stock is reported on statements accompanying Schedules L, Balance Sheets per Books, of its partnership returns.

FN185. A final regulation under sec. 6226 was promulgated effective for partnership taxable years beginning on or after Oct. 4, 2001. Sec. 301.6226(f)-1(c), Proced. & Admin. Regs.

FN186. Un like *River City R anches # 1 Ltd. v. Commissioner,* 401 F.3d 1136 (9th Cir.2005), affg. in part, revg. in part, and remanding T.C. Memo.2003-150, this is not a case where our findings with respect to this matter are alleged to have any bearing on penalty-interest under sec. 6621 or on any other penalties. For instance, respondent has not alleged that an adjustment to SMP's reported basis in SMHC stock would give rise to any underpayment for purposes of sec. 6662 accuracy-related penal- ties.

FN187. In the Taxpayer Relief Act of 1997, Pub.L. 105-34, sec. 1238(a), 111 Stat. 1026, Congress amended sec. 6221 to include, as an item to be determined at the partnership level, the applicability of any penalty, addition to tax, or additional amount which relates to an adjustment to a partnership item, effective for part-

nership taxable years ending after Aug. 5, 1997. Consequently, we have jurisdiction in this partnership-level proceeding to decide issues relating to the sec. 6662 penalties that respondent determined. Partner-level defenses, however, must be asserted in a separate refund action following assessment and payment. See sec. 6230(c)(1)(C), (4); cf. sec. 301.6221-1(d), Proced. & Admin. Regs. (effective for partnership taxable years beginning on or after Oct. 4, 2001).

FN188. This burden of production, if applicable, requires the Commissioner to "initially come forward with evidence that it is appropriate to apply a particular penalty to the taxpayer". H. Conf. Rept. 105-599, at 241 (1998), 1998-3 C.B. 747, 995. This provision is not intended, however, to require the Commissioner to introduce evidence regarding reasonable cause, substantial authority, or similar provisions.*Id.*

FN189. The substantial or gross valuation misstatement penalty applies only if the portion of the underpayment for the taxable year attributable to substantial valuation misstatements exceeds $5,000 ($10,000 in the case of a corporation other than an S corporation or a personal holding company). Sec. 6662(e)(2). In the case of a partnership, this dollar limitation is applied at the partner level. Sec. 1.6662-5(h)(1), Income Tax Regs. Consequently, we do not decide whether the dollar limitation applies in these partnership-level proceedings.

FN190. As an alternative holding, we have concluded that the step transaction doctrine applies to recast Generale Bank's and CLIS's contributions of the receivables and Somerville S Trust's purchases of Generale Bank's and CLIS's preferred interests in SMP as direct sales of the SMHC receivables and stock from Generale Bank and CLIS to Somerville S Trust followed by Somerville S Trust's contributions of those items for preferred interests in SMP.

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Pursuant to this holding, Somerville S Trust seemingly would receive a $10 million cost basis in the SMHC receivables and stock which would carry over to SMP. The parties have not addressed this issue, but presumably this $10 million cost basis would be divided among the SMHC receivables and stock on a proportional basis. The basis amounts that SMP reported on its 1997 and 1998 partnership tax returns and Corona reported on its 1997 partnership tax return would still exceed by far more than 400 percent any $10 million cost basis in the receivables.

FN191. In the Omnibus Reconciliation Act of 1989, Pub.L. 101-239, sec. 7721, 103 Stat. 2395, Congress repealed former sec. 6659 and consolidated the various accuracy-related penalties into sec. 6662, carrying over the same essential language as sec. 6659. In the Omnibus Reconciliation Act of 1990, Pub.L. 101-508, sec. 11312, 104 Stat. 1388-454 to 1388-455, Congress amended sec. 6662, changing, inter alia, the phrase "valuation overstatement" to refer to "valuation misstatement".

FN192. For mer sec. 6659(c), similar to current sec. 6662(e) and (h), provided: "there is a valuation overstatement if the value of any property, or the adjusted basis of any property, claimed on any return is 150 percent or more of the amount determined to be the correct amount of such valuation or adjusted basis (as the case may be)."

FN193. The term "rules or regulations" includes the provisions of the Code, temporary or final regulations issued under the Code, and revenue rulings or notices issued by the Internal Revenue Service. Sec. 1.6662-3(b)(2), Income Tax Regs. A disregard of rules or regulations is "careless" if the taxpayer does not exercise reasonable diligence to determine the correctness of a return position that is contrary to the rule or regulation. *Id.* A disregard is "reckless" if the taxpayer makes little or no ef-

fort to determine whether a rule or regulation exists, under circumstances which demonstrate a substantial deviation from the standard of conduct that a reasonable person would observe. *Id.* A disregard is "intentional" if the taxpayer knows of the rule or regulation that is disregarded. *Id.*

FN194. Petitioner argues that negligence penalties do not apply because the instant cases involve issues of first impression. The accuracy-related penalty is inappropriate where an issue to be resolved by the Court is one of first impression involving unclear statutory language. *Bunney v. Commissioner,* 114 T.C. 259, 266, 2000 WL 380121 (2000); see *Braddock v. Commissioner,* 95 T.C. 639, 645, 1990 WL 210322 (1990) (holding penalties inapplicable where the issue has never before been considered by any court, and the answer is not entirely clear from the statutory language). Petitioner does not point to the issues which he considers to be issues of first impression. The only issue that we decide against petitioner, which might be construed as an issue of first impression, is whether a contribution of worthless debts to a partnership constitutes a "contribution of property" for purposes of sec. 721 and the partnership basis rules. This issue arises in our holding sustaining respondent's alternative argument regarding basis; this issue is not directly implicated in our primary holding that the transaction in question lacked economic substance or in our alternative holding involving the application of the step transaction doctrine. Moreover, this Court previously decided that a contribution of worthless stock to a corporation was not a "contribution" for purposes of the analogous corporate carryover basis rules. See *Seaboard Commercial Corp. v. Commissioner,* 28 T.C. 1034, 1054, 1957 WL 1131 (1957). The Court of Appeals for the Eleventh Circuit in *United States v. Stafford,* 727 F.2d 1043, 1052 n. 14 (11th Cir.1984), has also considered whether a contribution of valueless

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

property represents a contribution of property for purposes of sec. 721 of the partnership rules, concluding that it did not. Moreover, we do not find the language of sec. 721 or the partnership basis rules unclear. On the contrary, we find it to be quite obvious from those Code sections that a contribution of worthless debt is not a contribution of property. Consequently, petitioner cannot avoid the negligence penalty on this basis.

FN195. In a partnership-level proceeding, we do not calculate the understatement or determine whether it is substantial for purposes of sec. 6662. Because the penalties apply at the partner level, the understatement must be calculated on the basis of the partner's return and is the subject of a computational adjustment. A partner may file a claim for refund on the ground that the Secretary erroneously imposed any penalty which relates to an adjustment to a partnership item. Sec. 6230(c)(1)(C), (4); see sec. 301.6221-1(c) and (d), Proced. & Admin. Regs. (applicable to partnership taxable years beginning on or after Oct. 4, 2001).

FN196. Even if sec. 7491(c) is applicable, respondent is not required to introduce evidence as to substantial authority. Petitioner bears both the burden of production and the burden of proof as to these issues. See *Higbee v. Commissioner,* 116 T.C. 438, 446-447, 2001 WL 617230 (2001); H. Conf. Rept. 105-599, at 241 (1998), 1998-3 C .B. 747, 995.

FN197. Conclusions reached in legal opinions or opinions rendered by tax professionals are not authority; however, the authorities underlying such expressions of opinion where applicable to the facts of a particular case may give rise to substantial authority. Sec. 1.6662-4(d)(3)(iii), Income Tax Regs.

FN198. The determination of whether a taxpayer acted with reasonable cause and in good faith with respect to an underpayment that is related to an item reflected on the return of a pass-through entity is made on the basis of all pertinent facts and circumstances, including the taxpayer's own actions, as well as the actions of the pass-through entity. Sec. 1.6664-4(d), Income Tax Regs.

FN199. Petitioner bears the burden of production and burden of proof with respect to the reasonable cause exception. *Higbee v. Commissioner,* 116 T.C. at 446-447; H. Conf. Rept. 105-599, *supra* at 241, 1998-3 C.B. at 995.

FN200. Petitioner contends that a major focus of this investigation was establishing the amount of the NOLs, which petitioner contends was an important aspect of the subsequent transaction involving CDR. We cannot agree. Although Kaye Scholer documented the NOLs in the various MGM companies, the NOLs in MGM Group Holdings were by no means a "major focus" of its investigation.

FN201. On May 12, 1997, Mr. Rhodes asked for and received a confirmation from White & Case that neither CDR, Generale Bank, nor CLIS derived any U.S. tax benefit from the contribution of the SMHC receivables and stock or the subsequent disposition by Generale Bank and CLIS of their preferred interests in SMP.

FN202. Petitioner also offered into evidence a Jan. 3, 1997, memorandum from Messrs. Rokoff and Knott of Shearman & Sterling. The memorandum discusses a proposed transaction involving SMP's transfer of high-basis assets to an existing corporation as part of a sec. 351 contribution. The memorandum does not analyze or discuss the transaction between the Ackerman group and CDR. In fact, the memorandum states that "P's current members acquired a substantial portion of their interests in transactions unrelated to that described in" the memorandum. Although the memorandum analyzes whether an "ownership change" would

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

occur under the sec. 382 rules, it does so in the context of the built-in loss rules (not the rules regarding NOL carryovers). The proposed transaction apparently did not occur, and we cannot agree that any reasonable person, let alone a sophisticated tax attorney like Mr. Lerner, would place any reliance on it in determining the proper treatment of the CDR transaction. In any event, Mr. Lerner testified that he relied on this memorandum in preparing SMHC's corporate tax return and not in preparing SMP's and Corona's 1997 and 1998 partnership tax returns.

FN203. Petitioner listed James Rhodes, Howard Levinton, Gerald Rokoff, and Alvin Knott as witnesses in his pretrial memorandum. Petitioner called none of these witnesses to testify at trial. Instead, petitioner relies solely on his own testimony and the various documents to establish his reasonable cause position. The law firm of Chamberlain, Hrdlicka, White, Williams & Martin represented petitioner in these cases. Joseph R. Valentino did not testify.

FN204. In the first memorandum dated Aug. 27, 1996, Shearman & Sterling analyzed two alternative transactions. In the first alternative, the "Section 351 Transaction", Acquirer, a U.S. corporation, transfers property to a new or existing subsidiary ("Sub") in exchange for stock of Sub, and, concurrently, CDR transfers all the stock of MGM Holdings to Sub in exchange for cash and stock of Sub. After these transfers, Acquirer owns 80 percent of the vote and value of Sub. In the second alternative, the "B Reorganization", Acquirer acquires all the stock of MGM Holdings from CDR in exchange for Acquirer's publicly traded voting common stock or voting preferred stock redeemable in 5 years.

In the second memorandum dated Aug. 30, 1996, Shearman & Sterling also analyzed two alternative transactions. In the first al-

ternative, the "Section 351 Transaction", Acquirer, a U.S. corporation ("GCo"), transfers property to a new or existing subsidiary ("DCo") in exchange for stock of DCo, and, concurrently, CDR transfers all the stock of MGM Holdings to DCo in exchange for cash and stock of DCo. Immediately after these transfers, GCo owns at least 80 percent of the vote and value of DCo. In the second alternative, the "B Reorganization", GCo acquires all the stock of MGM Holdings from CDR in exchange for GCo's publicly traded voting common stock or voting preferred stock redeemable in 5 years.

FN205. The memoranda were prepared before the closing date of the New MGM transaction and MGM Holdings's dissolution. Although the memoranda acknowledge the New MGM sale and the existence of tax attributes in MGM Holdings, the memoranda are framed in terms of CDR's "expected" basis in MGM Holdings's stock following the sale. The memoranda do not analyze these expectations or provide any insight regarding CDR's basis in MGM Group Holdings or the effect of a dissolution of MGM Holdings.

FN206. With respect to the SMHC receivables, Ernst & Young reached a rather ambivalent conclusion: "We have seen nothing inconsistent in the materials made available to date with the view that the outstanding balance of the receivable in the hands of Santa Monica could be as high as the amount reflected on the contribution agreement".

FN207. Gerald Rokoff and Alvin Knott do not appear to have been independent, "outside", professional tax advisers, as petitioner claims. Messrs. Rokoff and Knott represented the Ackerman group in the CDR transaction and assisted Mr. Lerner in structuring the partnership transactions at issue. Messrs. Rokoff and Knott appear to have been actively involved in structuring transactions for the Ackerman group's

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

subsequent exploitation of the acquired built-in loss tax attributes, including as we explain below, the "marketing" of the tax attributes to an outside "investor".

FN208. Petitioner did not offer Donald Alexander's memorandum into evidence, and we have no basis for ascertaining its context. There is no indication that Mr. Alexander (a former IRS Commissioner) ever provided any favorable advice to petitioner with respect to the proposed transaction or the issues discussed in Shearman & Sterling's memorandum.

FN209. The Shearman & Sterling memorandum does not discuss whether the NOLs in SMHC had any value.

FN210. The memorandum does not identify "GCo" but acknowledges that Crown Capital might deliver the memorandum to "GCo" in the course of discussions.

FN211. Shearman & Sterling's Feb. 26, 1998, memorandum again relies on the same faulty factual assumptions: that SMHC held valuable film rights estimated to have a present value of approximately $29 million and a future value in excess of $35 million, and that SMHC was also pursuing its rights to maximize the recovery of its investment in Carolco.

FN212. Mr. Levinton examined, in great detail, *Esmark & Affiliated Cos. v. Commissioner,* 90 T.C. 171, 1988 WL 5887 (1988). Mr. Levinton posited that "the pivotal factual issue that makes *Esmark* persuasive, if not controlling, is that GB and CLIS entered the LLC with the intention of remaining participants in it, and with no immediate intention to sell to Rockport or anyone else". Mr. Levinton cautioned, however, that the Generale Bank's and CLIS's contributions to SMP in exchange for preferred interests might be viewed as a meaningless step under *Esmark,* if neither Generale Bank nor CLIS ever intended to become members of

SMP and did so only as an intermediate and meaningless step in disposing of the stock and receivables.

FN213. The Chamberlain Hrdlicka opinion was issued after Mr. Lerner prepared and filed SMP's and Corona's 1997 partnership tax returns. Mr. Lerner claims, however, that he had discussions with Mr. Valentino prior to filing the 1997 returns and that Mr. Valentino's oral advice closely tracked the written advice, as well as Mr. Levinton's conclusions. Mr. Lerner did not call Mr. Valentino as a witness, and, with the exception of Mr. Lerner's self-serving testimony, we have no basis for determining the true nature of Mr. Lerner's discussions with Mr. Valentino or any way to gauge his reliance on any advice Mr. Valentino might have given. In any event, if the advice was consistent with the Chamberlain Hrdlicka opinion letter, Mr. Lerner could not have reasonably relied upon it.

FN214. Although *Daubert* and *Kumho Tire Co.* provide a hurdle for the admissibility of expert testimony, the Federal Rules of Evidence continue to provide a liberal standard for the admissibility of expert testimony. See *Daubert v . Merrell Dow Pharms., Inc.,* 509 U.S. 579, 588, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993); *United States v. Dukagjini,* 326 F.3d 45, 57 (2d Cir.2003).

FN215. In calculating the present value of the NOLs, Mr. Crawford discounted one year too many, causing his calculations to be off by one year. Although this error would serve to increase the range of values that Mr. Crawford determined, it leads us to question the reliability of his valuation as a whole.

FN216. Even if we were to admit Mr. Crawford's report and testimony into evidence, his valuation analysis would not materially affect our decisions in these cases. Given the speculative nature of Mr. Crawford's conclusions and

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

T.C. Memo. 2005-104                                                                    Page 133
T.C. Memo. 2005-104, 2005 WL 1111792 (U.S.Tax Ct.), 89 T.C.M. (CCH) 1157, T.C.M. (RIA) 2005-104, 2005
RIA TC Memo 2005-104
**T.C. Memo. 2005-104, (U.S.Tax Ct.)2005 WL 1111792**

the complexity of making any predetermination of whether the NOLs might survive the gauntlet of sec. 382, we would give little weight to his valuation analysis.

FN217. At one time, Ms. Nemschoff served as general counsel and vice president of business affairs at Concorde-New Horizons Corp., a motion picture production and distribution company.

FN218. The legal committee of the International Film & Television Alliance addresses the transfer of film rights, chain-of-title issues, and copyright issues.

FN219. In preparing her report, Ms. Nemschoff retained the services of the law offices of Dennis Angel to search the records of the U.S. Copyright Office with respect to the film titles in the EBD film library. Ms. Nemschoff represents that it is customary for entertainment lawyers to rely on copyright searches and reports by professionals such as Mr. Angel and his staff and that she has been retaining his services and relying on his copyright searches and reports for at least 15 years.

Under Fed.R.Evid. 702 and 703, experts are permitted to rely on evidence outside the trial record, which may include hearsay that is otherwise inadmissible. *RLC Indus. Co. & Subs. v. Commissioner,* 98 T.C. 457, 499, 1992 WL 80336 (1992), affd. 58 F.3d 413 (9th Cir.1995); *H Group Holding, Inc. v. Commissioner,* T.C. Memo.1999-334. The information that Mr. Angel relayed to Ms. Nemschoff is admitted to understand or explain the basis of her expert opinion; however, we do not rely on that information or consider it for the truth of the matters asserted therein. See *Engebretsen v. Fairchild Aircraft, Corp.,* 21 F.3d 721, 728-729 (6th Cir.1994); *H Group Holding, Inc. v. Commissioner,supra.*

FN220. Mr. Shapiro also submitted a rebuttal report to Mr. Crawford's expert opinion, which we received into evidence without objection.

FN221. Relying on the information contained in the bankruptcy plans of reorganization, including the various scenarios discussed in the disclosure statements, Mr. Shapiro observed that the total estimated amount of asserted claims that had a higher priority than SMHC's Carolco securities was $557,482,968. Thus, for SMHC to receive anything, the net proceeds from Carolco's liquidation would have to exceed $557,482,968. The net proceeds were projected to be far less, however-between $66,491,040 and $93,027,900. On the basis of this and other information, Mr. Shapiro concluded that there was no reasonable expectation of receiving anything on the Carolco securities as of Dec. 11, 1996.

FN222. Mr. Shapiro describes this phenomenon as the "underinvestment problem"; i.e., debtholders will appropriate value created by a new equity infusion, and, therefore, such equity infusions do not occur. Mr. Shapiro assumed that Generale Bank and CLIS were unrelated for purposes of his analysis.

FN223. Mr. Shapiro also observed that the $5 million advisory fee exactly equaled SMP's "cost basis" in the EBD film library. On this basis, without elaboration, Mr. Shapiro concluded: "It appears that CLIS was paid separately for its Film Rights in the guise of an advisory fee, instead of being paid for the Film Rights as part of the price paid for SMHC's debt."

FN224. Although respondent seeks to capitalize on certain gratuitous statements in Mr. Shapiro's expert report and testimony, we do not construe respondent's position to contemplate CLIS's contribution of the EBD film rights to SMP. Inasmuch as CLIS's contribution of the film rights to SMHC is not a fact in issue, we

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

T.C. Memo. 2005-104                                                                                      Page 134
T.C. Memo. 2005-104, 2005 WL 1111792 (U.S.Tax Ct.), 89 T.C.M. (CCH) 1157, T.C.M. (RIA) 2005-104, 2005
RIA TC Memo 2005-104
**T.C. Memo. 2005-104, (U.S.Tax Ct.)2005 WL 1111792**

question the relevance of Mr. Shapiro's eco-
nomic analysis.

FN225. Petitioner, as the proponent of this
evidence, must show that each of these require-
ments is met. See *Little v. Commissioner*, T .C.
Memo.1996-270.

FN226. The requirement that "the statement is
more probative on the point for which it is
offered than any other evidence which the pro-
ponent can procure through reasonable efforts"
requires a consideration of two factors: (1) The
availability of other evidence on a particular
point; and (2) whether such other evidence can
be procured through reasonable efforts. *Gold-
smith v. Commissioner*, 86 T.C. 1134, 1141,
1986 WL 22137 (1986).

FN227. Even if Mr. Jouannet's response were
admitted into evidence, it would not change our
decisions in these cases. For the reasons dis-
cussed above, we would attach little weight to
Mr. Jouannet's response, which is filled with
equivocations that beg the question posed to
him. We are not persuaded that Mr. Jouannet
was adverse to petitioner's interests. Moreover,
the response itself is contradicted by the salient
testimony of Mr. Geary, who acted as CDR's
counsel in the transaction with the Ackerman
group.

U.S.Tax Ct.,2005.
Santa Monica Pictures, LLC v. C.I.R.
T.C. Memo. 2005-104, 2005 WL 1111792 (U.S.Tax
Ct.), 89 T.C.M. (CCH) 1157, T.C.M. (RIA) 2005-104,
2005 RIA TC Memo 2005-104

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.